1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8
                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                         **LOS ANGELES DIVISION**

11  In re:                                 | Case No.: 2:09-31853-ER

12  T ASSET ACQUISITION COMPANY, LLC, a    | Chapter 11
    Delaware limited liability company; HALCYON
13  HOLDING GROUP, LLC, dba THE HALCYON    | (Jointly Administered with Case Nos.:
    COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER)
14  and DOMINION GROUP LLC, a California limited
15  liability company,                     | **NOTICE OF MOTION AND MOTION OF
                                             DEBTORS FOR ORDER AUTHORIZING
16                         Debtors.          AND APPROVING SALE OF DEBTORS'
                                             ASSETS RELATING TO THE
17                                           *TERMINATOR* MOTION PICTURE
                                             FRANCHISE FREE AND CLEAR OF ALL
18                                           LIENS, CLAIMS, ENCUMBRANCES AND
                                             OTHER INTERESTS PURSUANT TO
19                                           SECTIONS 363 AND 365 OF THE
                                             BANKRUPTCY CODE; MEMORANDUM
20                                           OF POINTS AND AUTHORITIES;**

21                                           **[DECLARATIONS OF DEREK ANDERSON
                                             AND KEVIN SHULTZ FILED
22                                           CONCURRENTLY HEREWITH]**

    **Check One or More as Appropriate:**
23                                           Date:      January 27, 2010
    Affects All Debtors:                 ☒  Time:      10:00 a.m.
    Affects T Asset Acquisition Company, LLC only: ☐  Location:  Courtroom 1568
24  Affects Halcyon Holding Group, LLC only: ☐             255 East Temple St.
    Affects Dominion Group LLC only:     ☐             Los Angeles, California

25
26  TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE,

27  THE UNITED STATES TRUSTEE, COUNSEL FOR THE OFFICIAL COMMITTEE OF

28  UNSECURED CREDITORS AND OTHER PARTIES IN INTEREST:

**PLEASE TAKE NOTICE** that on January 27, 2010, at 10:00 a.m., or as soon thereafter as the matter can be heard, before the Honorable Ernest M. Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California, the above-captioned debtors (the "Debtors") will move the Bankruptcy Court for an Order authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise free and clear of all liens, claims, encumbrances and other interests pursuant to sections 363 and 365 of the Bankruptcy Code (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that concurrently herewith, the Debtors have filed a motion for an Order establishing sale procedures for the sale of the assets (the "Sale Procedures Motion").  The hearing on the Sale Procedures Motion is scheduled to take place on January 6, 2010, at 10:00 a.m.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the separately filed and served Declarations of Derek Anderson and Kevin Shultz, the separately filed and served Notices related to this Motion, the records and files in these chapter 11 cases, and such additional evidence and argument as may be presented at or before the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f), any party wishing to respond to the Motion must file with the Bankruptcy Court and serve on the counsel for the Debtors a written response at least fourteen (14) days before the hearing.  Pursuant to Local Bankruptcy Rule 9013-1(h), failure to file and serve timely a response in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be consent to the granting of the relief requested in the Motion.

Dated: December 18, 2009                    PEITZMAN, WEG & KEMPINSKY LLP


                                            By:____/s/ David B. Shemano_____
                                                  Howard J. Weg
                                                  David B. Shemano
                                            Counsel for the Debtors

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

## JURISDICTION AND VENUE

On August 17, 2009 (the "Petition Date"), T Asset Acquisition Company, LLC ("TAC"), Halcyon Holding Group, LLC ("Halcyon") and Dominion Group, LLC ("Dominion," and together with TAC and Halcyon, the "Debtors") filed voluntary petitions commencing these chapter 11 cases. On August 27, 2009, the Court ordered the joint administration of the Debtors' cases.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the administration of the Debtors' bankruptcy estates and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (M) and (O). Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure ("FRBP").

### II.

## FACTUAL BACKGROUND

The Debtors and their non-debtor affiliates (collectively, the "Halcyon Companies") comprise a privately-financed media development, production and financing corporate group. The Halcyon Companies focus on the production of new motion picture and television projects across traditional and non-traditional channels of distribution. In May 2007, the Halcyon Companies acquired all of the future rights in relation to the *Terminator* movie franchise (the "Franchise"). These Franchise rights include production of future *Terminator* films, merchandising and licensing rights, certain revenues from *Terminator 3: Rise of the Machines*, as well as certain rights in the television series *The Sarah Connor Chronicles*. In early 2009, Warner Brothers and Sony began domestic and international theatrical distribution of the much-anticipated summer blockbuster *Terminator: Salvation*, which was financed and produced by the Halcyon Companies and Dominion and recently released on DVD.

In order to purchase the *Terminator* rights, on April 16, 2007, TAC and Halcyon obtained a $30 million loan (the "Pacificor Loan") from Pacificor, LLC ("Pacificor"). As collateral for the

repayment of the Pacificor Loan, TAC and Halcyon granted Pacificor a security interest in substantially all of their assets.  To obtain further needed funding, in December 2007, Halcyon obtained a second loan from Pacificor, on similar terms to the Pacificor Loan, for $5 million (the "Pacificor Bridge Loan").  As additional collateral for the Pacificor Bridge Loan, Dominion pledged its membership interest in Halcyon to Pacificor.

In late July 2009, Pacificor demanded that the Halcyon Companies immediately repay the Pacificor Loan and Pacificor Bridge Loan and began enforcement of its purported rights and remedies against the Halcyon Companies to take control of the Franchise.  The Halcyon Companies disputed the right of Pacificor to exercise any rights or remedies against the Halcyon Companies.  After considering all reasonable alternatives, the Debtors determined that it would be in the best interests of the Halcyon Companies and their creditors to commence these chapter 11 cases to stop Pacificor's improper efforts to seize the very valuable Franchise and to use the chapter 11 process to maximize the value of Debtors' assets for the benefit of all creditors.

## III.

## THE DEBTORS' MARKETING EFFORTS

Prior to and during these cases, the Debtors have engaged in extensive efforts to locate entities interested in either recapitalizing the Debtors or acquiring the Debtors' assets, including the Franchise.  To assist in that effort, the Debtors engaged FTI Consulting, Inc. and FTI Capital Advisors, LLC (collectively, "FTI") as their financial advisors and investment bankers.  Since their engagement in early September 2009, FTI has worked diligently on behalf of the Debtors to locate new capital and/or a purchaser for the Debtors' assets.  A detailed description of FTI's marketing efforts can be found in the concurrently filed Declaration of Kevin Shultz (the "Shultz Declaration").

Pertinently, on or before November 17, 2009, FTI delivered detailed bid packages to 23 different entities identified by FTI as potential purchasers of the Debtors' assets.  The bid packages initially requested that the potential purchaser deliver a bid to FTI no later than November 25, 2009 for consideration to be a stalking horse bid for the assets.  The time to submit a stalking horse bid was

extended by the Debtors for various reasons, including the request of several potential purchasers for additional time to prepare a stalking horse bid.

Subsequent to November 25, 2009, the Debtors engaged in serious discussions with several potential purchasers concerning the terms and conditions of a stalking horse bid.  The Debtors have recently received several bids that, subject to clarification and negotiation, the Debtors consider candidates to be potentially accepted as a stalking horse bid.  The Debtors are presently taking all appropriate and necessary steps to negotiate a final stalking horse bid.  As soon as the Debtors are prepared to accept a finalized stalking horse bid, the Debtors will discuss the finalized stalking horse bid and the Debtors' refinancing options with the creditors and other interested parties.

The Debtors anticipate that a stalking horse bid will be finalized and accepted shortly. However, after consultation with FTI and the Debtors' other professionals, the Debtors believe that it is in the best interests of the estates that the sale process promptly commence and be completed by February 2010.  Therefore, the Debtors have decided to notice an auction of the assets without first accepting a stalking horse bid and request that the Court approve the sale procedures set forth below. If a stalking horse bid is accepted prior to the hearing on the sale procedures, the Debtors will modify the relief requested at the hearing to reflect the stalking horse bid.

## IV.

## THE MATERIAL TERMS OF THE PROPOSED ASSET SALE

The Debtors contemplate that the auction will result in straightforward cash sale of the Debtors' assets, "as-is, where-is," without representations or warranties, free and clear of all liens, claims, interests and encumbrances, to the winning bidder (the "Buyer").  Attached as Exhibit A is a form asset purchase agreement (the "APA") that the Debtors propose that bidders use as a template. As set forth in the APA, the assets to be sold include all of the Debtors' right, title and interest, if any, in the following (collectively, the "Assets"):

(a)    All rights to develop, produce or exploit remakes, sequels, and prequels ("Sequel and Remake Rights") derived from, appurtenant to, or related to the motion pictures entitled "The Terminator" ("T1"), "Terminator 2: Judgment Day" ("T2"), and "Terminator 3: Rise of the Machines" ("T3"), and "Terminator Salvation" ("T4");

(b)      All rights to exploit and distribute existing rights in T3 and T4;

(c)      All literary properties upon which T1, T2, T3 and T4 are based;

(d)      The original video animation project currently entitled "Termination" (the "Termination OVA");

(e)      All rights in the television series currently entitled "Terminator: The Sarah Connor Chronicles" (the "Television Series");

(f)      Two (2) animated television series currently in development (the "Animated Television Series");

(g)      A live action television series contemplated for production after the final theatrical motion picture (the "Live Action Television Series");

(h)      All console, platform, personal computer, or online video game rights (including creation, development, production and manufacturing rights) based on, derived from, or related to Sequel and Remake Rights, Sequels and/or the Terminator Assets (the "Terminator Video Game Rights") (but specifically excluding any console, platform, personal computer, or online video game rights based on T1 or T2);

(i)      All accounts receivables, cash, or cash equivalents received as a result of such accounts receivable, royalties, participations, fees, overages and other consideration from any source relating to the Terminator Assets (collectively, "Payment Rights") that (i) are earned in accordance with generally accepted accounting principles after the closing of the sale (the "Closing"), and (ii) are received after the Closing (collectively, "Included Payment Rights"); and

(j)      All physical property of every kind or nature of or relating to the Terminator Assets and all versions thereof, including, without limitation, the Literary Property (the "Physical Property").

## V.

## THE SALE IS IN THE BEST INTERESTS OF THE ESTATE

Section 363(b) of the Bankruptcy Code provides, in relevant part, that a trustee "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." The standard to be applied in determining whether a sale should be authorized under section 363(b) is whether such sale is in the best interests of the estate and the price is fair and reasonable. *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985). The Debtors are given substantial discretion in this regard. *Id*.

After careful consideration of the Debtors' present financial and operating condition, the Debtors have concluded that a sale of the Assets by February 2010 provides the best mechanism to maximize the value of the Assets for the benefit of creditors. The Assets have been intensively marketed since September 2009, and the Debtors believe that the sale of the Assets at auction offers the best source of recovery for creditors.

A.    Accurate and Appropriate Notice Has Been Given.

The Debtors have served notice of the Motion by U.S. mail or electronic delivery on the following entities: (i) the Office of the United States Trustee, (ii) all creditors, (iii) all parties that have filed requests for special notice in this case, (iv) all parties that have asserted liens on or interests in the Assets, and (v) all potential bidders that have expressed an interest in submitting an offer for the Assets or that FTI has identified as possibly having an interest in submitting an offer for the Assets. The Debtors will be making copies of the Motion and the approved sale procedures available to all inquiring potential bidders.

B.    The Purchase Price Is Fair And Reasonable.

The fact that parties can come forward to bid at an auction that has been widely noticed satisfies the requirement that the price paid for the Assets be fair and reasonable. An auction sale is generally considered to establish sufficient value for the assets being sold. *See, e.g., In re Abbott Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

C.    The Proposed Sale Is In Good Faith And The Successful Bidder Should Obtain The Protections Of Section 363(m) Of The Bankruptcy Code.

Section 363(m) of the Bankruptcy Code authorizes the Bankruptcy Court to make a finding that the Buyer is a good faith purchaser. A purchaser of property is protected from the effects of reversal on appeal of the authorization to sell or lease as long as the Court finds that the purchaser acted in good faith and the appellant fails to obtain a stay of the sale. *See,* 11 U.S.C. § 363(m). Although the Code does not define "good faith," courts generally have followed traditional principles in holding that a good faith purchaser is one who buys "in good faith" and "for value." *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also, Kham and Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1355 (7th Cir. 1990) ("The purpose of Section 363(m) is to

disable courts from backtracking on promises with respect to bankruptcy sales in the absence of bad faith"); *In re Pine Coast Enters., Ltd.*, 147 B.R. 30, 33 (Bankr. N.D. Ill. 1992) ("The requirement that a purchaser act in good faith speaks to the integrity of its conduct in the course of the sale proceeding").

In order to encourage bidding, the Debtors request that the Court make a finding that the successful bidder is a good faith purchaser of the Assets within the meaning of section 363(m).  In *In re M Capital Corp.*, 290 B.R. 743 (Bankr. 9th Cir. 2003), the Bankruptcy Appellate Panel held that a bankruptcy court may not make a finding of good faith in the absence of evidence, but may make such a finding if appropriate evidence is presented.  The Debtors will be prepared to make a record at the hearing that the auction process was untainted by any fraud or collusion and, therefore, a finding of good-faith is warranted.  Under these circumstances, a finding of good faith within the meaning of section 363(m) is appropriate.

## VI.

### SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

The Debtors propose to transfer the Assets free and clear of all liens, claims, encumbrances and other interests (collectively, the "Liens").  The Bankruptcy Court is authorized to approve the transfer of the Assets free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code, which provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

As set forth below, section 363(f) is satisfied with respect to each of the known Liens asserted against the Assets.

All Liens will attach to the net proceeds of the sale with the same priority, validity and enforceability, if any, as they had had against the Assets, which proceeds shall be held by the Debtors in a segregated account pending further Order of the Bankruptcy Court.  Notice of the Motion has been served on all parties who have asserted Liens on the Assets.

The following is a list of the parties who have asserted Liens and been served with notice of the Motion, and the basis for the sale free and clear of such Liens pursuant to section 363(f) of the Bankruptcy Code.  Furthermore, failure to object to the sale free and clear of Liens should be deemed consent pursuant to section 363(f)(2) of the Bankruptcy Code.  *See, e.g., Homeowners Services, Inc. v. Elliot (In re Elliott),* 94 B.R. 343 (E.D. Pa. 1988).  If any other entity asserts any Liens against the Assets, the Debtors will demonstrate at or prior to the hearing on the Motion that the Assets may be sold free and clear of such Liens.

A.    <u>Pacificor</u>.  Pacificor asserts a perfected security interest in substantially all of the Debtors' assets to secure the Pacificor Loan and Pacificor Bridge Loan.  The Debtors dispute that Pacificor holds a perfected security interest in the Assets.  On November 25, 2009, the Debtors commenced an adversary proceeding against Pacificor by filing a complaint alleging, among other claims for relief, that (1) Pacificor's claims should be equitably subordinated, (2) Pacificor's Liens should be avoided as fraudulent transfers, and (3) Pacificor's claims and Liens were previously released pursuant to a settlement agreement.  Because Pacificor's alleged Liens are the subject of a bona fide dispute, section 363(f)(4) is satisfied with respect to its alleged Liens.

B.    <u>Susan Guinn</u>.  Susan Guinn ("Guinn") is an attorney that provided limited services to the Debtors over a period of several months in connection with the Pacificor Bridge Loan.  Guinn has made claims that the Debtors owe her several million dollars for her services.  Without the requisite authorization from the Debtors, Guinn filed UCC-1 financing statements with the California and Delaware Secretaries of State alleging a security interest in substantially all of the Debtors' assets.  The Debtors dispute the amounts owed to Guinn and deny that the Debtors granted Susan Guinn a security interest and/or authorized her to file the UCC-1 financing statements.  Guinn's improper liens

and claims are currently subject to an adversary action that has been removed to and is pending before this Court and to a non-binding arbitration proceeding before the Los Angeles County Bar Association Dispute Resolution. Because Guinn's alleged claims and Liens are the subject of a bona fide dispute, section 363(f)(4) is satisfied with respect to her alleged Liens.

C.    Screen Actors Guild. T4 was produced subject to collective bargaining agreements with various entertainment guilds (the "Guilds"). TAC granted the Screen Actors Guild ("SAG") a Lien on T4 to secure its obligations to SAG. The APA provides that the Buyer will assume all post-Closing obligations and execute Guild assumption agreements. The Buyer's post-Closing obligations to SAG will be secured by the Lien. To the extent SAG disputes the treatment of the Lien under the APA, the Debtors will work in good faith with SAG to resolve the dispute prior to the Sale Hearing.

D.    Warner Bros. Pictures, a Division of WB Studio Enterprises Inc. ("Warner Bros."). Warner Bros. asserts a Lien that secures certain rights and rights to payment pursuant to the distribution contracts between the Debtors and Warner Bros. The Debtors believe that all financial obligations secured by the Lien have been satisfied and that Warner Bros. no longer asserts a secured claim against the Debtors. If Warner Bros. disputes that all secured obligations have been satisfied, the Debtors will either (1) sell the Assets subject to the Lien, (2) satisfy the Lien at Closing, or (3) demonstrate that the Lien is subject to a bona fide dispute.

E.    Worldwide SPE Acquistions, Inc. ("Sony"). Sony asserts a Lien that secures certain rights and rights to payment pursuant to the distribution contracts between the Debtors and Sony. The Debtors believe that all financial obligations secured by the Lien have been satisfied and that Sony no longer asserts a secured claim against the Debtors. If Sony disputes that all secured obligations have been satisfied, the Debtors will either (1) sell the Assets subject to the Lien, (2) satisfy the Lien at Closing, or (3) demonstrate that the Lien is subject to a bona fide dispute.

F.    Union Bank of California, N.A. ("UB"). UB asserts a Lien that secures a right to repayment of loans made by UB to the Debtors and/or their non-debtor affiliates. The Debtors believe that all financial obligations secured by the Lien have been satisfied and that UB no longer asserts a secured claim against the Debtors. If UB disputes that all secured obligations have been satisfied, the Debtors will either (1) sell the Assets subject to the Lien, (2) satisfy the Lien at Closing, or (3)

demonstrate that the Lien is subject to a bona fide dispute.

G.    International Film Guarantors, LLC ("IFG").  IFG asserts a Lien that secures a right to repayment of obligations by the Debtors and/or their non-debtor affiliates to IFG. The Debtors believe that all financial obligations secured by the Lien have been satisfied and that IFG no longer asserts a secured claim against the Debtors.  If IFG disputes that all secured obligations have been satisfied, the Debtors will either (1) sell the Assets subject to the Lien, (2) satisfy the Lien at Closing, or (3) demonstrate that the Lien is subject to a bona fide dispute.

## VII.

## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

As set forth in the APA, the sale of the Debtors' rights in the Franchise will be subject to all existing distribution agreements.  Furthermore, the Debtors expect that the Buyer will require the Debtors to assume and assign certain of their other agreements, including licensing agreements (collectively with the distribution agreements, the "Assigned Contracts"). [1]  The list of the expected Assigned Contracts and respective cure amounts is attached hereto as Exhibit B.  The Debtors believe that they are current on all obligations under the Assigned Contracts and, as set forth on Exhibit B, no cure claims must be paid in connection with the assumption and assignment of the Assigned Contracts.

A.    The Assumption And Assignment Of The Contracts Is In The Best Interests Of The Debtors' Estates.

Section 365(a) of the Bankruptcy Code provides, in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the Debtor." The United States Supreme Court has held that the debtor's decision to assume or reject an agreement as an executory contract should be judged by the "business judgment" test.  *See, National Labor Relations Board v. Bildisco and Bildisco*, 465 U.S. 513, 523, 104 S.Ct. 1188, 1194-95 (1984).

In order to maximize the value of the Assets, the Debtors must have the authority to assume and assign the Assigned Contracts.  As the owner, producer and distributor of motion pictures, the

---

[1] The Debtors reserve all rights to assert that any specific Assigned Contract is not an executory contract.

Debtors are licensees and licensors of intellectual property rights.  It is evident that the Buyer of the Debtors' Assets will want the assignment of some or all of the Debtors' licensing agreements in connection with any sale transaction.  If the Debtors' cannot assign their licensing agreements, some or all of the Assets will have little if any realizable value.  Therefore, the Debtors believe that the assumption and assignment of the Assigned Contracts to the Buyer is in the best interests of the Debtors' estates.

B.    Objections To Cure Amounts And Requests For Adequate Assurance.

Concurrently herewith, the Debtors have served a notice on all parties to the Assigned Contracts advising them of the deadline to assert cure claims, if any, as well as their right to object to the assumption and assignment of any Assigned Contracts (the "Cure Notice").  In the Sale Procedures Motion, the Debtors have requested that the Bankruptcy Court approve the Cure Notice and procedures for objections to cure amounts and requests for adequate assurance.

In summary, unless a written objection to the specified cure amount set forth in the Cure Notice and/or the proposed adequate assurance of performance, together with evidence that supports the objection, is filed with the Bankruptcy Court and served on counsel for the Debtors no later than January 13, 2010, the non-Debtor party shall be forever barred from asserting against the Debtors or the Buyer any default allegedly arising or incurred prior to the Closing, any actual pecuniary loss resulting from such default, or any other unpaid obligation under the assumed and assigned Assigned Contract arising or incurred prior to the Closing, other than the cure amount set forth in the Cure Notice, which shall only be asserted against the Debtors.

The Debtors have further requested that if a written objection to the specified cure amount set forth in the Cure Notice and/or the proposed adequate assurance of performance, together with evidence that supports the objection, is timely filed and served, the Debtors or the Buyer can elect to reject the Assigned Contract rather than assume it.  If the Debtors and the Buyer do not elect to reject the Assigned Contract and agree to assume and assign the Assigned Contract to the Buyer, then the following shall apply:

1.      Upon the Closing or promptly after the Closing, the Debtors shall pay or provide for the payment of the specified cure amount to the non-Debtor party to the Assigned Contract;

2.      The Debtors will be authorized to assume and assign the Assigned Contract to the Buyer;

3.      The Debtors and their estates shall have no liability under the Assigned Contract after the Closing;

4.      The only adequate assurance required of the Buyer shall be its promise to perform in accordance with the applicable Assigned Contract with respect to obligations first arising or incurred following the Closing; and

5.      If a non-Debtor party to an Assigned Contract timely files a written objection to the proposed cure amount that is supported by evidence, the Debtors shall escrow the cure amount in controversy at the Closing (or a lower amount if authorized by the Bankruptcy Court) until the dispute is resolved by the Bankruptcy Court after hearing or stipulation by the parties, and such dispute shall not in any manner whatsoever affect the Closing of the sale of the Assets to the Buyer or consummation of the assumption and assignment of the Assigned Contract by the Debtors to the Buyer.

6.      If a non-Debtor party to an Assigned Contract timely files a written objection to the proposed adequate assurance of future performance, and the objection cannot be resolved before or at the Sale Hearing, the Debtors will request that the Bankruptcy Court schedule an expedited hearing to resolve the objection.

## VIII.

## THE PROPOSED TREATMENT OF PARTICIPATIONS AND ATTACHMENTS

The Debtors are parties to certain agreements with third parties that are related to the Franchise but are not executory contracts within the meaning of section 365 of the Bankruptcy Code.  These agreements are not executory contracts within the meaning of section 365 because one or more parties to the agreement do not have obligations remaining to be performed under the agreement which, if not

performed, would constitute a material breach of the agreement that would excuse a refusal to perform by the other party. *See, Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991); *In re Adelphia Communications Corp.*, 307 B.R. 404, 428, (Bankr. S.D.N.Y. 2004); *In re Stein and Day, Inc.*, 81 B.R. 263 (Bankr. S.D.N.Y. 1988).

These agreements provide for, among other things, (i) the payment of participations or royalties to various entities based on the performance of an existing *Terminator* motion picture ("Participations"), or (ii) certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of an existing *Terminator* motion picture ("Attachment Rights").

Under the proposed APA, the Buyer will not assume and shall have no obligation to pay or satisfy any Participations or Attachment Rights in the motion pictures that accrued prior to the Closing, but shall assume any Participations or Attachment Rights that accrue on and after the Closing. The Participations and Attachments Rights that will not be assumed by the Buyer will be treated as prepetition claims against the Debtors. [2] With respect to any future *Terminator* movies, because such movies have not yet been developed, there are no outstanding Participations or Attachment Rights that must be paid and, under the APA, the Debtors propose that the Buyer will assume and pay any Participations and Attachment Rights required to be performed after the Closing if and when a future *Terminator* movie is developed. However, it is possible that the Buyer will refuse to assume the post-Closing Participations and Attachment Rights, in which case the post-Closing Participations and Attachment Rights will also be treated as prepetition claims against the Debtors.

Concurrently herewith, the Debtors have served a notice on entities that have Participations and Attachment Rights agreements advising them of the proposed treatment of Participations and Attachment Rights under the proposed APA (the "Participations and Attachments Rights Notice"). In the Sale Procedures Motion, the Debtors have requested that the Bankruptcy Court approve the

---

[2] Certain Participations owed on account of T4 are paid by a third party in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement"). The sale of the Assets shall be subject to the T4 CAM Agreement and nothing in the APA is intended to affect the right of any party to the T4 CAM Agreement.

Participations and Attachment Rights Notice.  If any such entity disputes its treatment under the APA, such entity will be required to file and serve a timely objection to the Motion, and the Debtors will request that the objection be overruled at the Sale Hearing.

**WHEREFORE**, the Debtors request that the Bankruptcy Court enter an Order, substantially in the form attached as Exhibit C:

A.    Authorizing the Debtors to sell, assign and transfer the Assets to the successful bidder ("Buyer") pursuant to the Buyer's APA, and determining that, when the sale, assignment and transfer is effective, the Debtors shall be deemed to have sold, assigned and transferred all of the Debtors' rights, title and interest in and to the Assets to Buyer free and clear of all Liens of any and every kind whatsoever;

B.    Directing that all Liens shall attach to the proceeds of the sale with the same priority, validity and enforceability, if any, as they had against the Assets, which proceeds shall be held by the Debtors in a segregated account pending further Order of the Bankruptcy Court;

C.    Authorizing the Debtors to assume and assign the Assigned Contracts to the Buyer;

D.    Determining that Buyer acted in good faith in purchasing the Assets within the meaning of section 363(m) of the Bankruptcy Code;

E.    Authorizing the Debtors to execute all documents and instruments and to take all actions necessary to effectuate the APA; and

F.    Granting such other and further relief as may be appropriate under the circumstances.

Dated: December 18, 2009          PEITZMAN, WEG & KEMPINSKY LLP


                                  By:    /s/ David B. Shemano
                                        Howard J. Weg
                                        David B. Shemano
                                  Counsel for the Debtors

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered into this __ day of January, 2010 ("Agreement Date"), by and between Halcyon Holding Group, LLC d/b/a The Halcyon Company ("Halcyon") and all of Halcyon's Affiliates with any right, title or interest in or to any of the rights, property or assets that are the subject matter hereof (collectively the "Halcyon Parties").  Without limiting the foregoing, the Halcyon Parties shall be deemed to include, without limitation, T Asset Acquisition Company LLC ("T Asset"), T Asset International (BVI) Ltd. ("T Asset International"), T Salvation Distribution, LLC ("T Distribution"), T Salvation Distribution (BVI) Ltd. ("T Distribution International"), T Salvation Productions, LLC ("T Productions"), Halcyon Consumer Products, LLC ("HCP"), Halcyon Games, LLC ("Games"), Halcyon International (BVI) Ltd. ("Halcyon International"), Halcyon Music Publishing, LLC d/b/a Halcyon Worldwide Music Publishing ("Halcyon Music") and Dominion, LLC ("Dominion") (each of the Halcyon Parties are individually and collectively referred to as "Seller"), and _____ ("Buyer").

All capitalized terms shall have the meanings ascribed to them in this Agreement or on Exhibit A, as the case may be.  All Schedules to this Agreement that are not available as of the date of execution of this Agreement shall be completed prior to Closing and must be agreed to by Seller and Buyer before they are incorporated into this Agreement, with such agreement of the parties being a condition to the effectiveness of this Agreement.

## RECITALS

A.      On August 17, 2009 (the "Petition Date"), Halcyon, T Asset, and Dominion (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Central District of California (the "Bankruptcy Court").  On August 27, 2009, the Bankruptcy Court ordered the joint administration of the Debtors' cases under Case No. 2:09-31853-ER (collectively, the "Bankruptcy Cases");

B.      Seller has acquired certain rights in the Terminator Assets by virtue of that certain Purchase Agreement ("Prior Purchase Agreement") dated April 12, 2007 between T Asset, on the one hand, and AGV Productions, Inc., Mario Kassar Productions LP, C2 Pictures LLC and AGB Productions T4 LLC (collectively, "Seller's Grantor") on the other hand;

C.      Except for productions and derivative works created, developed and/or produced by Seller since its acquisition of the Terminator Assets from Seller's Grantor, including, without limitation, the produced motion picture Terminator Salvation ("T4"), Seller's rights in the Terminator Assets are derived only from the Prior Purchase Agreement, the Terminator Rights Agreements and the Carolco Bankruptcy Court Order; and

D.      Seller and Buyer have agreed on the terms of a proposed acquisition by Buyer of the Terminator Assets on the terms and conditions contemplated in this Agreement and the Related Agreements (the "Transaction"):

1

# AGREEMENT

Based on the above premises and in consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

# ARTICLE I

## SALE AND TRANSFER OF ASSETS

1.1    <u>Purchase and Sale of Terminator Assets</u>.  Pursuant to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, and deliver to Buyer for the consideration specified below, all of Seller's right, title and interest of every kind and nature whatsoever in, to and under the Terminator Assets, if any, including, without limitation, all of Seller's right, title and interest in and to the following:

(a)    Sequel and Remake Rights derived from, appurtenant to or related to the motion picture entitled "The Terminator" ("T1");

(b)    Sequel and Remake Rights derived from, appurtenant to or related to the motion picture entitled "Terminator 2: Judgment Day" ("T2");

(c)    Sequel and Remake Rights and Recapture Rights derived from, appurtenant to or related to the motion picture entitled "Terminator 3: Rise of the Machines" ("T3");

(d)    Sequel and Remake Rights and Recapture Rights derived from, appurtenant to or related to the motion picture entitled "Terminator Salvation" ("T4");

(e)    All Derivative Rights to the Sequel and Remake Rights to T1, T2, T3 and T4 and including, without limitation, any and all pictures, films, television productions or any other motion picture productions/programs made pursuant to such Sequel and Remake Rights;

(f)    All Literary Properties upon which T1, T2, T3 and T4 are based;

(g)    The Original Video Animation project currently entitled "Termination" (the "Termination OVA"), including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, including, without limitation, the following:

(i)    All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Termination OVA, the Literary Property upon which the Termination OVA is based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue for past (but only to the

2

extent such past infringement claims are assignable), present and future infringements of copyright;

   (ii) All contracts, agreements, assignments and instruments of every kind and character under which Seller may have heretofore acquired or may hereafter acquire any right, title and interest in or to the Termination OVA, including, that certain Memorandum of Agreement with Itochu Corp (together with the long form agreement to be negotiated, the "Itochu Agreement").

   (h) All of Seller's right, title and interest in, to and from the television series currently entitled "Terminator: The Sarah Connor Chronicles" (the "Television Series") and including all contracts, agreements, assignments, instruments and rights to receive payments relating to the Television Series, including, without limitation, payments from the Option-Purchase Agreement and Executive Producer Agreement with Warner Bros. Television (collectively, the "Warner Bros. Television Agreements"), subject only to the rights of Seller's Grantor to receive the Television Series Participation payable pursuant to the Warner Bros. Television Agreements;

   (i) The two (2) animated television series currently in development (the "Animated Television Series"), including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, including, without limitation, all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Animated Television Series or the Literary Properties upon which they are based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

   (j) The live action television series contemplated for production after the final theatrical motion picture (the "Live Action Television Series") and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced including, without limitation, all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Live Action Television Series or the Literary Property upon which it is based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

   (k) All console, platform, personal computer or online video game rights (including creation, development, production and manufacturing rights) based on, derived from, or related to Sequel and Remake Rights, Sequels and/or the Terminator Assets (the "Terminator Video Game Rights") (but specifically excluding any console, platform, personal computer or online video game rights based on T1 or T2), including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter

3

made, acquired or produced including, without limitation, all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Terminator Video Game Rights or the Literary Properties upon which such rights are based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

(l)      All of Seller's interest in all trademarks, trademark licenses, trade names and trademark interests set forth on Schedules A, B and C to Exhibit D;

(m)      All accounts receivables, cash or cash equivalents received as a result of such accounts receivable, royalties, participations, fees, overages and other consideration from any source relating to the Terminator Assets (collectively, "Payment Rights") that (i) are earned in accordance with generally accepted accounting principles after the Closing, and (ii) are received after the Closing (collectively, "Included Payment Rights"); *provided, however*, all amounts received after the Closing on account of the Terminator 3 Collection Account Agreements and the T4 CAMA shall be deemed Included Payment Rights transferred to Buyer regardless of when the amounts were earned.

(n)      All physical property of every kind or nature of or relating to the Terminator Assets and all versions thereof, including, without limitation, the Literary Property (the "Physical Property").

1.2      Assumption and Assignment of Executory Contracts.   Seller shall assign to Buyer all of Seller's right, title and interest in and to the contracts listed on Schedule 1.2(a) (collectively, the "Assigned Contracts").   The Debtors shall assume and assign their Assigned Contracts to Buyer pursuant to section 365 of the Bankruptcy Code.   Buyer shall pay or otherwise cure all cure claims under the Assigned Contracts required under section 365 of the Bankruptcy Code.   At any time prior to the Closing, Buyer may notify Seller in writing of its determination to remove a contract from Schedule 1.2(a) other than the Existing Exploitation Agreements listed on Schedule 1.2(b).

1.3      Excluded Assets.   Notwithstanding anything to the contrary in this Agreement, the Terminator Assets shall not include Seller's (i) cash and cash equivalents, (ii) contracts not listed on Schedule 1.2 or removed from Schedule 1.2 prior to the Closing, (iii) all Payment Rights that are not Included Payment Rights ("Excluded Payment Rights"), including with respect to Payments Rights arising from the Assigned Contracts, (iv) all entitlement to contingent compensation owed by any third party to Dominion, and (v) all causes of action arising under chapter 5 of the Bankruptcy Code.

1.4      Possessory Liens.   Buyer acknowledges that to the extent that any of the Physical Properties are subject to possessory Liens asserted by laboratories and other third parties ("Possessory Liens"), the transfer of such Physical Properties shall be subject to the Possessory Liens and Seller shall have no obligation to obtain releases of any Possessory Liens and/or deliver possession of such Physical Properties to Buyer.

1.5    <u>Assumption of Liabilities</u>.

(a)    <u>Obligations Not Assumed by Buyer</u>.  Buyer shall not assume and shall not be liable for any obligations or liabilities of the Seller not expressly assumed herein (the "Excluded Obligations").  Without affecting the generality of the foregoing, Buyer shall not be liable for:

(i)    Costs, expenses, obligations or liabilities that primarily relate to benefits received by Seller;

(ii)    Costs, expenses, obligations or liabilities related to or arising out of any employment relationships of Seller;

(iii)    Guild Obligations resulting from Excluded Payment Rights;

(iv)    Participation Obligations resulting from Excluded Payment Rights;

(v)    Obligations in respect of any litigation, claims, demands or proceedings primarily related to any of the activities of Seller;

(vi)    Obligations under output or distribution agreements unless such obligations are contained in the Assigned Contracts;

(vii)    Obligations arising out of audits, arbitrations, settlements, or judgments with respect to Participation Obligations or Residual Obligations that are not assumed by the Buyer, even if the audit, arbitration, settlement or judgment requires a payment after the Closing.

(b)    <u>Obligations Assumed by Buyer</u>.  From and after the date of the Closing, Buyer agrees to assume and be liable only for the following specifically identified obligations (collectively, the "Assumed Obligations").

(i)  Guild Obligations resulting from Included Payment Rights;

(ii)  Participation Obligations resulting from Included Payment Rights, including Participation Obligations listed on Schedule 1.5(b);

(iii)  Rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of the Terminator Assets ("Attachments"), including Attachment obligations listed on Schedule 1.5(b);

(iv) Obligations under the Assigned Contracts which relate to benefits under such Assigned Contracts to which Buyer is entitled under this Agreement;

(v)  Obligations under output or distribution agreements that are Assigned Contracts that relate to Included Payment Rights.

5

(vi) Obligations arising out of audits, arbitrations, settlements, or judgments with respect to Participation Obligations or Residual Obligations that are assumed.

1.6    Purchase Price.    Buyer agrees to pay _____ Dollars ($_____) (the "Purchase Price") for the Terminator Assets by wire transfer in immediately available funds as follows:

(a)    Concurrently with the execution of this Agreement, Buyer shall transfer to Seller $750,000 Dollars (the "Deposit") to be applied to the Purchase Price on Closing.  Seller shall hold the Deposit in an account at a federally insured financial institution that has total assets in excess of $10 billion.  If the Closing does not occur in accordance with this Agreement as a result of any breach or violation of this Agreement, the Related Agreements or any order of the Bankruptcy Court related thereto by Buyer, Seller shall retain the Deposit and apply it to any damages, attorneys fees or other costs, expenses or charges incurred by Seller as a result of Buyer's breach.  Unless this Agreement is terminated pursuant to its terms, if the Closing does not occur in accordance with this Agreement for any other reason, or within three (3) Business Days after the Terminator Assets are sold to another Person pursuant to the Overbidding Procedures Order described in Section 1.9 below, Seller shall promptly return the Deposit to Buyer.

(b)    Buyer shall transfer to Seller the balance of the Purchase Price on the Closing.

(c)    The wiring instructions are as follows:

_____
_____
_____
_____

1.7    Television Series Participation.    Subject to Buyer receiving any and all payments due pursuant to the Warner Bros. Television Agreements, Buyer shall pay to Seller's Grantor the Television Series Participation within thirty (30) days of Buyer's receipt thereof.  Seller shall make reasonable efforts for Buyer to receive direct payments of the Television Series Participation from Warner Bros. and to have direct audit rights with Warner Bros.

1.8    Allocation.    For tax purposes, Seller and Buyer shall allocate the Purchase Price in the manner set forth on Schedule 1.8.

1.9    Bankruptcy Order.    The Transaction is subject to entry of an Order authorizing the Debtors, to the extent of their right, title and interest, to (i) transfer the Terminator Assets to Buyer free and clear of all Liens ("Free and Clear"), except as otherwise set forth in this Agreement, and (ii) assume and assign the Assigned Contracts to Buyer (the "Halcyon Bankruptcy Court Order").  Accordingly, Buyer acknowledges and is aware that (i) the Transaction and Agreement shall be noticed to creditors and parties in interest in the Bankruptcy Cases, (ii) the sale contemplated by the Transaction and Agreement is subject to any higher or better offers at the hearing held to approve the Transaction (the "Sale Hearing"), as well as any

6

objections by creditors and parties in interest, and (iii) Seller and its agents and representatives are obligated to continue to market the Terminator Assets for sale and to solicit higher or better offers until the Terminator Assets are sold.

1.10    Closing.  The closing of the Transaction (the "Closing") shall take place at the offices of Peitzman, Weg & Kempinsky LLP in Los Angeles, California within seven (7) Business Days following the satisfaction or waiver of all conditions to the obligations of the parties to consummate the Transaction (other than conditions with respect to actions the respective parties will take at the Closing itself) or such other date as the parties may mutually agree (the "Closing Date"), but in no event later than March 1, 2010.

1.11    Deliveries at Closing.

(a)    Deliveries by Seller.  At the Closing, Seller will deliver to Buyer the following: (i) the various certificates, instruments, and documents referred to in Article V below; and (ii) such other instruments of sale, transfer, conveyance, and assignment as Buyer and its counsel may reasonably request.

(b)    Deliveries by Buyer.  At the Closing, Buyer will deliver to Seller the following: (i) the Purchase Price in accordance with Section 1.6; (ii) the various certificates, instruments, and documents referred to in Article VI below; and (iii) such other instruments of assumption as Seller and its counsel may reasonably request.


# ARTICLE II

# SELLER'S REPRESENTATIONS AND WARRANTIES

2.1    Power and Authority.  Subject to entry of the Halcyon Bankruptcy Court Order, Seller has all requisite power and authority to enter into this Agreement and carry out all of its obligations under this Agreement.

2.2    No Transfer of Assets.  To the best of Seller's knowledge, Seller has not disposed of, transferred or agreed to transfer any of the Terminator Assets except for the rights sold, conveyed, transferred, licensed, or assigned to third parties under the agreements set forth on Schedule 2.2.

2.3    No Litigation Prohibiting the Transaction.  To the best of Seller's knowledge, there are no actions, suits or proceedings pending or threatened in any court or before any administrative agency which would prevent Seller from completing the Transaction.

2.4    No Other Warranties by Seller.  Seller is selling the Terminator Assets on an **"as is, where is" basis,** with no representations or warranties of any kind, express or implied, either oral or written, with respect to the condition or value of the Terminator Assets, including any representation or warranty of title or use.  Upon the Closing, Buyer shall assume all responsibility, liability and obligation for the condition and status of the Terminator Assets. Seller has made and hereby makes no warranty or representation whatsoever regarding the

fitness for a particular purpose, quality or merchantability of the Terminator Assets, including without limitation, any warranty or representation that Seller's claim to ownership, possession, distribution or other exploitation of the Terminator Assets does not or will not violate or infringe the right of any other person or entity in any respect.

2.5    No Claims.  To the best of Seller's knowledge, no Person has made any claim with respect to the Terminator Assets that has or could in any way Materially Adversely Affect or impair Seller's right, title, and interest under this Agreement in and to the Terminator Assets, except as set forth on Schedule 2.5.

2.6    Insurance Claims.  Except as set forth on Schedule 2.6, to the best of Seller's knowledge, no insurance claims have been made and are currently outstanding and unsettled as of the date of this Agreement on the producer's errors and omissions policies or any other liability insurance policies that Seller maintains with respect to the Terminator Assets.  Except as set forth on Schedule 2.6, to the best of Seller's knowledge, no claim with respect to any of the Terminator Assets under any errors and omissions or other liability policy has required a payment by the insurance company or Seller and to the best of Seller's knowledge, no claim with respect to any Project that would be covered under any errors and omissions policy has been asserted other than as set forth on Schedule 2.6.

2.7    Litigation.  Except as set forth in Schedule 2.7, to the best of Seller's knowledge, (a) there is no litigation, arbitration, other proceeding, written audit request, or investigation pending against Seller or any of its officers or directors (in their capacities as such) that in any way could have a Material Adverse Effect on the Terminator Assets, and (b) Seller does not know of any threats of any such litigation, arbitration, other proceedings or written audit requests the results of which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Terminator Assets.

2.8    Legal Compliance.  To the best of Seller's knowledge, Seller has conducted and is conducting its business in compliance with all applicable laws and regulations in all material respects and has obtained all necessary governmental licenses, permits and other approvals of any governmental authority.

2.9    No Agent.  To the extent Seller or any of its officers, directors, agents or employees have incurred or caused to be incurred liability to any broker, finder or agent relating to this Transaction, Seller hereby agrees that all such amounts payable shall be the sole obligation of Seller and Seller hereby indemnifies and holds Buyer harmless from any claims arising from such obligations.

## ARTICLE III

## BUYER'S REPRESENTATIONS AND WARRANTIES

3.1    Power and Authority.  Buyer has all requisite power and authority to enter into this Agreement and carry out all of its obligations under this Agreement, and has sufficient

capitalization and the required financial resources to conclude the Transaction and to make and carry out the Transaction

3.2 <u>No Litigation Prohibiting the Transaction</u>. To the best of Buyer's knowledge, there are no actions, suits or proceedings pending or threatened in any court or before any administrative agency which would prevent Seller from completing the Transaction.

3.3 <u>Buyer's Inspection and Financing</u>. Buyer acknowledges that no further inspection, due diligence or financing is a condition to complete the Transaction. Buyer acknowledges that it is purchasing the Termination Assets on an "as is, where is" basis, with no representations or warranties of any kind by Seller except as specifically set forth in Section 2 above.

3.4 <u>No Agent.</u> To the extent Buyer or any of its officers, directors, agents or employees have incurred or caused to be incurred liability to any broker, finder or agent relating to this Transaction, Buyer hereby agrees that all such amounts payable shall be the sole obligation of Buyer and Buyer hereby indemnifies and holds Seller harmless from any claims arising from such obligations.


# ARTICLE IV

# COVENANTS

4.1 <u>Best Efforts to Consummate Transaction.</u> Upon the terms and subject to the conditions set forth in this Agreement, each of the parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transaction, including (a) the obtaining of all necessary waivers and other consents from Governmental Authorities and the making of all necessary registrations and filings and the taking of all reasonable steps as may be necessary to obtain any necessary waiver or other consent from, or to avoid an action or proceeding by, any Governmental Authority, (b) the obtaining of all necessary waivers or other consents from third parties as are conditions to the consummation of the Transaction, and (c) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transaction; provided, however, that nothing contained herein shall require any party to waive any condition to its obligation to consummate the Transaction.

4.2 <u>Notices.</u> Seller and Buyer shall each keep the other apprised of the status of matters relating to completion of the Transaction, including without limitation, promptly furnishing the other with copies of notices or other communications received by Seller or Buyer, as the case may be, or any of their respective Affiliates, from any Governmental Authority or third party with respect to the Transaction.

4.3    Operation of Business; Preservation of Assets.  Seller agrees that upon signature of this Agreement and until the Closing Date or earlier termination of this Agreement, unless Buyer otherwise consents in writing and except for the Transaction, Seller will:

(a)    Not offer, license or sell or agree to offer, license or sell any rights or property (tangible or intangible) that are included in the Terminator Assets or modify, amend, terminate, rescind or cancel or grant any waiver with respect to any existing agreements (including without limitation any Existing Exploitation Agreements) with respect to the Terminator Assets or expand any rights or property (tangible or intangible) with respect to the Terminator Assets granted to any Person or accelerate the time for payments of any amounts owing to Seller under any such agreements without first securing the written consent of Buyer; provided, however, that Seller may continue to operate in the ordinary course of its business and enter into transactions that will not have a Material Adverse Effect on the Terminator Assets without first securing the written consent of Buyer; in any event, however, Seller shall not offer, license or sell, or agree to offer, license or sell, in the ordinary course of its business or otherwise, any rights or property (tangible or intangible) that are included in the Terminator Assets without first securing the written consent of Buyer;

(b)    Not enter into any new Exploitation Agreements relating to the Exploitation of any Terminator Assets without securing the prior written consent of Buyer;

(c)    Not transfer or encumber or agree to transfer or encumber any of the Terminator Assets in any way, except as specifically permitted herein; and

(d)    Maintain its Books and Records for the Terminator Assets in accordance with past practices and policies, except for such changes of which it will advise Buyer as are required to comply with generally accepted accounting principles or applicable law.

4.4    Provisions Regarding Assignments.

(a)    Notwithstanding anything to the contrary in this Agreement, except for Assigned Contracts of the Debtors that are assigned to the Buyer pursuant to the Halcyon Bankruptcy Court Order, this Agreement shall not constitute an agreement to assign or transfer any Assigned Contract or any claim or right or any benefit or obligation thereunder or resulting therefrom of any of the Halcyon Parties if an assignment or transfer thereof, without the consent of a third party thereto, would constitute a breach or violation thereof or impose any Liability on Seller or any of its Affiliates and such a consent is not obtained at or before the Closing, in which case the provisions of Section 4.4(b) shall apply.

(b)    If a consent to assignment or transfer as contemplated by Section 4.4(a) is required by any third party to any Assigned Contract is not obtained at or before the Closing, or if an attempted transfer, conveyance or assignment of any such Assigned Contract is ineffective, the parties shall cooperate in any commercially reasonable arrangement that provides to Buyer the benefits under, and imposes on Buyer the Liabilities under, such Assigned Contract.

4.5    Full Access.  Until the Closing Date or earlier termination of this Agreement Seller will (a) upon reasonable prior notice permit Buyer and its authorized representatives and agents to have reasonable access during normal business hours to all contracts, accounting books

10

and records and documents relevant to the Terminator Assets or the Transaction, whether in Seller's possession or control or the possession or control of Seller's representatives and agents, and to make extracts from and copies of such contracts, books and records and documents, subject only to (x) the attorney-client and attorney work-product privileges, and (y) third party confidentiality rights (and Seller shall use all reasonable efforts to obtain as soon as possible waivers by such third parties to permit such access), (b) furnish to Buyer or its authorized representatives and agents such other information with respect to the business or properties of Seller relating to the Terminator Assets or the Transaction as Buyer may from time to time reasonably request, (c) otherwise reasonably cooperate in the examination or audit of Seller by Buyer relevant to the Terminator Assets and (d) confer with Buyer to keep it informed with respect to operational matters of a material nature affecting the Terminator Assets or the Transaction and to report on the general status of the business of Seller as it relates to the Terminator Assets or the Transaction, except to the extent restricted by confidentiality obligations to third parties that are not Affiliates of Seller.

       4.6   <u>Confidentiality</u>.  Seller and Buyer (each a "Recipient Party") will (and will cause its respective Affiliates to) hold, and will use commercially reasonable efforts to cause its respective representatives and agents to hold, in strict confidence from any Person (other than any such representatives and agents) all documents and information concerning the other (the "Protected Party") or any of its Affiliates furnished to it by the Protected Party or such Protected Party's Affiliates, representatives or agents, or to which such Recipient Party otherwise has obtained access, in connection with this Agreement or the Transaction, including without limitation, information associated with the Terminator Assets and Assumed Obligations ("Confidential Information"), except to the extent that such documents or information can be shown to have been (a) previously known by the Recipient Party (excluding, with respect to Seller and its Affiliates, representatives and agents, information included in the Terminator Assets or Assumed Obligations that are being transferred to Buyer pursuant to this Agreement), (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such Recipient Party or any of its Affiliates, representatives or agents or (c) lawfully acquired by the Recipient Party or any of its Affiliates, representatives or agents from another source if the Recipient Party does not have actual knowledge that such source is under an obligation to another Person to keep such documents and information confidential; provided, however, that the foregoing restrictions will not apply to Buyer's and its Affiliates' use after Closing of documents and information included in the Terminator Assets or Assumed Obligations.  Each Recipient Party shall (and shall cause its respective Affiliates, representatives and agents to) use at least the same degree of care to safeguard and to prevent the disclosure, publication or dissemination of the Confidential Information as it employs to avoid unauthorized disclosure, publication or dissemination of its own information of a similar nature, but in no case less than reasonable care.  In the event that a Recipient Party is requested or required (by oral question, interrogatory, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information of the Protected Party, such Recipient Party shall (x) provide the Protected Party with prompt written notice so that such Protected Party may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 4.6 and (y) cooperate with such Protected Party (at the Protected Party's expense) in any effort such Protected Party undertakes to obtain a protective order or other remedy.  In the event that such protective order or other remedy is not obtained or such Protected Party waives compliance with the provisions of this Section 4.6, such

EXHIBIT A
Page 26

Recipient Party may disclose to the Person compelling disclosure only that portion of the Confidential Information that such Recipient Party is advised by counsel is legally required to be disclosed and shall use commercially reasonable efforts to obtain reliable assurance, to the extent available, that confidential treatment is accorded the Confidential Information so disclosed.  If the Closing does not occur or this Agreement is terminated, Buyer agrees to return to Seller or destroy any Confidential Information it receives pursuant to this Agreement, and the provisions of this Section 4.6 shall survive any such termination of this Agreement.

4.7    Representations and Warranties.  Neither party shall perform any act or omit to take any action that would make any of its representations or warranties set forth in this Agreement materially untrue or incorrect on and as of the Closing Date.  Without either party waiving any rights and claims it may have, each party will inform the other promptly upon discovery that any of its representations or warranties ceases to be true or correct in any material respect.

4.8    Non-disturbance.  Buyer will not interfere with the rights of existing licensees or distributors under Existing Exploitation Agreements, including, without limitation, all rights of access in and to the Physical Properties.  However, if any such licensees are in default under Existing Exploitation Agreements, Buyer reserves the right to exercise any of Seller's rights, claims and remedies pursuant to such Existing Exploitation Agreements.

4.9    Delivery of Books and Records.  As soon as possible after the Closing, to the extent available and to the extent Seller has access during normal business hours and has not theretofore done so, Seller shall deliver to a location specified by Buyer original copies of all Books and Records that relate solely to the Terminator Assets or accurate copies of all Books and Records that relate solely to the Terminator Assets.

4.10    Insurance  Seller shall request Buyer be named as an "additional insured" under the existing errors and omissions insurance policy for T4, if any.

4.11    Remittances; Payments.  Seller shall promptly turn over to Buyer proceeds of all Included Payment Rights, mail and other communications to the extent related to the Terminator Assets or the Assumed Obligations received by it at any time after the Closing.  Buyer shall promptly turn over to Seller proceeds of all Excluded Payment Rights received by it at any time after the Closing.

4.12    Amendment of Schedules and Exhibits.  Prior to the Closing, Seller and Buyer shall cooperate in good faith to amend the Schedules and Exhibits hereto based upon any information obtained by Seller or Buyer after the Agreement Date.

4.13    Further Assurances.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, Seller and Buyer will take such further action (including the execution and delivery of such further instruments and documents) as the other party reasonably may request, all at the sole cost and expense of the requesting party (unless the requesting party is entitled to indemnification for such action under Article VIII).

# ARTICLE V

## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to consummate the Transaction is subject to the following conditions:

5.1     <u>Entry of Halcyon Bankruptcy Court Order</u>.  The Bankruptcy Court shall have entered the Halcyon Bankruptcy Court Order and there shall be no applicable stay in effect.

5.2     <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall have been accurate, true and correct in all material respects on and as of the Agreement Date, subject to Schedules to be delivered subsequent to the Agreement Date and, except to the extent that any such representation or warranty is made solely as of the Agreement Date or as of another date before the Closing Date, the representations and warranties of Seller contained herein and in the Related Agreements shall also be accurate, true and correct in all material respects on and as of the Closing Date, subject to Schedules to be delivered subsequent to the Agreement Date.

5.3     <u>Compliance with Covenants</u>.  Seller shall have in all material respects performed and complied with all of its covenants and obligations contained in this Agreement to be performed and complied with by it on or before the Closing Date.

5.4     <u>Third Party Consents</u>.  All consents identified on Schedule 5.4 attached hereto shall have been obtained and be in effect on the Closing Date.  All consents of, and filings and notifications to, and actions and non-action by, any Governmental Authority required for the consummation of the Transaction shall have been obtained, made or occurred and be in effect at the Closing.

5.5     <u>No Legal Restraints</u>.  No injunction or other legal restraint or prohibition enacted, entered, promulgated, enforced or issued by any Governmental Authority preventing the consummation of the Transactions shall be in effect.  If any injunction or legal restraint or prohibition prevents the Closing by more than 30 days then this Agreement shall, at the written option of the Seller, be subject to termination.

5.6     <u>Terminator 3 Collection Account Agreements</u>.  Seller shall have delivered to Buyer the Terminator 3 Trust Agreement, the Terminator 3 Secondary Trust Agreement, the Terminator 3 Ancillary Trust Agreement and any amendments there to (collectively, the "Terminator 3 Collection Account Agreements"), together with the Account Notices applicable thereto.  After the Closing, Seller agrees that if it receives any payments pursuant to any of the Terminator 3 Collection Account Agreements that are Included Payment Rights, Seller shall promptly remit such amounts to Buyer.

5.7     <u>T4 Collection Account Management Agreement</u>.  Seller shall have delivered to Buyer the Collection Account Management Agreement in connection with T4 ("T4 CAMA"), together with the Account Notice applicable thereto.  After the Closing, Seller agrees that if it receives any payments pursuant to the T4 CAMA that are Included Payment Rights, Seller shall promptly remit such amounts to Buyer.

13

5.8    Exploitation Agreements.  Seller shall have delivered to Buyer true and complete copies of all Existing Exploitation Agreements relating to any Project.

5.9    Quitclaim Agreement and Assignment of Trademarks.  Seller shall have executed and delivered to Buyer a Quitclaim Agreement and Assignments of Trademarks, the forms of which are attached hereto as Exhibits C and D, relating to all copyrights, trademarks and rights and interests in domestic and foreign copyrights and trademarks registered to, claimed by or licensed by Seller that are included in the Terminator Assets.

5.10    Bill of Sale.  Seller shall have executed and delivered to Buyer a Bill of Sale substantially in the form of Exhibit E attached hereto.

5.11    Related Agreements.  Seller shall have executed and delivered each of the Related Agreements and each and every other document required to be delivered at Closing as set forth in this Agreement, each in form and substance reasonably satisfactory to Buyer.  Seller shall have also executed and delivered any and all documents necessary or appropriate to assign all interests of Seller with respect to the Terminator Assets, any portion thereof or any Included Payment Rights from the Terminator Assets (collectively, the "Assignment and Assumption Agreements").

5.12    Further Assurances.  Seller shall have executed and delivered, and shall have caused all third parties to execute and deliver, any and all documents reasonably requested by Buyer that are necessary to consummate the Transaction.

## ARTICLE VI

## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

Seller's obligation to consummate the Transaction is subject to the following conditions:

6.1    Entry of Halcyon Bankruptcy Court Order.  The Bankruptcy Court shall have entered the Halcyon Bankruptcy Court Order and there shall be no applicable stay in effect.

6.2    Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained herein shall have been accurate, true and correct in all material respects on and as of the Agreement Date and, except to the extent that any such representation or warranty is made solely as of the Agreement Date or as of another date before the Closing Date, the representations and warranties of Buyer contained herein and in the Related Agreements shall also be accurate, true and correct in all material respects on and as of the Closing Date.

6.3    Compliance with Covenants.  Buyer shall have in all material respects performed and complied with all of its covenants and obligations contained in this Agreement to be performed and complied with by it on or before the Closing Date.

6.4    Third Party Consents.  All consents identified on Schedule 6.4 attached hereto shall have been obtained and be in effect at the Closing.  All consents of, and filings and notifications to, and actions and non-actions by, any Governmental Authority required for the

14

consummation of the Transaction shall have been obtained, made or occurred and be in effect at the Closing.

6.5    No Legal Restraints.  No injunction or other legal restraint or prohibition enacted, entered, promulgated, enforced or issued by any Governmental Authority preventing the consummation of the Transaction shall be in effect

6.6    Related Agreements.  Buyer shall have delivered to Seller a copy of all Assignment and Assumption Agreements and License Agreements, duly executed by Buyer, including, without limitation, all guild assumption agreements for all assumed Guild Obligations.

6.7    Schedules.  Buyer shall have agreed to and approved all Schedules.

## ARTICLE VII
## TERMINATION

7.1    Grounds for Termination.  This Agreement may be terminated at any time before the Closing as follows:

(a)    Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)    Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (i) in the event Seller has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach or (ii) if the Closing shall not have occurred on or before March 1, 2010 by reason of the failure of any condition precedent under Article V hereof (unless the failure results primarily from Buyer itself breaching any representation, warranty, or covenant contained in this Agreement);

(c)    Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (i) in the event Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach or (ii) if the Closing shall not have occurred on or 30 days following entry of the Halcyon Bankruptcy Court Order; and

7.2    Effect of Termination.  Upon termination of this Agreement pursuant to the provisions of Section 7.1, this Agreement shall forthwith become void and there shall be no further obligation or Liability on the part of any party (except as set forth in Section 4.6 which shall survive the termination).

15

# ARTICLE VIII

# INDEMNIFICATION

8.1    <u>Indemnification by Seller</u>.  Seller agrees to indemnify, defend at its own costs and expense and hold harmless Buyer and its directors, officers, employees, Affiliates (and directors, officers and employees of such Affiliates), agents, representatives and assigns, including, without limitation, reasonable attorneys' fees, costs and expenses incurred from and against any and all Losses of Buyer arising from, under or related to, or as a result of any material breach by Seller or its Affiliates of any of the representations, warranties, covenants or agreements made by Seller pursuant to this Agreement or the Related Agreements.  Notwithstanding anything to the contrary in this Agreement, Seller's indemnification responsibility under this Clause 8.1 shall (a) not exceed $250,000 and (b) expire six (6) months from the Closing Date (i.e., any claim, demand, liability or action which is asserted after six (6) months from the Closing Date and which would otherwise be Seller's responsibility under this Clause 8.1 even if the basis of such claim or action arose prior to said six (6) month period, Seller shall not be responsible for).

8.2    <u>Indemnification by Buyer</u>.  Buyer agrees to indemnify, defend at its own costs and expense, and hold harmless Seller and its directors, officers, employees, Affiliates (and directors, officers and employees of such Affiliates), agents and assigns, including, without limitation, reasonable attorneys' fees, costs and expenses incurred from and against any Losses of Seller arising from, under or related to, or as a result of (a) any material breach of any of the representations, warranties, covenants or agreements made by Buyer in or pursuant to this Agreement or the Related Agreements, (b) any claim, right, breach or violation of the obligations arising under the Terminator Rights Agreements resulting from Buyer's exploitation of the Terminator Assets; and (c) any claim or right resulting from Buyer's exploitation of the Terminator Assets, provided that, notwithstanding Seller's obligation to indemnify Buyer, Buyer agrees that in the interim period between the initial assertion of a claim against Seller until the final judgment, after all appeals, if any, is awarded on such claim, Buyer shall defend at Buyer's sole cost and expense such claim; and provided further that, if such final judgment is found against Buyer and such claim resulted primarily from any material breach by Seller of any representation, warranty, agreement or covenant contained in this Agreement, Seller shall, within ten (10) Business Days of receipt of an invoice from Buyer, reimburse Buyer for all liabilities, losses, fees and costs incurred by Buyer in connection with such claim.

8.3    <u>Claims Procedure</u>.

(a)    <u>Notice</u>.  Any party seeking indemnification (an "Indemnified Party") with respect to any Loss shall give written notice thereof to the party required to provide indemnity hereunder (the "Indemnifying Party").  Notwithstanding the foregoing, the rights and claims of any Indemnified Party to be indemnified in respect of any Loss resulting from the asserted liability shall not be adversely affected by the Indemnified Party's failure to give or delay in giving notice unless (and then only to the extent that) the Indemnifying Party is materially prejudiced thereby.

(b)    <u>Defense</u>.  Subject to the last sentence of Section 8.1 and 8.2, if any claim, right, demand or liability is asserted by any third party against any Indemnified Party, the

16

Indemnifying Party shall be entitled to participate therein and defend any action or proceeding brought against the Indemnified Party in respect of matters embraced by the indemnity, and the Indemnifying Party shall have the right to conduct and control the defense subject to the Indemnified Party's prior approval in writing of outside counsel selected by the Indemnifying Party, not to be unreasonably withheld or delayed.  After notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such claim or action, (which assumption of the defense shall occur within fourteen (14) days of receipt of the Indemnified Party's notice to the Indemnifying Party) the Indemnifying Party shall not be liable to the Indemnified Party under this Article VIII for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation.  The Indemnifying Party will not, without Indemnified Party's written consent, which written consent shall not be unreasonably withheld, settle or compromise any Indemnifiable Claim or consent to the entry of any judgment in respect thereof unless such settlement, compromise or consent includes an unconditional release of the Indemnified Party from all liability in respect of such Indemnifiable Claim.  The parties shall cooperate in the defense of all third party claims which may give rise to Indemnifiable Claims hereunder.

## ARTICLE IX

### MISCELLANEOUS

9.1    <u>Injunctive Relief; Specific Performance</u>.  Each party acknowledges and agrees that the other party would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached, so that a party shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which such party may be entitled, at law or in equity.  In particular, the parties acknowledge, solely for the purposes of determining whether injunctive relief is appropriate, that the Terminator Assets are uniquely suited for the purposes and needs of Buyer.  If Seller should materially breach any of its representations, warranties or covenants under this Agreement and providing the Closing shall have occurred, including payment in full of the Purchase Price to Seller, the parties each acknowledge that the remedy at law would be inadequate to compensate Buyer.  Accordingly, Buyer, in addition to any other available rights or remedies, may at its sole option sue in equity for specific performance, injunctive relief, and/or other equitable relief, and Seller expressly waives the defense that a remedy in damages will be adequate.

9.2    <u>Remedies Not Exclusive</u>.  Except as expressly stated to the contrary herein, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and will be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.  The election of any one or more remedies will not constitute a waiver of the right to pursue other available remedies.

9.3    <u>No Third Party Beneficiaries</u>.  None of the provisions of this Agreement will be for the benefit of, or enforceable by, any third-party beneficiary.

17

9.4    Entire Agreement.  This Agreement, and any documents referred to herein or executed contemporaneously herewith pursuant hereto, constitute the parties' entire agreement with respect to the subject matter hereof and are integrated with and supersede all other prior or contemporaneous agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the Terminator Assets and the Transaction.

9.5    Amendments.  No amendment of any provision of this Agreement or the Related Agreements shall be effective unless it is in writing and signed by all the parties hereto and then such amendment shall be effective only in the specific instance and for the specific purpose for which it was given.

9.6    Waivers.  No failure or delay of any party in exercising any power, claim, right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, claim, right or remedy preclude any other or further exercise thereof or the exercise of any other power, claim, right or remedy.  Any waiver hereof shall be effective only if given in writing by the party against which such waiver is sought to be enforced and in the specific instance and for the specific purpose for which such waiver was given.  After any waiver, unless otherwise mutually agreed, the parties shall be restored to their former position and rights.

9.7    Headings.  The Article and Section headings in this Agreement are provided only as a matter of convenience, and in no way define, limit, or extend or scope of this Agreement or of any particular Article or Section.

9.8    Construction.  The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  For purposes of this Agreement, the terms "know," "known," "knowledge," "best knowledge and belief," and other similar terms shall all mean the actual knowledge of the relevant person, without any duty of investigation.  The plural of any defined word shall include the singular and the singular of any defined word shall include the plural.

9.9    Illegality.  Nothing herein contained shall be construed to require the performance by either party of any act contrary to law.

9.10    Notices.  All notices under this Agreement will be in writing and will be delivered by personal service, overnight courier, facsimile, electronic mail (with an electronic delivery confirmation received) or certified mail (postage prepaid) to such address as may be designated from time to time by the relevant party, and which will initially be as set forth below. Any notice delivered by personal service or overnight courier will be deemed delivered when it is actually delivered and received by the relevant party. Any notice sent by facsimile will be deemed delivered when the confirmation of the successful transmission of the facsimile is printed by the facsimile machine and received by the sending party. Any notice sent by electronic mail will be deemed delivered when the electronic delivery confirmation of delivery to the recipient's computer is received by the sending party.  Any notice sent by certified mail will be deemed to have been given three (3) days after the date on which it is mailed.  No objection may be made to

18

the manner of delivery of any notice actually received in writing by an authorized representative or agent of a party. Notices will be addressed as follows or to such other address as the party to whom the same is directed will have specified in conformity with the foregoing:

(a)　　If to Buyer:　　　　_____
　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Fax:_____
　　　　　　　　　　　　　　Email: _____

　　　　With a copy to:　　　_____
　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　Fax: _____
　　　　　　　　　　　　　　Email: _____

(b)　　If to Seller:　　　　The Halcyon Company
　　　　　　　　　　　　　　8455 Beverly Blvd., Suite 600
　　　　　　　　　　　　　　Los Angeles, CA 90048
　　　　　　　　　　　　　　Attn: _____
　　　　　　　　　　　　　　Fax: _____
　　　　　　　　　　　　　　Email: _____

　　　　With a copy to:　　　Peitzman, Weg & Kempinsky LLP
　　　　　　　　　　　　　　10100 Santa Monica Blvd, Ste. 1450
　　　　　　　　　　　　　　Los Angeles, CA  90067
　　　　　　　　　　　　　　Attn: Howard J. Weg, Esq.
　　　　　　　　　　　　　　Telephone: (310) 552-2100
　　　　　　　　　　　　　　Fax: (310) 552-3101
　　　　　　　　　　　　　　Email: hweg@pwkllp.com

　　9.11　Relationship of the Parties.  This Agreement does not constitute and shall not be construed to constitute an agency, a partnership or a joint venture between the parties.  Neither party shall have any power, claim or right, nor shall it represent itself as having any power, claim or right to obligate or bind the other party in any manner whatsoever.  This is an agreement between separate entities and neither is the agent or partner of the other for any purpose whatsoever.

　　9.12　Successors and Assigns.  This Agreement shall inure to the benefit of and shall be binding on the parties, and their respective successors and assigns, including any bankruptcy trustee.  Seller may assign its rights and obligations under this Agreement without the prior written consent of Buyer if the assignment is made to an Affiliate or pursuant to a merger, consolidation or sale of all or substantially all of Seller's assets or pursuant to an order of the Bankruptcy Court after notice and opportunity for hearing have been provided to Buyer and

19

interested parties; provided, except in the case of a assignment pursuant to an order of the Bankruptcy Court, Seller's successor/assignee must assume in writing Seller's obligations hereunder and Buyer must be reasonably satisfied that said successor/assignee is at least as able to perform Seller's obligations pursuant to this Agreement as Seller.  Buyer may assign its rights and obligations under this Agreement without the prior written consent of Seller if the assignment is made to an Affiliate or pursuant to a merger, consolidation or sale of all or substantially all of Buyer's assets; provided that Buyer remains primarily liable under this Agreement and Buyer's assignee must assume in writing Buyer's obligations hereunder and Seller must be reasonably satisfied that Buyer's assignee is at least able to perform Buyer's obligations pursuant to this Agreement as Buyer.  Except with respect to any assignment by Seller pursuant to an order of the Bankruptcy Court after notice and opportunity for hearing have been provided to Buyer and interested parties, any assignment made by Seller or Buyer pursuant to this Section 9.13 shall not release Seller or Buyer from any of its obligations or liabilities hereunder and any assignment made in violation of this Section shall be null and void.

    9.13   <u>Expenses</u>.  Except as otherwise expressly provided herein, whether or not the Closing is consummated, all costs and expenses incurred in connection with this Agreement and the Transaction, including the fees and disbursements of counsel, financial advisors, tax advisors and accountants, shall be paid by the party incurring such costs and expenses.

    9.14   <u>Governing Law</u>.  This Agreement has been negotiated and entered into in the State of California, and all questions with respect to the Agreement and the rights and liabilities of the parties will be governed by the laws of that state, regardless of the choice of law provisions of California or any other jurisdiction.  The resolution of any and all disputes between the parties herein concerning the Terminator Assets, the Transaction, this Agreement or the Related Agreements shall be resolved by the Bankruptcy Court upon motion by any party hereto.

    9.15   <u>Jurisdiction; Service of Process</u>.  After the Bankruptcy Cases are closed, unless otherwise ordered by the Bankruptcy Court, any and all disputes between the parties which may arise under or relate to this Agreement or the Related Agreements will be heard and determined exclusively before an appropriate federal or state court located in Los Angeles, California.  The parties hereto acknowledge that such court has the jurisdiction to interpret and enforce the provisions of this Agreement and the parties waive any and all objections that they may have as to personal jurisdiction or venue in any of the above courts.  The parties hereby agree that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to the applicable party at its address provided in Section 9.11, such service being hereby acknowledged by the applicable party to be sufficient for personal jurisdiction in any action against such party in any such court and to be otherwise effective and binding service in every respect.  Nothing herein shall affect the right to serve process in any other manner permitted by law.

    9.16   <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

[Signatures on Following Page]

21

IN WITNESS WHEREOF, the parties hereto have duly caused the execution of this Agreement by its authorized representative as of the date first above written.

**SELLER:**

Halcyon Holding Group, LLC
a Delaware limited liability company

By: _____
Name: _____
Title: _____


T Asset Acquisition Company, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


T Asset International (BVI) Ltd.
a British Virgin Islands corporation

By: _____
Name: _____
Title: _____


T Salvation Distribution, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


T Salvation Distribution (BVI) Ltd.
a British Virgin Islands corporation

By: _____
Name: _____
Title: _____


*Signature Page*

T Salvation Productions, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon Consumer Products, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon Games, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon International (BVI) Ltd.
a British Virgin Islands corporation

By: _____
Name: _____
Title: _____


Halcyon Music Publishing, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Dominion, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


*Signature Page*

**BUYER:**

_____

a _____

By: _____
Name: _____
Title: _____

*Signature Page*

# SCHEDULE A

# DEFINITIONS

As used in the Agreement and the Exhibits and Schedules delivered pursuant to the Agreement, the following definitions shall apply:

"Account Notices" means irrevocable payment instructions delivered to the Trustee of the Terminator 3 Collection Accounts (presently Fintage) and the CAM pursuant to the T4 CAMA (presently Fintage), providing for amounts otherwise to be paid to Seller pursuant to the Terminator 3 Collection Accounts and/or (except for any contingent compensation entitlement of Dominion) pursuant to the T4 CAMA to be paid to Buyer.

"Affiliate" means, for any specified Person, any other Person which, directly or indirectly, controls, is controlled by or is under common control with such specified Person and "Affiliated" has a meaning correlative to the foregoing. For purposes of this definition, "control" means the power, directly or indirectly, to cause the direction of the management and policies of a Person (whether by or through the ownership of securities, by contract or otherwise).

"Books and Records" means all of Seller's files, books and records (including, without limitation, financial books and records), data bases, ledger cards, files, correspondence, computer programs, tapes, disks and related data processing software that at any time evidence or contain information relating to the Terminator Assets or are otherwise necessary or helpful in the Exploitation, ownership or collection thereof or realization thereupon, continuity lists, dialogue lists, spotting lists, synchronization licenses, contracts, correspondence and business affairs and legal files relating to the development, acquisition, production and Exploitation of any Project, cast lists, artwork, press books, story synopses, credit requirements lists, posters, advertising and publicity materials and all versions thereof and all of Seller's rights of access to the foregoing, contracts, agreements, assignments, documents or other papers, including originally executed copies of such contracts, agreements, assignments, documents or other papers relating to the Terminator Assets.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Los Angeles, California are authorized or required to close.

"CAM" means Collection Account Manager.

"Carolco Bankruptcy Court Order" means that certain Order Authorizing and Approving (a) Auction Sale under Section 363(b) and (f) of the Bankruptcy Code of all of Carolco's Rights in the Motion Pictures 'Terminator' and 'Terminator 2: Judgment Day,' including a Portion of the Rights to Produce and Exploit Prequels, Sequels and Remakes; (2) Treatment of Related Participations and Attachments; and (3) the

1

Assignment under Section 365 of the Bankruptcy Code of Related Executory Contracts, entered on October 14, 1997 in the United States Bankruptcy Court, Central District of California, Case No. LA95-39299-LF

"Contracts" means all contracts, agreements, assignments and instruments of every kind and character under which the Seller or any third party may have heretofore acquired or may hereafter acquire any right, title, and interest in or to the Terminator Assets.

"Derivative Rights" means all of Seller's rights under the Prior Purchase Agreement in ancillary, subsidiary or allied rights now known and unknown, including without limitation, Seller's rights in and to the Sequel and Remake Rights, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to any and all pictures/films/television productions/other motion picture productions/programs made, produced or created pursuant to or under the Sequel and Remake Rights ("Sequels").  Without limiting the foregoing, Derivative Rights also include all of Seller's rights in and to the Literary Properties and the Sequels, the title(s) of the Sequels and the characters (including their names and characteristics) appearing in the Sequels.

"Existing Exploitation Agreements" means the Exploitation Agreements in effect as of the date hereof and listed on Schedule 1.2(b) hereto.

"Existing Third Party Exploitation Rights" means the Exploitation rights sold, licensed or granted to third parties pursuant to Existing Exploitation Agreements.

"Exploitation" and the correlative "Exploit" means:

(a)     The right, under copyright and otherwise, to release, sell, exhibit, distribute, sub-distribute, lease, sublease, market, exploit, license, sublicense, broadcast, transmit, reproduce, advertise, publicize, perform or otherwise exploit and derive revenues from the Terminator Assets in perpetuity, throughout the universe, in any and all languages and versions, on any and all sizes and gauges of film, videotape or other material and by any and every means and media, now known or which may hereafter be developed (including, without limitation, theatrical, non-theatrical, all forms of television (including free, pay, basic cable and satellite) and video devices, all interactive and computer assisted media; and in connection with any such uses (whether the same be for profit or otherwise) to use and perform all sound and music synchronized therewith.

(b)     The right to manufacture and procure such positive prints and preprint and other materials and to cause the performance of such laboratory work with respect to the Terminator Assets as Buyer may require and to cause trailers to be produced, manufactured, exhibited and distributed by every means, method or device now or hereafter known.

(c)      The right to advertise, publicize and exploit the Terminator Assets by such means in such media now known and unknown, and to such extent as Buyer may deem desirable.  Such rights shall include without limitation, with respect to all Persons appearing in or rendering services in connection with the Terminator Assets, the right to issue and authorize publicity concerning them and the right to use, reproduce, transmit, broadcast, exploit, publicize and exhibit their names, photographs, likenesses, transcriptions, films and other reproductions thereof in connection with the distribution, exhibition, advertising and exploitation of the Terminator Assets.

(d)      The right to exercise Sequel and Remake Rights.

"Exploitation Agreement" means any agreement that Seller has entered into relating to the sale, grant, license or other conferral to any Person of any right to release, sell, distribute, sub-distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise Exploit any of the Terminator Assets or any rights in the Terminator Assets.

"Fintage" means Fintage Collection Account Management B.V., which is presently the Trustee with respect to the Terminator 3 Collection Accounts and the CAM with respect to the T4 CAMA.

"Governmental Authority" means any: (i) federal, state, local, municipal or foreign government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, instrumentality or entity and any court or other tribunal); (iii) multi-national organization or body; or (iv) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power.

"Guild" means any guild, craft, union or labor organization having jurisdiction over any Person rendering services or granting any rights in any capacity in connection with the Terminator Assets.

"Guild Obligations" means all obligations, liabilities and/or commitments of any kind or nature arising under or in connection with any contract, collective bargaining agreement or other document or instrument with any Guild including, without limitation, any obligation or liability to make any payments pursuant to any such contracts, agreements, documents or instruments arising in connection with or as a result of the development, acquisition, production or Exploitation of the Terminator Assets, including, without limitation, any so-called "residual," "reuse," "rerun" or "supplemental market" payments.

"Indemnifiable Claim" means any Loss for or against which any party is entitled to indemnification under this Agreement.

"Instrument" shall have the meaning given to such term in the Uniform Commercial Code.

3

"Liabilities" means any and all debts, liabilities, obligations, commitments, responsibilities, fines, penalties and sanctions, absolute or contingent, matured or unmatured, liquidated or unliquidated, joint, several or individual, asserted or unasserted, accrued or unaccrued, known or unknown, due or to become due, whenever arising, including without limitation any costs, expenses, interest, reasonable attorneys' fees, disbursements and expense of counsel, expert and consulting fees and costs related thereto or to the investigation or defense thereof.

"Lien" means, for any property or asset of a Person, a lien, security interest, encumbrance, interest, mortgage or pledge on such property or asset in favor of any other Person, except those in favor, or for the benefit, of Buyer.

"Literary Property" or "Literary Properties" means all of Seller's rights of every kind and nature (including, without limitation, copyrights) in and to the screenplay and any other literary, musical, dramatic or other literary material of any kind or nature upon which, in whole or in part, any Terminator Asset is based, or from which it is adapted or has been used or included in any Terminator Asset including, without limitation, all scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof.

"Loss" or "Losses" means any action, cost, damage, obligation, judgment, disbursement, expense, liability, loss and settlement payments, including without limitation attorneys', accountants and other professional fees and costs incurred by a party pursuant to this Agreement in connection with the Terminator Assets.

"Material Adverse Effect" means:

(a)    With respect to the Terminator Assets, any effect which would materially prejudice or derogate from the Terminator Assets or otherwise materially alter or diminish the value of the Terminator Assets or Buyer's rights, claims and remedies with respect to the Terminator Assets or would materially increase the liabilities assumed by Buyer pursuant to this Agreement.

(b)    With respect to any Person, any effect which renders a Person insolvent or which would materially diminish the ability of such Person to perform its obligations under this Agreement or to consummate the Transaction.

"Participation Obligations" means all of Seller's financial obligations for contingent compensation in connection with the Exploitation of the Terminator Assets in the nature of gross participations, net profit or net proceeds participations or so-called deferments based upon the Exploitation of the Terminator Assets, any Sequel and Remake Rights, Derivative Rights, or any other rights in and to the Terminator Assets.

"Person" means an individual, partnership, corporation, limited liability company, trust, association, joint venture, Governmental Authority or other entity of any kind.

4

"Project" means each of Termination OVA, Animated Television Series and Live Action Television Series.

"Recapture Rights" means any and all rights of Seller to Exploit, purchase or otherwise acquire any Exploitation rights, copyright or distribution rights in and to T3 or T4 at any time in the future, including, without limitation, upon the termination or expiration of any license or distribution periods pursuant to the Existing Exploitation Agreements.

"Related Agreements" means the Assignments of Copyright, Assignment of Trademark, the Short Form Assignments, the Account Notices, Assignment and Assumption Agreements, and any documents executed or delivered under Article V.

"Sequel and Remake Rights" means all of Seller's rights under the Terminator Rights Agreements, the Prior Purchase Agreement and the Carolco Bankruptcy Court Order to develop, produce or exploit remakes, sequels, prequels and any other motion picture, television program or series of programs or other production based in whole or in part on T1, T2, T3, T4, Termination OVA, Television Series, Animated Television Series, Live Action Television Series, or Terminator Video Game Rights and the title, characters, names, underlying Literary Property, or any material included in any of the foregoing.

"Television Series Participation" means Seller's Grantor's rights to receive from Buyer a participation equal to 25% (twenty five percent) of the contingent compensation irrevocably received by or credited to the account of Buyer under the Warner Bros. Television Agreements for the Television Series.

"Terminator Assets" means all of the Seller's right, title and interest in and to T1, T2, T3 and T4 arising under or related to the Terminator Rights Agreements, the Carolco Bankruptcy Court Order, the Prior Purchase Agreement and the Halcyon Bankruptcy Court Order including, without limitation, all of Seller's right, title and interest in and to the Payment Rights, Recapture Rights, Termination OVA, Television Series, Animated Television Series, Live Action Television Series, and Terminator Video Games (all as defined in Section 1.1).

"Terminator Rights Agreements" means, collectively, (a) that certain Purchase and Sale - Quitclaim Agreement, dated as of September 11, 1997, by and between The Carolco Liquidating Trust as successor in interest to the rights  of Carolco Pictures Inc., Carolco International Inc., formerly known as Carolco International N.V., Carolco Service Inc. and Carolco Production Services Inc., for themselves and on behalf of their respective bankruptcy estates, on the one hand, and AGV Productions, Inc., on the other hand, as authorized and approved by the Carolco Bankruptcy Court Order, and (b) that certain Assignment Agreement, dated as of March 19, 1998, by and between Pacific Western Productions, Inc., and Gale Ann Hurd, on the one hand, and AGV Productions, Inc., on the other hand.

EXHIBIT A
Page 44

"Uniform Commercial Code" means the Uniform Commercial Code in effect in the State of California as of the date hereof.

EXHIBIT A
Page 45

## SCHEDULE 1.2(a)

## Assigned Contracts

## TERMINATOR RIGHTS CONVEYANCES BY AND TO CAROLCO

1.    Sale of Assets Agreement dated as of January 16, 1996 between Canal + D.A. ("Canal +") and Carolco Pictures, Inc. and its subsidiaries (collectively "Carolco"), pursuant to which Carolco conveyed to Canal + all of Carolco's right, title and interest in and to certain motion pictures, including T2.  This Agreement as amended by the documents referred to in Items 7 and 8 was authorized and approved by Order of the Bankruptcy Court referred to in Item 5.

2.    First Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco.

3.    Second Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco.

4.    Trademark License Agreement dated as of April 29, 1996 between Canal + and CPI, pursuant to which Canal + granted CPI a non-exclusive license to use the titles, trademarks, trade mark rights, service marks and service mark rights in and to the motion pictures covered by the Sale of Assets Agreement referred to in Item 6, including T2.

5.    Purchase and Sale – Quitclaim Agreement dated as of September 11, 1997 between the Carolco Liquidating Trust, as successor in interest to the rights of Carolco, and AGV Productions, Inc. ("AGV"), pursuant to which AGV acquired all of Carolco's right, title and interest in and to T1 and T2, including the right to produce and exploit prequels, sequels and remakes based thereon.

6.    Amendment to Trademark License Agreement dated as of April, 2003 between StudioCanal Image S.A., ("StudioCanal") as successor in interest to Canal+, and AGV, pursuant to which StudioCanal granted AGV an exclusive license to use the marks Terminatrix, T-X and T3.

7.    Second Amendment to Trademark License Agreement dated as of July 22, 2008 between StudioCanal S.A. (as successor to StudioCanal Image S.A) and T- Asset Acquisition Company, LLC, as successor to AGV's rights relating to the making of Remakes and Sequels to the films T1 and T2.

## TRANSFER OF TERMINATOR ASSETS FROM C-2 AND AGV TO T ASSET ACQUSITION COMPANY, LLC ("T ASSET"):

8.    Purchase Agreement ("Purchase Agreement") dated as of  May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV T4 (collectively "Seller"),

1

on the one hand, and T Asset on the other hand with respect to all of Seller's right, title and interest in and to the Terminator Assets.

9.   Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 1, together with the Schedules to the Purchase Agreement.

**INTERNAL CONVEYANCES:**

10.  Asset Purchase Agreement dated as of April 12, 2007 (effective as of the closing date of the purchase transaction set forth in the Purchase Agreement referred to in Item 1) among T Asset and T Asset International (BVI) Ltd. ("T Asset International") with respect to the Terminator Asset Rights outside the United States and Canada (the "Domestic Territory").

11.  One Picture License Agreement dated as of November 9, 2007 between T Asset and T Salvation Distribution, LLC ("T Salvation Distribution") with respect to the production of one motion picture and distribution rights in the Domestic Territory.

12.  Amended and Restated  One Picture License Agreement dated as of November 9, 2007 between T Asset and T Salvation Distribution with respect to the production of one motion picture and distribution rights in the Domestic Territory.

13.  Exclusive Grant of Rights dated as of November 9, 2007 from T Asset to T Salvation Distribution with respect to the Domestic Territory.

14.  One Picture License Agreement dated as of November 9, 2007 between T Asset International and T Salvation Distribution (BVI) Ltd. ("T Distribution BVI") with respect to the production of one motion picture and distribution rights outside the Domestic Territory.

15.  Production Services Agreement dated as of November 9, 2007 between T Asset and T Asset International, on the one hand, and T Salvation Productions, LLC ("T Salvation Productions").

16.  Assignment Agreement dated as of January 29, 2008 between T Asset and Halcyon Consumer Products, LLC ("HCP") with respect to merchandising rights.

17.  Termination and Reassignment dated as of February 12, 2008 between T Asset International and T Distribution BVI, terminating the one picture license referred to in Item 12 and reassigning the rights conveyed therein to T Asset International.

18.  One Picture License Agreement dated as of February 12, 2008 between T Asset and T Salvation Distribution with respect to the production of one motion picture and distribution rights for the world outside of the Domestic Territory, South Korea and the Middle East.

19.  Exclusive Grant of Rights dated as of February 12, 2008 from T Asset to T Salvation Distribution with respect to the world outside the Domestic Territory, South

2

Korea and the Middle East.

20.  Amended and Restated Production Services Agreement dated as of November 9. 2007 as amended as of February 12, 2008 between T Salvation Distribution and T Salvation Productions.

21.  Amended and Restated Security Agreement and Mortgage of Copyright dated as of November 9, 2007 as amended as of February 12, 2008, between T Salvation Productions and T Salvation Distribution.

22.  Assignment Agreement dated as of April 17, 2008 between T Asset and Halcyon Games, LLC ("Games") with respect to interactive/video game rights.

### T4 PRODUCTION RELATED DOCUMENTS:

23.  Agreement dated as of  March 17, 2009 between T Salvation Productions and T Salvation Distribution, on the one hand, and Warner Bros. on the other hand with respect to shortfall payments which may be made by Warner Bros. to Five Pennies, Inc. f/s/o McG.

24.  Amended and Restated Agreement dated as of May __, 2009 between T Salvation Productions and T Salvation Distribution, on the one hand, and Warner Bros. on the other hand with respect to certain shortfall payments which may be made by Warner Bros. to Aboriginal Merchants, Inc. f/s/o Bale.

25.  Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company.

26.  Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 47.

### MOTION PICTURE DISTRIBUTION RIGHTS:

27.  Distribution Agreement dated as of November 10, 2007 with effect as of September 7, 2007 between T Salvation Distribution and Warner Bros. with respect to the Domestic Territory.

28.  Master License Agreement dated as of  December 3, 2007 between T Distribution BVI and Batrax Entertainment B.V. ("Batrax") for the territory described therein as the Middle East.

29.  Master License Agreement dated as of December 3, 2007 between T Distribution BVI and Fintage Magyar Kft. ("Fintage Magyar") for the territory of  South Korea.

30.  Memorandum of Agreement dated December 5, 2007 between Batrax and

3

Gulf Film LLC with respect to the territory described therein as the Middle East.

31.  Motion Picture Lease Agreement dated as of January 25, 2008 between Fintage Magyar, on the one hand, and Mars Entertainment Korea and Lotte Shopping Co., Ltd on the other hand for the territory of South Korea.

32.  Distribution Agreement dated as of February 13, 2008 between T Salvation Distribution and Worldwide SPE Acquisitions, Inc. ("Sony") for the world exclusive of the Domestic Territory, South Korea and the Middle East.

33.  Non-Theatrical Distribution Agreement dated April 3, 2009 between T Salvation Distribution and Entertainment In Motion Inc. with respect to Airline Rights in South Korea and the Middle East.

### MOTION PICTURE DISTRIBUTION FIRST NEGOTIATION RIGHTS:

34.  Settlement and First-Negotiation Agreement dated as of May 23, 2008 between T Asset, on the one hand, and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. on the other hand.  The Orion Foreign Distribution Agreement and Domestic Distribution Agreement referenced in Paragraph 2 are the Documents referred to in Index 1, Items 20 and 24 respectively.

35.  First Amendment to Settlement and First-Negotiation Agreement, dated as of October 27, 2009, amending the document referred to in Item 8.

### MERCHANDISING/TRADEMARK LICENSE AGREEMENTS:

36.  Merchandising Licensing Agreement dated as of February 1, 2009 between HCP and Art You Grew Up With Ltd.

37.  Trademark License Agreement dated as of February 1, 2009 between T Asset and Art You Grew Up With.

38.  Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Bladez Toys PLC.

39.  Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Bladez Toys PLC.

40.  Merchandising Licensing Agreement dated as of March 10, 2008 between HCP and C-Life Group, Ltd.

41.  Trademark Licensing Agreement dated as of July 10, 2008 between T Asset and C-Life Group, Ltd.

42.  Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and Danilo Promotions Ltd.

43. Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and Danilo Promotions Ltd..

44. Merchandising Licensing Agreement dated as of June 15, 2008 between HCP and DC Comics.

45. Trademark Licensing Agreement dated as of June 15, 2008 between T Asset and DC Comics.

46. Merchandising Licensing Agreement dated as of March 30, 2009 between HCP and Designworks Clothing Company Pty. Ltd.

47. Trademark Licensing Agreement dated as of March 30, 2009 between T Asset and Designworks Clothing Company Pty. Ltd.

48. Merchandising Licensing Agreement dated as of January 19, 2009 between HCP and Dryen Australia Pty. Ltd.

49. Trademark Licensing Agreement dated as of January 19, 2009 between T Asset and Dryen Australia Pty. Ltd.

50. Merchandising Licensing Agreement dated as of September 3, 2008 between HCP and FunKo.

51. Trademark Licensing Agreement dated as of September 3, 2008 between T Asset and FunKo.

52. Merchandising Licensing Agreement dated as of June 1, 2008 between HCP and GB Posters Limited.

53. Trademark Licensing Agreement dated as of June 1, 2008 between T Asset and GB Eye Ltd.

54. First Amendment to Merchandising Licensing Agreement dated as of November 1, 2008 between HCP and GB Posters Limited.

55. Merchandising Licensing Agreement dated as of October 10, 2008 between HCP and Gendai Merchandise Inc.

56. Trademark Licensing Agreement dated as of October 10, 2008 between T Asset and Gendai Merchandise Inc.

57. First Amendment to Merchandising Licensing Agreement dated as of January 23, 2009 between HCP and Gendai Merchandise Inc.

58. Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and H Grossman HK Ltd.

59. Trademark Licensing Agreement dated as of September 1, 2008 between T

5

Asset and H Grossman HK Ltd.

60.  Merchandising Licensing Agreement dated as of _____, 2008 between HCP and Hollywood Collectibles.

61.  Trademark Licensing Agreement dated as of September 1, 2008 between HCP and Hollywood Collectibles..

62.  Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Hot Toys Limited.

63.  Trademark Licensing Agreement dated as of June 15, 2008 between HCP and Hot Toys Limited.

64.  Merchandising Licensing Agreement dated as of January 19, 2008 between HCP and Hunter Overseas Pty. Ltd.

65.  Trademark Licensing Agreement dated as of January 19, 2008 between T Asset and Hunter Overseas Pty. Ltd.

66.  Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC.

67.  Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC.

68.  First Amendment to Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC.

69.  First Amendment to Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC.

70.  Merchandising Licensing Agreement dated as of January 25, 2008 between HCP and Iris Co., Ltd.

71.  Trademark Licensing Agreement dated as of January 25, 2008 between T Asset and Iris Co., Ltd.

72.  Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Licensing Essentials Pty. Ltd.

73.  Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Licensing Essentials Pty. Ltd.

74.  Merchandising Licensing Agreement dated as of October 28, 2008 between HCP and Lightec Inc.

75.  Trademark Licensing Agreement dated as of October 28, 2008 between T Asset and Lightec Inc.

EXHIBIT A
Page 51

76. Merchandising Licensing Agreement dated as of April 30, 2008 between HCP and Medicom Toy Corporation.

77. Trademark Licensing Agreement dated as of June 27, 2008 between T Asset and Medicom Toy Corporation.

78. Merchandising Licensing Agreement dated as of December 2, 2008 between HCP and Moderati, a Bellrock Media Inc. company.

79. Trademark Licensing Agreement dated as of February 17, 2009 between T Asset and Moderati, a Bellrock Media Inc. company.

80. Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Muckle Mannequins e.K.

81. Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Muckle Mannequins e.K.

82. Merchandising Licensing Agreement dated as of August 1, 2008 between HCP and New Era Cap Company Ltd.

83. Trademark Licensing Agreement dated as of August 1, 2008 between T Asset and New Era Cap Company Ltd.

84. Merchandising Deal Memo dated August 28, 2008 between HCP and Playground Maniacs, Inc.

85. Merchandising Deal Memo dated February 13, 2008 between HCP and Playmate Toys Inc.

86. Short Form License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc.

87. Merchandising License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc.

88. Trademark License Agreement dated as of February 13, 2008 between T Asset and Playmate Toys Inc.

89. First Amendment to License Agreement dated as of June 22, 2009 between HCP and Playmate Toys Inc.

90. Merchandising License Agreement dated as of March 17, 2009 between HCP and Promotional Partners Worldwide Inc.

91. Trademark License Agreement dated as of February 25, 2009 between T Asset and Promotional Partners Worldwide Inc.

92. Merchandising License Agreement dated as of December 16, 2008 between

7

HCP and Raffles Inc.

93.     Trademark License Agreement dated as of December 16, 2008 between T Asset and Raffles Inc.

94.     Merchandising License Agreement dated as of September 3, 2008 between HCP and Ripple Junction Design Co., Inc.

95.     Trademark License Agreement dated as of September 3, 2008 between T Asset and Ripple Junction Design Co., Inc.

96.     Merchandising License Agreement dated as of July 13, 2008 between HCP and Rubies Costume Co. Inc.

97.     Trademark License Agreement dated as of July 13, 2008 between T Asset and Rubies Costume Co. Inc.

98.     Merchandising License Agreement dated as of April 30, 2008 between HCP and Sideshow Collectibles.

99.     Trademark License Agreement dated as of April 30, 2008 between T Asset and Sideshow Collectibles.

100.    Theme Park License Agreement dated as of June 30, 2008 between HCP and Six Flags, Inc.

101.    Trademark  License Agreement dated as of June 30, 2008 between T Asst and Six Flags, Inc.

102.    Merchandising Deal Memo Dated June 9, 2009 between HCP and Sony Pictures Home Entertainment Inc.

103.    Merchandising License Agreement dated as of December 3, 2008 between HCP and Targa Co., Ltd.

104.    Trademark License Agreement dated as of December 3, 2008 between T Asset and Targa Co., Ltd.

105.    Merchandising License Agreement dated as of April 28, 2009 between HCP and Three OZ. Co., Ltd.

106.    Trademark License Agreement dated as of April 28, 2009 between T Asset and Three OZ. Co., Ltd.

107.    Publishing Agreement dated April 1, 2008 between The Halcyon Company (executed by HCP) and Titan Publishing Group Ltd.

108.    Trademark License Agreement dated as of May 15, 2008 between T Asset and Titan Publishing Group Ltd.

109.     Merchandising Deal Memo dated March 27, 2008 between The Halcyon Company and The Topps Company, Inc.

110.     Merchandising License Agreement dated as of April 1, 2008 between HCP and Trends International, LLC.

111.     Trademark License Agreement dated as of August 5, 2008 between T Asset and Trends International, LLC.

112.     Merchandising License Agreement dated as of February 25, 2009 between HCP and Vibe Inc.

113.     Trademark License Agreement dated as of January 6, 2009 between T Asset and Vibe Inc.

114.     Merchandising License Agreement dated as of February 25, 2009 between HCP and Visions Inc.

115.     Trademark License Agreement dated as of July 22, 2008 between T Asset and Visions Inc.

### INTERACTIVE/VIDEO GAME DEVELOPMENT, PRODUCTION AND EXPLOITATION AGREEMENTS:

116.     Video Game Development Agreement dated as of August 8, 2008 between Games and Attaction AG d/b/a EGI Equity International AG ("Attaction").

117.     Accommodation Security Agreement (California law) dated as of August 8, 2008 between Attaction, on the one hand, and Games, Halcyon Holding Group, LLC ("HHG") and T Asset on the other hand.

118.     Security Transfer and Assignment Agreement (German law) dated as of August 8, 2008 between Games, HHG and T Asset, on the one hand, and Attaction on the other hand.

119.     Guarantee Agreement executed on August 14, 2008 by HHG in favor of Attaction.

120.     Video Game Work for Hire Agreement between Games and Grin AB.

121.     License Agreement dated as of March 25, 2008 between Games and Gameloft S.A. with respect to video game for wireless devices.

122.     License Agreement dated as of April 30, 2008 between Games and Raw Thrills, Inc. with respect to arcade game.

123.     Trademark License Agreement dated as of April 30, 2008 between T Asset and Raw Thrills, Inc.

9

124.    Video Game Distribution Agreement dated as of May 18, 2008 between XIM, Inc. d/b/a Evolved Games, Inc. and Warner Bros. Home Entertainment, Inc.

125.    Letter of Intent, draft dated November 21, 2008, executed February, 2009 between Games and Stillfront AB with respect to the development and exploitation of an online T4 Fan Immersion Game.

126.    Digital Distribution License Agreement dated as of March 30, 2009 between T Asset and Games, on the one hand, and Warner Specialty Video Productions Inc on the other hand with respect to the production and exploitation of a Machinima animated series based on the T4 Video Game.

127.    Long Form Merchandise License Agreement dated as of March 20, 2009 between Halcyon Games, LLC, on the one hand, and DK/Brady Games, on the other hand, with respect to the production and exploitation of "Terminator: Salvation, the Game."

10

**SCHEDULE 1.2(b)**

**Existing Exploitation Agreements**

**MOTION PICTURE DISTRIBUTION RIGHTS:**

1.    Distribution Agreement dated as of November 10, 2007 with effect as of September 7, 2007 between T Salvation Distribution and Warner Bros. with respect to the Domestic Territory.

2.    Master License Agreement dated as of  December 3, 2007 between T Distribution BVI and Batrax Entertainment B.V. ("Batrax") for the territory described therein as the Middle East.

3.    Master License Agreement dated as of December 3, 2007 between T Distribution BVI and Fintage Magyar Kft. ("Fintage Magyar") for the territory of  South Korea.

4.    Memorandum of Agreement dated December 5, 2007 between Batrax and Gulf Film LLC with respect to the territory described therein as the Middle East.

5.    Motion Picture Lease Agreement dated as of January 25, 2008 between Fintage Magyar, on the one hand, and Mars Entertainment Korea and Lotte Shopping Co., Ltd on the other hand for the territory of South Korea.

6.    Distribution Agreement dated as of February 13, 2008 between T Salvation Distribution and Worldwide SPE Acquisitions, Inc. ("Sony") for the world exclusive of the Domestic Territory, South Korea and the Middle East.

7.    Non-Theatrical Distribution Agreement dated April 3, 2009 between T Salvation Distribution and Entertainment In Motion Inc. with respect to Airline Rights in South Korea and the Middle East.

**MOTION PICTURE DISTRIBUTION FIRST NEGOTIATION RIGHTS:**

8.    Settlement and First-Negotiation Agreement dated as of May 23, 2008 between T Asset, on the one hand, and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. on the other hand.  The Orion Foreign Distribution Agreement and Domestic Distribution Agreement referenced in Paragraph 2 are the Documents referred to in Index 1, Items 20 and 24 respectively.

9.    First Amendment to Settlement and First-Negotiation Agreement, dated as of October 27, 2009, amending the document referred to in Item 8.

**MERCHANDISING/TRADEMARK LICENSE AGREEMENTS:**

10. Merchandising Licensing Agreement dated as of February 1, 2009 between HCP and Art You Grew Up With Ltd.

1

11. Trademark License Agreement dated as of February 1, 2009 between T Asset and Art You Grew Up With.

12. Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Bladez Toys PLC.

13. Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Bladez Toys PLC.

14. Merchandising Licensing Agreement dated as of March 10, 2008 between HCP and C-Life Group, Ltd.

15. Trademark Licensing Agreement dated as of July 10, 2008 between T Asset and C-Life Group, Ltd.

16. Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and Danilo Promotions Ltd.

17. Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and Danilo Promotions Ltd..

18. Merchandising Licensing Agreement dated as of June 15, 2008 between HCP and DC Comics.

19. Trademark Licensing Agreement dated as of June 15, 2008 between T Asset and DC Comics.

20. Merchandising Licensing Agreement dated as of March 30, 2009 between HCP and Designworks Clothing Company Pty. Ltd.

21. Trademark Licensing Agreement dated as of March 30, 2009 between T Asset and Designworks Clothing Company Pty. Ltd.

22. Merchandising Licensing Agreement dated as of January 19, 2009 between HCP and Dryen Australia Pty. Ltd.

23. Trademark Licensing Agreement dated as of January 19, 2009 between T Asset and Dryen Australia Pty. Ltd.

24. Merchandising Licensing Agreement dated as of September 3, 2008 between HCP and FunKo.

25. Trademark Licensing Agreement dated as of September 3, 2008 between T Asset and FunKo.

26. Merchandising Licensing Agreement dated as of June 1, 2008 between HCP and GB Posters Limited.

27. Trademark Licensing Agreement dated as of June 1, 2008 between T Asset

2

and GB Eye Ltd.

28. First Amendment to Merchandising Licensing Agreement dated as of November 1, 2008 between HCP and GB Posters Limited.

29. Merchandising Licensing Agreement dated as of October 10, 2008 between HCP and Gendai Merchandise Inc.

30. Trademark Licensing Agreement dated as of October 10, 2008 between T Asset and Gendai Merchandise Inc.

31. First Amendment to Merchandising Licensing Agreement dated as of January 23, 2009 between HCP and Gendai Merchandise Inc.

32. Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and H Grossman HK Ltd.

33. Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and H Grossman HK Ltd.

34. Merchandising Licensing Agreement dated as of _____, 2008 between HCP and Hollywood Collectibles.

35. Trademark Licensing Agreement dated as of September 1, 2008 between HCP and Hollywood Collectibles..

36. Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Hot Toys Limited.

37. Trademark Licensing Agreement dated as of June 15, 2008 between HCP and Hot Toys Limited.

38. Merchandising Licensing Agreement dated as of January 19, 2008 between HCP and Hunter Overseas Pty. Ltd.

39. Trademark Licensing Agreement dated as of January 19, 2008 between T Asset and Hunter Overseas Pty. Ltd.

40. Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC.

41. Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC.

42. First Amendment to Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC.

43. First Amendment to Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC.

3

44. Merchandising Licensing Agreement dated as of January 25, 2008 between HCP and Iris Co., Ltd.

45. Trademark Licensing Agreement dated as of January 25, 2008 between T Asset and Iris Co., Ltd.

46. Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Licensing Essentials Pty. Ltd.

47. Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Licensing Essentials Pty. Ltd.

48. Merchandising Licensing Agreement dated as of October 28, 2008 between HCP and Lightec Inc.

49. Trademark Licensing Agreement dated as of October 28, 2008 between T Asset and Lightec Inc.

50. Merchandising Licensing Agreement dated as of April 30, 2008 between HCP and Medicom Toy Corporation.

51. Trademark Licensing Agreement dated as of June 27, 2008 between T Asset and Medicom Toy Corporation.

52. Merchandising Licensing Agreement dated as of December 2, 2008 between HCP and Moderati, a Bellrock Media Inc. company.

53. Trademark Licensing Agreement dated as of February 17, 2009 between T Asset and Moderati, a Bellrock Media Inc. company.

54. Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Muckle Mannequins e.K.

55. Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Muckle Mannequins e.K.

56. Merchandising Licensing Agreement dated as of August 1, 2008 between HCP and New Era Cap Company Ltd.

57. Trademark Licensing Agreement dated as of August 1, 2008 between T Asset and New Era Cap Company Ltd.

58. Merchandising Deal Memo dated August 28, 2008 between HCP and Playground Maniacs, Inc.

59. Merchandising Deal Memo dated February 13, 2008 between HCP and Playmate Toys Inc.

60. Short Form License Agreement dated as of February 13, 2008 between HCP

4

and Playmate Toys Inc.

61. Merchandising License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc.

62. Trademark License Agreement dated as of February 13, 2008 between T Asset and Playmate Toys Inc.

63. First Amendment to License Agreement dated as of June 22, 2009 between HCP and Playmate Toys Inc.

64. Merchandising License Agreement dated as of March 17, 2009 between HCP and Promotional Partners Worldwide Inc.

65. Trademark License Agreement dated as of February 25, 2009 between T Asset and Promotional Partners Worldwide Inc.

66. Merchandising License Agreement dated as of December 16, 2008 between HCP and Raffles Inc.

67.    Trademark License Agreement dated as of December 16, 2008 between T Asset and Raffles Inc.

68.    Merchandising License Agreement dated as of September 3, 2008 between HCP and Ripple Junction Design Co., Inc.

69.    Trademark License Agreement dated as of September 3, 2008 between T Asset and Ripple Junction Design Co., Inc.

70.    Merchandising License Agreement dated as of July 13, 2008 between HCP and Rubies Costume Co. Inc.

71.    Trademark License Agreement dated as of July 13, 2008 between T Asset and Rubies Costume Co. Inc.

72.    Merchandising License Agreement dated as of April 30, 2008 between HCP and Sideshow Collectibles.

73.    Trademark License Agreement dated as of April 30, 2008 between T Asset and Sideshow Collectibles.

74.    Theme Park License Agreement dated as of June 30, 2008 between HCP and Six Flags, Inc.

75.    Trademark  License Agreement dated as of June 30, 2008 between T Asst and Six Flags, Inc.

76.    Merchandising Deal Memo Dated June 9, 2009 between HCP and Sony Pictures Home Eentertainment Inc.

EXHIBIT A
Page 60

77.    Merchandising License Agreement dated as of December 3, 2008 between HCP and Targa Co., Ltd.

78.    Trademark License Agreement dated as of December 3, 2008 between T Asset and Targa Co., Ltd.

79.    Merchandising License Agreement dated as of April 28, 2009 between HCP and Three OZ. Co., Ltd.

80.    Trademark License Agreement dated as of April 28, 2009 between T Asset and Three OZ. Co., Ltd.

81.    Publishing Agreement dated April 1, 2008 between The Halcyon Company (executed by HCP) and Titan Publishing Group Ltd.

82.    Trademark License Agreement dated as of May 15, 2008 between T Asset and Titan Publishing Group Ltd.

83.    Merchandising Deal Memo dated March 27, 2008 between The Halcyon Company and The Topps Company, Inc.

84.    Merchandising License Agreement dated as of April 1, 2008 between HCP and Trends International, LLC.

85.    Trademark License Agreement dated as of August 5, 2008 between T Asset and Trends International, LLC.

86.    Merchandising License Agreement dated as of February 25, 2009 between HCP and Vibe Inc.

87.    Trademark License Agreement dated as of January 6, 2009 between T Asset and Vibe Inc.

88.    Merchandising License Agreement dated as of February 25, 2009 between HCP and Visions Inc.

89.    Trademark License Agreement dated as of July 22, 2008 between T Asset and Visions Inc.

## INTERACTIVE/VIDEO GAME DEVELOPMENT, PRODUCTION AND EXPLOITATION AGREEMENTS:

90.    Video Game Development Agreement dated as of August 8, 2008 between Games and Attaction AG d/b/a EGI Equity International AG ("Attaction").

91.    Accommodation Security Agreement (California law) dated as of August 8, 2008 between Attaction, on the one hand, and Games, Halcyon Holding Group, LLC ("HHG") and T Asset on the other hand.

6

92.     Security Transfer and Assignment Agreement (German law) dated as of August 8, 2008 between Games, HHG and T Asset, on the one hand, and Attaction on the other hand.

93.     Guarantee Agreement executed on August 14, 2008 by HHG in favor of Attaction.

94.     Video Game Work for Hire Agreement between Games and Grin AB.

95.     License Agreement dated as of March 25, 2008 between Games and Gameloft S.A. with respect to video game for wireless devices.

96.     License Agreement dated as of April 30, 2008 between Games and Raw Thrills, Inc. with respect to arcade game.

97.     Trademark License Agreement dated as of April 30, 2008 between T Asset and Raw Thrills, Inc.

98.     Video Game Distribution Agreement dated as of May 18, 2008 between XIM, Inc. d/b/a Evolved Games, Inc. and Warner Bros. Home Entertainment, Inc.

99.     Letter of Intent, draft dated November 21, 2008, executed February, 2009 between Games and Stillfront AB with respect to the development and exploitation of an online T4 Fan Immersion Game.

100.    Digital Distribution License Agreement dated as of March 30, 2009 between T Asset and Games, on the one hand, and Warner Specialty Video Productions Inc on the other hand with respect to the production and exploitation of a Machinima animated series based on the T4 Video Game.

101.    Long Form Merchandise License Agreement dated as of March 20, 2009 between Halcyon Games, LLC, on the one hand, and DK/Brady Games, on the other hand, with respect to the production and exploitation of "Terminator: Salvation, the Game."

EXHIBIT A
Page 62

## SCHEDULE 1.5(b)

### Participation and Attachment Obligations

1.      Agreement dated as of September 10, 2007 between T Salvation Productions and Onda Entertainment, Inc. furnishing the producing services of Moritz Borman.

2.      Agreement dated as of October 1, 2007 between T Salvation Productions and Dominion, LLC furnishing the producing services of Derek Anderson and Victor Kubicek.

3.      Guaranty dated as of October 1, 2007 between T Asset and Dominion, LLC f/s/o Derek Anderson and Victor Kubicek.

4.      Agreement (draft with comments) dated as of October 19, 2007 between T Salvation Productions and Five Pennies, Inc. furnishing the directing services of Joseph McGinty Nichol (a/k/a McG) ("McG").

5.      Consulting/Executive Producer Agreement dated as of October __, 2007 between T Asset and Peter D Graves.

6.      Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver.

7.      Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale").

8.      Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand.

9.      Animatronic and Prosthetic Effects Agreement dated as of February 6, 2008 between T Salvation Productions and Stan Winston Studio, Inc.

10.      Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis.

11.      Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis.

12.      Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington.

13.      Executive Producer Agreement dated as of February 29, 2008 between T

1

Salvation Productions and Lin Pictures, Inc. furnishing the development and executive producer services of Dan Lin.

14.    Amendment dated as of June 16, 2008 between T Salvation Productions and Dominion, LLC amending the agreement referred to in Item 31.

15.    Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman.

16.    Acting Agreement dated as of April 21, 2008 between T Salvation Productions and Shell B Productions, Inc. furnishing the acting services of Moon Bloodgood.

17.    Acting Agreement dated as of June 28, 2008 between T Salvation Productions and Pigs Can Fly, Inc. furnishing the acting services of Helena Bonham Carter.

18.    Acting Agreement dated as of April 9, 2008 between T Salvation Productions and Anton Yelchin, Inc. furnishing the acting services of Anton Yelchin.

2

## SCHEDULE 1.8

### Allocation of Purchase Price for Tax Purposes

To be prepared

1

## SCHEDULE 2.2

**Rights Sold, Conveyed, Transferred, Licensed or Assigned to Third Parties**

To be prepared

1

## SCHEDULE 2.5

### Claims That Could in Any Way Materially Adversely Affect or Impair

To be prepared

1.        Claims by StudioCanal S.A. set forth in correspondence from their counsel Baker & McKenzie LLP to  counsel for Seller Peter Eichler dated October 31, 2008, November 21, 2008, January 23, 2009 and June 30, 2009 alleging, among other things, that Seller is in violation of the Carolco Library Trademark License Agreement by reason of sublicensing rights in the TERMINATOR trademarks without obtaining the prior written consent of StudioCanal, granting sublicenses which purport to grant rights beyond those granted to AGV in the Carolco Library Trademark License Agreement and under the Carolco Sale Agreement and publicly claiming inaccurately to own the entire TERMINATOR film franchise.

1

## SCHEDULE 2.6

## E & O Insurance Claims

To be prepared

1

EXHIBIT A
Page 68

## SCHEDULE 2.7

### Material Litigation

To be prepared


1.      Claims by StudioCanal S.A. set forth in correspondence from their counsel Baker & McKenzie LLP to  counsel for Seller Peter Eichler dated October 31, 2008, November 21, 2008, January 23, 2009 and June 30, 2009 alleging, among other things, that Seller is in violation of the Carolco Library Trademark License Agreement by reason of sublicensing rights in the TERMINATOR trademarks without obtaining the prior written consent of StudioCanal, granting sublicenses which purport to grant rights beyond those granted to AGV in the Carolco Library Trademark License Agreement and under the Carolco Sale Agreement and publicly claiming inaccurately to own the entire TERMINATOR film franchise.

1

## SCHEDULE 5.4

### Third Party Consents Required by Buyer

To be prepared

1

## SCHEDULE 6.4

**Third Party Consents Required by Seller**

To be prepared

1

<u>EXHIBIT C</u>

<u>QUITCLAIM AGREEMENT</u>

This Quitclaim Agreement is made and entered into as of _____, 20__ by and between Halcyon Holding Group, LLC d/b/a The Halcyon Company ("Halcyon"), T Asset Acquisition Company LLC ("T Asset"), T Asset International (BVI) Ltd. ("T Asset International"), T Salvation Distribution, LLC ("T Distribution"), T Salvation Distribution (BVI) Ltd. ("T Distribution International"), T Salvation Productions, LLC ("T Productions"), Halcyon Consumer Products, LLC ("HCP"), Halcyon Games, LLC ("Games"), Halcyon International (BVI) Ltd. ("Halcyon International"), Halcyon Music Publishing, LLC d/b/a Halcyon Worldwide Music Publishing ("Halcyon Music") and Dominion, LLC ("Dominion"), for themselves and on behalf of their respective bankruptcy estates (collectively "Company"), on the one hand, and _____ ("Purchaser"), on the other hand, in accordance with and subject to the terms of the Asset Purchase Agreement between Company and Buyer dated as of _____, 20__ (the "Asset Purchase Agreement").  Capitalized terms that are not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

Pursuant to the Halcyon Bankruptcy Court Order, and in consideration of the payment of the Purchase Price (as defined in the Asset Purchase Agreement) to Company, Company hereby irrevocably sells, assigns, transfers, conveys and quitclaims to Purchaser all of Company's right, title and interest in and to the Terminator Assets (as defined in the Asset Purchase Agreement), but only with such representations, warranties and covenants as are expressly set forth herein and/or in the Asset Purchase Agreement. Without limiting the generality of the foregoing, the Terminator Assets shall in any and all events include, without limitation, all of Company's right, title and interest in and to the following (i) the sole and exclusive "Motion Picture" (as defined below) rights, including, without limitation, the sole and exclusive right to produce one (1) or more Motion Pictures or other derivative works (including, without limitation, Sequels including, without limitation, prequels, Sequel and Remake Rights, musicals and/or serials) based, in whole or in part, on the Terminator Assets and the right to fix, release, distribute, exhibit, perform, transmit, broadcast; advertise, promote and otherwise exploit such Motion Pictures or other derivative works by any and all means and in any and all media whether now known and used, now known and hereafter used, or hereafter known and used, or devised, including, without limitation, all of the following: theatrical; non-theatrical (including airlines, ships and other carriers, military, educational industrial and the like); pay-per-view, home video (including videocassettes, digital videodiscs, laserdiscs, CD-ROMs and all other formats); all forms of television (including pay, free, network syndication, cable, satellite, high definition and digital); video-on-demand, near video-on-demand, and subscription-on-demand; all forms of digital or on-line exploitation, distribution and/or transmission (including without limitation, the internet), CD-ROMs, fiber optic or other exhibition, broadcast and/or delivery systems and/or computerized or computer-assisted media; all rights of communication to the public, rights of distribution to the public, rights of making available or other forms of public or

1

private communication and/or distribution; and all forms of dissemination, communication or distribution to one or more locations or parties, whether embodied or transmitted utilizing analog, digital or other format; (ii) Derivative Rights in connection with the foregoing and (iii) all ancillary, incidental and subsidiary rights including, without limitation, all merchandising, (e.g., games, computer, video and other electronic games, toys, comic books, so-called "making of books," apparel, food, beverages, posters, and other commodities, services or items), commercial tie-ins, co-promotions, music, music publishing, soundtrack, photonovel, novelization, screenplay publication, interactive media, multi-media, and theme park (or other "themed" or location-based attraction) rights in and to the Terminator Assets.  In connection with the exercise of the rights herein quitclaimed, Buyer shall have the unfettered right to adapt, modify, fictionalize, add to or take from the Terminator Assets, and to combine the same with any other literary or musical work.

Buyer is empowered, at its option and expense, to bring, prosecute, defend and appear in suits, actions and proceedings of any nature concerning all copyrights in and to the Terminator Assets, or concerning any infringements of any such copyright (but as to past infringements, if any, only to the extent such past infringement claims are assignable), or any interference with any of the rights hereby granted under said copyrights in its own name.  Any recovery of damages or costs from infringement or violation of any such copyright or renewal copyright, so far as it arises from any violation of the rights hereby quitclaimed, is likewise quitclaimed to and shall be paid to Buyer.

As used herein, "Motion Picture," or its equivalent, means and includes motion pictures, cinematography, films and photoplays of every kind and character whatsoever, including the sound records thereof as well as trailers and clips thereof, produced by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, pictures, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on material of any description (whether translucent or not) for later projection or exhibition in such manner that the same are, or appear to be, in motion on screen, mirror, tube or other medium or device, whether or not accompanied by sound records and whether now or hereafter known, invented, devised or contemplated.

As used herein, "Derivative Rights" means all of Company's rights under the Terminator Rights Agreements, the Prior Purchase Agreement and the Halcyon Bankruptcy Court Order in ancillary, subsidiary or allied rights now known and unknown, including without limitation, Buyer's rights in and to the Sequel and Remake Rights, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to the Terminator Assets, and any and all pictures/films/television productions/other motion picture productions/programs made, produced or created pursuant to or under the Sequel and Remake Rights ("Sequels").  Without limiting the foregoing, Derivative Rights also include all of Company's rights in and to the Literary Properties relating to each Project and the Sequels, the title(s) of the Sequels and the

2

characters (including their names and characteristics) appearing in the Terminator Assets and the Sequels.

As used herein, "Sequel and Remake Rights" means all of Company's rights under the Terminator Rights Agreements, the Prior Purchase Agreement and the Halcyon Bankruptcy Court Order to develop, produce or exploit remakes, sequels, prequels and any other motion picture, television program or series of programs or other production based in whole or in part on T1, T2, T3, T4, Termination OVA, Television Series, Animated Television Series, Live Action Television Series, or Terminator Video Games and the title, characters, names, underlying Literary Property, or any material included in any of the foregoing.

As used herein, "Carolco Bankruptcy Court Order" means that certain Order Authorizing and Approving (a) Auction Sale under Section 363(b) and (f) of the Bankruptcy Code of all of Carolco's Rights in the Motion Pictures 'Terminator' and 'Terminator 2: Judgment Day,' including a Portion of the Rights to Produce and Exploit Prequels, Sequels and Remakes; (2) Treatment of Related Participations and Attachments; and (3) the Assignment under Section 365 of the Bankruptcy Code of Related Executory Contracts, entered on October 14, 1997 in the United States Bankruptcy Court, Central District of California, Case No. LA95-39299-LF.

As used herein, "Terminator Rights Agreements" means, collectively, (a) that certain Purchase and Sale - Quitclaim Agreement, dated as of September 11, 1997, by and between The Carolco Liquidating Trust as successor in interest to the rights  of Carolco Pictures Inc., Carolco International Inc., formerly known as Carolco International N.V., Carolco Service Inc. and Carolco Production Services Inc., for themselves and on behalf of their respective bankruptcy estates, on the one hand, and AGV Productions, Inc., on the other hand, and (b) that certain Assignment Agreement, dated as of March 19, 1998, by and between Pacific Western Productions, Inc., and Gale Ann Hurd, on the one hand, and AGV Productions, Inc., on the other hand, as authorized and approved pursuant to the Carolco Bankruptcy Court Order.

As used herein, "Prior Purchase Agreement" means that certain Purchase Agreement  dated April 12, 2007 between T Asset Acquisition Company, LLC, on the one hand, and AGV Productions, Inc., Mario Kassar Productions LP, C2 Pictures LLC and AGB Productions T4 LLC, on the other hand.

As used herein, the "Halcyon Bankruptcy Court Order" means the Order_____ entered by the Bankruptcy Court on _____, 2010.

As used herein, "Sequels" shall mean any and all pictures/films/television productions/other motion picture productions/programs made, produced or created pursuant to or under the Sequel and Remake Rights.

This Quitclaim Agreement is executed pursuant to the Asset Purchase Agreement and the Halcyon Bankruptcy Court Order, and in the event of any inconsistencies between the provisions of this Quitclaim Agreement and the provisions of the Asset Purchase Agreement or the Halcyon Bankruptcy Court Order, the Asset Purchase Agreement and the Halcyon Bankruptcy Court Order shall control.

Executed as of this _____day of _____, 20__.


**SELLER:**

Halcyon Holding Group, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


T Asset Acquisition Company, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


T Asset International (BVI) Ltd.
a British Virgin Islands corporation


By: _____
Name: _____
Title: _____


T Salvation Distribution, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


T Salvation Distribution (BVI) Ltd.
a British Virgin Islands corporation


By: _____
Name: _____
Title: _____

4

T Salvation Productions, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon Consumer Products, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon Games, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon International (BVI) Ltd.
a British Virgin Islands corporation

By: _____
Name: _____
Title: _____


Halcyon Music Publishing, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Dominion, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


5

**BUYER:**

_____

a _____

By: _____
Name: _____
Title: _____

6

## EXHIBIT D

## TRADEMARK ASSIGNMENT

**THIS TRADEMARK ASSIGNMENT** is effective as of ____ __, 20__.

**WHEREAS**, _____ a _____ (hereinafter referred to as "Assignee"), desires to acquire all right, title and interest of T Asset Acquisition, LLC, a Delaware limited liability company (hereinafter referred to as the "Assignor"), in and to the (1) "Sarah Connor Chronicles" trademark and the registrations and registration applications relating to the "Sarah Connor Chronicles" trademark listed on Schedule A hereto, (2) the trademark registrations and applications listed on Schedule B hereto, and (3) certain trademark licenses and agreements listed on Schedule C hereto.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby grant, assign and set over to Assignee, its successors, assigns and legal representatives, (i) all of Assignor's right, title and interest in and to the trademarks and the registrations and registration applications relating to the trademarks set forth on Schedules A and B hereto, (ii) the trademark licenses and agreements set forth on Schedule C, and (iii) the goodwill symbolized by such trademarks, and with the right to sue and collect damages and/or profits for past infringements of said trademarks, the intent hereof being to substitute Assignee in the place of Assignor.

**IN WITNESS WHEREOF**, Assignor has caused this instrument to be signed in its name by its proper and duly authorized corporate officer as of the day and date first set forth above.

T Asset Acquisition Company, LLC
(**"Assignor"**)

By: _____

By: _____

7

## Schedule A to Trademark Assignment

(i)       The common law trademark rights of Assignor in and to the name "Sarah Connor Chronicles"

as well as the registration application filed therefor with the USPTO on November 8, 2006.

(ii)      The following logo designs of Assignor (the "Logos"):  See attached.

(iii)     USPTO trademark registration application serial no. 77 / 03977 for the mark "The Sarah Connor Chronicles."

8

**Schedule B to Trademark Assignment**

EXHIBIT A
Page 80

**<u>Schedule C to Trademark Assignment</u>**

10

# EXHIBIT B

**EXHIBIT B**

**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Aboriginal Merchants, Inc. f/s/o Christian Bale c/o The Endeavor Agency 9601 Wilshire Blvd. Beverly Hills, CA 90211 Attn: Patrick Whitesell | Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale") | $0.00 |
| Aboriginal Merchants, Inc. f/s/o Christian Bale c/o The Endeavor Agency 9601 Wilshire Blvd. Beverly Hills, CA 90211 Attn: Patrick Whitesell | Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand | $0.00 |
| AGV Productions, Inc. 11601 Wilshire Blvd., Ste 1900 Los Angeles, CA 90025 Attn: Amir Ohebsion | Purchase and Sale – Quitclaim Agreement dated as of September 11, 1997 between the Carolco Liquidating Trust, as successor in interest to the rights of Carolco, and AGV Productions, Inc. ("AGV"), pursuant to which AGV acquired all of Carolco's right, title and interest in and to T1 and T2, including the right to produce and exploit prequels, sequels and remakes based thereon | |
| AGV Productions, Inc. 11601 Wilshire Blvd., Ste 1900 Los Angeles, CA 90025 Attn: Amir Ohebsion | Amendment to Trademark License Agreement dated as of April __, 2003 between StudioCanal Image S.A., ("StudioCanal") as successor in interest to Canal+, and AGV, pursuant to which StudioCanal granted AGV an exclusive license to use the marks Terminatrix, T-X and T3 | $0.00 |
| AGV Productions, Inc. 11601 Wilshire Blvd., Ste 1900 Los Angeles, CA 90025 Attn: Amir Ohebsion | Purchase Agreement ("Purchase Agreement") dated as of May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV T4 (collectively "Seller"), on the one hand, and T Asset on the other hand with respect to all of the Seller's right, title and interest in and to the Terminator Assets | $0.00 |
| AGV Productions, Inc. 11601 Wilshire Blvd., Ste 1900 Los Angeles, CA 90025 Attn: Amir Ohebsion | Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 1, together with the Schedules to the Purchase Agreement | $0.00 |
| Art You Grew Up With Ltd The Offices, 68 The Crescent Brickett Wood, Herts AL2 3NF United Kingdom Attention: Mr. Russell Singler | Merchandising Licensing Agreement dated as of February 1, 2009 between HCP and Art You Grew Up With Ltd | $0.00 |
| Art You Grew Up With Ltd The Offices, 68 The Crescent Brickett Wood, Herts AL2 3NF United Kingdom Attention: Mr. Russell Singler | Trademark License Agreement dated as of February 1, 2009 between T Asset and Art You Grew Up With | $0.00 |
| Attaction AG d/b/a EGI Equity International AG Luessirainstrasse 52 6300 Zug, Switzerland | Video Game Development Agreement dated as of August 8, 2008 between Halcyon Games and Attaction AG d/b/a EGI Equity International AG ("Attaction") | $0.00 |
| Attaction AG d/b/a EGI Equity International AG Luessirainstrasse 52 6300 Zug, Switzerland | Accommodation Security Agreement (California law) dated as of August 8, 2008 between Attaction, on the one hand, and Games, Halcyon Holding Group, LLC ("HHG") and T Asset on the other hand | $0.00 |
| Attaction AG d/b/a EGI Equity International AG Luessirainstrasse 52 6300 Zug, Switzerland | Security Transfer and Assignment Agreement (German law) dated as of August 8, 2008 between Games, HHG and T Asset, on the one hand, and Attaction on the other hand | $0.00 |
| Attaction AG d/b/a EGI Equity International AG Luessirainstrasse 52 6300 Zug, Switzerland | Guarantee Agreement executed on August 14, 2008 by HHG in favor of Attaction | $0.00 |
| Batrax Entertainment B.V. Stationsweg 32 2312 AV Leiden The Netherlands Attn: Aloys Vet | Master License Agreement dated as of December 3, 2007 between T Distribution BVI and Batrax Entertainment B.V. ("Batrax") for the territory described therein as the Middle East | $0.00 |
| Batrax Entertainment B.V. Stationsweg 32 2312 AV Leiden The Netherlands Attn: Aloys Vet | Memorandum of Agreement dated December 5, 2007 between Batrax and Gulf Film LLC with respect to the territory described therein as the Middle East | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Bladez Toyz PLC<br>Portsmouth Technopole<br>Kingston Crescent<br>Portsmouth P02 8FA<br>United Kingdom<br>Attention: Mr. Iain Morgan | Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Bladez Toys PLC | $0.00 |
| Bladez Toyz PLC<br>Portsmouth Technopole<br>Kingston Crescent<br>Portsmouth P02 8FA<br>United Kingdom<br>Attention: Mr. Iain Morgan | Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Bladez Toys PLC | $0.00 |
| Bloom Hergott Diemer Rosenthal & LaViolette, LLP<br>150 S. Rodeo Drive, 3rd Floor<br>Beverly Hills, CA 90212<br>Attn: Jacob A. Bloom, Esq. and Patrick M. Knapp, Esq. | Agreement dated as of September 10, 2007 between T Salvation Productions and Onda Entertainment, Inc. furnishing the producing services of Moritz Borman | $0.00 |
| Bloom Hergott et al LLP<br>150 S Rodeo Dr 3FL<br>Beverly Hills, CA 90212<br>Attn: Carlos Goodman, Esq. | Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale") | $0.00 |
| Bloom Hergott et al LLP<br>150 S Rodeo Dr 3FL<br>Beverly Hills, CA 90212<br>Attn: Carlos Goodman, Esq. | Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand | $0.00 |
| C2 Pictures LLC<br>406 Wilshire Blvd 2nd Floor<br>Santa Monica, CA 90401<br>Attn: Sam Falconello /<br>Erick Feitshans | Purchase Agreement ("Purchase Agreement") dated as of May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV T4 (collectively "Seller"), on the one hand, and T Asset on the other hand with respect to all of the Seller's right, title and interest in and to the Terminator Assets | $0.00 |
| C2 Pictures LLC<br>406 Wilshire Blvd 2nd Floor<br>Santa Monica, CA 90401<br>Attn: Sam Falconello /<br>Erick Feitshans | Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 1, together with the Schedules to the Purchase Agreement | $0.00 |
| Canal + D.A.<br>c/o David Heroy, Esq.<br>Baker & McKenzie LLP<br>One Prudential Plaza, Suite 3500<br>Chicago, IL 60601 | Sale of Assets Agreement dated as of January 16, 1996 between Canal + D.A. ("Canal +") and Carolco Pictures, Inc. and its subsidiaries (collectively "Carolco"), pursuant to which Carolco conveyed to Canal + all of Carolco's right, title and interest in and to certain motion pictures, including T2. | $0.00 |
| Canal + D.A.<br>c/o David Heroy, Esq.<br>Baker & McKenzie LLP<br>One Prudential Plaza, Suite 3500<br>Chicago, IL 60601 | First Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco | $0.00 |
| Canal + D.A.<br>c/o David Heroy, Esq.<br>Baker & McKenzie LLP<br>One Prudential Plaza, Suite 3500<br>Chicago, IL 60601 | Second Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco | $0.00 |
| Canal + D.A.<br>c/o David Heroy, Esq.<br>Baker & McKenzie LLP<br>One Prudential Plaza, Suite 3500<br>Chicago, IL 60601 | Trademark License Agreement dated as of April 29, 1996 between Canal + and CPI, pursuant to which Canal + granted CPI a non-exclusive license to use the titles, trademarks, trade mark rights, service marks and service mark rights in and to the motion pictures covered by the Sale of Assets Agreement | $0.00 |
| Carolco Liquidating Trust<br>c/o Alice Neuhauser<br>280 S. Beverly Drive<br>Beverly Hills, CA 90212 | Purchase and Sale – Quitclaim Agreement dated as of September 11, 1997 between the Carolco Liquidating Trust, as successor in interest to the rights of Carolco, and AGV Productions, Inc. ("AGV"), pursuant to which AGV acquired all of Carolco's right, title and interest in and to T1 and T2, including the right to produce and exploit prequels, sequels and remakes based thereon | $0.00 |
| Carolco Pictures, Inc.<br>c/o Alice Neuhauser<br>280 S. Beverly Drive<br>Beverly Hills, CA 90212 | Sale of Assets Agreement dated as of January 16, 1996 between Canal + D.A. ("Canal +") and Carolco Pictures, Inc. and its subsidiaries (collectively "Carolco"), pursuant to which Carolco conveyed to Canal + all of Carolco's right, title and interest in and to certain motion pictures, including T2. | $0.00 |
| Carolco Pictures, Inc.<br>c/o Alice Neuhauser<br>280 S. Beverly Drive<br>Beverly Hills, CA 90212 | First Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco | $0.00 |

EXHIBIT B
ASSIGNED CONTRACTS

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Carolco Pictures, Inc.<br>c/o Alice Neuhauser<br>280 S. Beverly Drive<br>Beverly Hills, CA 90212 | Second Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco | $0.00 |
| Carolco Pictures, Inc.<br>c/o Alice Neuhauser<br>280 S. Beverly Drive<br>Beverly Hills, CA 90212 | Trademark License Agreement dated as of April 29, 1996 between Canal + and CPI, pursuant to which Canal + granted CPI a non-exclusive license to use the titles, trademarks, trade mark rights, service marks and service mark rights in and to the motion pictures covered by the Sale of Assets Agreement | $0.00 |
| C-Life Group, Ltd.<br>1400 Broadway<br>Suite 700<br>New York, NY 10018<br>Attention: Hymie Shamah | Merchandising Licensing Agreement dated as of March 10, 2008 between HCP and C-Life Group, Ltd. | $0.00 |
| C-Life Group, Ltd.<br>1400 Broadway<br>Suite 700<br>New York, NY 10018<br>Attention: Hymie Shamah | Trademark Licensing Agreement dated as of July 10, 2008 between T Asset and C-Life Group, Ltd | $0.00 |
| Danilo Promotions Ltd.<br>3 The io Centre<br>Lea Road<br>Waltham Cross, Herts. EN8 7PG<br>United Kingdom<br>Attention: Mr. Trevor Jones | Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and Danilo Promotions Ltd. | $0.00 |
| Danilo Promotions Ltd.<br>3 The io Centre<br>Lea Road<br>Waltham Cross, Herts. EN8 7PG<br>United Kingdom<br>Attention: Mr. Trevor Jones | Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and Danilo Promotions Ltd. | $0.00 |
| DC Comics<br>1700 Broadway<br>New York, NY 10019<br>Attention: Jeff Trojan | Merchandising Licensing Agreement dated as of June 15, 2008 between HCP and DC Comics | $0.00 |
| DC Comics<br>1700 Broadway<br>New York, NY 10019<br>Attention: Jeff Trojan | Trademark Licensing Agreement dated as of June 15, 2008 between T Asset and DC Comics | $0.00 |
| Designworks Clothing Company Pty. Ltd.<br>8-14 Hall Street<br>Hawthorn East VIC 3123<br>Australia<br>Att: Victoria Treloar | Merchandising Licensing Agreement dated as of March 30, 2009 between HCP and Designworks Clothing Company Pty. Ltd. | $0.00 |
| Designworks Clothing Company Pty. Ltd.<br>8-14 Hall Street<br>Hawthorn East VIC 3123<br>Australia<br>Att: Victoria Treloar | Trademark Licensing Agreement dated as of March 30, 2009 between T Asset and Designworks Clothing Company Pty. Ltd. | $0.00 |
| DK/BradyGAMES, a division of Penguin Group (USA) Inc.<br>800 East 96th Street<br>Indianapolis, Indiana 46240<br>Attention: Mike Degler | Long Form Merchandise License Agreement dated as of March 20, 2009 between Halcyon Games, LLC, on the one hand, and DK/Brady Games, on the other hand, with respect to the production and exploitation of "Terminator: Salvation, the Game." | $0.00 |
| Doug Mark<br>Mark Music and Media Law, P.C.<br>1900 Avenue of the Stars<br>25th Floor<br>Los Angeles, CA 90067 | Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman | $0.00 |
| Dryen Australia pty. Ltd.<br>14 Fairchild Street<br>Heatherton VIC 3202<br>Australia<br>Att: Louise Lorkin | Merchandising Licensing Agreement dated as of January 19, 2009 between HCP and Dryen Australia Pty. Ltd. | $0.00 |
| Dryen Australia pty. Ltd.<br>14 Fairchild Street<br>Heatherton VIC 3202<br>Australia<br>Att: Louise Lorkin | Trademark Licensing Agreement dated as of January 19, 2009 between T Asset and Dryen Australia Pty. Ltd. | $0.00 |

**EXHIBIT B**

**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Entertainment In Motion Inc.<br>5455 Centinela Avenue, 2nd Floor<br>Los Angeles, CA 90066 | Non-Theatrical Distribution Agreement dated April 3, 2009 between T Salvation Distribution and Entertainment In Motion Inc. with respect to Airline Rights in South Korea and the Middle East | $0.00 |
| Fintage Collection Account Management B.V.<br>Terez Krt. 46, 3rd Floor<br>H-1066 Budapest<br>Hungary | Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 1, together with the Schedules to the Purchase Agreement | $0.00 |
| Fintage Magyar Kft.<br>Attn: Said Boudarga<br>Terez Krt. 46, 3rd Floor<br>H-1066 Budapest<br>Hungary | Master License Agreement dated as of December 3, 2007 between T Distribution BVI and Fintage Magyar Kft. ("Fintage Magyar") for the territory of  South Korea | $0.00 |
| Fintage Magyar Kft.<br>Attn: Said Boudarga<br>Terez Krt. 46, 3rd Floor<br>H-1066 Budapest<br>Hungary | Motion Picture Lease Agreement dated as of January 25, 2008 between Fintage Magyar, on the one hand, and Mars Entertainment Korea and Lotte Shopping Co., Ltd on the other hand for the territory of South Korea | $0.00 |
| Fireman's Fund Insurance Company<br>International Film Guarantors Inc<br>2828 Donald Douglas Loop N<br>2nd Flr<br>Santa Monica, CA 90405 | Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company | $0.00 |
| Fireman's Fund Insurance Company<br>International Film Guarantors Inc<br>2828 Donald Douglas Loop N<br>2nd Flr<br>Santa Monica, CA 90405 | Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 31 | $0.00 |
| Five Pennies, Inc.<br>c/o Endeavor<br>9701 Wilshire Boulevard, 10th Floor<br>Beverly Hills, CA 90212<br>Attn: Phillip Raskind | Agreement (draft with comments) dated as of October 19, 2007 between T Salvation Productions and Five Pennies, Inc. furnishing the directing services of Joseph McGinty Nichol (a/k/a McG) ("McG") | $0.00 |
| FunKo<br>18916 North Creek Pkwy.<br>Suite 103<br>Bothell, Washington 98011<br>Attention: Brian Moriotti | Merchandising Licensing Agreement dated as of September 3, 2008 between HCP and FunKo | $0.00 |
| FunKo<br>18916 North Creek Pkwy.<br>Suite 103<br>Bothell, Washington 98011<br>Attention: Brian Moriotti | Trademark Licensing Agreement dated as of September 3, 2008 between T Asset and FunKo | $0.00 |
| Gameloft S.A.<br>81 rue Reaumur<br>75002 Paris<br>France | License Agreement dated as of March 25, 2008 between Games and Gameloft S.A. with respect to video game for wireless devices | $0.00 |
| Gamesloft S.A.<br>14, rue Auber<br>75009 Paris<br>France<br>Attention:  Business & Legal Affairs | License Agreement dated as of March 25, 2008 between Games and Gameloft S.A. with respect to video game for wireless devices | $0.00 |
| GB Eye Ltd.<br>1 Russell Street<br>Kelham Island,<br>Sheffield S3 8RW<br>United Kingdom<br>Attention: Max Arguile | Trademark Licensing Agreement dated as of June 1, 2008 between T Asset and GB Eye Ltd. | $0.00 |
| GB Posters Limited<br>1 Russell Street<br>Kelham Island,<br>Sheffield S3 8RW<br>United Kingdom<br>Attention: Max Arguile | Merchandising Licensing Agreement dated as of June 1, 2008 between HCP and GB Posters Limited | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| GB Posters Limited<br>1 Russell Street<br>Kelham Island,<br>Sheffield S3 8RW<br>United Kingdom<br>Attention: Max Arguile | First Amendment to Merchandising Licensing Agreement dated as of November 1, 2008 between HCP and GB Posters Limited | $0.00 |
| Gendai Merchandise Inc.<br>1-14-6 Sponichi Ginza Bldg. 7F<br>Chuo-ku, Tokyo<br>Japan<br>Attention: Kenji Ishijima | Merchandising Licensing Agreement dated as of October 10, 2008 between HCP and Gendai Merchandise Inc. | $0.00 |
| Gendai Merchandise Inc.<br>1-14-6 Sponichi Ginza Bldg. 7F<br>Chuo-ku, Tokyo<br>Japan<br>Attention: Kenji Ishijima | Trademark Licensing Agreement dated as of October 10, 2008 between T Asset and Gendai Merchandise Inc. | $0.00 |
| Gendai Merchandise Inc.<br>1-14-6 Sponichi Ginza Bldg. 7F<br>Chuo-ku, Tokyo<br>Japan<br>Attention: Kenji Ishijima | First Amendment to Merchandising Licensing Agreement dated as of January 23, 2009 between HCP and Gendai Merchandise Inc. | $0.00 |
| Grin AB<br>Sveavagen 9, Hitech Building 22<br>SE-101 52 Stockholm, Sweden | Video Game Work for Hire Agreement between Games and Grin AB | $0.00 |
| Gulf Film LLC<br>Alkhabissi Road<br>Dubai<br>United Arab Emirates | Memorandum of Agreement dated December 5, 2007 between Batrax and Gulf Film LLC with respect to the territory described therein as the Middle East | $0.00 |
| H Grossman HK Ltd.<br>16F Kingsfield Centre<br>18 Shell Street<br>North Point, Hong Kong<br>Attention: Mr. Cam Chak | Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and H Grossman HK Ltd. | $0.00 |
| H Grossman HK Ltd.<br>16F Kingsfield Centre<br>18 Shell Street<br>North Point, Hong Kong<br>Attention: Mr. Cam Chak | Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and H Grossman HK Ltd. | $0.00 |
| Hollywood Collectibles<br>13500 Magnolia Park Court<br>Windermere, FL 34786<br>Attention: Mark Hilliard | Merchandising Licensing Agreement dated as of _____, 2008 between HCP and Hollywood Collectibles | $0.00 |
| Hollywood Collectibles<br>13500 Magnolia Park Court<br>Windermere, FL 34786<br>Attention: Mark Hilliard | Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and Hollywood Collectibles | $0.00 |
| Hot Toys Limited<br>20th Floor, Southtex Building<br>51 Tsun Yip Street<br>Kwun Tong, Kowloon, Hong Kong<br>Attention: Yuki Chan | Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Hot Toys Limited | $0.00 |
| Hot Toys Limited<br>20th Floor, Southtex Building<br>51 Tsun Yip Street<br>Kwun Tong, Kowloon, Hong Kong<br>Attention: Yuki Chan | Trademark Licensing Agreement dated as of June 15, 2008 between T Asset and Hot Toys Limited | $0.00 |
| Hunter Overseas Pty. Ltd.<br>Level 1, 225 Bay Street<br>Brighton VIC 3186<br>Australia<br>Att: Mark O'Brien | Merchandising Licensing Agreement dated as of January 19, 2008 between HCP and Hunter Overseas Pty. Ltd. | $0.00 |
| Hunter Overseas Pty. Ltd.<br>Level 1, 225 Bay Street<br>Brighton VIC 3186<br>Australia<br>Att: Mark O'Brien | Trademark Licensing Agreement dated as of January 19, 2008 between T Asset and Hunter Overseas Pty. Ltd. | $0.00 |
| Idea and Design Works, LLC<br>5080 Santa Fe St.<br>San Diego, CA 92109<br>Attention: Ted Adams | Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Idea and Design Works, LLC<br>5080 Santa Fe St.<br>San Diego, CA 92109<br>Attention: Ted Adams | Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC | $0.00 |
| Idea and Design Works, LLC<br>5080 Santa Fe St.<br>San Diego, CA 92109<br>Attention: Ted Adams | First Amendment to Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC. | $0.00 |
| Idea and Design Works, LLC<br>5080 Santa Fe St.<br>San Diego, CA 92109<br>Attention: Ted Adams | First Amendment to Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC | $0.00 |
| International Film Group Pty. Ltd.<br>6 Cubitt Street<br>Richmond VIC 3121<br>Australia<br>Att: Jennie Hughes / Sue Woollard | Merchandising Licensing Agreement dated as of March 30, 2009 between HCP and Designworks Clothing Company Pty. Ltd. | $0.00 |
| International Film Group Pty. Ltd.<br>6 Cubitt Street<br>Richmond VIC 3121<br>Australia<br>Att: Sue Woollard | Merchandising Licensing Agreement dated as of January 19, 2009 between HCP and Dryen Australia Pty. Ltd. | $0.00 |
| International Film Group Pty. Ltd.<br>6 Cubitt Street<br>Richmond VIC 3121<br>Australia<br>Att: Sue Woollard | Merchandising Licensing Agreement dated as of January 19, 2008 between HCP and Hunter Overseas Pty. Ltd. | $0.00 |
| International Film Group Pty. Ltd.<br>6 Cubitt Street<br>Richmond VIC 3121<br>Australia<br>Att: Sue Woollard | Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Licensing Essentials Pty. Ltd. | $0.00 |
| International Film Guarantors, LLC<br>2828 Donald Douglas Loop North<br>2nd Floor<br>Santa Monica, CA 90405 | Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company | $0.00 |
| International Film Guarantors, LLC<br>2828 Donald Douglas Loop North<br>2nd Floor<br>Santa Monica, CA 90405 | Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 31 | $0.00 |
| Iris Co., Ltd.<br>1-11-8 Hama-cho, Nihonbashi,<br>Chuo-ku<br>Japan<br>Attention: Ichiro Tsugawa | Merchandising Licensing Agreement dated as of January 25, 2008 between HCP and Iris Co., Ltd. | $0.00 |
| Iris Co., Ltd.<br>1-11-8 Hama-cho, Nihonbashi,<br>Chuo-ku<br>Japan<br>Attention: Ichiro Tsugawa | Trademark Licensing Agreement dated as of January 25, 2008 between T Asset and Iris Co., Ltd. | $0.00 |
| Kaye Scholer LLP<br>1999 Avenue of the Stars, Ste 1800<br>Los Angeles, CA 90067<br>Attn: Sheri Jeffrey, Esq. | Purchase Agreement ("Purchase Agreement") dated as of May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV T4 (collectively "Seller"), on the one hand, and T Asset on the other hand with respect to all of the Seller's right, title and interest in and to the Terminator Assets | $0.00 |
| Kaye Scholer LLP<br>1999 Avenue of the Stars, Ste 1800<br>Los Angeles, CA 90067<br>Attn: Sheri Jeffrey, Esq. | Amendment dated as of May __, 2007 to the Purchase Agreement, together with the Schedules to the Purchase Agreement | $0.00 |
| Kidz Entertainment/EEMC<br>Vesterbrogade 35, 2nd floor<br>1620 Copenhagen V<br>Denmark<br>Attention: Anna Lisa McBride, CEO | Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and Danilo Promotions Ltd. | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Kidz Entertainment/EEMC<br>Vesterbrogade 35, 2nd floor<br>1620 Copenhagen V<br>Denmark<br>Attention: Anna Lisa McBride, CEO | Merchandising Licensing Agreement dated as of September 1, 2008<br>between HCP and H Grossman HK Ltd. | $0.00 |
| Kidz Entertainment/EEMCA<br>Vesterbrogade 35, 2nd floor<br>1620 Copenhagen V<br>Denmark<br>Attention: Anna Lisa McBride, CEO | Merchandising Licensing Agreement dated as of June 1, 2008 between<br>HCP and GB Posters Limited | $0.00 |
| Kidz Entertainment/EEMCA/S<br>Vesterbrogade 35, 2nd floor<br>1620 Copenhagen V<br>Denmark<br>Attention: Anna Lisa McBride, CEO | Merchandising Licensing Agreement dated as of February 1, 2009 between<br>HCP and Art You Grew Up With Ltd | $0.00 |
| Kidz Entertainment/EEMCA/S<br>Vesterbrogade 35, 2nd floor<br>1620 Copenhagen V<br>Denmark<br>Attention: Anna Lisa McBride, CEO | Merchandising Licensing Agreement dated as of December 1, 2008<br>between HCP and Bladez Toys PLC | $0.00 |
| Licensing Essentials Pty. Ltd.<br>44 Sparks Avenue<br>Fairfield VIC 3067<br>Australia<br>Att: Scott Bingley | Merchandising Licensing Agreement dated as of January 28, 2008 between<br>HCP and Licensing Essentials Pty. Ltd. | $0.00 |
| Licensing Essentials Pty. Ltd.<br>44 Sparks Avenue<br>Fairfield VIC 3067<br>Australia<br>Att: Scott Bingley | Trademark Licensing Agreement dated as of January 28, 2008 between T<br>Asset and Licensing Essentials Pty. Ltd. | $0.00 |
| LIGHTEC Inc.<br>2-13-9 Asakusa-bashi, Taito-ku,<br>Tokyo, Japan<br>Attention: Ms. Miho Katoh | Merchandising Licensing Agreement dated as of October 28, 2008 between<br>HCP and Lightec Inc. | $0.00 |
| LIGHTEC Inc.<br>2-13-9 Asakusa-bashi, Taito-ku,<br>Tokyo, Japan<br>Attention: Ms. Miho Katoh | Trademark Licensing Agreement dated as of October 28, 2008 between T<br>Asset and Lightec Inc. | $0.00 |
| Lin Pictures, Inc.<br>c/o Myman Abell et al LLP<br>11601 Wilshire Blvd. #2200<br>Los Angeles, CA 90025-1758<br>Attn: David Fox | Executive Producer Agreement dated as of February 29, 2008 between T<br>Salvation Productions and Lin Pictures, Inc. furnishing the development and<br>executive producer services of Dan Lin | $0.00 |
| Loeb & Loeb<br>10100 Santa Monica Blvd., Ste 2200<br>Los Angeles, CA 90067<br>Attn: Craig Emanuel | Line Producer Agreement dated as of December 4, 2007 between T<br>Salvation Productions and Sashamax Films, Inc. furnishing the line<br>producer services of Jeffrey Silver | $0.00 |
| Lotte Shopping Co., Ltd.<br>1556-4, Seocho3-Dong, Seocho-Gu<br>Seoul, Korea | Motion Picture Lease Agreement dated as of January 25, 2008 between<br>Fintage Magyar, on the one hand, and Mars Entertainment Korea and Lotte<br>Shopping Co., Ltd on the other hand for the territory of South Korea | $0.00 |
| Mario Kassar Productions LP<br>Attn: Mario F. Kassar<br>Kaye Scholer LLP<br>1999 Avenue of the Stars, Ste 1800<br>Los Angeles, CA 90067<br>Attn: Sheri Jeffrey, Esq. | Purchase Agreement ("Purchase Agreement") dated as of May 12, 2007<br>between AGV, Mario Kassar Productions, LP, C-2 and AGV T4 (collectively<br>"Seller"), on the one hand, and T Asset on the other hand with respect to all<br>of the Seller's right, title and interest in and to the Terminator Assets | $0.00 |
| Mario Kassar Productions LP<br>Attn: Mario F. Kassar<br>Kaye Scholer LLP<br>1999 Avenue of the Stars, Ste 1800<br>Los Angeles, CA 90067<br>Attn: Sheri Jeffrey, Esq. | Amendment dated as of May __, 2007 to the Purchase Agreement,<br>together with the Schedules to the Purchase Agreement | $0.00 |

**EXHIBIT B**

**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Mars Entertainment Korea<br>4F, Byuckeun Bldg, B-2, Nonhyun-Dung, Kangham-Ku<br>Seoul, Korea<br>Attn: Michael Kim | Motion Picture Lease Agreement dated as of January 25, 2008 between Fintage Magyar, on the one hand, and Mars Entertainment Korea and Lotte Shopping Co., Ltd on the other hand for the territory of South Korea | $0.00 |
| Medicom Toy Corporation<br>3-22-5 Uchara Shibuya<br>Tokyo 151-0064<br>Attention: Jun Shigenobu | Merchandising Licensing Agreement dated as of April 30, 2008 between HCP and Medicom Toy Corporation. | $0.00 |
| Medicom Toy Corporation<br>Attn:  Tatsuhiko "Rhy" Akashi<br>3-22-5 Uehara Shibuya<br>Tokyo 151-0064 | Trademark Licensing Agreement dated as of June 27, 2008 between T Asset and Medicom Toy Corporation. | $0.00 |
| Metro-Goldwyn-Mayer Inc.<br>10250 Constellation Blvd<br>Los Angeles, CA 90017 | Settlement and First-Negotiation Agreement dated as of May 23, 2008 between T Asset, on the one hand, and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. on the other hand | $0.00 |
| Metro-Goldwyn-Mayer Inc.<br>10250 Constellation Blvd<br>Los Angeles, CA 90017 | First Amendment to Settlement and First-Negotiation Agreement, dated as of October 27, 2009, amending the document referred to in Item 41 | $0.00 |
| Metro-Goldwyn-Mayer Studios Inc.<br>10250 Constellation Blvd<br>Los Angeles, CA 90017 | Settlement and First-Negotiation Agreement dated as of May 23, 2008 between T Asset, on the one hand, and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. on the other hand | $0.00 |
| Metro-Goldwyn-Mayer Studios Inc.<br>10250 Constellation Blvd<br>Los Angeles, CA 90017 | First Amendment to Settlement and First-Negotiation Agreement, dated as of October 27, 2009, amending the document referred to in Item 41 | $0.00 |
| Mexican Crab Apples, Inc. f/s/o Sam Worthington<br>c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: Mark Von Arx | Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington | $0.00 |
| Moderati, a Bellrock Media Inc. company<br>795 Folsom Street<br>Suite 250<br>San Francisco, CA 94107<br>Attention:  Nick Patton | Merchandising Licensing Agreement dated as of December 2, 2008 between HCP and Moderati, a Bellrock Media Inc. company. | $0.00 |
| Moderati, a Bellrock Media Inc. company<br>795 Folsom Street<br>Suite 250<br>San Francisco, CA 94107<br>Attention:  Nick Patton | Trademark Licensing Agreement dated as of February 17, 2009 between T Asset and Moderati, a Bellrock Media Inc. company | $0.00 |
| Morte Surgical Instruments, Inc.<br>c/o Richard Kraft<br>Kraft-Engel Management<br>15233 Ventura Blvd.<br>Suite 200<br>Sherman Oaks, CA 91403 | Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman | $0.00 |
| Muckle Mannequins e.K.<br>Langlachweg 11<br>D-68229 Mannheim<br>Germany<br>Attention:  Mathias Muckle | Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Muckle Mannequins e.K. | $0.00 |
| Muckle Mannequins e.K.<br>Langlachweg 11<br>D-68229 Mannheim<br>Germany<br>Attention:  Mathias Muckle | Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Muckle Mannequins e.K. | $0.00 |
| New Era Cap Company Ltd<br>Building H3<br>Wescott Venture Park<br>Wescott, Aylesbury, Bucks<br>HP18 OXB United Kingdom<br>Attention:  Mr. Peter Lee | Merchandising Licensing Agreement dated as of August 1, 2008 between HCP and New Era Cap Company Ltd. | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| New Era Cap Company Ltd<br>Building H3<br>Wescott Venture Park<br>Wescott, Aylesbury, Bucks<br>HP18 OXB United Kingdom<br>Attention:  Mr. Peter Lee | Trademark Licensing Agreement dated as of August 1, 2008 between T Asset and New Era Cap Company Ltd. | $0.00 |
| Onda Entertainment, Inc.<br>25022 Malibu Road<br>Malibu, CA 90265<br>Attn: Moritz Borman | Agreement dated as of September 10, 2007 between T Salvation Productions and Onda Entertainment, Inc. furnishing the producing services of Moritz Borman | $0.00 |
| Pacificor, LLC<br>740 State Street, Suite 202<br>Santa Barbara, CA 93101<br>Attn: Michael Klein | Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 1, together with the Schedules to the Purchase Agreement | $0.00 |
| Paul Haggis, Inc.<br>c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: Steven Brookman | Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis | $0.00 |
| Paul Haggis, Inc.<br>c/o Creative Artists Agency<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: Steven Brookman | Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis | $0.00 |
| Peter D. Graves<br>7981 Woodrow Wilson Drive<br>Los Angeles, CA 90046 | Consulting/Executive Producer Agreement dated as of October __, 2007 between T Asset and Peter D Graves | $0.00 |
| Playground Maniacs, Inc.<br>12600 Stowe Dr., Suite 5<br>Poway, CA 92064<br>Attention:  Mike Simon | Merchandising Deal Memo dated August 28, 2008 between HCP and Playground Maniacs, Inc. | $0.00 |
| Playmate Toys Inc.<br>611 Anton Blvd., Suite 600<br>Costa Mesa, CA 92626<br>Attention:  Andre Lake Meyer | Merchandising Deal Memo dated February 13, 2008 between HCP and Playmate Toys Inc. | $0.00 |
| Playmate Toys Inc.<br>611 Anton Blvd., Suite 600<br>Costa Mesa, CA 92626<br>Attention:  Andre Lake Meyer | Short Form License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc. | $0.00 |
| Playmate Toys Inc.<br>611 Anton Blvd., Suite 600<br>Costa Mesa, CA 92626<br>Attention:  Andre Lake Meyer | Merchandising License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc. | $0.00 |
| Playmate Toys Inc.<br>611 Anton Blvd., Suite 600<br>Costa Mesa, CA 92626<br>Attention:  Andre Lake Meyer | Trademark License Agreement dated as of February 13, 2008 between T Asset and Playmate Toys Inc. | $0.00 |
| Playmate Toys Inc.<br>611 Anton Blvd., Suite 600<br>Costa Mesa, CA 92626<br>Attention:  Andre Lake Meyer | First Amendment to License Agreement dated as of June 22, 2009 between HCP and Playmate Toys Inc. | $0.00 |
| Promotional Partners Worldwide Inc.<br>2-3-1 Kajicho, Chiyoda-ku<br>Tokyo, Japan<br>Attention:  Mr. Nobuhiro Katoh | Merchandising License Agreement dated as of March 17, 2009 between HCP and Promotional Partners Worldwide Inc. | $0.00 |
| Promotional Partners Worldwide Inc.<br>2-3-1 Kajicho, Chiyoda-ku<br>Tokyo, Japan<br>Attention:  Mr. Nobuhiro  Katoh | Trademark License Agreement dated as of February 25, 2009 between T Asset and Promotional Partners Worldwide Inc. | $0.00 |
| Raffles, Inc.<br>2-11-1-301 Hirai, Edogawa-ku<br>Tokyo, Japan | Merchandising License Agreement dated as of December 16, 2008 between HCP and Raffles Inc. | $0.00 |
| Raffles, Inc.<br>2-11-1-301 Hirai, Edogawa-ku<br>Tokyo, Japan | Trademark License Agreement dated as of December 16, 2008 between T Asset and Raffles Inc. | $0.00 |
| Raw Thrills, Inc.<br>5441 Fargo Ave.<br>Skokie, IL 60077<br>Attention:  Eugene Jarvis | License Agreement dated as of April 30, 2008 between Games and Raw Thrills, Inc. with respect to arcade game | $0.00 |

EXHIBIT B
ASSIGNED CONTRACTS

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Raw Thrills, Inc.<br>5441 Fargo Ave.<br>Skokie, IL 60077<br>Attention: Eugene Jarvis | Trademark License Agreement dated as of April 30, 2008 between T Asset and Raw Thrills, Inc. | $0.00 |
| Ripple Junction Design Co., Inc.<br>11529 Goldcoast Drive<br>Cincinnati, OH 45249<br>Attention: Neil Hoynes | Merchandising License Agreement dated as of September 3, 2008 between HCP and Ripple Junction Design Co., Inc. | $0.00 |
| Ripple Junction Design Co., Inc.<br>11529 Goldcoast Drive<br>Cincinnati, OH 45249<br>Attention: Neil Hoynes | Trademark License Agreement dated as of September 3, 2008 between T Asset and Ripple Junction Design Co., Inc. | $0.00 |
| Rubie's Costume Co. Inc.<br>1770 Walt Whitman Rd.<br>Melville, NY 11747<br>Attention: Howard J. Beige | Merchandising License Agreement dated as of July 13, 2008 between HCP and Rubies Costume Co. Inc. | $0.00 |
| Rubie's Costume Co. Inc.<br>1770 Walt Whitman Rd.<br>Melville, NY 11747<br>Attention: Howard J. Beige | Trademark License Agreement dated as of July 13, 2008 between T Asset and Rubies Costume Co. Inc. | $0.00 |
| Sashamax Films, Inc.<br>c/o United Talent Agency<br>9560 Wilshire Blvd., Suite 500<br>Beverly Hills, CA 90212<br>Attn: Wayne Fitterman and Mike Rubi | Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver | $0.00 |
| Sideshow Collectibles<br>2630 Conejo Spectrum Street<br>Thousand Oaks, CA 91320<br>Attention: Brock Otterbacher | Merchandising License Agreement dated as of April 30, 2008 between HCP and Sideshow Collectibles. | $0.00 |
| Sideshow Collectibles<br>2630 Conejo Spectrum Street<br>Thousand Oaks, CA 91320<br>Attention: Brock Otterbacher | Trademark License Agreement dated as of April 30, 2008 between T Asset and Sideshow Collectibles. | $0.00 |
| Six Flags, Inc.<br>1540 Broadway,15th Floor<br>New York, NY 10036<br>Attention: Dan Weinberg | Theme Park License Agreement dated as of June 30, 2008 between HCP and Six Flags, Inc. | $0.00 |
| Six Flags, Inc.<br>1540 Broadway,15th Floor<br>New York, NY 10036<br>Attention: Dan Weinberg | Trademark License Agreement dated as of June 30, 2008 between T Asst and Six Flags, Inc. | $0.00 |
| Six Flags, Inc.<br>1540 Broadway,15th Floor<br>New York, NY 10036<br>Attention: General Counsel | Theme Park License Agreement dated as of June 30, 2008 between HCP and Six Flags, Inc. | $0.00 |
| Sony Pictures Home Entertainment, Inc.<br>Sony Pictures Plaza<br>10202 West Washington Blvd.<br>Culver City, CA 90232-3195<br>Attention: Alison Biggers | Merchandising Deal Memo Dated June 9, 2009 between HCP and Sony Pictures Home Eentertainment Inc. | $0.00 |
| Stillfront AB<br>Smedsgrand 2a<br>753 20 UPPSALA<br>Sweden<br>Attention: Marco Ahlgren | Letter of Intent, draft dated November 21, 2008, executed February, 2009 between Games and Stillfront AB with respect to the development and exploitation of an online T4 Fan Immersion Game | $0.00 |
| Striker Entertainment, LLC<br>22231 Mulholland Highway<br>Suite 212<br>Calabasas, CA 91302<br>Attention: Russell Binder | Merchandising Licensing Agreement dated as of March 10, 2008 between HCP and C-Life Group, Ltd. | $0.00 |
| Striker Entertainment, LLC<br>22231 Mulholland Highway<br>Suite 212<br>Calabasas, CA 91302<br>Attention: Russell Binder | Merchandising Licensing Agreement dated as of June 15, 2008 between HCP and DC Comics | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Striker Entertainment, LLC<br>22231 Mulholland Highway<br>Suite 212<br>Calabasas, CA 91302<br>Attention: Russell Binder | Merchandising Licensing Agreement dated as of September 3, 2008 between HCP and FunKo | $0.00 |
| Striker Entertainment, LLC<br>22231 Mulholland Highway<br>Suite 212<br>Calabasas, CA 91302<br>Attention: Russell Binder | Merchandising Licensing Agreement dated as of _____, 2008 between HCP and Hollywood Collectibles | $0.00 |
| Striker Entertainment, LLC<br>22231 Mulholland Highway<br>Suite 212<br>Calabasas, CA 91302<br>Attention: Russell Binder | Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Hot Toys Limited | $0.00 |
| Striker Entertainment, LLC<br>22231 Mulholland Highway<br>Suite 212<br>Calabasas, CA 91302<br>Attention: Russell Binder | Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC | $0.00 |
| Striker Entertainment, LLC<br>23371 Mulholland Highway<br>Suite 289<br>Calabasas, CA 91302<br>Attention: Russell Binder | Long Form Merchandise License Agreement dated as of March 20, 2009 between Halcyon Games, LLC, on the one hand, and DK/Brady Games, on the other hand, with respect to the production and exploitation of "Terminator: Salvation, the Game." | $0.00 |
| StudioCanal Image S.A.<br>c/o David Heroy, Esq.<br>Baker & McKenzie LLP<br>One Prudential Plaza, Suite 3500<br>Chicago, IL 60601 | Amendment to Trademark License Agreement dated as of April __, 2003 between StudioCanal Image S.A., ("StudioCanal") as successor in interest to Canal+, and AGV, pursuant to which StudioCanal granted AGV an exclusive license to use the marks Terminatrix, T-X and T3 | $0.00 |
| StudioCanal S.A.<br>c/o David Heroy, Esq.<br>Baker & McKenzie LLP<br>One Prudential Plaza, Suite 3500<br>Chicago, IL 60601 | Second Amendment to Trademark License Agreement dated as of July 22, 2008 between StudioCanal S.A., (as successor to StudioCanal Image S.A.) and T-Asset Acquisition Company, LLC, as successor to AGV's rights relating to the making of Remakes and Sequels to the films T1 and T2 | $0.00 |
| Sun R&P Co., Ltd.<br>13-9 Araki-cho,<br>Shinjuku-ku, Tokyo 160-0007 | Merchandising Licensing Agreement dated as of October 10, 2008 between HCP and Gendai Merchandise Inc. | $0.00 |
| Sun R&P Co., Ltd.<br>13-9 Araki-cho,<br>Shinjuku-ku, Tokyo 160-0007 | Merchandising Licensing Agreement dated as of January 25, 2008 between HCP and Iris Co., Ltd. | $0.00 |
| Sun R&P Co., Ltd.<br>13-9 Araki-cho,<br>Shinjuku-ku, Tokyo 160-0007 | Merchandising Licensing Agreement dated as of October 28, 2008 between HCP and Lightec Inc. | $0.00 |
| Targa Co., Ltd.<br>7-2-4 Musashi 7 Bldg. 3F, Ginza,<br>Chuo-Ku<br>Tokyo, Japan 104-0061 | Merchandising License Agreement dated as of December 3, 2008 between HCP and Targa Co., Ltd. | $0.00 |
| Targa Co., Ltd.<br>7-2-4 Musashi 7 Bldg. 3F, Ginza,<br>Chuo-Ku<br>Tokyo, Japan 104-0061 | Trademark License Agreement dated as of December 3, 2008 between T Asset and Targa Co., Ltd. | $0.00 |
| The Topps Company, Inc.<br>One Whitehall Street<br>New York, NY 10004-2109<br>Attention: Ira Friedman | Merchandising Deal Memo dated March 27, 2008 between The Halcyon Company and The Topps Company, Inc. | $0.00 |
| Three OZ. Co., Ltd.<br>1-11-11 1F Chuo, Matsumoto-shi<br>Nagano, Japan<br>Attention: Shintaro Ozawa | Merchandising License Agreement dated as of April 28, 2009 between HCP and Three OZ. Co., Ltd. | $0.00 |
| Three OZ. Co., Ltd.<br>1-11-11 1F Chuo, Matsumoto-shi<br>Nagano, Japan<br>Attention: Shintaro Ozawa | Trademark License Agreement dated as of April 28, 2009 between T Asset and Three OZ. Co., Ltd. | $0.00 |
| Titan Publishing Group Ltd.<br>144 Southwark St.<br>London SE1 0UP<br>Attention: C. Wild | Publishing Agreement dated April 1, 2008 between The Halcyon Company (executed by HCP) and Titan Publishing Group Ltd. | $0.00 |
| Titan Publishing Group Ltd.<br>144 Southwark St.<br>London SE1 0UP<br>Attention: C. Wild | Trademark License Agreement dated as of May 15, 2008 between T Asset and Titan Publishing Group Ltd. | $0.00 |

EXHIBIT B
ASSIGNED CONTRACTS

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Trends International, LLC<br>5188 West 74th Street<br>Indianapolis, IN 46268<br>Attention:  Kat Driscoll | Merchandising License Agreement dated as of April 1, 2008 between HCP and Trends International, LLC | $0.00 |
| Trends International, LLC<br>5188 West 74th Street<br>Indianapolis, IN 46268<br>Attention:  Kat Driscoll | Trademark License Agreement dated as of August 5, 2008 between T Asset and Trends International, LLC | $0.00 |
| Union Bank, N.A., formerly known as Union Bank of California, N.A.<br>Attn Alex Cho<br>1900 Avenue of the Stars<br>Suite 600<br>Los Angeles, CA 90067 | Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company | $0.00 |
| Union Bank, N.A., formerly known as Union Bank of California, N.A.<br>Attn Alex Cho<br>1900 Avenue of the Stars<br>Suite 600<br>Los Angeles, CA 90067 | Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 31 | $0.00 |
| Vibe Inc.<br>4-12-4 Shinagawa Seaside Park<br>Tower 19F<br>Higashi-shinagawa<br>Tokyo 140-0002 Japan<br>Attention:  Mai Ohira | Merchandising License Agreement dated as of February 25, 2009 between HCP and Vibe Inc. | $0.00 |
| Vibe Inc.<br>4-12-4 Shinagawa Seaside Park<br>Tower 19F<br>Higashi-shinagawa, Shinagawa-ku<br>Tokyo 140-0002 Japan<br>Attention:  Mai Ohira | Trademark License Agreement dated as of January 6, 2009 between T Asset and Vibe Inc. | $0.00 |
| Visions, Inc.<br>651 Tearaimizu-cho, Nakagyo-ku<br>Kyoto City 604-8152 Japan<br>Attention:  Naoko Yamashita | Merchandising License Agreement dated as of February 25, 2009 between HCP and Visions Inc. | $0.00 |
| Visions, Inc.<br>651 Tearaimizu-cho, Nakagyo-ku<br>Kyoto City 604-8152 Japan<br>Attention:  Naoko Yamashita | Trademark License Agreement dated as of July 22, 2008 between T Asset and Visions Inc. | $0.00 |
| Warner Bros. Home Entertainment, Inc.<br>4000 Warner Blvd.<br>Burbank, CA 91522 | Video Game Distribution Agreement dated as of May 18, 2008 between XIM, Inc. d/b/a Evolved Games, Inc. and Warner Bros. Home Entertainment, Inc. | $0.00 |
| Warner Bros. Pictures, a division of WB Studio Enterprises, Inc.<br>Theatrical Legal Department<br>David Sagal, Sr. Vice President and General Counsel<br>4000 Warner Boulevard<br>Burbank, CA 91522 | Agreement dated as of  March 17, 2009 between T Salvation Productions and T Salvation Distribution, on the one hand, and Warner Bros. on the other hand with respect to shortfall payments which may be made by Warner Bros. to Five Pennies, Inc. f/s/o McG. | $0.00 |
| Warner Bros. Pictures, a division of WB Studio Enterprises, Inc.<br>Theatrical Legal Department<br>David Sagal, Sr. Vice President and General Counsel<br>4000 Warner Boulevard<br>Burbank, CA 91522 | Amended and Restated Agreement dated as of May __, 2009 between T Salvation Productions and T Salvation Distribution, on the one hand, and Warner Bros. on the other hand with respect to certain shortfall payments which may be made by Warner Bros. to Aboriginal Merchants, Inc. f/s/o Bale. | $0.00 |
| Warner Bros. Pictures, a division of WB Studio Enterprises, Inc.<br>Theatrical Legal Department<br>David Sagal, Sr. Vice President and General Counsel<br>4000 Warner Boulevard<br>Burbank, CA 91522 | Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company | $0.00 |
| Warner Bros. Pictures, a division of WB Studio Enterprises, Inc.<br>Theatrical Legal Department<br>David Sagal, Sr. Vice President and General Counsel<br>4000 Warner Boulevard<br>Burbank, CA 91522 | Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 31 | $0.00 |

**EXHIBIT B**
**ASSIGNED CONTRACTS**

| PARTY | CONTRACT | CURE AMOUNT |
|---|---|---|
| Warner Bros. Pictures, a division of WB Studio Enterprises, Inc. Theatrical Legal Department David Sagal, Sr. Vice President and General Counsel 4000 Warner Boulevard Burbank, CA 91522 | Distribution Agreement dated as of November 10, 2007 with effect as of September 7, 2007 between T Salvation Distribution and Warner Bros. with respect to the Domestic Territory | $0.00 |
| Warner Specialty Video Productions, Inc. 4000 Warner Blvd. Burbank, CA 91522 Attention:  Business & Legal Affairs | Digital Distribution License Agreement dated as of March 30, 2009 between T Asset and Games, on the one hand, and Warner Specialty Video Productions Inc on the other hand with respect to the production and exploitation of a Machinima animated series based on the T4 Video Game | $0.00 |
| Weissmann Wolff Bergman et al LLP 9665 Wilshire Blvd. 9FL Beverly Hills, CA 90212 Attn: Peter Dekom, Esq. | Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis | $0.00 |
| Weissmann Wolff Bergman et al LLP 9665 Wilshire Blvd. 9FL Beverly Hills, CA 90212 Attn: Peter Dekom, Esq. | Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis | $0.00 |
| Worldwide SPE Acquisitions, Inc. Theatrical Legal Department Executive Vice President Legal Affairs 10202 West Washington Boulevard 2nd Floor Culver City, CA 90232 | Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company | $0.00 |
| Worldwide SPE Acquisitions, Inc. Theatrical Legal Department Executive Vice President Legal Affairs 10202 West Washington Boulevard 2nd Floor Culver City, CA 90232 | Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 31 | $0.00 |
| Worldwide SPE Acquisitions, Inc. Theatrical Legal Department Executive Vice President Legal Affairs 10202 West Washington Boulevard 2nd Floor Culver City, CA 90232 | Distribution Agreement dated as of February 13, 2008 between T Salvation Distribution and Worldwide SPE Acquisitions, Inc. ("Sony") for the world exclusive of the Domestic Territory, South Korea and the Middle East | $0.00 |
| XIM, Inc. d/b/a Evolved Games, Inc. 800 East Broward Blvd., Suite 700 Fort Lauderdale, FL 33301 Attention:  Reto Bodmer | Video Game Distribution Agreement dated as of May 18, 2008 between XIM, Inc. d/b/a Evolved Games, Inc. and Warner Bros. Home Entertainment, Inc. | $0.00 |

# EXHIBIT C

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

9              UNITED STATES BANKRUPTCY COURT

              CENTRAL DISTRICT OF CALIFORNIA
10
                  LOS ANGELES DIVISION
11

| In re: | Case No.: 2:09-31853-ER |
|---|---|
| T ASSET ACQUISITION COMPANY, LLC, a Delaware limited liability company; HALCYON HOLDING GROUP, LLC, dba THE HALCYON COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited liability company, | Chapter 11 |
| | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |
| | **ORDER AUTHORIZING AND APPROVING SALE OF DEBTORS' ASSETS RELATING TO THE *TERMINATOR* MOTION PICTURE FRANCHISE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE** |
| Debtors. | |
| **Check One or More as Appropriate:** | Date:      January 27, 2010 |
| Affects All Debtors:  ☒ | Time:      10:00 a.m. |
| Affects T Asset Acquisition Company, LLC only:  ☐ | Location:  Courtroom 1568 |
| Affects Halcyon Holding Group, LLC only:  ☐ | 255 East Temple St. |
| Affects Dominion Group LLC only:  ☐ | Los Angeles, California |

    The Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets

Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims,

Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the

"Sale Motion"), filed by the above-captioned debtors (the "Debtors"), came on for hearing before the

Honorable Ernest M. Robles, United States Bankruptcy Judge, on January 27, 2010, at 10:00 a.m. (the "Hearing").  Appearances were made as reflected in the Bankruptcy Court's record.  Capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion, unless otherwise defined.

On December 18, 2009, the Debtors filed and served their motion for approval of sale procedures and related relief (the "Sale Procedures Motion").  The Sale Procedures Motion was granted by an Order entered on January __, 2010 (the "Sale Procedures Order").

As approved by the Sale Procedures Order, on December 18, 2009, the Debtors filed and served the Sale Motion and the separate (i) Notice of Hearing on Motion of Debtors for Order Authorizing and Approving Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise Free and Clear of All Liens, Claims, Encumbrances and Other Interests pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Sale Notice"), (ii) Notice of Deadline to (1) Object to the Assumption and Assignment of Executory Contracts in Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) File Claims for Amount Due to Cure Defaults Under Executory Contracts to be Assumed and Assigned in Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Assigned Contract Notice"), and (iii) Notice of Proposed Treatment of Participations and Attachment Rights in Connection with Sale of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Participations and Attachments Notice").

After consideration of the Sale Motion and accompanying supporting papers, the arguments of counsel, the files and records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT**:

A.    The Debtors are authorized to sell, assign and transfer the Assets to _____ ("Buyer") for the purchase price of $_____ pursuant to and in accordance with the asset purchase agreement submitted by Buyer (the "APA"), and when the sale, assignment and transfer is effective, the Debtors shall be deemed to have sold, assigned and transferred all of the Debtors' rights, title and interest in and to the Assets to Buyer.  The Debtors are authorized to execute all documents

EXHIBIT C
Page 96

and instruments and to take all actions necessary to effectuate the APA without further Order of the Court.

B.     The sale, assignment and transfer of the Assets to Buyer shall be free and clear of all Liens, except that the Lien held by the Screen Actors Guild shall continue as provided for in the APA, and that prospective Guild residuals in all motion pictures subject to the APA shall be paid as set forth in the APA or applicable supplemental documentation.

C.     All Liens shall attach to the proceeds of the sale with the same priority, validity and enforceability, if any, as they had had against the Assets, which proceeds shall be held by the Debtors in a segregated account pending further Order of the Bankruptcy Court and subject to all defenses, objections, claims, counterclaims and rights of setoff and recoupment.

D.     The Debtors are hereby authorized to assume and assign, and the Debtors shall be deemed to have assumed and assigned, the Assigned Contracts to Buyer, effective as of the Closing of the sale.   There are no unpaid amounts or other obligations that must be paid or performed as a condition to such assumption and assignment, and the Debtors are relieved from any liability for any breach of any of the Assigned Contracts occurring after the Closing pursuant to section 365(k) of the Bankruptcy Code.

E.     The Debtors' treatment of the Participations and Attachment Rights agreements described in the Sale Motion is authorized and approved.

F.     The Buyer acted in good faith in purchasing the Assets within the meaning of section 363(m) of the Bankruptcy Code.

G.     The Court hereby retains jurisdiction to (i) enforce and implement the terms and provisions of the APA and any supplemental documents or agreements executed in connection therewith, (ii) compel delivery and payment of the consideration provided for under the APA, (iii) resolve any disputes, controversies, or claims arising out of or relating to the APA, and (iv) interpret, implement and enforce the provisions of this Order.

H.     This Order shall be effective immediately.

Dated:     _____
           UNITED STATES BANKRUPTCY JUDGE

| In re:  T Asset Acquisition Company, LLC, | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER  2:09-bk-31853-ER |
| | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**10100 Santa Monica Boulevard, Suite 1450, Los Angeles, CA  90067.**

The foregoing document described **NOTICE OF MOTION AND MOTION OF DEBTORS FOR ORDER AUTHORIZING AND APPROVING SALE OF DEBTORS' ASSETS RELATING TO THE *TERMINATOR* MOTION PICTURE FRANCHISE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE; MEMORANDUM OF POINTS AND AUTHORITIES**, will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 18, 2009,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

David E Ahdoot      dahdoot@bushgottlieb.com, tjimines@bushgottlieb.com
Korin A Avelino      kelliott@ktbslaw.com
Austin K Barron      abarron@buchalter.com, IFS_filing@buchalter.com;salarcon@buchalter.com
Sandor T Boxer      tedb@tedboxer.com
Martin J Brill      mjb@lnbrb.com
Alberto J Campain      acampain@blutlaw.com
Marc S Cohen      mcohen@kayescholer.com
Ashleigh A Danker      adanker@kayescholer.com
G Larry Engel      lengel@mofo.com
Wayne S Flick      wayne.s.flick@lw.com, colleen.rico@lw.com
Scott F Gautier      sgautier@pwkllp.com
Julian I Gurule      jgurule@pwkllp.com
Brian T Harvey      bharvey@buchalter.com, IFS_filing@buchalter.com
Louis E Kempinsky      lkempinsky@pwkllp.com
Joseph A Kohanski      jkohanski@bushquinonez.com
Dare Law      dare.law@usdoj.gov
David W Levene      dwl@lnbrb.com
Richard Levy      rlevy@pryorcashman.com
Monserrat Morales      mmorales@pwkllp.com
Juliet Y Oh      jyo@lnbrb.com, jyo@lnbrb.com
Kimberly A Posin      kim.posin@lw.com
Adam M Starr      starra@gtlaw.com
United States Trustee (LA)      ustpregion16.la.ecf@usdoj.gov
Jason Wallach      jwallach@gladstonemichel.com
Pamela Kohlman Webster      pwebster@buchalter.com
Howard J Weg      hweg@pwkllp.com

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

| In re:  T Asset Acquisition Company, LLC, | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER  2:09-bk-31853-ER |
| | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **December 18, 2009**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**Served by U.S. Mail**
Honorable Ernest M. Robles
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

☐  Service information continued on attached page

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed*

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 18, 2009 | Grazel Garcia | /s/ Grazel Garcia |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**