1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  Monsi Morales (State Bar No. 235520)
   *mmorales@pwkllp.com*
4  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
5  Los Angeles, CA  90067
   Telephone: (310) 552-3100
6  Facsimile:  (310) 552-3101

7  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
8  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

9

10                  **UNITED STATES BANKRUPTCY COURT**

11                  **CENTRAL DISTRICT OF CALIFORNIA**

                    **LOS ANGELES DIVISION**

12  In re:                                  | Case No.: 2:09-31853-ER

13  T ASSET ACQUISITION COMPANY, LLC, a     | Chapter 11
    Delaware limited liability company; HALCYON
14  HOLDING GROUP, LLC, dba THE HALCYON     | (Jointly Administered with Case Nos.:
    COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER)
15  and DOMINION GROUP LLC, a California limited
    liability company,                      | **SUPPLEMENT TO MOTION OF DEBTORS**
16                                          | **FOR ORDER ESTABLISHING SALE**
                                            | **PROCEDURES FOR SALE OF CERTAIN**
17                             Debtors.     | **OF THE DEBTORS' ASSETS RELATING**
                                            | **TO THE *TERMINATOR* MOTION**
18                                          | **PICTURE FRANCHISE FREE AND CLEAR**
                                            | **OF ALL LIENS, CLAIMS,**
19                                          | **ENCUMBRANCES AND OTHER**
                                            | **INTERESTS PURSUANT TO SECTIONS**
20                                          | **363 AND 365 OF THE BANKRUPTCY**
                                            | **CODE; DECLARATION OF MONSI**
21                                          | **MORALES**

22  **Check One or More as Appropriate:**   |          Hearing:

23  Affects All Debtors:                ☒   | Date:      January 20, 2010
    Affects T Asset Acquisition Company, LLC only: ☐ | Time:      10:00 a.m.
24  Affects Halcyon Holding Group, LLC only:  ☐ | Location:  Courtroom 1568
    Affects Dominion Group LLC only:    ☐   |            255 East Temple St.
                                            |            Los Angeles, California
25

26  **TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE,**

27  **THE UNITED STATES TRUSTEE, COUNSEL FOR THE OFFICIAL COMMITTEE OF**

28  **UNSECURED CREDITORS AND OTHER PARTIES IN INTEREST:**

## THE DEBTORS HAVE ACCEPTED A STALKING
## HORSE BID FROM LIONS GATE FILMS, INC.

On December 18, 2009, the above-captioned debtors (the "Debtors") filed and served their motion for an Order establishing sale procedures for the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") free and clear of all liens, claims, encumbrances and other interests of any nature pursuant to sections 363 and 365 of the Bankruptcy Code (the "Sale Procedures Motion"). The initial hearing on the Sale Procedures Motion was held on January 6, 2010, at 10:00 a.m. (the "Initial Hearing"). At the Initial Hearing, the Debtors informed the Court and interested parties that they were in the final stages of a negotiation to enter into a stalking horse sale agreement. For this reason, among others, the Court granted a continuance of the hearing on the Sale Procedures Motion to January 20, 2010 at 10:00 a.m.

As set forth in the Sale Procedures Motion, as of December 18, 2009, the Debtors had not yet received and finalized an acceptable stalking horse bid, but the Debtors anticipated that a stalking horse bid would be finalized and accepted shortly. In the weeks after December 18, 2009, the Debtors worked with several potential bidders to finalize a stalking horse bid. On January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an asset purchase agreement (the "Lions Gate APA") with Lions Gate Films, Inc. ("Lions Gate"). A true and correct copy of the Lions Gate APA is attached as Exhibit A to the Declaration of Monsi Morales (the "Morales Declaration"). The material terms of the Lions Gate APA are described below[1]:

1.    Lions Gate will acquire certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivate rights related to sequel and remakes, and other assets, all as further specified in the Lions Gate APA (collectively, the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown. Lions Gate will not be

---

[1] The following is a summary of the material terms of the Lions Gate APA, and in the event any language provided herein is inconsistent with the Lions Gate APA, the Lions Gate APA shall control. Parties in interest are advised to read the Lions Gate APA, attached to the Morales Declaration as Exhibit A, in its entirety.

acquiring the Debtors' rights in the existing *Terminator* motion pictures, including payment streams related to *Terminator: Salvation* and *The Sarah Connor Chronicles*.

2.  As consideration for the assets, Lions Gate will be paying (1) $15 million cash, plus (2) contingent compensation, as set forth in Schedule 1.7(a) of the Lions Gate APA, with respect to each theatrical motion picture that is a sequel, if any, plus (3) the assumption of certain liabilities.

3.  The Debtors will be required to reject substantially all existing executory contracts and license agreements (including intellectual property license agreements) that include rights related to sequels and remakes, to the extent such contracts and agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code.  This includes certain agreements that provide for rights of negotiation and/or rights of first refusal with respect to sequels and remakes.  The non-Debtor licensees under rejected licenses of intellectual property (as defined in section 101(35A) of the Bankruptcy Code) will be required to make the election set forth in section 365(n)(1) of the Bankruptcy Code, in writing, in order to treat their contracts as terminated. Failure to elect to terminate such a license will be deemed to constitute the election by the licensee to retain its rights under the license as those rights existed as of the commencement of the respective Debtor's bankruptcy case.

4.  All existing agreements that provide for participations and/or attachment rights in sequels and remakes are treated as pre-petition claims and, to the extent they are executory contracts within the meaning of section 365 of the Bankruptcy Code, the Debtors are required to reject them.  The non-Debtor parties will have the right to submit claims, if any, against the Debtors, which claims shall be treated as pre-petition claims against the Debtors' chapter 11 estates, but will have no rights against Lions Gate regarding any sequels or remakes.

5.      Among other conditions precedent to the obligation of Lions Gate to close the transaction, (a) Lions Gate shall have until February 4, 2010, to complete its due diligence, and (b) the Debtors are obligated to resolve, to the satisfaction of Lions Gate, certain existing issues between the Debtors and StudioCanal S.A. concerning trademark and licensing rights.

6.      If Lions Gate is not the successful bidder at an auction scheduled for February 8, 2010, Lions Gate shall receive a break-up fee in the amount of $750,000 (the "Break Up Fee").

The Lions Gate APA requires (1) a modification of certain of the sale procedures requested in the Sale Procedures Motion, (2) a modification of the sale notices filed and served by the Debtors on December 18, 2009, and (3) service of a notice of rejected contracts on certain entities.  The modified bidding procedures are set forth on Exhibit 1 attached hereto.  Attached as exhibits to the Morales Declaration are the following documents:

Exhibit B:      Amended Bidding Procedures Order

Exhibit C:      Amended Sale Notice

Exhibit D:      Amended Order Approving Sale of Assets

Exhibit E:      Amended Cure Notice (as revised, the "Assumed Contracts Notice")

Exhibit F:      Rejected Contracts Notice

Exhibit G:      Amended Participations and Attachments Notice

Exhibit H:      Form of Notice of Sale Hearing to be published

Exhibit I:      Redline of Bidding Procedures Order showing differences from version attached as an exhibit to the Sale Procedures Motion

Exhibit J:      Redline of Sale Notice showing differences from version filed and served on December 18, 2009

Exhibit K:      Redline of Order Approving Sale of Assets showing differences from version attached as an exhibit to the Sale Motion filed and served on December 18, 2009

Exhibit L:              Redline of Cure Notice showing differences from version filed and
served on December 18, 2009

Exhibit M:              Redline of Participations and Attachments Rights Notice showing
differences from version filed and served on December 18, 2009

**WHEREFORE**, the Debtors request that the Bankruptcy Court enter an Order, substantially in the form attached as Exhibit B:

A.      Approving the Sale Procedures as set forth on Exhibit 1 to this Supplement;

B.      Approving the form of  Sale Notice attached as Exhibit C to the Morales Declaration;

C.      Approving the form of Assumed Contracts Notice and the deadline for Cure Claims under the Assumed Contracts attached as Exhibit E to the Morales Declaration;

D.      Approving the form of Rejected Contracts Notice attached as Exhibit F to the Morales Declaration;

E.      Approving the form of Participations and Attachments Notice attached as Exhibit G to the Morales Declaration;

F.      Authorizing the Debtors to pay to Lions Gate the Break-Up Fee in the amount of $750,000 if Lions Gate is not the successful bidder at the Auction; and

G.      Granting such other and further relief as may be appropriate under the circumstances.


Dated: January 8, 2010                    PEITZMAN, WEG & KEMPINSKY LLP



By:___/s/ Monsi Morales_____
Howard J. Weg
Monsi Morales
Counsel for the Debtors

EXHIBIT 1

# EXHIBIT 1

## Overbid Procedures

A.     Qualified Overbids.  The Debtors shall consider qualified overbids ("Qualified Overbids) for the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets"), but shall not consider proposed overbids that are not Qualified Overbids.  In order for a proposed overbid to be deemed a Qualified Overbid, a proposed overbid must meet each of the criteria set forth in the following subparagraphs 1 through 6:

1.     Deadline for Receipt of Overbids.  All of the documents and information required to be submitted pursuant to subparagraphs 2 through 6 below must be received by (a) the Debtors, (b) the Debtors' bankruptcy counsel, Howard J. Weg of Peitzman, Weg & Kempinsky LLP, (c) the Debtors' financial advisor, Kevin Shultz of FTI Capital Advisors, LLC, and (d) counsel for Buyer, no later than 5:00 p.m., Pacific Time, on February 4, 2010 (the "Overbid Deadline").  Unless a bid containing all of the required documents and information is submitted by the Overbid Deadline, it will not constitute a Qualified Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

2.     Initial Overbid Amount.  In order to be a Qualified Overbid, the overbid must be for a price, payable at the closing by bank cashier's check or wire transfer of immediately available funds, in an amount not less than the sum of (i) the Cash Payment, *plus* (ii) the Contingent Compensation (as defined and upon terms equal to or better than the terms set forth in the Asset Purchase Agreement (the "Lions Gate APA"), dated January 7, 2010, between the Debtors and Lions Gate Films, Inc. ("Lions Gate")), *plus* (iii) the Break-Up Fee described in Paragraph F below, *plus* (iii) Five Hundred Thousand Dollars ($500,000).  Any holder of an allowed claim that is authorized to credit bid under section 363(k) of the Bankruptcy Code must agree to pay *in cash* a minimum amount equal to (i) the Break-Up Fee described in Paragraph F below, *plus* (ii) Five Hundred Thousand Dollars ($500,000).

3.     Form and Content of Overbid.  In order to be a Qualified Overbid, any overbid must include an executed asset purchase agreement in form and substance the same as the Lions Gate APA (other than the identity of the Buyer and the amount of the bidder's price, which must satisfy the

conditions of paragraph 2 above), together with a redline comparison of the overbidder's asset purchase agreement showing the differences from the Lions Gate APA. Without limiting the foregoing, the overbid may not include any representations, warranties or conditions to closing (including due diligence or financing contingencies) other than those set forth in the Lions Gate APA (unless they have been previously waived by Buyer). If any Qualified Overbid is conditioned upon the assumption and assignment, or rejection, of any executory contracts or leases, the overbidder must identify such contracts or leases. For executory contracts or leases to be assumed and assigned, the overbidder must provide written evidence, satisfactory to the Debtors, of the overbidder's ability to provide adequate assurance of future performance of such assumed contracts or leases.

4.    Offers Irrevocable. In order to be a Qualified Overbid, any overbid must contain a letter from the overbidder stating that the overbid will remain open and irrevocable until sixty (60) days after the date of entry of an order by the Court approving the sale of the Assets (a "Sale Approval Order") has been entered by the Clerk of the Court.

5.    Deposits. In order to be a Qualified Overbid, any overbid must be accompanied by a deposit (the "Deposit") in the form of a bank cashier's check or wire transfer of immediately available funds to the Debtors in the amount of $750,000. The Debtors shall hold each Deposit in a segregated interest-bearing account, subject to Court order, to defray all costs, expenses and damages arising as a result of the failure of any winning overbidder to close for any reason other than the default of the Debtors. The Debtors shall return a Deposit to an overbidder as soon as practicable after the earlier to occur of: (i) the Debtors' delivery of written notice to an overbidder that its overbid is not a Qualified Overbid; or (ii) entry of a Sale Approval Order providing for the sale of the Assets to an entity other than the overbidder. Interest and investment income accrued or earned on the Deposit shall follow the principal. Interest that accrues or that is earned on the successful bidder's Deposit (including Lions Gate's Deposit if Lions Gate is the successful bidder) shall be credited toward the Purchase Price. If the successful bidder fails to consummate the sale because of a breach or failure to perform on the part of such successful bidder, the Deposit (plus interest and investment income accrued or earned thereon) will be forfeited to the Debtors, who will have no obligation to return such amount to the successful bidder, without prejudice to the Debtors' other rights, claims or remedies

against the defaulting successful bidder.

6.    Ability of Bidder to Consummate Transaction.  In order to be a Qualified Overbid, the overbidder must include written financial evidence, satisfactory to the Debtors, demonstrating that the overbidder has the ability to consummate the transactions contemplated by the Lions Gate APA.  Such financial evidence may include, among other things, background reports and/or references, financing commitments, financial statements, income statements, tax returns, balance sheets, annual reports and bank statements.

B.    Qualification and Disqualification of Overbids.  No later than 5:00 p.m., California time, on February 5, 2010 (the "Determination Deadline"), the Debtors shall determine whether any overbids timely submitted are Qualified Overbids and shall inform each overbidder whether it has submitted a Qualified Overbid or whether its overbid has been rejected as unqualified.  The Debtors also shall notify Lions Gate at that time whether any Qualified Overbid was received and, if so, the identity of each qualified overbidder and the terms of its overbid.  The Debtors shall have the right to permit a bidder that submitted a bid prior to the Bid Deadline that was not a Qualified Bid to modify the bid so that the bid will be deemed a Qualified Bid, except that the Debtors may not change: (i) the amount or form of the initial overbid required under Paragraph A(2) above, (ii) the amount or form of the Deposit required under Paragraph A(5) above, or (iii) the irrevocability of a bid required under Paragraph A(4) above.

C.    Bankruptcy Court Resolution of Disputes.  Any disputes concerning whether an overbidder submitted a Qualified Overbid shall be resolved by the Bankruptcy Court at the hearing to approve the sale of the Assets, which is scheduled for February 10, 2010 at 10:00 a.m. (the "Sale Hearing").

D.    Result If No Qualified Overbids.  If the Debtors determine by the Determination Deadline that there are no Qualified Overbids, the Debtors shall move the Court at the Sale Hearing for authority to sell the Granted Terminator Assets to Lions Gate pursuant to the terms of the Lions Gate APA.

E.    Auction To Be Held If A Qualified Overbid Is Timely Submitted.  If the Debtors determine by the Determination Deadline that at least one Qualified Overbid was submitted, the

Debtors shall hold an auction (the "Auction") as follows:

1.      The Auction shall take place on February 8, 2010 at 10:00 a.m. at the offices of FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until concluded by the Debtors.

2.      Only Lions Gate and entities that submitted Qualified Overbids may participate in the Auction.  The Debtors will not be required to entertain any bids submitted at the Auction by any entities other than Lions Gate and those entities that submitted Qualified Overbids.

3.      The Debtors may continue the Auction to a later date without further notice other than an announcement at the Auction and the service and filing of written notice in the docket of this case.

4.      At the commencement of the Auction, the Debtors shall announce which of the initial Qualifying Overbids is, in their determination, the highest and best offer.  In making this determination, the Debtors shall have the right to consider, among other things: (a) the number, type and nature of any changes to the Lions Gate APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the acquired Assets to such bidder and the cost to the Debtors of such modifications or delay; (c) the likelihood of the bidder's ability to close the transaction and the timing thereof, and (d) the net benefit to the Debtors' estates, taking into account Lions Gate's right to receive the Break-Up Fee described herein.

5.      At the Auction, after the announcement of the initial Qualifying Overbid, any further overbids must be in increments of not less than $1,000,000 in cash.

6.      At the conclusion of the Auction, the Debtors shall announce which of the bids is, in their determination, the highest and best offer, and that bid will be presented to the Court for approval at the Sale Hearing.

7.      All unsuccessful final bids at the Auction shall be treated as binding back-up bids and, in the event that the successful bidder fails to close, the Debtors shall have the right to select one of the unsuccessful final bids as the replacement successful bid; *provided, however*, the right of the Debtors to select an unsuccessful final bid as the replacement successful bid shall expire sixty (60) days after the date of entry of the Sale Approval Order.

F.    <u>Break-Up Fee</u>.  In the event that Lions Gate is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Lions Gate shall be paid a break-up fee in the amount of Seven Hundred Fifty Thousand Dollars ($750,000) which represents five percent (5%) of the Cash Payment that would have been due from Lions Gate at closing under the Lions Gate APA if Lions Gate had been the successful bidder (the "Break-Up Fee").  The Break-Up Fee shall be paid to Lions Gate from the proceeds of the sale, by bank cashier's check or wire transfer in the full amount of the Break-Up Fee without any deduction or offset of any nature, immediately upon the occurrence of the closing of the sale.

## DECLARATION OF MONSI MORALES

I, Monsi Morales, declare as follows:

1.     I am an associate with the law firm of Peitzman, Weg & Kempinsky LLP, bankruptcy counsel for the above-captioned Debtors.  I am admitted to practice law before all the courts of the State of California and the Bankruptcy Court.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would competently testify thereto.

2.     I submit this Declaration in support of the Supplement To Motion Of Debtors For Order Establishing Sale Procedures For Sale Of Certain Of The Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Supplement").  Any capitalized terms used herein and not defined shall have the same meaning ascribed to them in the Supplement.

3.     On December 18, 2009, the Debtors filed and served their motion for an Order establishing sale procedures for the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") free and clear of all liens, claims, encumbrances and other interests of any nature pursuant to sections 363 and 365 of the Bankruptcy Code (the "Sale Procedures Motion").

4.     The initial hearing on the Sale Procedures Motion was held on January 6, 2010, at 10:00 a.m. (the "Initial Hearing").  At the Initial Hearing, the Debtors informed the Court and interested parties that they were in the final stages of a negotiation to enter into a stalking horse agreement.  For this reason, among others, the Court granted a continuance of the hearing on the Sale Procedures Motion to January 20, 2010 at 10:00 a.m.

5.     As set forth in the Sale Procedures Motion, as of December 18, 2009, the Debtors had not yet received and finalized an acceptable stalking horse bid, but the Debtors anticipated that a stalking horse bid would be finalized and accepted shortly.  In the weeks after December 18, 2009, the Debtors, by and through their professionals, worked with several potential bidders to finalize a stalking horse bid.

6.     On January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an asset purchase agreement (the "Lions Gate APA") with Lions Gate Films, Inc. ("Lions Gate").

7.    Attached hereto as Exhibit A is a true and correct copy of the Lions Gate APA.

8.    Attached hereto as Exhibit B is the Amended Bidding Procedures Order.

9.    Attached hereto as Exhibit C is the Amended Sale Notice.

10.    Attached hereto as Exhibit D is the Amended Order Approving Sale of Assets.

11.    Attached hereto as Exhibit E is the Assumed Contracts Notice.

12.    Attached hereto as Exhibit F is the Rejected Contracts Notice.

13.    Attached hereto as Exhibit G is the Amended Participations and Attachments Notice.

14.    Attached hereto as Exhibit H is the Form of Notice of the Sale Hearing to be published.

15.    Attached hereto as Exhibit I is a redline draft of the Bidding Procedures Order showing differences from version attached as an exhibit to the Sale Procedures Motion.

16.    Attached hereto as Exhibit J is a redline draft of the Sale Notice showing differences from version filed and served on December 18, 2009.

17.    Attached hereto as Exhibit K is a redline draft of the Order Approving Sale of Assets showing differences from version attached as an exhibit to the Sale Motion filed and served on December 18, 2009.

18.    Attached hereto as Exhibit L is a redline draft of Assumed Contracts Notice showing differences from the Cure Notice filed and served on December 18, 2009.

19.    Attached hereto as Exhibit M is a redline draft of the Participations and Attachments Rights Notice showing differences from version filed and served on December 18, 2009.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information and belief.

Executed this 8th day of January, 2010 at Los Angeles, California.

_____/s/ Monsi Morales_____

Monsi Morales

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered into this 7th day of January, 2010 ("Agreement Date"), by and between Halcyon Holding Group, LLC d/b/a The Halcyon Company, a Delaware limited liability company ("Halcyon"), T Asset Acquisition Company LLC, a California limited liability company ("T Asset"), Dominion Group, LLC d/b/a or a/k/a Dominion LLC, a California limited liability company ("Dominion"), and all of Halcyon's Affiliates with any right, title or interest in or to any of the rights, property or assets that are the subject matter hereof including T Asset International (BVI) Ltd. ("T Asset International"), T Salvation Distribution, LLC ("T Distribution"), T Salvation Distribution (BVI) Ltd. ("T Distribution International"), T Salvation Productions, LLC ("T Productions"), Halcyon Consumer Products, LLC ("HCP"), Halcyon Games, LLC ("Games"), Halcyon International (BVI) Ltd. ("Halcyon International"), and Halcyon Music Publishing, LLC d/b/a Halcyon Worldwide Music Publishing ("Halcyon Music"), each as a debtor and debtor in possession (collectively the "Halcyon Parties") (each of the Halcyon Parties is individually and collectively referred to as "Seller" or "Debtor")), and Lions Gate Films Inc., a Delaware corporation and all of its Affiliates (collectively, "Buyer").

Unless otherwise defined below: (1) capitalized terms have the meanings given in Exhibit A; and (2) the definitions of terms defined in Sections 101 of Title 11, United States Code (the "Bankruptcy Code"), apply to those terms as and when used in this Agreement. All Schedules to this Agreement that are not available as of the date of execution of this Agreement shall be completed prior to the date of the Closing ("Closing Date") and must be agreed to by Seller and Buyer before they are incorporated into this Agreement, with such agreement being a condition to the Closing.

## RECITALS

A.      On August 17, 2009 (the "Petition Date"), Halcyon, T Asset, and Dominion (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). On August 27, 2009, the Bankruptcy Court ordered the joint procedural administration of the Debtors' cases under Case No. 2:09-31853-ER (collectively, the "Bankruptcy Cases");

B.      Prior to the commencement of the Bankruptcy Cases, Seller acquired various rights, including the Granted Terminator Assets (as defined below), by virtue of that certain Purchase Agreement dated April 12, 2007, between T Asset, on the one hand, and AGV Productions, Inc., Mario Kassar Productions LP, C2 Pictures LLC and AGV Productions T4 LLC (collectively, "Seller's Grantor"), on the other hand, together with the amendment thereto dated as of May __ 2007 and the Schedules thereto ("Prior Purchase Agreement");

C.      Except for productions and derivative works created, developed and/or produced by Seller since the date of the Prior Purchase Agreement including, without limitation, the produced motion picture Terminator Salvation ("T4"), Seller's rights in the

1

Granted Terminator Assets are derived only from the Prior Purchase Agreement, the Terminator Rights Agreements and the Carolco Bankruptcy Court Order;

D.    Seller and Buyer have agreed on the terms of a proposed acquisition by Buyer of the Granted Terminator Assets on the terms and conditions contemplated in this Agreement and the Related Agreements (the "Transaction"):

## AGREEMENT

Based on the above premises and in consideration of the mutual covenants and agreements contained herein, and subject to the approval of the Bankruptcy Court after notice and a hearing, the parties agree as follows:

## ARTICLE I

## SALE AND TRANSFER OF ASSETS

1.1    <u>Purchase and Sale of the Granted Terminator Assets</u>.

(a)    Pursuant to the terms and conditions of this Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, and deliver to Buyer for the consideration specified below, all of Seller's right, title and interest of every kind and nature whatsoever, on an exclusive basis, in, to and under the following assets (the "Granted Terminator Assets"):

(i)    Sequel and Remake Rights derived from, appurtenant to or related to each of the following:

(A)    the motion picture entitled "The Terminator" ("T1");

(B)    the motion picture entitled  "Terminator 2: Judgment Day" ("T2");

(C)    the motion picture entitled "Terminator 3: Rise of the Machines" ("T3");

(D)    the motion picture entitled "Terminator Salvation" ("T4");

(E)    the television series entitled "Terminator: The Sarah Connor Chronicles" (the "Television Series"); and

(F)    "Terminator Salvation the Machinima Series," consisting of six (6) machinima episodes of approximately 15 minutes in length based on

2

and incorporating elements of the T4 Video Game, produced by Warner Premiere and distributed by Warner Home Video (the "Machinima Series").

To the extent Seller holds any "moral rights" or similar rights in any of the Granted Terminator Assets, Seller hereby waives the benefits of any provision of law known as "moral rights" or any similar laws with respect to Sequels produced by Buyer pursuant to the rights granted to Buyer pursuant to this Agreement, and agrees not to institute, support, maintain or authorize any litigation, arbitration or other proceeding, on the ground that any motion pictures, other programming, or sound recordings, or other items produced pursuant to the rights granted hereunder in any way constitute an infringement of any of Seller's moral rights, "droit moral" or a defamation or mutilation or distortion of any part thereof, or contain unauthorized variations, alterations, modifications, changes or translations.

        (ii)     All Derivative Rights to the Sequel and Remake Rights to T1, T2, T3 and T4 and including, without limitation, all Derivative Rights based on or derived from or related to any and all Sequels produced after the Closing Date;

        (iii)     All console, platform, personal computer or online video game rights (including creation, development, production and manufacturing rights), based on or derived from or related to Sequels produced after the Closing Date ("Sequel Video Game Rights");

        (iv)     For purposes of exploitation, sale and/or license of all Sequel and Remake Rights and all Derivative Rights therein and other rights granted hereunder, (A) all Literary Properties upon which T1, T2, T3, T4, the Television Series and the Machimina Series are based; and (B) all of Seller's right, title and interest, if any, in all derivative works based on T1, T2, T3, T4, or the Television Series (including, without limitation, comic books, publications, "webisodes," merchandising, video games and the Machinima Series).

        (v)     The Original Video Animation project currently entitled "Termination" (the "Termination OVA"), including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, including, without limitation, the following:

        (A)     All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Termination OVA, the Literary Property upon which the Termination OVA is based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue for past (but only to the extent such past infringement claims are assignable), present and future infringements of copyright;

984105.18

(B)    All contracts, agreements, assignments and instruments of every kind and character under which Seller may have heretofore acquired or may hereafter acquire any right, title and interest in or to the Termination OVA, including, that certain Memorandum of Agreement with Itochu Corp (together with the long form agreement to be negotiated, the "Itochu Agreement").

(vi)    The two (2) untitled animated television series in development (collectively, the "Animated Television Series"), including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, including, without limitation, all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Animated Television Series or the Literary Properties upon which they are based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

(vii)    The untitled live action television series contemplated for production after the final theatrical motion picture (the "Live Action Television Series") and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced including, without limitation, all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Live Action Television Series or the Literary Property upon which it is based or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

(viii)    Subject to Section 1.12 below, all of Seller's right, title and interest under the Carolco Library Trademark License Agreement to use and create trademarks, service marks, trademark licenses, trade name and trademark interests inclusive of any and all common law rights associated therewith belonging to StudioCanal, S.A. for the purpose of the exploitation of the Granted Terminator Assets and all other rights granted herein (subject to the provisions of Sections 5.16 and 5.17 below) and all of Seller's right, title and interest to use and create trademarks, service marks, trademark licenses, trade name and trademark interests inclusive of any and all common law rights associated therewith belonging to Seller for the purpose of the exploitation of the Granted Terminator Assets and all other rights granted herein and all rights to register titles of Sequels with the MPAA or utilize same as the URLs of websites and the like;

(ix)    All physical property of every kind or nature of or relating to the Granted Terminator Assets and all versions thereof, including, without limitation, copies of the Literary Property (the "Physical Property");

4

(x)    For purposes of exploitation and sale and/or license of all Sequel and Remake Rights and all Derivative Rights therein and other rights granted hereunder, all Assumed Contracts; and

(xi)    Such other assets, if any, that are scheduled on Schedule 1.1(k).

(b)    The Granted Terminator Assets include without limitation the exclusive right to exploit (and grant to others the right to exploit) any and all such assets in any and all manner, means and/or media whatsoever, now known or hereafter created or becoming known, throughout the universe in perpetuity, in any and all languages and versions, including without limitation:

(i)    the right, under copyright and under any and all other forms of intellectual property rights and otherwise, to develop, produce, distribute and exploit any and all Sequels and works utilizing the Derivative Rights;

(ii)    the right to release, sell, exhibit, distribute, sub-distribute, lease, sublease, market, exploit, license, sublicense, broadcast, transmit, reproduce, advertise, publicize, perform or otherwise exploit and derive revenues from the Granted Terminator Assets by any and every means and media, now known or which may hereafter be created or becoming known (including, without limitation, theatrical, non-theatrical, all forms of television (including free, pay, basic cable and satellite) and video devices, digital media or video, all interactive, on-line or computer assisted media, live stage and arena, and in connection with any such uses (whether the same be for profit or otherwise) to use and perform all sound and music synchronized therewith;

(iii)    the right to reproduce, manufacture and procure all products and materials with respect to the Granted Terminator Assets by every means, method or device now or hereafter known; and

(iv)    the right to advertise, publicize and exploit the Granted Terminator Assets by such means in such media now known or hereafter known, and to such extent as deemed desirable. Such rights shall include without limitation, with respect to all persons appearing in or rendering services in connection with the Granted Terminator Assets, the right to issue and authorize publicity concerning them and the right to use, reproduce, transmit, broadcast, exploit, publicize and exhibit their names, photographs, likenesses, transcriptions, films and other reproductions thereof in connection with the distribution, exhibition, advertising and exploitation of the Granted Terminator Assets.

1.2    Assumption and Assignment of Certain Executory Contracts.  For purposes of exploitation and sale and/or license of all Sequel and Remake Rights and all Derivative Rights therein and other rights granted hereunder, Seller shall assign to Buyer, Seller's right, title and interest in and to the executory contracts listed on Schedule 1.2 (collectively, the "Assumed Contracts").  To the extent the Assumed Contracts are executory contracts, the Debtors shall assume and assign their Assumed Contracts to

5

Buyer pursuant to Section 365 of the Bankruptcy Code.  Seller shall pay all cure claims under the Assumed Contracts under Section 365 of the Bankruptcy Code as and when required by the Sale Approval Order, or shall reserve for any disputed cure claims pending post-Closing determination of the disputes by the Bankruptcy Court and shall pay such claims upon such resolution.  All claims for cure of any pre-Closing defaults under the Assumed Contracts shall be payable by the Seller, and shall not be an addition to any consideration payable by Buyer under this Agreement.  At any time prior to the Closing, Seller may notify Buyer in writing of its determination to remove a contract from Schedule 1.2.

   1.3 <u>Rejection of Certain Executory Contracts</u>.  The Debtors shall reject the executory contracts listed on Schedule 1.3 pursuant to Section 365 of the Bankruptcy Code ("Rejected Contracts").

   1.4 <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the Granted Terminator Assets shall not include:

    (a) Seller's cash and cash equivalents;

    (b) All contracts or agreements of any nature whatsoever, whether known or unknown, that are not listed as Assumed Contracts on Schedule 1.2 or removed from Schedule 1.2 prior to the Closing with the approval of Buyer;

    (c) All Rejected Contracts;

    (d) All Recapture Rights;

    (e) All accounts receivables, cash or cash equivalents received as a result of such accounts receivable, royalties, participations, fees, overages and other consideration from any source based upon agreements in existence as of the Closing, including the Terminator 3 Trust Agreement, the Terminator 3 Secondary Trust Agreement, the Terminator 3 Ancillary Trust Agreement and any amendments thereto, and the Collection Account Management Agreement in connection with T4.

    (f) All of Seller's right, title and interest in, to and from the television series currently entitled "Terminator: The Sarah Connor Chronicles" (the "Television Series") (except for Sequel and Remake Rights and Derivative Rights therein owned or controlled by Seller in the Television Series, if any, which are assigned to Buyer under Section 1.1(a)(v)) and including all contracts, agreements, assignments, instruments and rights to receive payments relating to the Television Series, including, without limitation, payments from the Option-Purchase Agreement and Executive Producer Agreement with Warner Bros. Television (collectively, the "Warner Bros. Television Agreements") and including the Television Series Participation payable pursuant to the Warner Bros. Television Agreements (and the obligation to pay any portion of such Television Series Participation to Seller's Grantor is retained exclusively by Seller hereunder and is an Excluded Asset and an Excluded Obligation); and

6

(g)    All causes of action arising under Chapter 5 of the Bankruptcy Code.

1.5    <u>Possessory Liens</u>.  Buyer acknowledges that, to the extent that any of the Physical Properties are subject to possessory Liens asserted by laboratories or storage facilities or professionals ("Possessory Liens"), such Possessory Liens, to the best of Seller's knowledge, shall be listed on Schedule 1.5 hereto and  the transfer of such Physical Properties shall be subject to the Possessory Liens and Seller shall have no obligation to obtain releases of any Possessory Liens and/or deliver possession of such Physical Properties to Buyer**.**

1.6    <u>Assumption of Liabilities</u>.

(a)    <u>Obligations Not Assumed by Buyer</u>.  Buyer shall not assume, shall not be liable for any, and shall not be required to pay, satisfy, discharge or perform, or take or agree to take any of the Granted Terminator Assets subject to, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered to or by Buyer at the Closing, or as a result of the consummation of the transactions contemplated by this Agreement or the Sale Approval Order, to have successor liability for, to have assumed, or to have agreed to assume, or to take, or to have agreed to take, or to pay, satisfy, discharge or perform, any of the liabilities, obligations and indebtedness of any nature whatsoever of Seller (whether primary, secondary, direct, indirect, under guaranty or otherwise, liquidated, unliquidated, contingent, matured, unmatured, inchoate, legal or equitable), excluding only the Assumed Obligations (as defined below) (collectively the "Excluded Obligations"). Without affecting the generality of the foregoing, Buyer shall not assume and shall not be liable in any respect for:

(i)    Except as set forth in Section 1.6(b)(ii), Guild Obligations including without limitation resulting from the exploitation of T1, T2, T3, T4 or the Television Series or from exploitation (other than by Buyer) of any Derivative Rights therein or any of the Terminator Assets;

(ii)    Except as set forth in Section 1.6 (b)(iii), Participation Obligations including without limitation resulting from the exploitation of T1, T2, T3, T4 or the Television Series or from exploitation (other than by Buyer) of any Derivative Rights therein or any of the Terminator Assets including without limitation any and all Attachments and Participations;

(iii)    Any obligations to any third parties or to the Seller, other than under Section 1.7(a)(i)(B), pursuant to any existing agreement or right at law or under any guild or union or collective bargaining agreement, whether known or unknown relating to or arising from or in way restricting the exploitation of any of the Sequel and Remake Rights or any of the Derivative Rights therein including without limitation any obligations under the Attachments and Participations;

7

(iv)      Costs, expenses, obligations or liabilities of any nature whatsoever, whether known or unknown, that primarily relate to benefits received by Seller;

(v)      Costs, expenses, obligations or liabilities of any nature whatsoever, whether known or unknown, related to or arising out of any employment relationships of Seller;

(vi)      Obligations or liabilities of any nature whatsoever, whether known or unknown, in respect of any litigation, claims, demands or proceedings primarily related to any of the activities of Seller;

(vii)      Obligations or liabilities of any nature whatsoever, whether known or unknown, under output or distribution agreements, unless such obligations are contained in the Assumed Contracts;

(viii)      Obligations or liabilities of any nature whatsoever, whether known or unknown, arising out of audits, arbitrations, settlements, or judgments with respect to Participation Obligations or Guild Obligations that are not assumed by the Buyer, even if the audit, arbitration, settlement or judgment requires a payment after the Closing;

(ix)      Obligations or liabilities for taxes of any nature whatsoever (including penalties and interest), whether known or unknown, owed to any taxing authority or Governmental Authority;

(x)      Obligations or liabilities of any nature whatsoever, whether known or unknown, arising under or relating to all employees benefit plans or employee welfare benefits plans, if any, of the Seller, and any environmental liabilities of Seller;

(xi)      Obligations or liabilities of any nature whatsoever, whether known or unknown, of Seller under any Rejected Contract;

(xii)      Obligations or liabilities of Seller of any nature whatsoever, whether known or unknown, under any contract or instrument relating to or arising in relation to any Excluded Assets; and

(xiii)      Any other obligations, duties or liabilities of any nature whatsoever, whether known or unknown, of Seller or related to the Granted Terminator Assets that are not specifically assumed by Buyer.

(b)      Obligations Assumed by Buyer.  From and after the Closing Date, Buyer agrees to assume and be liable only for (i) the obligations arising after the Closing under the Assumed Contracts with respect to and resulting from exploitation by Buyer of the Granted Terminator Assets after the date of Closing, (ii) Guild Obligations resulting from or relating to any Sequels produced by Buyer after the Closing Date and Derivative Rights with respect thereto (prior to the Closing, Buyer and the Guilds will enter into a standard-form assumption agreement for each Guild, in form and substance reasonably

8

acceptable to Buyer, clarifying the scope of Guild obligations with respect to any Sequels produced by Buyer after the Closing); and (iii) Participations arising under contracts entered into by Buyer after the date of Closing with persons or entities providing goods or services for Sequels produced by Buyer after the Closing Date and Derivative Rights with respect thereto (collectively, the "Assumed Obligations").  The obligations that arise under subsection 1.6(b)(ii) will be secured by SAG's existing Lien on the Granted Terminator Assets.

     1.7   <u>Purchase Price.</u>

     (a)   For its purchase of the Granted Terminator Assets, Buyer shall (i) pay Seller: (A) Fifteen Million Dollars ($15,000,000.00), in cash, at the Closing (the "Cash Payment"), and (B) the contingent consideration specified in Schedule 1.7(a) of this Agreement with respect to each theatrical motion picture that is a Sequel, if any (the "Contingent Compensation"); and (ii) assume the Assumed Obligations.

     (b)   Not later than one day after entry of the Overbidding Procedures Order in the Bankruptcy Cases and in all of the Affiliate Cases, Buyer shall transfer to Seller, by wire transfer in accordance with the wire transfer instructions are set forth in Schedule 1.7(b), the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) representing five percent (5%) of the Cash Payment (the "Deposit"), which shall be applied (inclusive of any interest or investment income accrued or earned thereon) to the Cash Payment.  Seller shall hold the Deposit in a separate interest-bearing account at a federally insured financial institution that has total assets in excess of $10 billion.  All interest or investment income accrued or earned on the Deposit shall follow the principal. If the Closing does not occur in accordance with this Agreement as a result of termination of this Agreement pursuant to Section 7.1(c)(i) below, Seller shall retain the Deposit and apply it to any damages, attorneys fees or other costs, expenses or charges incurred by Seller as a result of such termination.  Unless this Agreement is terminated pursuant to Section 7.1(c)(i), if the Closing does not occur in accordance with this Agreement for any reason, or if any of the Granted Terminator Assets are sold to another Person pursuant to the Overbidding Procedures Order described in Section 1.9 below, Seller, within five (5) Business Days, shall return the Deposit to Buyer in full plus all interest or investment income accrued or earned thereon, in cash, without any deduction or offset of any nature.

     (c)   Buyer shall transfer to Seller the balance of the Cash Payment at the Closing.

     (d)   Notwithstanding the foregoing , the amount of Five Hundred Thousand Dollars ($500,000) shall be held back by Buyer from, and shall reduce, the Cash Payment at Closing and shall be deposited into an interest-bearing escrow account to secure the indemnification obligations of Seller under Sections 4.16, 8.1 and 8.3 hereof (the "Hold Back").  Interest shall follow the principal of the Hold Back.  The Hold Back, including all interest or investment income accrued or earned thereon, in cash, will be released to Seller on the date that is six (6) months from the Closing Date unless Buyer has asserted any claim(s) in writing to Seller under Section 8.4 hereof prior to such date, in which event the Hold Back shall be retained until resolution of such claim, provided

9

984105.18

that in the event that Buyer asserts one or more claims in the aggregate amount of less than $500,000, the amount of the Hold Back not subject to the claim shall be released to Seller on such date.

1.8    Allocation. For tax purposes, Seller and Buyer shall allocate consideration payable under Section 1.7(a) in the manner set forth on Schedule 1.8. If the parties cannot agree on the allocation on Schedule 1.8, each party shall allocate in accordance with its own accounting rules and practices.

1.9    Bankruptcy Motion and Order. Promptly after execution of this Agreement by all parties, the Debtors, and each debtor for whom an Affiliate Case must be filed as defined and described in Section 5.2, will prepare, file and serve at their sole expense a motion, or appropriate further pleadings in support of any previously filed motions seeking approval of bidding procedures and/or approval of a sale of any Granted Terminator Assets, which shall request that the Bankruptcy Court enter (a) an Order approving bidding procedures for the Transaction substantially in the form attached as Exhibit B (the "Overbidding Procedures Order"); and (b) an Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code authorizing the Debtors, to the extent of their right, title and interest, to (i) transfer the Granted Terminator Assets to Buyer free and clear of all Liens, claims, interests and encumbrances of any nature whatsoever, whether known or unknown, other than Assumed Obligations ("Interests"), except as otherwise specifically set forth in this Agreement, (ii) assume and assign the Assumed Contracts to Buyer, and (iii) reject the Rejected Contracts and set a date by which the non-Debtor parties must file rejection damage claims and, in the case of rejection of any licenses of intellectual property within the scope of Sections 101(35A) and 365(n) of the Bankruptcy Code ("Rejected IP Licenses"), by which each licensee must elect, as provided in Section 365(n), either to retain the licensee's rights as of the date of rejection under the Rejection IP License or treat the Rejected IP License as terminated (the "Sale Approval Order"). Buyer acknowledges and is aware that (i) the Transaction and Agreement shall be noticed to creditors and parties in interest in the Bankruptcy Cases and the Affiliates Cases, (ii) the sale contemplated by the Transaction and Agreement is subject to any higher or better offers at the hearing held to approve the Transaction (the "Sale Hearing"), as well as any objections by creditors and parties in interest, and (iii) Seller and its agents and representatives are obligated to continue to market the Granted Terminator Assets for sale and to solicit higher or better offers until the Granted Terminator Assets are sold. Seller shall use its reasonable efforts to obtain entry by the Bankruptcy Court of the Overbidding Procedures Order no later than January 22, 2010 in the Bankruptcy Cases and in all of the Affiliate Cases. Seller does not guarantee that the Bankruptcy Court will approve the Overbid Procedures Order without any modification thereto, and except as otherwise provided in this Agreement the entry of the Overbid Procedures Order in whole or in part is not a condition to this Agreement or to the Closing or consummation of the Transaction by any party hereto.

1.10    Closing. The closing of the Transaction (the "Closing") shall take place at the offices of Peitzman, Weg & Kempinsky LLP in Los Angeles, California, within ten (10) Business Days following the satisfaction or waiver of all conditions to the obligations of the parties to consummate the Transaction (other than conditions with

984105.18

respect to actions the respective parties will take at the Closing itself) or such other date as the parties may mutually agree (the "Closing Date"), but in no event later than March 22, 2010.

1.11    Deliveries at Closing.

(a)    Deliveries by Seller.  At the Closing, Seller will deliver to Buyer the following: (i) the various certificates, instruments, and documents referred to in Article V below; and (ii) such other instruments of sale, transfer, conveyance, and assignment as Buyer and its counsel may reasonably request.

(b)    Deliveries by Buyer.  At the Closing, Buyer will deliver to Seller the following: (i) the Cash Payment in accordance with Section 1.7; (ii) the various certificates, instruments, and documents referred to in Article VI below; and (iii) such other instruments of assumption as Seller and its counsel may reasonably request.

1.12    Acknowledgement of Rights of StudioCanal, S.A.  Buyer acknowledges that it has reviewed the Terminator Rights Agreement and Carolco Library Trademark License Agreement and that, Buyer's rights in and to the Granted Terminator Assets after the Closing shall be subject to the rights of StudioCanal, S.A. under the Terminator Rights Agreements and Carolco Library Trademark License Agreement.

## ARTICLE II

## SELLER'S REPRESENTATIONS AND WARRANTIES

2.1    Power and Authority.  Subject to entry of the Sale Approval Order, Seller has all requisite power and authority to enter into this Agreement and carry out all of its obligations under this Agreement.

2.2    No Transfer of Assets.  Seller has not disposed of, transferred or agreed to transfer any of the Granted Terminator Assets except for the rights sold, conveyed, transferred, licensed, or assigned to third parties under the agreements set forth on Schedule 2.2.

2.3    No Litigation Prohibiting the Transaction.  To the best of Seller's knowledge, there are no actions, suits or proceedings pending or threatened in any court or before any administrative agency which would prevent Seller from completing the Transaction.

2.4    No Claims.  To the best of Seller's knowledge, no Person has made any claim with respect to the Granted Terminator Asset that has or could in any way Materially Adversely Affect or impair Seller's right, title, and interest under this Agreement in and to the Granted Terminator Assets, except as set forth on Schedule 2.4, which claims shall be settled prior to Closing pursuant to Section 5.16.

2.5    Insurance Claims.  Except as set forth on Schedule 2.5, to the best of Seller's knowledge, no insurance claims have been made and are currently outstanding

984105.18

and unsettled as of the Agreement Date on the producer's errors and omissions policies or any other liability insurance policies that Seller maintains with respect to the Granted Terminator Assets.  Except as set forth on Schedule 2.5, to the best of Seller's knowledge, no claim with respect to any of the Granted Terminator Assets under any errors and omissions or other liability policy has required a payment by the insurance company or Seller and to the best of Seller's knowledge, no claim with respect to T4 or any of the Projects that would be covered under any errors and omissions policy has been asserted other than as set forth on Schedule 2.6.

2.6    Litigation.  Except as set forth in Schedule 2.6 (which claims shall be settled prior to Closing pursuant to Section 5.16), to the best of Seller's knowledge, (a) there is no litigation, arbitration, other proceeding, written audit request, or investigation pending against Seller or any of its officers or directors (in their capacities as such) that in any way could have a Material Adverse Effect on the Granted Terminator Assets, and (b) Seller does not know of any threats of any such litigation, arbitration, other proceedings or written audit requests the results of which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Granted Terminator Assets.

2.7    Legal Compliance.  To the best of Seller's knowledge, Seller has conducted and is conducting its business in compliance with all applicable laws and regulations in all material respects and has obtained all necessary governmental licenses, permits and other approvals of any Governmental Authority.

2.8    No Agent.  To the extent Seller or any of its officers, directors, agents or employees have incurred or caused to be incurred liability to any broker, finder or agent relating to this Transaction, Seller hereby agrees that all such amounts payable shall be the sole obligation of Seller and Seller hereby indemnifies and holds Buyer harmless from any claims arising from such obligations.

2.9    Fictitious Names and Aliases.

(a)    Dominion, LLC is a name under which Dominion sometimes does business.  There is no separate legal entity named "Dominion LLC" that is owned by Seller or an Affiliate of Seller.  The proper party to the agreement listed as Item 7 on Schedule 1.3 is Dominion Group LLC d/b/a Dominion LLC.

(b)    Seller has not owned, or done business relating to, any of the Granted Terminator Assets except under the corporate names, fictitious names or aliases set forth on Schedule 2.9.

(c)    Seller does not own, and has not disposed of, transferred or agreed to transfer, any of the Granted Terminator Assets except under the corporate names, fictitious names or aliases set forth on Schedule 2.9.

2.10    Full Disclosure of Material Information.  The virtual data room to which Buyer was granted access by Seller, entitled "Halcyon Holding Group" and maintained at Merrill DataSite (https://datasite.merrillcorp.com/bidder/splash_check.do?locale=en) (the

984105.18

"Data Room"), contains, to the best of Seller's knowledge, all materials and documents of any kind (whether of past or prospective effect, and whether in hard copy or electronic form) that relate to, diminish, limit, restrict, enhance, improve, extend or otherwise affect the Granted Terminator Assets, and all chain of title documentation (of which Seller currently has knowledge) relating to the Granted Terminator Assets.

2.11    No Other Warranties by Seller.  Except as otherwise stated in this Agreement, Seller is selling the Granted Terminator Assets on an "as is, where is" basis, with no representations or warranties of any kind, express or implied, either oral or written, with respect to the value of the Granted Terminator Assets, including any representation or warranty of title or use.

# ARTICLE III

## BUYER'S REPRESENTATIONS AND WARRANTIES

3.1    Power and Authority.  Subject only to entry of the Sale Approval Order, Buyer has all requisite power and authority to enter into this Agreement and carry out all of its obligations under this Agreement, and has sufficient capitalization and the required financial resources to conclude the Transaction and to make and carry out the Transaction

3.2    No Litigation Prohibiting the Transaction.  To the best of Buyer's knowledge, there are no actions, suits or proceedings pending or threatened in any court or before any administrative agency which would prevent Seller from completing the Transaction.

3.3    Buyer's Inspection and Financing.  Buyer acknowledges that financing is not a condition to complete the Transaction.  Buyer further acknowledges that it is purchasing the Granted Terminator Assets on an "as is, where is" basis, with no representations or warranties of any kind by Seller except as stated in this Agreement.

3.4    No Agent.  To the extent Buyer or any of its officers, directors, agents or employees have incurred or caused to be incurred liability to any broker, finder or agent relating to this Transaction, Buyer hereby agrees that all such amounts payable shall be the sole obligation of Buyer and Buyer hereby indemnifies and holds Seller harmless from any claims arising from such obligations.

# ARTICLE IV

## COVENANTS

4.1    Commercially Reasonable Efforts to Consummate Transaction.  Upon the terms and subject to the conditions set forth in this Agreement, each of the parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to consummate and make effective, in the most

984105.18

expeditious manner practicable, the Transaction, including (a) the obtaining of all necessary waivers and other consents from Governmental Authorities and the making of all necessary registrations and filings and the taking of all reasonable steps as may be necessary to obtain any necessary waiver or other consent from, or to avoid an action or proceeding by, any Governmental Authority, (b) the obtaining of all necessary waivers or other consents from third parties as are conditions to the consummation of the Transaction, and (c) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transaction; provided, however, that nothing contained herein shall require any party to waive any condition to its obligation to consummate the Transaction.

4.2     Notices.  Seller and Buyer shall each keep the other apprised of the status of matters relating to completion of the Transaction, including without limitation, promptly furnishing the other with copies of notices or other communications received by Seller or Buyer, as the case may be, or any of their respective Affiliates, from any Governmental Authority or third party with respect to the Transaction.

4.3     Operation of Business; Preservation of Assets.  Seller agrees that upon signature of this Agreement and until the Closing Date or earlier termination of this Agreement, unless Buyer otherwise consents in writing and except for the Transaction, Seller will:

(a)     Not offer, license or sell or agree to offer, license or sell any rights or property (tangible or intangible) that are included in the Granted Terminator Assets or modify, amend, terminate, rescind or cancel or grant any waiver with respect to any existing agreements (including without limitation any existing exploitation agreements) with respect to the Granted Terminator Assets or expand any rights or property (tangible or intangible) with respect to the Granted Terminator Assets granted to any Person or accelerate the time for payments of any amounts owing to Seller under any such agreements without first securing the written consent of Buyer; provided, however, that Seller may continue to operate in the ordinary course of its business and enter into transactions that will not have a Material Adverse Effect on the Granted Terminator Assets without first securing the written consent of Buyer; in any event, however, Seller shall not offer, license or sell, or agree to offer, license or sell, in the ordinary course of its business or otherwise, any rights or property (tangible or intangible) that are included in the Granted Terminator Assets without first securing the written consent of Buyer;

(b)     Not enter into any new agreements relating to the exploitation of any Granted Terminator Assets without securing the prior written consent of Buyer;

(c)     Not transfer or encumber or agree to transfer or encumber any of the Granted Terminator Assets in any way, except as specifically permitted herein; and

(d)     Maintain its Books and Records for the Granted Terminator Assets in accordance with past practices and policies, except for such changes of which it will advise Buyer as are required to comply with generally accepted accounting principles or applicable law.

984105.18

4.4    <u>Holdback/Freeze on Certain New Ancillary Licenses for T4 and T3</u>.

(a)    From the date of Seller's signature of this Agreement until the date that is the earliest of (i) termination of this Agreement, (ii) three (3) months after the initial theatrical release date of the first theatrical Sequel based on the Granted Terminator Assets hereafter, or (iii) two (2) years after the date of signature of this Agreement ("Merchandising Holdback"), Seller will not enter into any new license or exploitation agreement (or modify, amend or extend any of Seller's existing such license or exploitation agreements, copies of all of which have been provided by Seller to Buyer) which relate to: any merchandising or theme park rights ("Merchandising Rights") which are related to, and/or based on, T4 (and to the extent controlled by Seller, T3) .

(b)    Upon Seller's signature of this Agreement, Seller, in perpetuity, will not enter into any new license or exploitation agreement (or modify, amend or extend any of Seller's existing such license or exploitation agreements, copies of all of which have been provided by Seller to Buyer prior to the Due Diligence Deadline) which relate to any ancillary, allied, subsidiary or derivative rights whatsoever of any kind including without limitation any Video Game Rights, novelization rights, publishing rights, soundtrack album rights, publication rights, commercial tie-in or tie-up rights, sponsorship rights, character rights, live stage rights or rights to produce or exploit any Machinima episodes or productions (other than those existing agreements permitting exploitation of the existing Machinima Series in effect on the Closing Date), which are related to, and/or based on, T4, and to the extent controlled by Seller, T3 (but excluding Merchandising Rights, which rights are subject to Section 4.4(a) above and the Merchandising Holdback, and excluding the right to exhibit, license, distribute and otherwise exploit the completed motion pictures T3 and T4; provided, however, that for the avoidance of doubt, such reserved right, with respect to the distribution and exploitation of the completed motion pictures T3 and T4, does not include the right to create or exploit any derivative works whatsoever) ("Other Ancillary Rights").  Such Other Ancillary Rights that are not subject to existing agreements are frozen and are hereby assigned by Seller to Buyer but shall not be exploited by either Seller or Buyer hereafter.

(c)    Notwithstanding the foregoing, the Merchandising Holdback and the assignment and freeze of the Ancillary Rights do not limit Seller's rights to continue to exploit: (i) the distribution and exhibition rights solely of the completed motion pictures T3 and T4 including the right to advertise and publicize such exhibition and distribution, or (ii) Merchandising Rights or Other Ancillary Rights but only pursuant to exploitation agreements in effect on the Closing Date (subject to the Rejected Contracts and the other provisions hereof) which are directly related and solely based on T4 or T3, and which reference only the name, title and logo of "Terminator: Salvation" or "T4", or in the case of T3, "Terminator Rise of the Machines" or "T3" (and which are also in compliance with, and subject to, the Carolco Library Trademark License Agreement).

15

4.5    <u>Provisions Regarding Assignments.</u>

(a)    Notwithstanding anything to the contrary in this Agreement, except for Assumed Contracts of the Debtors that are assigned to the Buyer pursuant to the Sale Approval Order, this Agreement shall not constitute an agreement to assign or transfer any Assumed Contract or any claim or right or any benefit or obligation thereunder or resulting therefrom of any of the Halcyon Parties if an assignment or transfer thereof, without the consent of a third party thereto, would constitute a breach or violation thereof or impose any Liability on Seller or any of its Affiliates and such a consent is not obtained at or before the Closing, in which case the provisions of Section 4.5(b) shall apply.

(b)    If a consent to assignment or transfer as contemplated by Section 4.5(a) is required by any third party to any Assumed Contract is not obtained at or before the Closing, or if an attempted transfer, conveyance or assignment of any such Assumed Contract is ineffective, the parties shall cooperate in any commercially reasonable arrangement that provides to Buyer the benefits under, and imposes on Buyer the Liabilities under, such Assumed Contract.  This provision shall not constitute a waiver or suspension of any third party consent required as a condition to Closing.

4.6    <u>Full Access</u>.  Until the Closing Date or earlier termination of this Agreement, Seller will (a) upon reasonable prior notice permit Buyer and its authorized representatives and agents to have reasonable access during normal business hours to all contracts, accounting books and records and documents relevant to the Granted Terminator Assets or the Transaction (the "Business Records"), whether maintained in hard copy or electronic format, and whether in Seller's possession or control or the possession or control of Seller's representatives and agents, and to make extracts from and copies of such Business Records, subject only to (x) the attorney-client and attorney work-product privileges, and (y) third party confidentiality rights (and Seller shall use all reasonable efforts to obtain as soon as possible waivers by such third parties to permit such access), (b) furnish to Buyer or its authorized representatives and agents such other information with respect to the business or properties of Seller relating to the Granted Terminator Assets or the Transaction as Buyer may from time to time reasonably request, (c) otherwise reasonably cooperate in the examination or audit of Seller by Buyer relevant to the Granted Terminator Assets, (d) confer with Buyer to keep it informed with respect to operational matters of a material nature affecting the Granted Terminator Assets or the Transaction and to report on the general status of the business of Seller as it relates to the Granted Terminator Assets or the Transaction, except to the extent restricted by confidentiality obligations to third parties that are not Affiliates of Seller, and (e) at its sole expense, continue to maintain and update, and shall permit Buyer access to, the Data Room.  After the Closing Date, Seller will, upon reasonable prior notice, permit Buyer and its authorized representatives and agents to have reasonable access during normal business hours to all Business Records, and to make extracts from and copies of such Business Records, subject only to (x) the attorney-client and attorney work-product privileges, and (y) third party confidentiality rights (and Seller shall use all reasonable efforts to obtain as soon as possible waivers by such third parties to permit such access).

984105.18

4.7    <u>Preservation of Documents</u>.  Seller will maintain and preserve all Business Records for a period of eighteen (18) months after the Closing Date (the "Preservation Date").  Upon expiration of the Preservation Date, Seller, upon forty-five (45) days' prior written notice to Buyer (the "Records Notice"), may destroy any or all of such Business Records, as Seller deems necessary or appropriate.  In the event Buyer wants any of the Business Records that may be destroyed, Buyer shall (a) provide notice to Seller in writing within ten (10) Business Days after Buyer's receipt of the Records Notice, and (b) at its own expense, arrange to pick up and store such Business Records into its possession, custody, or control within ten (10) Business Days thereafter.

4.8    <u>Confidentiality</u>.  Seller and Buyer (each a "Recipient Party") will (and will cause its respective Affiliates to) hold, and will use commercially reasonable efforts to cause its respective representatives and agents to hold, in strict confidence from any Person (other than any such representatives and agents) all documents and information concerning the other (the "Protected Party") or any of its Affiliates furnished to it by the Protected Party or such Protected Party's Affiliates, representatives or agents, or to which such Recipient Party otherwise has obtained access, in connection with this Agreement or the Transaction, including without limitation, information associated with the Granted Terminator Assets and Assumed Obligations ("Confidential Information"), except to the extent that such documents or information can be shown to have been (a) previously known by the Recipient Party (excluding, with respect to Seller and its Affiliates, representatives and agents, information included in the Granted Terminator Assets or Assumed Obligations that are being transferred to Buyer pursuant to this Agreement), (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such Recipient Party or any of its Affiliates, representatives or agents or (c) lawfully acquired by the Recipient Party or any of its Affiliates, representatives or agents from another source if the Recipient Party does not have actual knowledge that such source is under an obligation to another Person to keep such documents and information confidential; provided, however, that the foregoing restrictions will not apply to Buyer's and its Affiliates' use after Closing of documents and information included in the Granted Terminator Assets or Assumed Obligations. Each Recipient Party shall (and shall cause its respective Affiliates, representatives and agents to) use at least the same degree of care to safeguard and to prevent the disclosure, publication or dissemination of the Confidential Information as it employs to avoid unauthorized disclosure, publication or dissemination of its own information of a similar nature, but in no case less than reasonable care.  In the event that a Recipient Party is requested or required (by oral question, interrogatory, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information of the Protected Party, such Recipient Party shall (x) provide the Protected Party with prompt written notice so that such Protected Party may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 4.7 and (y) cooperate with such Protected Party (at the Protected Party's expense) in any effort such Protected Party undertakes to obtain a protective order or other remedy.  In the event that such protective order or other remedy is not obtained or such Protected Party waives compliance with the provisions of this Section 4.6, such Recipient Party may disclose to the Person compelling disclosure only that portion of the Confidential Information that such Recipient Party is advised by counsel is legally

17

required to be disclosed and shall use commercially reasonable efforts to obtain reliable assurance, to the extent available, that confidential treatment is accorded the Confidential Information so disclosed.  If the Closing does not occur or this Agreement is terminated, Buyer agrees to return to Seller or destroy any Confidential Information it receives pursuant to this Agreement, and the provisions of this Section 4.8 shall survive any such termination of this Agreement.

   4.9 Representations and Warranties.  Neither party shall perform any act or omit to take any action that would make any of its representations or warranties set forth in this Agreement materially untrue or incorrect on and as of the Closing Date.  Without either party waiving any rights and claims it may have, each party will inform the other promptly upon discovery that any of its representations or warranties ceases to be true or correct in any material respect.

   4.10 Non-Disturbance.  Buyer will not interfere with the rights of licensees under Rejected IP Licenses but only to the extent that a licensee under a Rejected IP License is deemed to have elected, within the time and in accordance with the procedures provided by the Overbidding Procedures Order or the Sale Approval Order, to retain the licensee's rights under such license to the extent permitted by Section 365(n)(1)(B) of the Bankruptcy Code.

   4.11 Delivery of Books and Records.  As soon as possible after the Closing, to the extent available and to the extent Seller has access during normal business hours and has not theretofore done so, Seller shall deliver to a location specified by Buyer original copies of all Books and Records that relate solely to the Granted Terminator Assets or accurate copies of all Books and Records that relate solely to the Granted Terminator Assets.

   4.12 Insurance  Buyer shall be named as an "additional insured" under the existing errors and omissions insurance policies for T4, if any, copies of which policies and certificates of insurance reflecting the designation of Buyer as additional insured shall be delivered to Buyer at Closing.

   4.13 Remittances.  Seller shall promptly turn over to Buyer all mail and other communications to the extent related to the Granted Terminator Assets or the Assumed Obligations received by it at any time after the Closing. Buyer shall promptly turn over to Seller proceeds of all Excluded Payment Rights received by it at any time after the Closing.

   4.14 Amendment of Schedules and Exhibits.  Prior to the Closing, Seller and Buyer shall cooperate in good faith to amend the Schedules and Exhibits hereto based upon any information obtained by Seller or Buyer after the Agreement Date, provided however that neither Seller nor Buyer is obligated to agree to any such amendment.  Such amendment shall not constitute a waiver of any breach of any representation or warranty.

   4.15 Further Assurances.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, Seller and

18

984105.18

Buyer will take such further action (including the execution and delivery of such further instruments and documents) as the other party reasonably may request, all at the sole cost and expense of the requesting party (unless the requesting party is entitled to indemnification for such action under Article VIII).

4.16    Undisclosed Interests.  If, at any time prior to entry of the Sale Approval Order, Buyer or Seller discovers any Interests in any Sequel or Remake Right held by a Person who did not receive due notice of the Sale Hearing, then Seller shall, at Seller's expense, take all actions necessary to remove such Interest and deliver to Buyer evidence of the removal of such Interest in form and substance satisfactory to Buyer, which may include the obtaining of an order of the Bankruptcy Court determining that such Interest may not be enforced against Buyer or its Affiliates or against the Granted Terminator Assets.  Subject to Sections 1.7 and 8.3 of this Agreement, if any such Interest is discovered after the Closing and on or before the date that is six months after the Closing, Seller, shall indemnify, reimburse, defend at its own costs and expense and hold harmless Buyer and its directors, officers, employees, Affiliates (and directors, officers and employees of such Affiliates), agents, representatives and assigns, including, without limitation, reasonable attorneys' fees, costs and expenses incurred from and against any and all Losses of Buyer arising from, under or related to, or as a result of the discovery of, and the effect or operation of, any such Interest.

4.17    Changes to the Virtual Data Room.  From and after November 10, 2009, Debtors, directly or indirectly, shall neither make, permit to be made, nor cause to be made, any additions to or subtractions from the Data Room, other than the additions to or subtractions from the Data Room identified in Schedule 4.16, without giving prior and immediate written notification to Buyer that identifies all such additions or subtractions.

## ARTICLE V

## CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to consummate the Transaction is subject to the following conditions, unless waived in whole or in part, in writing, by Buyer in its sole discretion:

5.1    Entry of Sale Approval Order; Notice of Sale Hearing.

(a)    The Bankruptcy Court shall have entered the Sale Approval Order in all of the Bankruptcy Cases and Affiliate Cases not later than February 12, 2010, in a form and content satisfactory to Buyer, and (i) such order shall not have been amended, modified or supplemented without the written consent of Buyer; and (ii) no stay shall be in effect with respect to such order.

(b)    The Sale Approval Order shall, among other things:

(i)    determine that the Agreement was proposed by Buyer and Seller in good faith and represents the highest and best offer for the Granted Terminator Assets and should be approved;

(ii)       determine that Buyer is a good faith purchaser under and entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated by Buyer;

(iii)      (A) approve the sale of all of the Granted Terminator Assets to Buyer free and clear of any and all Interests of any nature whatsoever, whether known or unknown, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code (except as otherwise expressly agreed by Buyer under the Agreement); (B) authorize Seller pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code to convey to Buyer all of its right, title, and interest in and to all of the Granted Terminator Assets free and clear of any such Interests; and (C) provide that all Interests shall attach to the proceeds of the sale under Section 363 of the Bankruptcy Code;

(iv)      determine, with specific respect to the agreements listed on Exhibit A to the Supplemental Notice of Proposed Treatment of Attachments and Participations In Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, filed in the Bankruptcy Case on January __, 2010 as Docket Entry No. ___, and any other agreements or understandings with any person or entity which gave rise to an obligation on any Seller (or any of their predecessors in interest) or any related or affiliated entities thereto, that in any way impose a duty or obligation to give them the opportunity to perform services with respect to any Sequel or to receive any benefit or consideration or exercise any approval or restriction or affirmative requirement with respect any Sequel or any Derivative Rights therein (e.g. credit, passive payments, profit participations or other contingent compensation, approvals or veto rights) (collectively "Attachments and Participations"), that: (A) to the extent that any Attachments and Participations are executory contracts, such contracts are rejected pursuant to Section 365 of the Bankruptcy Code; (B) the Granted Terminator Assets are sold to Buyer, pursuant to Section 363(f) of the Bankruptcy Code, free and clear of any Attachments and Participations and any rights or entitlements held by, or any duties or obligations of any nature whatsoever, to, any person or entity arising under or relating to the Attachments and Participations or any other document, contract or agreement of any nature, whether known or unknown, that purports to create rights in the nature of Attachments and Participations; and (C) Buyer has not acquired, does not assume and is not subject to, any of the Attachments and Participations or any duties or obligations owed or owing to any person or entity thereunder or relating thereto, or any other contract or agreement, whether known or unknown, that purports to create rights in the nature of Attachments and Participations, unless and to the extent, if any, that Buyer, in writing, specifically assumes and/or agrees to be bound by any such Attachments and Participations or any duty or obligation owed or owing to any person or entity thereunder or relating thereto;

(v)       authorize Seller to execute, deliver, perform, consummate, and implement this Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing;

(vi)      require Seller (or any trustee(s) in bankruptcy that may be appointed for the Debtors) to deliver to Buyer any Sequel or Remake Right which comes

20

into the possession, custody or control of the Debtors or such trustee(s), and to cooperate with Buyer in compelling or obtaining the turnover or deliver to Buyer of any Granted Terminator Assets;

(vii)     reserve and retain jurisdiction in the Bankruptcy Court to interpret, enforce and effectuate the Sale Approval Order and the Agreement, and to resolve any disputes arising thereunder upon motion by any party;

(viii)     provide that the Sale Approval Order is self-executing and effective immediately upon entry, and waive the stays under Rules 6004(h) and 6006(g) of the Federal Rules of Bankruptcy Procedure;

(ix)     approve the assumption by Debtor and assignment to Buyer of the Assumed Contracts pursuant to Sections 363 and 365 of the Bankruptcy Code;

(x)     approve the rejection of the Rejected Contracts pursuant to Section 365 of the Bankruptcy Code, and approve the rejection of the Rejected IP Licenses pursuant to Section 365(n) of the Bankruptcy Code;

(xi)     establish a deadline by which each non-debtor party to a Rejected Contract (including Rejected IP Licenses) must file a proof of claim for damages arising by reason of the rejection;

(xii)     provide that Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for, or with respect to, any liability or obligation of Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this Agreement and the Sale Approval Order

(xiii)     requires any Person(s) having notice or knowledge of the Sale Approval Order and who is in possession of any property of the Debtor that constitutes Granted Terminator Assets to immediately deliver such property to Buyer and account to Buyer for such property (other than possessory lienholders);

(xiv)     enjoins, prohibits and restrains any Person(s) having notice or knowledge of the Sale Approval Order from possessing or using any Granted Terminator Assets without the prior written consent of Buyer (other than possessory lienholders), exercising any control or dominion over any Granted Terminator Assets without the prior written consent of Buyer, or interfering with the Closing or with the rights of Buyer or its successors under this Agreement or under the Sale Approval Order with respect to the acquisition, use, exploitation and/or further disposition of the Granted Terminator Assets;

(xv)     determines that Buyer does not constitute a successor to Seller or the bankruptcy estate of any Debtor.

(c)     Seller shall have used its best efforts to send adequate notice of the Sale Hearing to all holders of Interests in the Granted Terminator Assets, all counter-parties to the Assumed Contracts and the Rejected Contracts, and all counter-parties to

984105.18

any other contracts or obligations of the Debtors that will not be assumed by Buyer including but not limited to any party to any Attachments and Participations . Such efforts shall include, without limitation: (i) compliance with Rules 2002(a)(2), 6004, and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court; (ii) notice to all Governmental Authorities as is required to comply with the Federal Rules of Bankruptcy Procedure and applicable local laws relating to the issuance or transfer of any governmental licenses or permits or the issuance of any required from a Governmental Authority; and (iii) publication, at Buyer's sole expense, not less than once in the daily or weekly edition of *Variety* and such other publication(s) and in such form as the parties hereto may mutually agree**,** of notice of the Sale Hearing, in a form reasonably satisfactory to Buyer and Seller and approved by the Bankruptcy Court, which shall include particularized notice of the proposed sale of the Granted Terminator Assets free and clear of all Interests, the treatment of the Attachment Agreements, and giving notice, and the opportunity for holders of any Interests to appear and be heard.

5.2     Commencement of Chapter 11 Cases for all Halcyon Parties and Certain Subsidiaries or Affiliates of the Debtors.  Each of the Halcyon Parties that is not already a debtor in bankruptcy shall (and the Debtors shall cause any other subsidiary or affiliate of any of Halcyon Party that is not already a debtor in bankruptcy and that holds any right, title and interest in, or obligation relating to, a Granted Terminator Asset to be sold to Buyer pursuant to this Agreement to) promptly file a petition in the Bankruptcy Court for voluntary relief under chapter 11 of the Bankruptcy Code (the "Affiliate Cases"). Immediately upon the commencement of such Affiliate Cases, the Debtors shall seek joint procedural administration of the Affiliate Cases with the Debtors' Bankruptcy Cases under Case No. 2:09-31853-ER in the Bankruptcy Court.  The Debtors shall seek entry of the Overbidding Procedures Order and the Sale Approval Order in all of the Bankruptcy Cases and Affiliate Cases.

5.3     Entry of Overbidding Procedures Order.  The Bankruptcy Court shall have entered the Overbidding Procedures Order in the Bankruptcy Cases and in all of the Affiliates Cases not later than January 22, 2010, and such order shall: (a) approve and establish a break-up fee in favor of Buyer in an amount equal to five percent (5%) of the Cash Payment (the "Break-Up Fee"); and (b) provide for the service and filing of one or more notices, in form and content reasonably satisfactory to Buyer, of the sale hearing and of the treatment of Assumed Contracts, Rejected Contracts (including Rejected IP Licenses), and Attachments and Participations, and for publication of notice, in form and content reasonably satisfactory to Buyer, of the sale hearing.

5.4     Rejection of Intellectual Property Licenses.

(a)     The Bankruptcy Court, in the Overbidding Procedures Order, shall establish a deadline by which each licensee under a Rejected IP License must elect in writing, pursuant to section 365(n) of the Bankruptcy Code (the "Section 365(n) Election"), to treat the license as terminated, as permitted by section 365(n)(1)(A), and such Order shall further provide that the failure of a licensee under a Rejected IP Licensee timely to make such written election shall be deemed to constitute such

22

licensee's election to retain its rights under such Rejected IP License as such rights existed immediately before the commencement of the Bankruptcy Cases, as permitted by section 365(n)(1)(B) of the Bankruptcy Code.

(b)    Timely notice of the deadline and requirements for the Section 365(n) Election shall have been given to the non-debtor parties to the documents listed on Schedule 1.3.

5.5    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall have been accurate, true and correct in all material respects on and as of the Agreement Date, subject to Schedules to be delivered subsequent to the Agreement Date and, except to the extent that any such representation or warranty is made solely as of the Agreement Date or as of another date before the Closing Date, the representations and warranties of Seller contained herein and in the Related Agreements shall also be accurate, true and correct in all material respects on and as of the Closing Date, subject to Schedules to be delivered subsequent to the Agreement Date.

5.6    <u>Compliance with Covenants</u>.  Seller shall have in all material respects performed and complied with all of its covenants and obligations contained in this Agreement to be performed and complied with by it on or before the Closing Date.

5.7    <u>Third Party Consents</u>.  All consents identified on Schedule 5.6 attached hereto shall have been obtained and be in effect on the Closing Date.  All consents of, and filings and notifications to, and actions and non-action by, any Governmental Authority required for the consummation of the Transaction shall have been obtained, made or occurred and be in effect at the Closing.

5.8    <u>No Legal Restraints</u>.  No injunction or other legal restraint or prohibition enacted, entered, promulgated, enforced or issued by any Governmental Authority preventing the consummation of the Transactions shall be in effect.  If any injunction or legal restraint or prohibition prevents the Closing by more than 30 days then this Agreement shall, at the written option of the Seller, be subject to termination.

5.9    <u>Quitclaim Agreement and Assignment of Trademarks</u>.  Seller shall have executed and delivered to Buyer a Quitclaim Agreement and Assignments of Trademarks, the forms of which are attached hereto as Exhibits C and D, relating to all copyrights, trademarks and rights and interests in domestic and foreign copyrights and trademarks registered to, claimed by or licensed by Seller that are included in the Granted Terminator Assets.

5.10    <u>Bill of Sale</u>.  Seller shall have executed and delivered to Buyer a Bill of Sale in a form upon which the parties mutually agree.

5.11    <u>Related Agreements</u>.  Seller shall have executed and delivered each of the Related Agreements and each and every other document required to be delivered at Closing as set forth in this Agreement, each in form and substance reasonably satisfactory to Buyer.  Seller shall have also executed and delivered any and all documents necessary

23

or appropriate to assign all interests of Seller with respect to the Granted Terminator Assets (collectively, the "Assignment and Assumption Agreements").

5.12    Delivery of Original Documents.  To the best of Seller's knowledge, Seller shall have delivered to Buyer true and complete originals to the extent the Seller has them or, if Seller does not have complete originals, legible and complete copies, of all chain-of-title documents for the Granted Terminator Assets including without limitation the Assumed Contracts.

5.13    No Material Adverse Effect.  No Material Adverse Effect shall have occurred.

5.14    Further Assurances.  Seller shall have executed and delivered, and shall have caused all third parties to execute and deliver, any and all documents reasonably requested by Buyer that are necessary to consummate the Transaction.

5.15    Due Diligence.  Buyer shall have completed, to Buyer's satisfaction, its legal, financial and business due diligence, no later than 5:00 p.m., California time, five (5) days before the Sale Hearing (the "Due Diligence Deadline").  If Buyer does not deliver a written notice to Seller prior to the Due Diligence Deadline that Buyer is terminating this Agreement pursuant to Section 7.1(b), the due diligence condition precedent set forth in this Section shall be deemed satisfied.

5.16    Resolution of Claims.  Seller shall have resolved, to the satisfaction of Buyer, all claims listed on Schedules 2.4 and 2.6.

5.17    StudioCanal.  Notwithstanding Section 1.12 of this Agreement, Seller shall have obtained from StudioCanal, to the satisfaction of Buyer, resolution of issues concerning the right to use trademarks including, without limitation, the scope of such rights and any limitations thereon, pursuant to the Carolco Library Trademark License Agreement, as such agreement has been amended.  The parties hereto agree that (a) the conditions contained in Sections 5.16 and 5.17 apply only with respect to issues and claims relating to the Granted Terminator Assets being acquired by Buyer in the Transaction, and (b) Seller's failure to satisfy either or both of the conditions contained in Sections 5.16 and 5.17 shall not be deemed to be a breach or violation of any provision of this Agreement for any purpose, including, but not limited to, under Section 7.1; but, for the avoidance of doubt, such failure will permit Buyer to elect not to consummate the Transaction pursuant to Section 7.1(b)(ii).

## ARTICLE VI

## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

Seller's obligation to consummate the Transaction is subject to the following conditions, unless waived in whole or in part, in writing, by Seller in its sole discretion, except for Section 6.1, which may not be waived:

984105.18

6.1     Entry of Sale Approval Order.  The Bankruptcy Court shall have entered the Sale Approval Order in a form and content reasonably satisfactory to Buyer, and (a) such order shall not have been amended, modified or supplemented without the written consent of Buyer; and (b) no stay shall be in effect with respect to such order.

6.2     Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained herein shall have been accurate, true and correct in all material respects on and as of the Agreement Date and, except to the extent that any such representation or warranty is made solely as of the Agreement Date or as of another date before the Closing Date, the representations and warranties of Buyer contained herein and in the Related Agreements shall also be accurate, true and correct in all material respects on and as of the Closing Date.

6.3     Compliance with Covenants.  Buyer shall have in all material respects performed and complied with all of its covenants and obligations contained in this Agreement to be performed and complied with by it on or before the Closing Date.

6.4     Third Party Consents.  All consents identified on Schedule 6.4 attached hereto shall have been obtained and be in effect at the Closing.  All consents of, and filings and notifications to, and actions and non-actions by, any Governmental Authority required for the consummation of the Transaction shall have been obtained, made or occurred and be in effect at the Closing.

6.5     No Legal Restraints.  No injunction or other legal restraint or prohibition enacted, entered, promulgated, enforced or issued by any Governmental Authority preventing the consummation of the Transaction shall be in effect

6.6     Related Agreements.  Buyer shall have delivered to Seller a copy of all Assignment and Assumption Agreements duly executed by Buyer.

## ARTICLE VII

## TERMINATION

7.1     Grounds for Termination.  This Agreement may be terminated at any time before the Closing as follows:

(a)     Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing.

(b)     Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (i) in the event Seller has breached any representation, warranty, or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure, if susceptible to cure, for a period of ten (10) days after the notice of breach, (ii) if the Closing shall not have occurred on or before March 22, 2010 by reason of the failure of any condition precedent under Article V hereof (unless the failure results primarily

984105.18

from Buyer itself breaching any representation, warranty, or covenant contained in this Agreement and the implied covenant of good faith and fair dealing); (iii) Seller has accepted, and the Bankruptcy Court has approved, the bid of another Person to purchase any of the Granted Terminator Assets; (iv) the Break-Up Fee is not approved by the Bankruptcy Court by January 22, 2010; (v) the Sale Approval Order is not entered by the Bankruptcy Court by February 12, 2010; or (vi) Buyer delivers a notice of termination pursuant to Section 5.15 of this Agreement within the time frame provided by that section.

(c)    Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (i) in the event Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach or (ii) if the Closing shall not have occurred on or before March 22, 2010 by reason of the failure of any condition precedent under Article VI hereof (unless the failure results primarily from Seller itself breaching any representation, warranty, or covenant contained in this Agreement and the implied covenant of good faith and fair dealing).

7.2    Effect of Termination.  Except as set forth in Section 7.3, upon termination of this Agreement pursuant to the provisions of Section 7.1, this Agreement shall forthwith become void and there shall be no further obligation or Liability on the part of any party except: (a) Seller shall be entitled to retain the Deposit, with all interest and investment income accrued or earned thereon, if the Agreement is terminated pursuant to Section 7.1(c)(i); (b) Seller shall be obligated to pay the Break-Up Fee to Buyer if the Agreement is terminated pursuant to Section 7.1(b)(iii); (c) Seller shall be obligated to return the Deposit to Buyer, with all interest and investment income accrued or earned thereon, in the event of termination other than pursuant to Section 7.1(c)(i); (d) Buyer shall be entitled to assert all of its rights and remedies available under applicable law if the Agreement is terminated pursuant to Section 7.1(b)(i); and (e) the obligations in Section 4.8 shall survive termination.

7.3    Termination As A Result Of Buyer's Failure To Pay the Purchase Price. If Buyer fails to pay the Cash Payment and such failure to pay is a default under this Agreement, Seller may terminate the Agreement by providing written notice to Buyer and Seller shall be entitled to (i) retain and apply the Deposit to its damages, and (ii) assert any other rights or remedies available under applicable law to recover its monetary damages.

## ARTICLE VIII

## INDEMNIFICATION

8.1    Indemnification by Seller.  Seller agrees to indemnify, reimburse, defend at its own costs and expense and hold harmless Buyer and its directors, officers, employees, Affiliates (and directors, officers and employees of such Affiliates), agents,

984105.18

representatives and assigns, including, without limitation, reasonable attorneys' fees, costs and expenses incurred from and against any and all Losses of Buyer arising from, under or related to, or as a result of any third party claim, demand, liability or action based on material breach or failure by Seller or its Affiliates of any of the representations, warranties, covenants or agreements made by Seller pursuant to this Agreement or the Related Agreements.

8.2    Indemnification by Buyer.  Buyer agrees to indemnify, reimburse, defend at its own costs and expense, and hold harmless Seller and its directors, officers, employees, Affiliates (and directors, officers and employees of such Affiliates), agents and assigns, including, without limitation, reasonable attorneys' fees, costs and expenses incurred from and against any Losses of Seller arising from, under or related to, or as a result of (a) any third party claim, demand, liability or action based on material breach of any of the representations, warranties, covenants or agreements made by Buyer in or pursuant to this Agreement or the Related Agreements, and (b) any third party claim, right, breach or violation, arising after the Closing resulting from Buyer's exploitation of the Granted Terminator Assets.

8.3    Limitations on Indemnification.  Either party's indemnification responsibility under Sections 4.15, 8.1 and 8.2 shall not exceed Five Hundred Thousand Dollars ($500,000), and shall expire six (6) months from the Closing Date (i.e., neither party shall be responsible for any third party claim, demand, liability or action which is asserted after six (6) months from the Closing Date and which would otherwise be such party's responsibility under Sections 4.16, 8.1 or 8.2, as the case may be, even if the basis of such third party claim, demand, liability or action arose prior to said six (6) month period).

8.4    Claims Procedure.

(a)    Notice.  Any party seeking indemnification (an "Indemnified Party") with respect to any Loss shall give written notice thereof to the party required to provide indemnity hereunder (the "Indemnifying Party").  Notwithstanding the foregoing, the rights and claims of any Indemnified Party to be indemnified in respect of any Loss resulting from the asserted liability shall not be adversely affected by the Indemnified Party's failure to give or delay in giving notice unless (and then only to the extent that) the Indemnifying Party is materially prejudiced thereby.

(b)    Defense.  If any claim, right, demand or liability is asserted by any third party against any Indemnified Party, the Indemnifying Party shall be entitled to participate therein and defend any action or proceeding brought against the Indemnified Party in respect of matters embraced by the indemnity, and the Indemnifying Party shall have the right to conduct and control the defense subject to the Indemnified Party's prior approval in writing of outside counsel selected by the Indemnifying Party, not to be unreasonably withheld or delayed.  After notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such claim or action, (and they assumption of the defense, which shall occur within fourteen (14) days of receipt of the Indemnified Party's notice to the Indemnifying Party) the Indemnifying Party shall not be

984105.18

liable to the Indemnified Party for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than reasonable costs of investigation.  The Indemnifying Party will not, without Indemnified Party's written consent, which written consent shall not be unreasonably withheld, settle or compromise any Indemnifiable Claim or consent to the entry of any judgment in respect thereof unless such settlement, compromise or consent includes an unconditional release of the Indemnified Party from all liability in respect of such Indemnifiable Claim.  The parties shall cooperate, at the Indemnifying Party's expense, in the defense of all third party claims which may give rise to Indemnifiable Claims hereunder.

## ARTICLE IX

## MISCELLANEOUS

9.1     <u>Remedies</u>.

(a)     Each party acknowledges and agrees that the Buyer would be damaged irreparably in the event any provision of this Agreement is not performed by Seller in accordance with its specific terms or otherwise is breached, so that Buyer shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in addition to any other remedy to which such party may be entitled, at law or in equity.  In particular, the parties acknowledge, solely for the purposes of determining whether injunctive relief is appropriate, that the Granted Terminator Assets are uniquely suited for the purposes and needs of Buyer.  If Seller should materially breach any of its representations, warranties or covenants under this Agreement and providing the Closing shall have occurred, including payment in full of the Cash Payment to Seller, the parties each acknowledge that the remedy at law would be inadequate to compensate Buyer.  Accordingly, Buyer, in addition to any other available rights or remedies, may at its sole option sue in equity for specific performance, injunctive relief, and/or other equitable relief, and Seller expressly waives the defense that a remedy in damages will be adequate.

(b)     Except as set forth in Section 7.3 and provided the Closing has occurred, Seller hereby expressly waives any right to seek injunctive relief against Buyer (or any of its assignees or licensees) or to seek rescission or termination of this Agreement or of any rights assigned to Buyer hereunder or to seek any other equitable remedy whatsoever with respect to this Agreement, or to interfere with or detrimentally affect in any way the transfer of the Granted Terminator Assets to Buyer or the development, production, exploitation or advertising or publicity of any Sequels or the exploitation of any other rights granted to Buyer hereunder.

9.2     <u>Remedies Not Exclusive</u>.  Except as expressly stated to the contrary herein, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and will be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.  The election of any one

28

or more remedies will not constitute a waiver of the right to pursue other available remedies.

9.3    <u>No Third Party Beneficiaries</u>.  None of the provisions of this Agreement will be for the benefit of, or enforceable by, any third-party beneficiary.

9.4    <u>Entire Agreement</u>.  This Agreement, and any documents referred to herein or executed contemporaneously herewith pursuant hereto, constitute the parties' entire agreement with respect to the subject matter hereof and are integrated with and supersede all other prior or contemporaneous agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the Granted Terminator Assets and the Transaction.

9.5    <u>Amendments</u>.  No amendment of any provision of this Agreement or the Related Agreements shall be effective unless it is in writing and signed by all the parties hereto and then such amendment shall be effective only in the specific instance and for the specific purpose for which it was given.

9.6    <u>Waivers</u>.  No failure or delay of any party in exercising any power, claim, right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, claim, right or remedy preclude any other or further exercise thereof or the exercise of any other power, claim, right or remedy.  Any waiver hereof shall be effective only if given in writing by the party against which such waiver is sought to be enforced and in the specific instance and for the specific purpose for which such waiver was given.  After any waiver, unless otherwise mutually agreed, the parties shall be restored to their former position and rights.

9.7    <u>Headings</u>.  The Article and Section headings in this Agreement are provided only as a matter of convenience, and in no way define, limit, or extend or scope of this Agreement or of any particular Article or Section.

9.8    <u>Construction</u>.  The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  For purposes of this Agreement, the terms "know," "known," "knowledge," "best knowledge and belief," and other similar terms shall all mean the actual knowledge of the relevant person, without any duty of investigation.  The plural of any defined word shall include the singular and the singular of any defined word shall include the plural.

9.9    <u>Illegality</u>.  Nothing herein contained shall be construed to require the performance by either party of any act contrary to law.

9.10    <u>Notices</u>.  All notices under this Agreement will be in writing and will be delivered by personal service, overnight courier, facsimile, electronic mail (with an electronic delivery confirmation received) or certified mail (postage prepaid) to such address as may be designated from time to time by the relevant party, and which will

29

initially be as set forth below. Any notice delivered by personal service or overnight courier will be deemed delivered when it is actually delivered and received by the relevant party. Any notice sent by facsimile will be deemed delivered when the confirmation of the successful transmission of the facsimile is printed by the facsimile machine and received by the sending party. Any notice sent by electronic mail will be deemed delivered when the electronic delivery confirmation of delivery to the recipient's computer is received by the sending party. Any notice sent by certified mail will be deemed to have been given three (3) days after the date on which it is mailed. No objection may be made to the manner of delivery of any notice actually received in writing by an authorized representative or agent of a party. Notices will be addressed as follows or to such other address as the party to whom the same is directed will have specified in conformity with the foregoing:

| | | |
|---|---|---|
| (a) | If to Buyer: | Lions Gate Films, Inc. |
| | | 2700 Colorado Avenue, Suite 200 |
| | | Santa Monica, California 90404 |
| | | Attn:   Wayne Levin, Esq., General Counsel |
| | | Tel.:    (310) 449-9200 |
| | | Fax:    (310) 496-1359 |
| | | Email: wlevin@lionsgate.com |

| | | |
|---|---|---|
| | With a copy to: | Pryor Cashman LLP |
| | | 7 Times Square |
| | | New York, New York 10036-6569 |
| | | Attn:   James A. Janowitz, Esq. |
| | | Richard Levy, Jr., Esq. |
| | | Tel.:    (212) 421-4100 |
| | | Fax:    (212) 326-0806 |
| | | Email   jjanowitz@pryorcashman.com |
| | | rlevy@pryorcashman.com |

| | | |
|---|---|---|
| | If to Seller: | Peitzman, Weg & Kempinsky LLP |
| | | 10100 Santa Monica Blvd, Ste. 1450 |
| | | Los Angeles, California  90067 |
| | | Attn:   Howard J. Weg, Esq. |
| | | David B. Shemano, Esq. |
| | | Tel.    (310) 552-2100 |
| | | Fax:    (310) 552-3101 |
| | | Email   hweg@pwkllp.com |
| | | dshemano@pwkllp.com |

9.11    Relationship of the Parties.  This Agreement does not constitute and shall not be construed to constitute an agency, a partnership or a joint venture between the parties.  Neither party shall have any power, claim or right, nor shall it represent itself as

30

984105.18

having any power, claim or right to obligate or bind the other party in any manner whatsoever.  This is an agreement between separate entities and neither is the agent or partner of the other for any purpose whatsoever.

9.12    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and shall be binding on the parties, and their respective successors and assigns, including any bankruptcy trustee.  Seller may assign its rights and obligations under this Agreement without the prior written consent of Buyer if the assignment is made to an Affiliate or pursuant to a merger, consolidation or sale of all or substantially all of Seller's assets or pursuant to an order of the Bankruptcy Court after notice and opportunity for hearing have been provided to Buyer and interested parties; provided, except in the case of a assignment pursuant to an order of the Bankruptcy Court, Seller's successor/assignee must assume in writing Seller's obligations hereunder and Buyer must be reasonably satisfied that said successor/assignee is at least as able to perform Seller's obligations pursuant to this Agreement as Seller.  Buyer may assign its rights and obligations under this Agreement without the prior written consent of Seller: (a) if the assignment is made to (i) an Affiliate or (ii) pursuant to a merger, consolidation or sale of all or substantially all of Buyer's assets or (iii) any other Person; provided that Buyer remains primarily liable under this Agreement and Buyer's assignee must assume in writing Buyer's obligations hereunder; or (b) after the payment of the Cash Payment, provided that Buyer's assignee must assume in writing Buyer's obligations hereunder and Seller must be reasonably satisfied that said successor/assignee, at the time of the assignment, is at least as able to perform Buyer's obligations pursuant to this Agreement (including, without limitation, with respect to the payment of the Contingent Compensation) as is Buyer.  Except with respect to any assignment by Seller pursuant to an order of the Bankruptcy Court after notice and opportunity for hearing have been provided to Buyer and interested parties, any assignment made by Seller or Buyer pursuant to this Section 9.12 shall not release Seller or Buyer from any of its obligations or liabilities hereunder (except that an assignment by Buyer under Section 9.12(b) shall release Buyer from further liability hereunder) and any assignment made in violation of this Section shall be null and void.  Any dispute arising under this Section 9.12 shall be resolved, on an expedited basis, by motion to the Bankruptcy Court with all reasonably attorneys' fees and costs incurred in conjunction with such dispute to be awarded to the "prevailing party," as determined by the Bankruptcy Court.  In the event Buyer is deemed to be the "prevailing party" for such dispute, Buyer may set off any award of its costs against any Contingent Compensation that is payable to Seller at the time of such award or that becomes payable to Seller thereafter.

9.13    <u>Joint and Several Liability</u>.  The Halcyon Parties are jointly and severally liable for all representations, warranties, covenant and other agreements and obligations hereunder.

9.14    <u>Expenses</u>.  Except as otherwise expressly provided herein, whether or not the Closing is consummated, all costs and expenses incurred in connection with this Agreement and the Transaction, including the fees and disbursements of counsel, financial advisors, tax advisors and accountants, shall be paid by the party incurring such costs and expenses.

984105.18

9.15    Governing Law.  This Agreement has been negotiated and entered into in the State of California, and all questions with respect to the Agreement and the rights and liabilities of the parties will be governed by the laws of that state, regardless of the choice of law provisions of California or any other jurisdiction.  The resolution of any and all disputes between the parties herein concerning the Granted Terminator Asset, the Transaction, this Agreement or the Related Agreements shall be resolved by the Bankruptcy Court upon motion by any party hereto.

9.16    Jurisdiction; Service of Process.  The Bankruptcy Court shall retain jurisdiction to enforce and effectuate the Agreement and the Sale Approval Order, to interpret and enforce the provisions of this Agreement and the Sale Approval Order, and to resolve any disputes arising thereunder (collectively, "Disputes").  The parties agree that, notwithstanding any procedural rule to the contrary, the Bankruptcy Court shall have jurisdiction to adjudicate any Disputes brought by motion filed and served in accordance with the Local Bankruptcy Rules of the Bankruptcy Court.  After the Bankruptcy Cases are closed, unless the Bankruptcy Court exercises jurisdiction to consider any dispute between the parties which may arise under or relate to this Agreement or the Related Agreements after closure of the Bankruptcy Cases, such dispute will be heard and determined before a federal or state court of competent jurisdiction located in Los Angeles, California.  The parties hereto acknowledge that if the Bankruptcy Court refuses to exercise jurisdiction over the dispute, such federal or state court has jurisdiction to interpret and enforce the provisions of this Agreement and the parties waive any and all objections that they may have as to personal jurisdiction or venue in any of the above courts.  The parties hereby agree that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to the applicable party at its address provided in Section 9.10, such service being hereby acknowledged by the applicable party to be sufficient for personal jurisdiction in any action against such party in any such court and to be otherwise effective and binding service in every respect.  Nothing herein shall affect the right to serve process in any other manner permitted by law.

9.17    Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Signatures may be delivered by fax or by PDF email attachment, which shall operate with the effect of original signatures; provided that original signatures shall be furnished on request of any party.

32

IN WITNESS WHEREOF, the parties hereto have duly caused the execution of this Agreement by their authorized representatives as of the date first above written.

**SELLER:**

Halcyon Holding Group, LLC, a Delaware limited liability company

By: _____
Name: Derek Anders~   Victor Kubicek
Title: CO-CEO          CO-CEO

T Asset Acquisition Company, LLC, a California limited liability company

By: _____
Name: Derek Anders~   Victor Kubicek
Title: CO-CEO          CO-CEO

T Asset International (BVI) Ltd., a British Virgin Islands corporation

By: _____
Name: Derek Anders~   Victor Kubicek
Title: CO-CEO          CO-CEO

T Salvation Distribution, LLC, a California limited liability company

By: _____
Name: Derek Anders~   Victor Kubicek
Title: CO-CEO          CO-CEO

T Salvation Distribution (BVI) Ltd., a British Virgin Islands corporation

By: _____
Name: Derek Anders~   Victor Kubicek
Title: CO-CEO          CO-CEO

33

984105.18

T Salvation Productions, LLC, a California limited
liability company

By: _____
Name: _Derek Anders_ _Victor Kubicek_
Title: _Co-CEO_ _CO-CEO_

Halcyon Consumer Products, LLC, a California
limited liability company

By: _____
Name: _Derek Anders_ _Victor Kubicek_
Title: _Co-CEO_ _CO-CEO_

Halcyon Games, LLC, a California limited liability
company

By: _____
Name: _Derek Anders_ _Victor Kubicek_
Title: _Co-CEO_ _CO-CEO_

Halcyon International (BVI) Ltd., a British Virgin
Islands corporation

By: _____
Name: _Derek Anders_ _Victor Kubicek_
Title: _Co-CEO_ _CO-CEO_

Halcyon Music Publishing, LLC, a California
limited liability company

By: _____
Name: _Derek Anders_ _Victor Kubicek_
Title: _Co-CEO_ _CO-CEO_

Dominion Group, LLC, d/b/a or a/k/a Dominion
LLC, a California limited liability company

By: _____
Name: _Derek Anders_ _Victor Kubicek_
Title: _Co-CEO_ _CO-CEO_

984105.18

**BUYER:**

LIONS GATE FILMS, INC.

By: _____

Name: _____Wayne Levin_____

Title: _____General Counsel and Executive____

Vice President for Corporate Operations

EXHIBIT A
Page 47

## SCHEDULE 1.1(k)

**Other Assets to Be Purchased**

None

1

## SCHEDULE 1.2

### Assumed Contracts

The listing of the agreements in this Schedule is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases. The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract.  Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

1.    Subject to Sections 5.16 and 5.17 of the Asset Purchase Agreement between Lions Gate Films, Inc., as Buyer, and the Halcyon Parties, collectively as Seller, dated January ___, 2010: the Trademark License Agreement dated as of April 29, 1996 between  Canal+D.A. and Carolco Pictures Inc., as assigned by Carolco Pictures Inc. to AGV Productions, Inc ("AGV"), as amended by Amendment Agreement dated April __, 2003 by and between StudioCanal Image S.A., (as successor to Canal+D.A.) and AGV and Amendment Agreement dated July 22, 2008 by and between StudioCanal S.A. (as successor to StudioCanal Image S.A) and T Asset Acquisition Company, LLC, as successor to AGV's rights relating to the making of Remakes and Sequels to the films T1 and T2.

2.    Purchase Agreement ("Prior Purchase Agreement") dated as of  May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV Productions T4 , LLC ("AGV T4" ) (collectively the "AGV Sellers") on the one hand, and T Asset on the other hand, but only with respect to all of the AGV Sellers' right, title and interest in and to the Granted Terminator Assets.

3.    Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 2  together with the Schedules to the Prior Purchase Agreement, but only with respect to all of the AGV Sellers' right, title and interest in and to the Granted Terminator Assets.

1

## SCHEDULE 1.3

### Rejected Contracts

The listing of the agreements in this Schedule is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases. The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract.  Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

Certain of the non-Debtor parties to the agreements in this Schedule may be owed Participations on account of *Terminator: Salvation*, which Participations, if owed, are paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement").  Nothing in the APA, including the rejection of any agreement in this Schedule, is intended to affect the right of any party to the T4 CAM Agreement.

1.      Settlement Agreement dated as of May 23, 2008, between T Asset Acquisition Co. LLC and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. and the First Amendment thereto dated as of October 27, 2009, along with the underlying documents titled Financing/Distribution Agreement re: Terminator dated February 18, 1983 and Orion Sub-distribution Agreement dated October 24, 1984.

2.      Letter Agreement dated May 31, 2002 among AGV Productions and C-2 Pictures LLC, Intermedia Film Distribution Limited and Toho-Towa Company Limited

3.      Option and Purchase Agreement dated as of August 8, 2005 between Seller and Warner Bros. Television Production Inc. and all ancillary agreements and instruments thereto.

4.      Distribution Agreement dated as of February 13, 2008 between T Salvation Distribution LLC and Worldwide SPE Acquisition, Inc ("Sony") and all ancillary agreements and instruments thereto.

5.      Distribution Agreement dated as of November 10, 2007 and all ancillary agreements and instruments with effect as of September 7, 2007 between T Salvation Distribution, LLC and Warner Bros. and all ancillary agreements and instruments thereto.

6.      Director Loanout Agreement dated as of October 19, 2007 between T Salvation LLC and Five Pennies, Inc f/s/o Joseph McGinty Nichol a/k/a McG**.**

7.      Agreement dated as of October 1, 2007 between Dominion LLC f/s/o Derek Anderson and Victor Kubiecek and T Salvation Productions LLC, and the amendment dated as of June 16, 2008**.**

EXHIBIT A
Page 50

8.      Guaranty dated as of October 1, 2007 between T Asset and Dominion, LLC f/s/o Derek Anderson and Victor Kubicek.

9.      Agreement dated as of September 10, 2007 between Onda Entertainment Inc. f/s/o Moritz Borman and T Salvation Productions LLC.

10.     Video Game Development Agreement between Halcyon Games, LLC and Attaction AG d/b/a EGI Equity Games International AG.

11.     Agreement between Halcyon Games, LLC and Grin A.B.

12.     Theme Park License agreement dated as of June 30, 2008 between Halcyon Consumer Products, LLC and Six Flags, Inc. and the trademark license dated the same date

13.     Agreement between Halcyon Consumer Products, LLC and Titan Publishing Group

14.     Merchandising License Agreement dated as of February 13, 2008 between Halcyon Consumer Products, LLC and Playmates Toys, Inc. together with the Short Form License and the Trademark License dated the and the First Amendment thereto dated as of June 22, 2009.

15.     License Agreement between The Halcyon Company and The Topps Company.

16.     Consulting/Executive Producer Agreement dated as of October __, 2007 between T Asset and Peter D Graves.

17.     Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver.

18.     Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale").

19.     Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand.

20.     Animatronic and Prosthetic Effects Agreement dated as of February 6, 2008 between T Salvation Productions and Stan Winston Studio, Inc.

21.     Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis.

22.    Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis.

23.    Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington.

24.    Executive Producer Agreement dated as of February 29, 2008 between T Salvation Productions and Lin Pictures, Inc. furnishing the development and executive producer services of Dan Lin.

25.    Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman.

26.    Acting Agreement dated as of April 21, 2008 between T Salvation Productions and Shell B Productions, Inc. furnishing the acting services of Moon Bloodgood.

27.    Acting Agreement dated as of June 28, 2008 between T Salvation Productions and Pigs Can Fly, Inc. furnishing the acting services of Helena Bonham Carter.

28.    Acting Agreement dated as of April 9, 2008 between T Salvation Productions and Anton Yelchin, Inc. furnishing the acting services of Anton Yelchin.

29.    The following documents and correspondence provided by Seller to Buyer with respect to Joseph McGinty (a/k/a McG):  the letter from David E. Weber to Tom Hunter, Esq., dated May 26, 2009 regarding "'T5 / McG – Deal Memorandum and Availability Provisions Language", and the memorandum attached thereto from David E. Weber to Joel Michaels and Tom Hunter, dated May 13, 2009 and entitled "McG – 'T5' / Terms", with various handwritten notations thereon including notes dated May 26, 2009; and email correspondence regarding "McG – T5" between David Weber and Tom Hunter dated June 15 and June 30, 2009, and any related documents.

30.    "Terminator Salvation" Digital Distribution License Agreement dated as of March 30, 2009 between Halcyon Games, LLC and T Asset Acquisition, LLC, on the one hand, and Warner Specialty Video Productions Inc., on the other hand, with respect to the distribution of the Machinima Series.

31.    Writer Loanout Agreement  between AGV Production T4 and  Jonathan Mostow dated July 1, 2003.

32.    Writer Loanout Agreement between AGV Productions T4 & Michael Ferris and John Brancato dated October 15, 2003 and First Amendment to Writer Loanout Agreement re: T4 between AGV Production T4 and The Deadpan

EXHIBIT A
Page 52

Corp/Consumer Recreation Services for Michael Ferris & John Brancato dated July 8, 2005.

     33.     Development Agreement dated September 18, 2002, between AGV Productions T4 LLC and RJ Info Tech, Inc. f/s/o Jonathan Mostow and Lieberville Inc. f/s/o Hal Lieberman; First Amendment to Development Agreement dated as of October 15, 2003, with respect to the document and  the Second Amendment to Development Agreement dated December 22, 2003.

4

## SCHEDULE  1.5

## Possessory Liens

None

## SCHEDULE 1.7(a)

## Contingent Consideration - First Dollar Participation

With respect to each and every theatrical motion picture which is a Sequel produced and distributed hereunder ("Picture"), Buyer shall pay to Seller the First Dollar Participation, if any, set out below. For the purposes of this Schedule 1.7(a) only, Buyer shall mean Lions Gate Films Inc. and/or its Affiliates, and their respective assigns and successors in interest.

(a)  First Dollar Participation.  Seller shall be entitled to receive the aggregate sum equal to Five Percent (5%) of One Hundred Percent (100%) of Gross Receipts remaining following deduction from Gross Receipts of the Off the Tops ("First Dollar Participation"). On each Picture a deemed amount equal to Five Million Dollars ($5,000,000) ("Deemed Cash Payment") shall be One Hundred (100%) applicable against the First Dollar Participation.

(b)  Definitions.  As used in this Schedule 1.7(a), the following definitions shall apply:

(1)    "Gross Receipts" shall be defined as all amounts (including, without limitation, minimum guarantees and advances for the Picture when the same have become non-refundable) received by and/or credited to the account of Buyer or its Affiliates, on a nonrefundable basis from worldwide distribution, sale, license, and/or other exploitation of the Picture in perpetuity, and any rights therein, in all media now known or hereafter devised, except that with respect to Home Video Gross Receipts from exploitation of all forms of Video in the Domestic Territory and all Foreign Direct-Distributed Territories (i.e., other than in the International Territories subject to Section (c)(1) of this Schedule 1.7(a)), only the Home Video Royalty amount shall be included in Gross Receipts. For clarity, Gross Receipts (whether received by Buyer or an Affiliate or other third party) do not include amounts received by any entity or person (whether or not an Affiliate) that are: exhibitors or others who may actually exhibit, rent, license, sell or transmit a Picture to the public;  amusement, theme park or other location-based entertainment operators; book or music publishers; programming services, broadcasters, transmitters, parties providing communications hardware, software or services and/or the like [including, without limitation, free, pay, cable and/or satellite television networks, broadcasters, services or systems, and/or parties providing video-on-demand, electronic home video, video downloading, streaming video, pay-per-view, closed circuit, digital, on-line and/or internet hardware, software, programming, distribution services or systems (e.g. i-tunes, Movielink, TV Guide Channel), handheld or mobile devices delivery systems]; manufacturers, wholesale or retail distributors, licensees or sellers of Video versions of the Picture; record, tape or CD producers, distributors or retailers; and merchandisers or other similar users;  notwithstanding the foregoing, all agreements between Buyer and any of  its Affiliates receiving any such sums which are not deemed Gross Receipts because of the foregoing exclusions, shall be on a good faith arms-length basis consistent with Buyer's or its Affiliates' agreements with unrelated third parties.

6

(i)      Gross Receipts shall be calculated at "source" (i.e., at the level of Buyer or its Affiliate), if Buyer or its Affiliate is the domestic theatrical distributor of the Picture in the Domestic Territory.  In addition, Gross Receipts shall be calculated "at source" (i.e. at the level of Buyer or its Affiliate) in all Foreign Direct Distributed Territories.

(ii)      In the International Territories, Seller acknowledges that Buyer distributes on a territory by territory licensing basis (and/or all territories, licensing basis or group of territories licensing basis) and Gross Receipts shall include all amounts received by Buyer and/or its Affiliates, including, without limitation, license fees, advances, minimum guarantees, and overages (all of which are specific to the Picture) received by and/or credited to Buyer and/or its Affiliates, on a nonrefundable basis, from such distribution.  For the avoidance of doubt, Gross Receipts from the International Territories shall include all amounts received by Buyer and/or its Affiliates from licensees in connection with the exploitation of a Picture by means of Video, as opposed to the Home Video Royalty (subject to Section (c)(1) of this Schedule 1.7(a)).

(iii)      Notwithstanding anything to the contrary contained herein, the following shall not be included in Gross Receipts:  any sums paid or payable to, or derived by, Buyer for, in connection with or as a result of (i) Buyer's production and/or exploitation of any theatrical, television, home video, Internet or any other production which is a remake of, sequel to, or otherwise derived from any Picture ("Subsequent Productions"), or the sale, transfer or assignment of all or any part of Buyer's right to produce and/or exploit same based on the Picture or based on any of the underlying material on which the Picture was based (provided that notwithstanding that revenues from Subsequent Productions will not be included in Gross Receipts of the Picture, Seller shall nevertheless be entitled to receive its First Dollar Participation as set forth herein with respect the Gross Receipts attributable to all such Subsequent Productions that are Pictures as defined hereunder) and/or (ii) Buyer's inclusion of advertising or promotional material for products and/or services prior to, during and/or after any Picture in any and all media.  In this regard, Buyer hereby reserves unto itself an unlimited amount of time on each Video device of the Picture for Buyer's own corporate purposes ("Promotional Time"), including, but not limited to, the purposes of promoting other motion pictures distributed by Buyer and promoting Buyer; provided that Buyer shall not insert such Promotional Time into the body of the Picture.  Any and all revenue received by or credited to the account of Buyer from the exploitation of the Promotional Time (if any) shall be credited to Buyer's own account and shall not be included in Gross Receipts.

(2)      "Home Video Gross Receipts" shall be defined as 100% of all amounts (including, without limitation, minimum guarantees and advances for the Picture when the same have become nonrefundable) received by and/or credited to Buyer from the exploitation of Video on a non-refundable basis in the Domestic Territory and all Foreign Direct Distributed Territories. The "Home Video Royalty" shall mean Twenty Percent (20 %) of the Home Video Gross Receipts with no deduction of home video costs, fees and expenses of the Picture.  No royalties shall be payable from Video exploitation of the Picture in which the Picture is distributed as free goods or for promotional purposes (subject to reasonable limitations and good faith arms-length dealing) and Buyer shall be

7

entitled to take reasonable reserves for Video returns which shall be liquidated within twelve (12) months.

(3)    "Video" means home video/DVD, high definition video/DVD (e.g., Blu-ray), electronic sell-through, video-on-demand, digital video/DVD, and functionally equivalent devices, means or methods, in whatever form and whether now known or hereafter devised, and however delivered, transmitted or made available to the viewer through which the Picture is available for viewing at a time or times selected by the viewer.

(4)    "Off the Tops" shall mean One Hundred Percent (100%) of the following so-called "off the tops" directly related to the Picture and which are direct, actual, reasonable and out-of-pocket and verifiable: conversion costs, checking costs and collection costs (all of which shall be capped at One Percent (1%) of Gross Receipts or $250,000 in the aggregate whichever is the lesser); residuals; trade dues (which shall be capped at the greater of One-Half of One Percent (1/2%) or $125,000); permits, duties; and taxes (other than Buyer's income or similar taxes).

(5)    "Third Party Distributor" shall mean a major studio or other third party distributor (other than Buyer or any of its Affiliates) which is the distributor for any of the media or territories of the Picture.

(6)    "Affiliate" shall mean, solely with respect to this Schedule 1.7(a), in relation to Buyer, any entity or person that, directly or indirectly, controls, is controlled by, or is under common control with, Buyer. For purposes of the Agreement, ownership directly or indirectly of fifty-one percent (51%) or more of the voting stock and/or other voting equity security of an entity is deemed "control."

(7)    "Domestic Territory", shall mean the District of Columbia and the states of the United States, and military installations, aircraft, and ships flying the United States flag, and aircraft and ships which were booked in the United States, but excluding its territories, possessions, and Puerto Rico.

(8)    "Foreign Direct Distributed Territories" shall mean those foreign territories distributed on an "at source" basis by Buyer.

(10)    "International Territories" shall mean those territories other than the Domestic Territory and Foreign Direct Distributed Territories (i.e., the remainder of the world).

(c)  Accounting on Pictures Distributed by a Third Party Distributor.  In the event that Buyer grants any distribution rights in a Picture to a Third Party Distributor and therefore Buyer is not the direct distributor of such rights granted to such Third Party Distributor ("Third Party Rights") then, at Buyer's sole election, either:

(1)    Buyer shall require that such Third Party Distributor be solely contractually responsible to pay Seller its First Dollar Participation hereunder with respect to such Third Party Rights in the Picture and such Third Party Distributor shall account directly

8

to Buyer as per Section (d) below, in which case the Third Party Distributor shall account to Seller as if the Third Party Distributor were defined as Buyer under this Schedule 1.7(a) for such Third Party Rights in the Picture and "Gross Receipts" shall be the Gross Receipts (including only the Home Video Gross Receipts Royalty amount as defined above) of such Third Party Distributor and shall be calculated "at source" (i.e. at the level of Third Party Distributor or its Affiliates) in media and territories where such Third Party Distributor distributes directly and otherwise as per Section (b) (1) (ii) and (iii) and, furthermore, the "Off the Tops" shall be the "Off the Tops" of the Third Party Distributor and its Affiliates (capped as set forth in Section 1(b)(4) of this Schedule 1.7(a)) and, if mutually agreed between Buyer and such Third Party Distributor, such Third Party Distributor shall be permitted to deduct a mutually agreed share of the Deemed Cash Payment applicable against the First Dollar Gross Participation paid by such Third Party Distributor. If Buyer so elects and the Third Party Distributor contractually agrees to pay such First Dollar Participation then: (i) Buyer shall have no liability with respect to the First Dollar Participation on such Picture with respect to those Third Party Rights; (ii) Seller shall look solely to such Third Party Distributor for payment of its First Dollar Participation, if and when, due, with respect to those Third Party Rights and (iii) Buyer shall not include any consideration it receives from  such Third Party Distributor (whether in the form of a minimum nonrefundable guarantee and/or any back-end participation, whether first dollar or not) in its definition of Gross Receipts hereunder for the purpose of accounting to Seller on its Gross Receipts with respect to any distribution rights Buyer retains); or

(2)      Buyer shall account to Seller on the basis of its Gross Receipts and Buyer shall include in Gross Receipts only such non-refundable sums as it receives or is credited to it from such Third Party Distributor together with any Gross Receipts it receives hereunder from other media or territories hereunder whether under Section b.(1)(i) or (ii) or otherwise and Buyer shall deduct its Off the Tops accordingly and apply the Deemed Cash Payment in order to calculate the First Dollar Participation.

(d)  Accounting/Audit.  Buyer shall account to and pay to Seller all sums due under this Schedule 1.7(a), if any, on a quarterly basis for three (3) years and semi-annually thereafter with all quarterly statements and accountings delivered within 45 days following the close of each quarterly period and with all semi-annual statements and accountings delivered within 60 days following the close of each semi-annual period. Seller shall have the right to audit Buyer's books and records with respect to the Picture once per year at Buyer's principal place of business in Santa Monica, CA at Seller's sole cost and expense. Seller shall provide Buyer with ten (10) days prior written notice of Seller's intent to conduct such audit.  All notices, statements and payments made pursuant to this Agreement shall be deemed valid and shall not be subject to dispute or audit unless disputed within thirty-six (36) months after first received.  In all media, including Video, Buyer shall be entitled to take reasonable allowances for bad debt, returns and residuals (which reserves shall be calculated in accordance with Buyer's customary business practices and shall be liquidated within a reasonable time, but in no event later than six (6) months following their creation).

**SCHEDULE 1.7(b)**

**Wire Transfer Instructions for Deposit**

To be prepared

1

## SCHEDULE 1.8

## Allocation of Consideration for Tax Purposes

To be prepared

EXHIBIT A
Page 60

## SCHEDULE 2.2

**Rights Sold, Conveyed, Transferred, Licensed or Assigned to Third Parties**

None

1

## SCHEDULE 2.4

## Claims That Could in Any Way Materially Adversely Affect or Impair

1.       Claims by StudioCanal S.A. set forth in correspondence from their counsel Baker & McKenzie LLP to  counsel for Seller Peter Eichler dated October 31, 2008, November 21, 2008, January 23, 2009 and June 30, 2009 alleging, among other things, that Seller is in violation of the Carolco Library Trademark License Agreement by reason of sublicensing rights in the TERMINATOR trademarks without obtaining the prior written consent of StudioCanal, granting sublicenses which purport to grant rights beyond those granted to AGV in the Carolco Library Trademark License Agreement and under the Carolco Sale Agreement and publicly claiming inaccurately to own the entire TERMINATOR film franchise.

1

## SCHEDULE 2.5

## Insurance Claims

None

1

## SCHEDULE 2.6

## Litigation

1.      Claims by StudioCanal S.A. set forth in correspondence from their counsel Baker & McKenzie LLP to  counsel for Seller Peter Eichler dated October 31, 2008, November 21, 2008, January 23, 2009 and June 30, 2009 alleging, among other things, that Seller is in violation of the Carolco Library Trademark License Agreement by reason of sublicensing rights in the TERMINATOR trademarks without obtaining the prior written consent of StudioCanal, granting sublicenses which purport to grant rights beyond those granted to AGV in the Carolco Library Trademark License Agreement and under the Carolco Sale Agreement and publicly claiming inaccurately to own the entire TERMINATOR film franchise.

EXHIBIT A
Page 64

## SCHEDULE 2.9

### Corporate Names, Fictitious Names
### and Aliases Used by the Halcyon Parties

Halcyon Holding Group, LLC

Halcyon Holding Group, LLC, dba The Halcyon Company

The Halcyon Company

Halcyon Productions Group

Halcyon Entertainment Group

Halcyon LLC

Halcyon International (BVI) Ltd.

T Asset Acquisition Company, LLC

T Asset Acquisition, LLC

T Asset International (BVI) Ltd.

T Salvation Distribution, LLC

T Salvation Distribution (BVI) Ltd.

T Salvation Productions, LLC

Dominion Group, LLC

Dominion, LLC

Halcyon Consumer Products, LLC

Halcyon Development, LLC

Halcyon Games, LLC

Halcyon Games, Inc.

Halcyon Music Publishing, LLC

Halcyon Music Publishing, LLC, dba Halcyon Worldwide Music Publishing

Halcyon Music, LLC

Halcyon Worldwide Music Publishing

EXHIBIT A
Page 65

**SCHEDULE 4.16**

**Additions To, or Subtractions From, the Virtual Data Room
After November 10, 2009**

1.      A fully executed copy of the Amendment to the Settlement/First Negotiation Agreement with MGM was substituted for the draft version previously uploaded to the data Room (i.e., the prior draft was "subtracted" and the fully executed copy was "added" in its place);

2.      A final executed copy of the First Settlement Agreement with respect to the Terminator 3 Trust Agreement was substituted for the draft version previously uploaded (i.e., the prior draft was "subtracted" and the fully executed copy was "added" in its place);

3.      A copy of the July 22, 2008 Amendment to the StudioCanal Trademark License Agreement was added (Lions Gate was previously provided with a copy of this document);

4.      A copy of a draft proposed Second Settlement Agreement with respect to the Terminator 3 Trust Agreement was added;

5.      A Copy of the T4 Collection Account Management Agreement was added (Lions Gate was previously provided with a copy of this document);

6.      A Licensing Agreement and a Certification/Indemnity Agreement with an International Lottery Company (for a Russian Lottery) were added;

7.      A Confidentiality Agreement and a Merchandising License Agreement with a Russian company called Zvezda LLC were added;

8.      A Merchandising License Agreement with DK/Brady Games was added; and

9.      A Digital Distribution Agreement with Warner Specialty Video Productions (in connection with the Machinima Series) was added.

1

**SCHEDULE 5.6**
**Third Party Consents Required by Buyer**

None

EXHIBIT A
Page 67

## SCHEDULE 6.4

## Third Party Consents Required by Seller

None

EXHIBIT A
Page 68

# EXHIBIT A

## DEFINITIONS

As used in the Agreement and the Exhibits and Schedules delivered pursuant to the Agreement, the following definitions shall apply:

"Affiliate" (except as used in Schedule 1.7(a), which has a separate definition of the term for purposes of that Schedule) means, for any specified Person, any other Person which, directly or indirectly, controls, is controlled by or is under common control with such specified Person and "Affiliated" has a meaning correlative to the foregoing.  For purposes of this definition, "control" means the power, directly or indirectly, to cause the direction of the management and policies of a Person (whether by or through the ownership of securities, by contract or otherwise).

"Attachments and Participations" has the meaning ascribed to it Section 5.1(b)(iv).

"Books and Records" means all of Seller's files, books and records (including, without limitation, financial books and records), data bases, ledger cards, files, correspondence, computer programs, tapes, disks and related data processing software that at any time evidence or contain information relating to the Granted Terminator Assets or are otherwise necessary or helpful in the exploitation, ownership or collection thereof or realization thereupon, continuity lists, dialogue lists, spotting lists, synchronization licenses, contracts, correspondence and business affairs and legal files relating to the development, acquisition, production and exploitation of any of the Granted Terminator Assets or the other Sequel and Remake Rights, cast lists, artwork, press books, story synopses, credit requirements lists, posters, advertising and publicity materials and all versions thereof and all of Seller's rights of access to the foregoing, contracts, agreements, assignments, documents or other papers, including originally executed copies of such contracts, agreements, assignments, documents or other papers relating to the Granted Terminator Assets.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Los Angeles, California are authorized or required to close.

"Carolco Bankruptcy Court Order" means that certain Order Authorizing and Approving (a) Auction Sale under Section 363(b) and (f) of the Bankruptcy Code of all of Carolco's Rights in the Motion Pictures 'Terminator' and 'Terminator 2: Judgment Day,' including a Portion of the Rights to Produce and Exploit Prequels, Sequels and Remakes; (2) Treatment of Related Attachments and Participations; and (3) the Assignment under Section 365 of the Bankruptcy Code of Related Executory Contracts, entered on October 14, 1997 in the United States Bankruptcy Court, Central District of California, Case No. LA95-39299-LF.

"Carolco Library Trademark License Agreement" means that certain Trademark License Agreement dated as of April 29, 1996 between  Canal+D.A. and Carolco Pictures Inc., as assigned by Carolco Pictures Inc. to AGV, as amended by Amendment Agreement dated April __, 2003 by and between StudioCanal Image S.A., (as successor to Canal+D.A.)

1

and AGV and Amendment Agreement dated July 22, 2008 by and between StudioCanal S.A. (as successor to StudioCanal Image S.A) and T- Asset Acquisition Company, LLC, as successor to AGV's rights relating to the making of Remakes and Sequels to the films T1 and T2.

"Contracts" means all contracts, agreements, assignments and instruments of every kind and character under which the Seller or any third party may have heretofore acquired or may hereafter acquire any right, title, and interest in or to the Granted Terminator Asset.

"Derivative Rights" means all ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to the Granted Terminator Assets and the Sequels.  Without limiting the foregoing, Derivative Rights also include all rights in and to the Literary Properties upon which the Sequels are based and the Sequels, the title(s) of the Sequels and the characters (including their names and characteristics) appearing in the Sequels.

"Governmental Authority" means any: (i) federal, state, local, municipal or foreign government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, instrumentality or entity and any court or other tribunal); (iii) multi-national organization or body; or (iv) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power.

"Granted Terminator Assets" shall have the meaning ascribed in Section 1.1.

"Guild" means any guild, craft, union or labor organization having jurisdiction over any Person rendering services or granting any rights in any capacity in connection with the Granted Terminator Assets.

"Guild Obligations" means all obligations, liabilities and/or commitments of any kind or nature arising under or in connection with any contract, collective bargaining agreement or other document or instrument with any Guild including, without limitation, any obligation or liability to make any payments pursuant to any such contracts, agreements, documents or instruments arising in connection with or as a result of the development, acquisition, production or exploitation of T1, T2, T3, and T4 and Derivative Rights therein, any Sequel and Remake Rights and any Derivative Rights therein, including the Television Series, Termination OVA, Animated Television Series, Live Action Television Series, and Sequel Video Game Rights and any other Terminator Assets., including, without limitation, any so-called "residual," "reuse," "rerun" or "supplemental market" payments.

"Indemnifiable Claim" means any Loss for or against which any party is entitled to indemnification under this Agreement.

2

EXHIBIT A
Page 70

"Instrument" shall have the meaning given to such term in the Uniform Commercial Code.

"Interest" shall have the meaning given to such term in Section 1.9.

"Liabilities" means any and all debts, liabilities, obligations, commitments, responsibilities, fines, penalties and sanctions, absolute or contingent, matured or unmatured, liquidated or unliquidated, joint, several or individual, asserted or unasserted, accrued or unaccrued, known or unknown, due or to become due, whenever arising, including without limitation any costs, expenses, interest, reasonable attorneys' fees, disbursements and expense of counsel, expert and consulting fees and costs related thereto or to the investigation or defense thereof.

"Lien" means, for any property or asset of a Person, a lien, security interest, encumbrance, interest, mortgage (including without limitation, copyright mortgage) or pledge on such property or asset in favor of any other Person, including but not limited to any Lien held or asserted by any Guild, except those in favor, or for the benefit, of Buyer.

"Literary Property" or "Literary Properties" means all of Seller's rights of every kind and nature (including, without limitation, copyrights) in and to the screenplay and any other literary, musical, dramatic, visual, artistic, or other literary material of any kind or nature upon which, in whole or in part, any Terminator Asset is based, or from which it is adapted or has been used or included in any Terminator Asset including, without limitation, all scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts, designs, drawings, artwork, models, mock-ups, animation, or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof.

"Loss" or "Losses" means any action, cost, damage, obligation, judgment, disbursement, expense, liability, loss and settlement payments, including without limitation attorneys', accountants and other professional fees and costs incurred by a party pursuant to this Agreement in connection with the Granted Terminator Assets.

"Material Adverse Effect" means:

(a)    With respect to the Granted Terminator Assets, any effect which would materially prejudice or derogate from the Granted Terminator Assets or otherwise materially alter or diminish the value of the Granted Terminator Assets or Buyer's rights, claims and remedies with respect to the Granted Terminator Assets or would materially increase the liabilities assumed by Buyer pursuant to this Agreement.

(b)    With respect to any Person, any effect which renders a Person insolvent or which would materially diminish the ability of such Person to perform its obligations under this Agreement or to consummate the Transaction.

"Participation Obligations" means all of Seller's financial obligations for contingent compensation in the nature of gross participations, net profit or net proceeds participations or

3

so-called deferments (including without limitation the Television Series Participation) in connection with the exploitation of the Seller's right, title and interest in and to T1, T2, T3, and T4 and any Derivative Rights therein, any Sequel and Remake Rights and any Derivative Rights therein, including the Television Series, Termination OVA, Animated Television Series, Live Action Television Series, and Terminator Video Games and any other Terminator Assets.

"Person" means an individual, partnership, corporation, limited liability company, trust, incorporated or unincorporated association, joint venture, Governmental Authority or other entity of any kind.

"Project" means each of Termination OVA, Animated Television Series and Live Action Television Series.

"Recapture Rights" means any and all rights of Seller to exploit, purchase or otherwise acquire the copyright or distribution rights in and to the motion pictures T3 or T4 in any media (and any Merchandising Rights or Other Ancillary Rights directly related to and based solely on T3 or T4 but subject to the Merchandising Holdback and the freeze of Other Ancillary Rights under Section 4.4 of the Agreement which holdback and freeze the parties agree shall also apply to T3 to the extent Seller recaptures any such rights in T3), at any time in the future, including, without limitation, upon the termination or expiration of any license or distribution periods pursuant to the existing distribution agreements; but for the avoidance of doubt, Seller shall not retain and hereby assigns any rights that are recaptured by Seller that include any Sequel or Remake Rights or Derivative Rights not related to and based solely on T3 or T4 or any other of the rights included in the Granted Terminator Assets assigned to Buyer hereunder and any exercise or license by Seller (or its assignees or licensees ) of the distribution rights in T3 or T4 (or such Derivative Rights related to and based solely thereon) shall be subject to all the terms of this Agreement including without limitation Section 4.4.(c).

"Related Agreements" means the Assignments of Copyright, Assignment of Trademark, the Short Form Assignments, the Account Notices, Assignment and Assumption Agreements, and any documents executed or delivered under Article V.

"Sequels" means any and all remakes, sequels, prequels and any other motion picture, television program or series of programs or other productions made, produced or created pursuant to or under the Sequel and Remake Rights.

"Sequel and Remake Rights" means all of Seller's rights under the Terminator Rights Agreements, the Prior Purchase Agreement and the Carolco Bankruptcy Court Order and the Sale Approval Order to develop, produce or exploit remakes, sequels, prequels and any other motion picture, television program or series of programs or other production based in whole or in part on T1, T2, T3, T4, Termination OVA, Television Series, Animated Television Series, Live Action Television Series, or Terminator Video Game Rights, including the right to use the title, characters, names, underlying Literary Property, or any material included in or utilized in connection with any of the foregoing (including without limitation, any settings, costumes, props, sets, models, miniatures, vehicles, titles, visuals, trademarks, logos,

4

characters (human or non human including without limitation robots), incidents, artwork, dialog, images, sounds, events, music and lyrics from any and all of such works including T1, T2, T3, T4, Termination OVA, Television Series, Animated Television Series, Live Action Television Series or Video Game Rights and, for the avoidance of doubt, with respect to T4, Seller hereby expressly grants an irrevocable free license under copyright to utilize, reproduce and adapt any and all such material included in or utilized in connection with T4 throughout the universe in perpetuity in the Sequels and in or relating to the exploitation of the Sequel and Remake Rights and/or the Granted Terminator Assets).

"Television Series Participation" means Seller's right to receive contingent compensation in connection with the Television Series pursuant to the Warner Bros. Television Agreements (inclusive of any share thereof owing to Seller's Grantor).

"Terminator Assets" means all of the Seller's right, title and interest in and to T1, T2, T3 and T4 arising under or related to the Terminator Rights Agreements, the Carolco Bankruptcy Court Order, and the Prior Purchase Agreement including, without limitation, all of Seller's right, title and interest in and to the Sequel and Remake Rights, Payment Rights, Recapture Rights, Termination OVA, Television Series, Animated Television Series, Live Action Television Series, and Video Game Rights.

"Terminator Rights Agreements" means, collectively, (a) that certain Purchase and Sale - Quitclaim Agreement, dated as of September 11, 1997, by and between The Carolco Liquidating Trust as successor in interest to the rights of Carolco Pictures Inc., Carolco International Inc., formerly known as Carolco International N.V., Carolco Service Inc. and Carolco Production Services Inc., for themselves and on behalf of their respective bankruptcy estates, on the one hand, and AGV Productions, Inc., on the other hand, as authorized and approved by the Carolco Bankruptcy Court Order, (b) that certain Assignment Agreement, dated as of March 19, 1998, by and between Pacific Western Productions, Inc., and Gale Anne Hurd, on the one hand, and AGV Productions, Inc., on the other hand and (c) Television Rights Assignment of All Rights dated as of November 5, 2004 by and between AGV Productions Inc on the one hand and  Red Giant Productions, Inc f/s/o John Daly and Century Corporation f/s/o Derek Gibson.

"Uniform Commercial Code" means the Uniform Commercial Code in effect in the State of California as of the date hereof.

"Video Game Rights" means all console, platform, personal computer or online video game rights (including creation, development, production and manufacturing rights) based on or derived from or related to the Terminator Assets.

5

# **EXHIBIT B**

## **PROPOSED OVERBIDDING PROCEDURES ORDER**

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8              **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10                 **LOS ANGELES DIVISION**

11 In re:                                          Case No.: 2:09-31853-ER

   T ASSET ACQUISITION COMPANY, LLC, a          Chapter 11
12 Delaware limited liability company; HALCYON
   HOLDING GROUP, LLC, dba THE HALCYON          (Jointly Administered with Case Nos.:
13 COMPANY, a Delaware limited liability company;  2:09-31854-ER and 2:09-31855-ER)
14 and DOMINION GROUP LLC, a California limited
   liability company,                            **ORDER GRANTING MOTION OF
15                                                DEBTORS FOR ORDER: (1)
                                                  ESTABLISHING SALE PROCEDURES
                          Debtors.                FOR SALE OF CERTAIN OF THE
16                                                DEBTORS' *TERMINATOR* ASSETS, (2)
                                                  APPROVING BREAK-UP FEE, AND (3)
17                                                APPROVING FORM AND MANNER OF
                                                  NOTICE OF SALE**
18 **Check One or More as Appropriate:**
   Affects All Debtors:                    ☒    **Hearing:**
19 Affects T Asset Acquisition Company, LLC only: ☐
                                                  Date:  January 20, 2010
20 Affects Halcyon Holding Group, LLC only:  ☐    Time:  10:00 a.m.
                                                  Place: Courtroom 1568
21 Affects Dominion Group LLC only:          ☐          255 E. Temple Street
                                                        Los Angeles, CA 90012
22

23

24         The Motion Of Debtors For Order Establishing Sale Procedures For Sale Of  Debtors' Assets

25 Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims,

26 Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (as

27 supplemented and amended, the "Overbidding Procedures Motion"), filed by the above-captioned

28 debtors (the "Debtors"), came on for hearing before the Honorable Ernest M. Robles, United States

                                      1

Bankruptcy Judge, on January 20, 2010, at 10:00 a.m. (the "Hearing"). Appearances were made as reflected in the Bankruptcy Court's record.

On January 8, 2010, the Debtors filed a supplement to the Overbidding Procedures Motion (the "Overbidding Supplement") disclosing that, subject to approval of the Bankruptcy Court, the Debtors had agreed to sell to Lions Gate Films, Inc. ("Buyer"), for the amount of Fifteen Million Dollars ($15,000,000.00) in cash (the "Cash Payment"), plus certain contingent consideration, plus the assumption of certain liabilities (together, the "Purchase Price"), the Granted Terminator Assets specified in that certain Asset Purchase Agreement dated as of January 7, 2010 attached as Exhibit A to the Overbidding Supplement (the "Lions Gate APA"), pursuant to the terms set forth in the Lions Gate APA. Capitalized terms used herein have the meanings ascribed to them in the Overbidding Procedures Motion and the Overbidding Supplement, unless otherwise defined.

The Court has jurisdiction over the Overbidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1333. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409. Good and appropriate notice of the relief sought by the Overbidding Procedures Motion has been given under the circumstances, and no other or further notice is required. A reasonable opportunity was afforded to all interested parties and entities to object to or to be heard regarding the relief requested in the Overbidding Procedures Motion including, without limitation, with respect to the Break-Up Fee described below.

After consideration of the Overbidding Procedures Motion, the Overbidding Supplement and accompanying supporting papers, the arguments of counsel, the files and records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT:**

A.    <u>Sale Hearing</u>. On February 10, 2010, at 10:00 a.m. Pacific Time (the "Sale Hearing"), the Bankruptcy Court (the "Court") shall hold a hearing on the Debtors' motion for approval of a sale of the Granted Terminator Assets to Buyer pursuant to the terms set forth in the Lions Gate APA. No later than January 22, 2010, the Debtors shall file and serve a supplement to the previously filed motion for approval of sale of the Debtors' assets relating to the *Terminator* motion picture franchise that describes the terms of the Lions Gate APA and the modified relief that will be requested at the Sale Hearing (as

supplemented and modified, the "Sale Approval Motion").  Any objections to the Sale Approval Motion must be filed and served in accordance with Local Bankruptcy Rule 9013-1(f) no later than fourteen (14) days before the Sale Hearing, and replies thereto must be filed and served in accordance with Local Bankruptcy Rule 9013-1(g) no later than seven (7) days before the Sale Hearing.

B.    Qualified Overbids.  The Debtors shall consider qualified overbids for the Granted Terminator Assets ("Qualified Overbids), but shall not consider proposed overbids that are not Qualified Overbids.  In order for a proposed overbid to be deemed a Qualified Overbid, a proposed overbid must meet each of the criteria set forth in the following subparagraphs 1 through 6:

1.    Deadline for Receipt of Overbids.  All of the documents and information required to be submitted pursuant to subparagraphs 2 through 6 below must be received by (a) the Debtors, (b) the Debtors' bankruptcy counsel, Howard J. Weg of Peitzman, Weg & Kempinsky LLP, (c) the Debtors' financial advisor, Kevin Shultz of FTI Capital Advisors, LLC, and (d) counsel for Buyer, no later than 5:00 p.m., Pacific Time, on February 4, 2010 (the "Overbid Deadline").  Unless a bid containing all of the required documents and information is submitted by the Overbid Deadline, it will not constitute a Qualified Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

2.    Initial Overbid Amount.  In order to be a Qualified Overbid, the overbid must be for a price, payable at the closing by bank cashier's check or wire transfer of immediately available funds, in an amount not less than the sum of (i) the Cash Payment, *plus* (ii) the Contingent Compensation (upon terms equal to or better than the terms set forth in the Lions Gate APA), *plus* (iii) the Break-Up Fee described in Paragraph G below, *plus* (iii) Five Hundred Thousand Dollars ($500,000).  Any holder of an allowed claim that is authorized to credit bid under section 363(k) of the Bankruptcy Code must agree to pay *in cash* a minimum amount equal to (i) the Break-Up Fee described in Paragraph G below, *plus* (ii) Five Hundred Thousand Dollars ($500,000).

3.    Form and Content of Overbid.  In order to be a Qualified Overbid, any overbid must include an executed asset purchase agreement in form and substance the same as the Lions Gate APA (other than the identity of the Buyer and the amount of the bidder's price, which must satisfy the conditions of paragraph 2 above), together with a redline comparison of the overbidder's asset purchase agreement showing the differences from the Lions Gate APA.  Without limiting the foregoing, the overbid may not include any representations, warranties or conditions to closing (including due diligence

3

or financing contingencies) other than those set forth in the Lions Gate APA (unless they have been previously waived by Buyer). If any Qualified Overbid is conditioned upon the assumption and assignment, or rejection, of any executory contracts or leases, the overbidder must identify such contracts or leases. For executory contracts or leases to be assumed and assigned, the overbidder must provide written evidence, satisfactory to the Debtors, of the overbidder's ability to provide adequate assurance of future performance of such assumed contracts or leases.

4.    <u>Offers Irrevocable</u>.  In order to be a Qualified Overbid, any overbid must contain a letter from the overbidder stating that the overbid will remain open and irrevocable until sixty (60) days after the date of entry of an order by the Court approving the sale of the Granted Terminator Assets (a "Sale Approval Order") has been entered by the Clerk of the Court.

5.    <u>Deposits</u>.  In order to be a Qualified Overbid, any overbid must be accompanied by a deposit (the "Deposit") in the form of a bank cashier's check or wire transfer of immediately available funds to the Debtors in the amount of $750,000. The Debtors shall hold each Deposit in a segregated interest-bearing account, subject to Court order, to defray all costs, expenses and damages arising as a result of the failure of any winning overbidder to close for any reason other than the default of the Debtors. The Debtors shall return a Deposit to an overbidder as soon as practicable after the earlier to occur of: (i) the Debtors' delivery of written notice to an overbidder that its overbid is not a Qualified Overbid; or (ii) entry of a Sale Approval Order providing for the sale of the Granted Terminator Assets to an entity other than the overbidder. Interest and investment income accrued or earned on the Deposit shall follow the principal. Interest that accrues or that is earned on the successful bidder's Deposit (including Buyer's Deposit if Buyer is the successful bidder) shall be credited toward the Purchase Price. If the successful bidder fails to consummate the sale because of a breach or failure to perform on the part of such successful bidder, the Deposit (plus interest and investment income accrued or earned thereon) will be forfeited to the Debtors, who will have no obligation to return such amount to the successful bidder, without prejudice to the Debtors' other rights, claims or remedies against the defaulting successful bidder.

6.    <u>Ability of Bidder to Consummate Transaction</u>.  In order to be a Qualified Overbid, the overbidder must include written financial evidence, satisfactory to the Debtors, demonstrating that the overbidder has the ability to consummate the transactions contemplated by the Lions Gate APA. Such

4

financial evidence may include, among other things, background reports and/or references, financing

commitments, financial statements, income statements, tax returns, balance sheets, annual reports and

bank statements.

       C.    <u>Qualification and Disqualification of Overbids</u>.  No later than 5:00 p.m., California time,

on February 5, 2010 (the "Determination Deadline"), the Debtors shall determine whether any overbids

timely submitted are Qualified Overbids and shall inform each overbidder whether it has submitted a

Qualified Overbid or whether its overbid has been rejected as unqualified.  The Debtors also shall notify

Buyer at that time whether any Qualified Overbid was received and, if so, the identity of each qualified

overbidder and the terms of its overbid.  The Debtors shall have the right to permit a bidder that

submitted a bid prior to the Bid Deadline that was not a Qualified Bid to modify the bid so that the bid

will be deemed a Qualified Bid, except that the Debtors may not change: (i) the amount or form of the

initial overbid required under Paragraph B(2) above, (ii) the amount or form of the Deposit required

under Paragraph B(5) above, or (iii) the irrevocability of a bid required under Paragraph B(4) above.

       D.    <u>Bankruptcy Court Resolution of Disputes.</u>  Any disputes concerning whether an

overbidder submitted a Qualified Overbid shall be resolved by the Bankruptcy Court at the Sale Hearing.

       E.    <u>Result If No Qualified Overbids</u>.  If the Debtors determine by the Determination Deadline

that there are no Qualified Overbids, the Debtors shall move the Court at the Sale Hearing for authority

to sell the Granted Terminator Assets to Buyer pursuant to the terms of the Lions Gate APA.

       F.    <u>Auction To Be Held If A Qualified Overbid Is Timely Submitted</u>.  If the Debtors

determine by the Determination Deadline that at least one Qualified Overbid was submitted, the Debtors

shall hold an auction (the "Auction") as follows:

       1.    The Auction shall take place on February 8, 2010 at 10:00 a.m. at the offices of

FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until

concluded by the Debtors.

       2.    Only the Buyer and entities that submitted Qualified Overbids may participate in

the Auction.  The Debtors will not be required to entertain any bids submitted at the Auction by any

entities other than the Buyer and those entities that submitted Qualified Overbids.

       3.    The Debtors may continue the Auction to a later date without further notice other

than an announcement at the Auction and the service and filing of written notice in the docket of this

case.

4.      At the commencement of the Auction, the Debtors shall announce which of the initial Qualifying Overbids is, in their determination, the highest and best offer.  In making this determination, the Debtors shall have the right to consider, among other things: (a) the number, type and nature of any changes to the Lions Gate APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the acquired Granted Terminator Assets to such bidder and the cost to the Debtors of such modifications or delay; (c) the likelihood of the bidder's ability to close the transaction and the timing thereof, and (d) the net benefit to the Debtors' estates, taking into account the Buyer's right to receive the Break-Up Fee described herein.

5.      At the Auction, after the announcement of the initial Qualifying Overbid, any further overbids must be in increments of not less than $1,000,000 in cash.

6.      At the conclusion of the Auction, the Debtors shall announce which of the bids is, in their determination, the highest and best offer, and that bid will be presented to the Court for approval at the Sale Hearing.

7.      All unsuccessful final bids at the Auction shall be treated as binding back-up bids and, in the event that the successful bidder fails to close, the Debtors shall have the right to select one of the unsuccessful final bids as the replacement successful bid; *provided, however*, the right of the Debtors to select an unsuccessful final bid as the replacement successful bid shall expire sixty (60) days after the date of entry of the Sale Approval Order.

G.      <u>Break-Up Fee</u>.  In the event that Buyer is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Buyer shall be paid a break-up fee in the amount of Seven Hundred Fifty Thousand Dollars ($750,000) which represents five percent (5%) of the Cash Payment that would have been due from Buyer at closing under the Lions Gate APA if Buyer had been the successful bidder (the "Break-Up Fee").  The Break-Up Fee shall be paid to Buyer from the proceeds of the sale, by bank cashier's check or wire transfer in the full amount of the Break-Up Fee without any deduction or offset of any nature, immediately upon the occurrence of the closing of the sale.

H.      <u>Sale Notice</u>.  The form of the Sale Notice attached as Exhibit C to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Sale Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive

6

electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or

that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted

Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts, (v) each party that

previously submitted or expressed an interest in submitting an offer for the Granted Terminator Assets,

(vi) all parties identified on the Debtors' Master Mailing Matrix; (vii) all parties to any other contracts or

obligations of the Debtors that will not be assumed by Buyer; and (viii) any other Persons to whom

notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.  In addition, the

Debtors, at the sole expense of Buyer, shall cause notice substantially in the form attached to the

Overbidding Supplement as Exhibit H to be published not less than once in the daily or weekly edition of

*Variety* and such other publication(s) as the Debtors and Buyer may agree.

I.    Assumed Contracts Notice.  The form of the Assumed Contract Notice attached as Exhibit

E to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall

file and serve the Assumed Contracts Notice upon the following parties: (i) the Office of the United

States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in

these cases,  (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any

nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and

Rejected Contracts, and (v) any other Persons to whom notice is required in order to comply with Rules

2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local

Bankruptcy Rules of the Bankruptcy Court.

J.    Participations and Attachment Rights Notice.  The form of the Participations and

Attachment Rights Notice attached as Exhibit G to the Overbidding Supplement is hereby approved.  No

later than January 22, 2010, the Debtors shall file and serve the Participations and Attachment Rights

Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive

electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or

that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted

Terminator Assets, (iv) all parties to the Participations and Attachment Rights, and (v) any other Persons

to whom notice is required in order to comply with Rules 2002(a)(2) 6004, and 6006 of the Federal Rules

of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

EXHIBIT A
Page 81

K.    <u>Rejected Contracts and Intellectual Property Licenses Notice</u>. The form of the Rejected Contracts Notice attached as Exhibit F to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Rejected Contracts Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts (including Rejected IP Licences), and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

L.    <u>Effectiveness</u>.  This Order shall be effective immediately upon entry.

Dated: _____          _____

                                      UNITED STATES BANKRUPTCY JUDGE

8

## EXHIBIT C

## QUITCLAIM AGREEMENT

This Quitclaim Agreement is made and entered into as of _____, 20__ by and between Halcyon Holding Group, LLC d/b/a The Halcyon Company ("Halcyon"), T Asset Acquisition Company LLC ("T Asset"), Dominion Group, LLC d/b/a or a/k/a Dominion, LLC ("Dominion"), T Asset International (BVI) Ltd. ("T Asset International"), T Salvation Distribution, LLC ("T Distribution"), T Salvation Distribution (BVI) Ltd. ("T Distribution International"), T Salvation Productions, LLC ("T Productions"), Halcyon Consumer Products, LLC ("HCP"), Halcyon Games, LLC ("Games"), Halcyon International (BVI) Ltd. ("Halcyon International"), Halcyon Music Publishing, LLC d/b/a Halcyon Worldwide Music Publishing ("Halcyon Music") and as debtors and debtors in possession, for themselves and on behalf of their respective bankruptcy estates (collectively "Seller"), on the one hand, and Lions Gate Films, Inc. and its Affiliates("Buyer"), on the other hand, in accordance with and subject to the terms of (i) the Asset Purchase Agreement between Seller and Buyer dated as of _____, 20__ (the "Asset Purchase Agreement"), and (ii) the Sale Approval Order.  Capitalized terms that are not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

Pursuant to the Sale Approval Order, and in consideration of the payment of the Cash Payment (as defined in the Asset Purchase Agreement) to Seller, Seller hereby irrevocably sells, assigns, transfers, conveys and quitclaims to Buyer all of Seller's right, title and interest in and to the Granted Terminator Assets (as defined in the Asset Purchase Agreement), but only with such representations, warranties and covenants as are expressly set forth herein and/or in the Asset Purchase Agreement.  The Granted Terminator Assets include:

(a) all of Seller's right, title and interest in and to the sole and exclusive "Motion Picture" (as defined below) rights, including, without limitation, the sole and exclusive right to produce one (1) or more Motion Pictures or other derivative works (including, without limitation, Sequels including, without limitation, prequels, remakes, musicals, live stage productions and/or serials) based, in whole or in part, on the Granted Terminator Assets, including without limitation derived from, appurtenant to or related to

(i) Each of the following:

(A) motion picture entitled "The Terminator" ("T1");

(B) motion picture entitled "Terminator 2: Judgment Day" ("T2");

(C) motion picture entitled "Terminator 3: Rise of the Machines" ("T3");

(D) motion picture entitled "Terminator Salvation" ("T4")];

(E) the television series "Sarah Connor Chronicles" ("Television Series"); and

2

(F) the "Terminator Salvation the Machinima Series," consisting of six (6) machinima episodes of approximately 15 minutes in length based on and incorporating elements of the T4 Video Game, produced by Warner Premiere and distributed by Warner Home Video (the "Machinima Series").

(ii)   For purposes of exploitation, sale and/or license of all Sequel and Remake Rights and all Derivative Rights therein and other rights granted hereunder, (A) all Literary Properties upon which T1, T2, T3, T4, the Television Series and the Machimina Series are based; and (B) all of Seller's right, title and interest, if any, in all derivative works based on T1, T2, T3, T4, or the Television Series (including, without limitation, comic books, publications, "webisodes," merchandising, video games and the Machinima Series).;

(iii)  The Original Video Animation project currently entitled "Termination" (the "Termination OVA"),

(iv)  The two (2) untitled animated television series in development (collectively, "Animated Television Series"),

(v)    The untitled live action television series contemplated for production after the final theatrical motion picture (the "Live Action Television Series"),

and the right to fix, release, distribute, exhibit, perform, transmit, broadcast; advertise, promote and otherwise exploit such Motion Pictures or other derivative works by any and all means and in any and all media whether now known and used, now known and hereafter used, or hereafter known and used, or devised, including, without limitation, all of the following: theatrical; non-theatrical (including airlines, ships and other carriers, military, educational industrial and the like); pay-per-view, home video (including videocassettes, digital videodiscs, laserdiscs, CD-ROMs and all other formats); all forms of television (including pay, free, network syndication, cable, satellite, high definition and digital); video-on-demand, near video-on-demand, and subscription-on-demand; all forms of digital or on-line exploitation, distribution and/or transmission (including without limitation, the internet), CD-ROMs, fiber optic or other exhibition, broadcast and/or delivery systems and/or computerized or computer-assisted media; all rights of communication to the public, rights of distribution to the public, rights of making available or other forms of public or private communication and/or distribution; and all forms of dissemination, communication or distribution to one or more locations or parties, whether embodied or transmitted utilizing analog, digital or other format;

(b) Derivative Rights in connection with the foregoing;

(c) all ancillary, incidental and subsidiary rights including, without limitation, all merchandising, (e.g., games, computer, video and other electronic games, toys, comic books, so-called "making of books," apparel, food, beverages, posters, and other commodities, services or items), commercial tie-ins, co-promotions, music, music publishing, soundtrack, photonovel, novelization, screenplay publication, interactive media, multi-media, and theme park (or other "themed" or location-based attraction)

3

rights in and to any Sequels produced after the Closing Date (as defined in the Asset Purchase Agreement).  In connection with the exercise of the rights herein quitclaimed, Buyer shall have the unfettered right to adapt, modify, fictionalize, add to or take from the Granted Terminator Assets, and to combine the same with any other literary or artistic or musical work including without limitation:

       (i) All merchandising, theme park and live stage rights based on or derived from or related to Sequels produced after the Closing;

       (ii)All console, platform, personal computer or online video game rights (including creation, development, production and manufacturing rights) based on or derived from or related to Sequels produced after the Closing Date;

    (d)    (i) All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Termination OVA, the Literary Property upon which the Termination OVA is based or any part thereof, including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced,: and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue for past (but only to the extent such past infringement claims are assignable), present and future infringements of copyright;

       (ii) All contracts, agreements, assignments and instruments of every kind and character under which Seller may have heretofore acquired or may hereafter acquire any right, title and interest in or to the Termination OVA, including, that certain Memorandum of Agreement with Itochu Corp (together with the long form agreement to be negotiated, the "Itochu Agreement").

    (e) all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Animated Television Series or the Literary Properties upon which they are based or any part thereof, including, without limitation, all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

    (f) all copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Live Action Television Series or the Literary Property upon which it is based or any part thereof, and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a

4

claim under copyright, and the right (but not the obligation) to renew and extend such copyrights;

Holdback/Freeze on Certain New Ancillary Licenses for T4 and T3:

(a)  From the date of execution of this Quitclaim Agreement until the date that is the earliest of (i) termination of the Asset Purchase Agreement, (ii) three (3) months after the initial theatrical release date of the first theatrical Sequel based on the Granted Terminator Assets hereafter, or (iii) two (2) years after the date of signature of the Asset Purchase Agreement ("Merchandising Holdback"), Seller will not enter into any new license or exploitation agreement (or modify, amend or extend any of Seller's existing such license or exploitation agreements, copies of all of which have been provided by Seller to Buyer) which relate to: any merchandising or theme park rights ("Merchandising Rights") which are related to, and/or based on, T4 (and to the extent controlled by Seller, T3) .

(b)  Upon Seller's signature of this QuitclaimAgreement, Seller, in perpetuity, will not enter into any new license or exploitation agreement (or modify, amend or extend any of Seller's existing such license or exploitation agreements, copies of all of which have been provided by Seller to Buyer prior to the Due Diligence Deadline) which relate to any ancillary, allied, subsidiary or derivative rights whatsoever of any kind including without limitation any Video Game Rights, novelization rights, publishing rights, soundtrack album rights, publication rights, commercial tie-in or tie-up rights, sponsorship rights, character rights, live stage rights or rights to produce or exploit any Machinima episodes or productions (other than those existing agreements permitting exploitation of the existing Machinima Series in effect on the Closing Date), which are related to, and/or based on, T4, and to the extent controlled by Seller, T3 (but excluding Merchandising Rights, which rights are subject to Section 4.4(a) of the Asset Purchase Agreement and the Merchandising Holdback, and excluding the right to exhibit, license, distribute and otherwise exploit the completed motion pictures T3 and T4; provided, however, that for the avoidance of doubt, such reserved right, with respect to the distribution and exploitation of the completed motion pictures T3 and T4, does not include the right to create or exploit any derivative works whatsoever) ("Other Ancillary Rights").  Such Other Ancillary Rights that are not subject to existing agreements are frozen and are hereby assigned by Seller to Buyer but shall not be exploited by either Seller or Buyer hereafter.

(c)  Notwithstanding the foregoing, the Merchandising Holdback and the assignment and freeze of the Ancillary Rights do not limit Seller's rights to continue to exploit: (i) the distribution and exhibition rights solely of the completed motion pictures T3 and T4 including the right to advertise and publicize such exhibition and distribution, or (ii) Merchandising Rights or Other Ancillary Rights but only pursuant to exploitation agreements in effect on the Closing Date (subject to the Rejected Contracts and the other provisions hereof) which are directly related and solely based on T4 or T3, and which reference only the name, title and logo of "Terminator: Salvation" or "T4", or in the case of T3, "Terminator Rise of the Machines" or "T3" (and which are also in compliance with, and subject to, the Carolco Library Trademark License Agreement).

5

Buyer is empowered, at its option and expense, to bring, prosecute, defend and appear in suits, actions and proceedings of any nature concerning all copyrights in and to the Granted Terminator Assets, or concerning any infringements of any such copyright (but as to past infringements, if any, only to the extent such past infringement claims are assignable), or any interference with any of the rights hereby granted under said copyrights in its own name or in the name of the copyright proprietor, but at the expense of Buyer, and, at its option and expense, Buyer may join such copyright proprietor and/or the undersigned as a party plaintiff or defendant  in any such suit, action or proceeding.. Any recovery of damages or costs from infringement or violation of any such copyright or renewal copyright, so far as it arises from any violation of the rights hereby quitclaimed, is likewise quitclaimed to and shall be paid to Buyer.

As used herein, "Motion Picture," or its equivalent, means and includes motion pictures, cinematography, films and photoplays of every kind and character whatsoever, including the sound records thereof as well as trailers and clips thereof, produced by means of any photographic, electrical, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, pictures, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on material of any description (whether translucent or not) for later projection or exhibition in such manner that the same are, or appear to be, in motion on screen, mirror, tube or other medium or device, whether or not accompanied by sound records and whether now or hereafter known, invented, devised or contemplated.

As used herein, "Derivative Rights" means all of Seller's rights in ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to the Granted Terminator Assets and the Sequels.  Without limiting the foregoing, Derivative Rights also include all of Seller's rights in and to the Literary Properties upon which the Sequels are based and the Sequels, the title(s) of the Sequels and the characters (including their names and characteristics) appearing in the Sequels.

As used herein, "Sequel and Remake Rights" means all of Seller's rights under the Terminator Rights Agreements, the Prior Purchase Agreement and the Carolco Bankruptcy Court Order and the Sale Approval Order to develop, produce or exploit remakes, sequels, prequels and any other motion picture, television program or series of programs or other production based in whole or in part on T1, T2, T3, T4, Termination OVA, Television Series, Animated Television Series, Live Action Television Series, or Video Game Rights, including the right to use the title, characters, names, underlying Literary Property, or any material included in or utilized in connection with any of the foregoing (including without limitation, any settings, costumes, props, sets, models, miniatures, vehicles, titles, visuals, trademarks, logos, characters (human or non human including without limitation robots), incidents, artwork, dialog, images, sounds, events, music and lyrics from any and all of such works including T1, T2, T3, T4, Termination OVA, Television Series Animated Television Series, Live Action Television Series or

6

Video Game Rights and, for the avoidance of doubt, with respect to T4, Seller hereby expressly grants an irrevocable free license under copyright to utilize, reproduce and adapt any and all such material included in or utilized in connection with T4 throughout the universe in perpetuity in the Sequels and in or relating to the exploitation of the Sequel and Remake Rights and/or the Granted Terminator Assets).

As used herein, "Carolco Bankruptcy Court Order" means that certain Order Authorizing and Approving (a) Auction Sale under Section 363(b) and (f) of the Bankruptcy Code of all of Carolco's Rights in the Motion Pictures 'Terminator' and 'Terminator 2: Judgment Day,' including a Portion of the Rights to Produce and Exploit Prequels, Sequels and Remakes; (2) Treatment of Related Attachments and Participations; and (3) the Assignment under Section 365 of the Bankruptcy Code of Related Executory Contracts, entered on October 14, 1997 in the United States Bankruptcy Court, Central District of California, Case No. LA95-39299-LF.

As used herein, "Terminator Rights Agreements" means, collectively, (a) that certain Purchase and Sale - Quitclaim Agreement, dated as of September 11, 1997, by and between The Carolco Liquidating Trust as successor in interest to the rights of Carolco Pictures Inc., Carolco International Inc., formerly known as Carolco International N.V., Carolco Service Inc. and Carolco Production Services Inc., for themselves and on behalf of their respective bankruptcy estates, on the one hand, and AGV Productions, Inc., on the other hand, and (b) that certain Assignment Agreement, dated as of March 19, 1998, by and between Pacific Western Productions, Inc., and Gale Ann Hurd, on the one hand, and AGV Productions, Inc., on the other hand, as authorized and approved pursuant to the Carolco Bankruptcy Court Order and (c) Television Rights Assignment of All Rights dated as of November 5, 2004 by and between AGV Productions Inc on the one hand and Red Giant Productions, Inc f/s/o John Daly and Century Corporation f/s/o Derek Gibson.

As used herein, "Prior Purchase Agreement" means that certain Purchase Agreement dated April 12, 2007 between T Asset Acquisition Company, LLC, on the one hand, and AGV Productions, Inc., Mario Kassar Productions LP, C2 Pictures LLC and AGV Productions T4 LLC, on the other hand and the amendment thereto and the schedules thereto

As used herein, the "Sale Approval Order" means the Order_____ entered by the Bankruptcy Court on _____, 2010.

As used herein, "Sequels" shall mean any and all pictures/films/television productions/other motion picture productions/programs made, produced or created pursuant to or under the Sequel and Remake Rights.

This Quitclaim Agreement is executed pursuant to the Asset Purchase Agreement and the Sale Approval Order, and in the event of any inconsistencies between the provisions of this Quitclaim Agreement and the provisions of the Asset Purchase Agreement or the Sale Approval Order, the Asset Purchase Agreement and the Sale Approval Order shall control.

7

Executed as of this _____day of _____, 20__.


**SELLER:**

Halcyon Holding Group, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: _____


T Asset Acquisition Company, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


T Asset International (BVI) Ltd.
a British Virgin Islands corporation


By: _____
Name: _____
Title: _____


T Salvation Distribution, LLC
a California limited liability company


By: _____
Name: _____
Title: _____


T Salvation Distribution (BVI) Ltd.
a British Virgin Islands corporation


By: _____
Name: _____
Title: _____

8

T Salvation Productions, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon Consumer Products, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon Games, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Halcyon International (BVI) Ltd.
a British Virgin Islands corporation

By: _____
Name: _____
Title: _____


Halcyon Music Publishing, LLC
a California limited liability company

By: _____
Name: _____
Title: _____


Dominion Group, LLC d/b/a or a/k/a Dominion LLC
a California limited liability company

By: _____
Name: _____
Title: _____

9

**BUYER:**

LIONS GATE FILMS, INC.


By: _____

Name: _____

Title: _____

10

## EXHIBIT D

## TRADEMARK ASSIGNMENT

**THIS TRADEMARK ASSIGNMENT** is effective as of ____ __, 20__.

**WHEREAS**, _____ a _____ (hereinafter referred to as "Assignee"), desires to acquire all right, title and interest of T Asset Acquisition Company, LLC, a California limited liability company (hereinafter referred to as the "Assignor"), in and to: certain trademark licenses and agreements listed on Schedule D1 attached hereto (collectively, the "Licenses").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby grant, assign and set over to Assignee, its successors, assigns and legal representatives forever throughout the world, all of Assignor's entire right, title and interest in and to such Licenses in perpetuity, together with that part of the goodwill associated and any and all of Assignor's other rights, privileges and priorities in connection therewith provided under state and federal law of the United States, and under the laws of any and all foreign jurisdictions including, without limitation, Assignor's common law rights and rights under the laws of unfair competition, and any and all rights of action at law and suits in equity to recover for past infringements of the Licenses currently known to Assignor as of the date hereof or that may become known after the Agreement Date (hereinafter the "Transferred Rights"), and any and all of Assignor's rights to obtain renewals, reissues, and extensions for such Licenses and upon registration of such Marks throughout the world, or other legal protections pertaining to the Transferred Rights, the intent hereof being to substitute Assignee in the place of Assignor.

**IN WITNESS WHEREOF**, Assignor has caused this instrument to be signed in its name by its proper and duly authorized corporate officer as of the day and date first set forth above.

T Asset Acquisition Company, LLC
("Assignor")

By:_____
Name:_____
Title:_____

11

## Schedule D1 to Trademark Assignment

To be completed

(i)      [More TM/SMs and Logos to be added, if any]

(ii)     [The Carolco Library Trademark license Agreement subject to Sections 5.16 and 5.17]

12

## Schedule D1 to Trademark Assignment

To be completed

13

# EXHIBIT B

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8                    **UNITED STATES BANKRUPTCY COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10                         **LOS ANGELES DIVISION**

11 | In re: | Case No.: 2:09-31853-ER |

12 T ASSET ACQUISITION COMPANY, LLC, a
   Delaware limited liability company; HALCYON
13 HOLDING GROUP, LLC, dba THE HALCYON
   COMPANY, a Delaware limited liability company;
14 and DOMINION GROUP LLC, a California limited
   liability company,
15
16                                        Debtors.
17

| | |
|---|---|
| Chapter 11 | |
| (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) | |

**ORDER GRANTING MOTION OF DEBTORS FOR ORDER: (1) ESTABLISHING SALE PROCEDURES FOR SALE OF CERTAIN OF THE DEBTORS' *TERMINATOR* ASSETS, (2) APPROVING BREAK-UP FEE, AND (3) APPROVING FORM AND MANNER OF NOTICE OF SALE**

18 **Check One or More as Appropriate:**

   Affects All Debtors:                            ⊠

19 Affects T Asset Acquisition Company, LLC only: ☐

20 Affects Halcyon Holding Group, LLC only:       ☐

   Affects Dominion Group LLC only:               ☐
21

**Hearing:**

Date:  January 20, 2010
Time:  10:00 a.m.
Place:  Courtroom 1568
        255 E. Temple Street
        Los Angeles, CA 90012

22

23

24          The Motion Of Debtors For Order Establishing Sale Procedures For Sale Of  Debtors' Assets

25 Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims,

26 Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (as

27 supplemented and amended, the "Overbidding Procedures Motion"), filed by the above-captioned

28 debtors (the "Debtors"), came on for hearing before the Honorable Ernest M. Robles, United States

                                        1

Bankruptcy Judge, on January 20, 2010, at 10:00 a.m. (the "Hearing").  Appearances were made as reflected in the Bankruptcy Court's record.

On January 8, 2010, the Debtors filed a supplement to the Overbidding Procedures Motion (the "Overbidding Supplement") disclosing that, subject to approval of the Bankruptcy Court, the Debtors had agreed to sell to Lions Gate Films, Inc. ("Buyer"), for the amount of Fifteen Million Dollars ($15,000,000.00) in cash (the "Cash Payment"), plus certain contingent consideration, plus the assumption of certain liabilities (together, the "Purchase Price"), the Granted Terminator Assets specified in that certain Asset Purchase Agreement dated as of January 7, 2010 attached as Exhibit A to the Overbidding Supplement (the "Lions Gate APA"), pursuant to the terms set forth in the Lions Gate APA. Capitalized terms used herein have the meanings ascribed to them in the Overbidding Procedures Motion and the Overbidding Supplement, unless otherwise defined.

The Court has jurisdiction over the Overbidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1333.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409. Good and appropriate notice of the relief sought by the Overbidding Procedures Motion has been given under the circumstances, and no other or further notice is required.  A reasonable opportunity was afforded to all interested parties and entities to object to or to be heard regarding the relief requested in the Overbidding Procedures Motion including, without limitation, with respect to the Break-Up Fee described below.

After consideration of the Overbidding Procedures Motion, the Overbidding Supplement and accompanying supporting papers, the arguments of counsel, the files and records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT:**

A.    <u>Sale Hearing</u>.  On February 10, 2010, at 10:00 a.m. Pacific Time (the "Sale Hearing"), the Bankruptcy Court (the "Court") shall hold a hearing on the Debtors' motion for approval of a sale of the Granted Terminator Assets to Buyer pursuant to the terms set forth in the Lions Gate APA.  No later than January 22, 2010, the Debtors shall file and serve a supplement to the previously filed motion for approval of sale of the Debtors' assets relating to the *Terminator* motion picture franchise that describes the terms of the Lions Gate APA and the modified relief that will be requested at the Sale Hearing (as

supplemented and modified, the "Sale Approval Motion"). Any objections to the Sale Approval Motion must be filed and served in accordance with Local Bankruptcy Rule 9013-1(f) no later than fourteen (14) days before the Sale Hearing, and replies thereto must be filed and served in accordance with Local Bankruptcy Rule 9013-1(g) no later than seven (7) days before the Sale Hearing.

B.    Qualified Overbids. The Debtors shall consider qualified overbids for the Granted Terminator Assets ("Qualified Overbids), but shall not consider proposed overbids that are not Qualified Overbids. In order for a proposed overbid to be deemed a Qualified Overbid, a proposed overbid must meet each of the criteria set forth in the following subparagraphs 1 through 6:

1.    Deadline for Receipt of Overbids. All of the documents and information required to be submitted pursuant to subparagraphs 2 through 6 below must be received by (a) the Debtors, (b) the Debtors' bankruptcy counsel, Howard J. Weg of Peitzman, Weg & Kempinsky LLP, (c) the Debtors' financial advisor, Kevin Shultz of FTI Capital Advisors, LLC, and (d) counsel for Buyer, no later than 5:00 p.m., Pacific Time, on February 4, 2010 (the "Overbid Deadline"). Unless a bid containing all of the required documents and information is submitted by the Overbid Deadline, it will not constitute a Qualified Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

2.    Initial Overbid Amount. In order to be a Qualified Overbid, the overbid must be for a price, payable at the closing by bank cashier's check or wire transfer of immediately available funds, in an amount not less than the sum of (i) the Cash Payment, *plus* (ii) the Contingent Compensation (upon terms equal to or better than the terms set forth in the Lions Gate APA), *plus* (iii) the Break-Up Fee described in Paragraph G below, *plus* (iii) Five Hundred Thousand Dollars ($500,000). Any holder of an allowed claim that is authorized to credit bid under section 363(k) of the Bankruptcy Code must agree to pay *in cash* a minimum amount equal to (i) the Break-Up Fee described in Paragraph G below, *plus* (ii) Five Hundred Thousand Dollars ($500,000).

3.    Form and Content of Overbid. In order to be a Qualified Overbid, any overbid must include an executed asset purchase agreement in form and substance the same as the Lions Gate APA (other than the identity of the Buyer and the amount of the bidder's price, which must satisfy the conditions of paragraph 2 above), together with a redline comparison of the overbidder's asset purchase agreement showing the differences from the Lions Gate APA. Without limiting the foregoing, the overbid may not include any representations, warranties or conditions to closing (including due diligence

or financing contingencies) other than those set forth in the Lions Gate APA (unless they have been previously waived by Buyer). If any Qualified Overbid is conditioned upon the assumption and assignment, or rejection, of any executory contracts or leases, the overbidder must identify such contracts or leases. For executory contracts or leases to be assumed and assigned, the overbidder must provide written evidence, satisfactory to the Debtors, of the overbidder's ability to provide adequate assurance of future performance of such assumed contracts or leases.

4.    <u>Offers Irrevocable</u>. In order to be a Qualified Overbid, any overbid must contain a letter from the overbidder stating that the overbid will remain open and irrevocable until sixty (60) days after the date of entry of an order by the Court approving the sale of the Granted Terminator Assets (a "Sale Approval Order") has been entered by the Clerk of the Court.

5.    <u>Deposits</u>. In order to be a Qualified Overbid, any overbid must be accompanied by a deposit (the "Deposit") in the form of a bank cashier's check or wire transfer of immediately available funds to the Debtors in the amount of $750,000. The Debtors shall hold each Deposit in a segregated interest-bearing account, subject to Court order, to defray all costs, expenses and damages arising as a result of the failure of any winning overbidder to close for any reason other than the default of the Debtors. The Debtors shall return a Deposit to an overbidder as soon as practicable after the earlier to occur of: (i) the Debtors' delivery of written notice to an overbidder that its overbid is not a Qualified Overbid; or (ii) entry of a Sale Approval Order providing for the sale of the Granted Terminator Assets to an entity other than the overbidder. Interest and investment income accrued or earned on the Deposit shall follow the principal. Interest that accrues or that is earned on the successful bidder's Deposit (including Buyer's Deposit if Buyer is the successful bidder) shall be credited toward the Purchase Price. If the successful bidder fails to consummate the sale because of a breach or failure to perform on the part of such successful bidder, the Deposit (plus interest and investment income accrued or earned thereon) will be forfeited to the Debtors, who will have no obligation to return such amount to the successful bidder, without prejudice to the Debtors' other rights, claims or remedies against the defaulting successful bidder.

6.    <u>Ability of Bidder to Consummate Transaction</u>. In order to be a Qualified Overbid, the overbidder must include written financial evidence, satisfactory to the Debtors, demonstrating that the overbidder has the ability to consummate the transactions contemplated by the Lions Gate APA. Such

4

financial evidence may include, among other things, background reports and/or references, financing commitments, financial statements, income statements, tax returns, balance sheets, annual reports and bank statements.

C.    <u>Qualification and Disqualification of Overbids</u>.  No later than 5:00 p.m., California time, on February 5, 2010 (the "Determination Deadline"), the Debtors shall determine whether any overbids timely submitted are Qualified Overbids and shall inform each overbidder whether it has submitted a Qualified Overbid or whether its overbid has been rejected as unqualified.  The Debtors also shall notify Buyer at that time whether any Qualified Overbid was received and, if so, the identity of each qualified overbidder and the terms of its overbid.  The Debtors shall have the right to permit a bidder that submitted a bid prior to the Bid Deadline that was not a Qualified Bid to modify the bid so that the bid will be deemed a Qualified Bid, except that the Debtors may not change: (i) the amount or form of the initial overbid required under Paragraph B(2) above, (ii) the amount or form of the Deposit required under Paragraph B(5) above, or (iii) the irrevocability of a bid required under Paragraph B(4) above.

D.    <u>Bankruptcy Court Resolution of Disputes.</u>  Any disputes concerning whether an overbidder submitted a Qualified Overbid shall be resolved by the Bankruptcy Court at the Sale Hearing.

E.    <u>Result If No Qualified Overbids</u>.  If the Debtors determine by the Determination Deadline that there are no Qualified Overbids, the Debtors shall move the Court at the Sale Hearing for authority to sell the Granted Terminator Assets to Buyer pursuant to the terms of the Lions Gate APA.

F.    <u>Auction To Be Held If A Qualified Overbid Is Timely Submitted</u>.  If the Debtors determine by the Determination Deadline that at least one Qualified Overbid was submitted, the Debtors shall hold an auction (the "Auction") as follows:

1.    The Auction shall take place on February 8, 2010 at 10:00 a.m. at the offices of FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until concluded by the Debtors.

2.    Only the Buyer and entities that submitted Qualified Overbids may participate in the Auction.  The Debtors will not be required to entertain any bids submitted at the Auction by any entities other than the Buyer and those entities that submitted Qualified Overbids.

3.    The Debtors may continue the Auction to a later date without further notice other than an announcement at the Auction and the service and filing of written notice in the docket of this

case.

4.    At the commencement of the Auction, the Debtors shall announce which of the initial Qualifying Overbids is, in their determination, the highest and best offer.  In making this determination, the Debtors shall have the right to consider, among other things: (a) the number, type and nature of any changes to the Lions Gate APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the acquired Granted Terminator Assets to such bidder and the cost to the Debtors of such modifications or delay; (c) the likelihood of the bidder's ability to close the transaction and the timing thereof, and (d) the net benefit to the Debtors' estates, taking into account the Buyer's right to receive the Break-Up Fee described herein.

5.    At the Auction, after the announcement of the initial Qualifying Overbid, any further overbids must be in increments of not less than $1,000,000 in cash.

6.    At the conclusion of the Auction, the Debtors shall announce which of the bids is, in their determination, the highest and best offer, and that bid will be presented to the Court for approval at the Sale Hearing.

7.    All unsuccessful final bids at the Auction shall be treated as binding back-up bids and, in the event that the successful bidder fails to close, the Debtors shall have the right to select one of the unsuccessful final bids as the replacement successful bid; *provided, however*, the right of the Debtors to select an unsuccessful final bid as the replacement successful bid shall expire sixty (60) days after the date of entry of the Sale Approval Order.

G.    Break-Up Fee.  In the event that Buyer is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Buyer shall be paid a break-up fee in the amount of Seven Hundred Fifty Thousand Dollars ($750,000) which represents five percent (5%) of the Cash Payment that would have been due from Buyer at closing under the Lions Gate APA if Buyer had been the successful bidder (the "Break-Up Fee").  The Break-Up Fee shall be paid to Buyer from the proceeds of the sale, by bank cashier's check or wire transfer in the full amount of the Break-Up Fee without any deduction or offset of any nature, immediately upon the occurrence of the closing of the sale.

H.    Sale Notice.  The form of the Sale Notice attached as Exhibit C to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Sale Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive

6

electronic delivery or have filed requests for special notice in these cases, (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts, (v) each party that previously submitted or expressed an interest in submitting an offer for the Granted Terminator Assets, (vi) all parties identified on the Debtors' Master Mailing Matrix; (vii) all parties to any other contracts or obligations of the Debtors that will not be assumed by Buyer; and (viii) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.  In addition, the Debtors, at the sole expense of Buyer, shall cause notice substantially in the form attached to the Overbidding Supplement as Exhibit H to be published not less than once in the daily or weekly edition of *Variety* and such other publication(s) as the Debtors and Buyer may agree.

I.    <u>Assumed Contracts Notice</u>.  The form of the Assumed Contract Notice attached as Exhibit E to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Assumed Contracts Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases, (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts, and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

J.    <u>Participations and Attachment Rights Notice</u>.  The form of the Participations and Attachment Rights Notice attached as Exhibit G to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Participations and Attachment Rights Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases, (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to the Participations and Attachment Rights, and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2) 6004, and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

K.      <u>Rejected Contracts and Intellectual Property Licenses Notice</u>. The form of the Rejected Contracts Notice attached as Exhibit F to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Rejected Contracts Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts (including Rejected IP Licences), and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

L.      <u>Effectiveness</u>.  This Order shall be effective immediately upon entry.

Dated:                                _____
                                         UNITED STATES BANKRUPTCY JUDGE

EXHIBIT B
Page 102

EXHIBIT C

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

9                    UNITED STATES BANKRUPTCY COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

                          LOS ANGELES DIVISION

11  In re:                                    | Case No.: 2:09-31853-ER

12  T ASSET ACQUISITION COMPANY, LLC, a       | Chapter 11
    Delaware limited liability company; HALCYON
13  HOLDING GROUP, LLC, dba THE HALCYON        | (Jointly Administered with Case Nos.:
    COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER)
14  and DOMINION GROUP LLC, a California limited
15  liability company,                        | **SUPPLEMENTAL NOTICE OF HEARING
                                              | ON MOTION OF DEBTORS FOR ORDER
                                              | AUTHORIZING AND APPROVING SALE
16                              Debtors.       | OF CERTAIN OF THE DEBTORS' ASSETS
                                              | RELATING TO THE *TERMINATOR*
17                                            | MOTION PICTURE FRANCHISE FREE
                                              | AND CLEAR OF ALL LIENS, CLAIMS,
18                                            | ENCUMBRANCES AND OTHER
                                              | INTERESTS PURSUANT TO SECTIONS
19                                            | 363 AND 365 OF THE BANKRUPTCY
                                              | CODE**

20  <u>Check One or More as Appropriate:</u>

21  Affects All Debtors:                    ☒  <u>Sale Hearing:</u>
    Affects T Asset Acquisition Company, LLC only: ☐  Date:     February 10, 2010
22  Affects Halcyon Holding Group, LLC only: ☐     Time:     10:00 a.m.
    Affects Dominion Group LLC only:        ☐     Location: Courtroom 1568
23                                                         255 East Temple St.
                                                           Los Angeles, California
24                                             <u>Objection Deadline</u>**:**
                                                          January 27, 2010
25

26       **PLEASE TAKE NOTICE** that on January 22, 2010, the above-captioned debtors

27  (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or

    as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M.

28  Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los

                                         1

Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction").

**PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "Lions Gate APA") with Lions Gate Films Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the Lions Gate APA (collectively, the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the Lions Gate APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the Lions Gate APA (the "Supplement").  A copy of the Lions Gate APA is attached as an exhibit to the Supplement.

**PLEASE TAKE FURTHER NOTICE** that the sale of the Granted Terminator Assets to Lions Gate is subject to higher and better bids at the Auction.

**PLEASE TAKE FURTHER NOTICE** that on January __, 2010, the Bankruptcy Court entered its Order approving the following procedures for the Auction:

A.    Auction.  The Auction shall take place on February 8, 2010 at 10:00 a.m. at the offices of FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until concluded by the Debtors.

B.    Qualified Overbids.  The Debtors shall consider qualified overbids for the Granted Terminator Assets ("Qualified Overbids"), but shall not consider proposed overbids that are not Qualified Overbids.  In order for a proposed overbid to be deemed a Qualified Overbid, a proposed overbid must meet each of the criteria set forth in the following subparagraphs 1 through 6:

1.    Deadline for Receipt of Overbids.  All of the documents and information required to be submitted pursuant to subparagraphs 2 through 6 below must be received by (a) the Debtors, (b) the Debtors' bankruptcy counsel, Howard J. Weg of Peitzman, Weg & Kempinsky LLP, (c) the Debtors' financial advisor, Kevin Shultz of FTI Capital Advisors, LLC, and (d) counsel for Buyer, no later than 5:00 p.m., Pacific Time, on February 4, 2010 (the "Overbid Deadline").  Unless a bid containing all of the required documents and information is submitted by the Overbid Deadline, it will not constitute a Qualified Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

2.    Initial Overbid Amount.  In order to be a Qualified Overbid, the overbid must be for a price, payable at the closing by bank cashier's check or wire transfer of immediately available funds, in an amount not less than the sum of (i) the Cash Payment, *plus* (ii) the Contingent

2

EXHIBIT C
Page 104

Compensation (upon terms equal to or better than the terms set forth in the Lions Gate APA), *plus* (iii) the Break-Up Fee described in Paragraph G below, *plus* (iii) Five Hundred Thousand Dollars ($500,000).  Any holder of an allowed claim that is authorized to credit bid under section 363(k) of the Bankruptcy Code must agree to pay *in cash* a minimum amount equal to (i) the Break-Up Fee described in Paragraph G below, *plus* (ii) Five Hundred Thousand Dollars ($500,000).

3.  <u>Form and Content of Overbid</u>.  In order to be a Qualified Overbid, any overbid must include an executed asset purchase agreement in form and substance the same as the Lions Gate APA (other than the identity of the Buyer and the amount of the bidder's price, which must satisfy the conditions of paragraph 2 above), together with a redline comparison of the overbidder's asset purchase agreement showing the differences from the Lions Gate APA.  Without limiting the foregoing, the overbid may not include any representations, warranties or conditions to closing (including due diligence or financing contingencies) other than those set forth in the Lions Gate APA (unless they have been previously waived by Buyer).  If any Qualified Overbid is conditioned upon the assumption and assignment, or rejection, of any executory contracts or leases, the overbidder must identify such contracts or leases.  For executory contracts or leases to be assumed and assigned, the overbidder must provide written evidence, satisfactory to the Debtors, of the overbidder's ability to provide adequate assurance of future performance of such assumed contracts or leases.

4.  <u>Offers Irrevocable</u>.  In order to be a Qualified Overbid, any overbid must contain a letter from the overbidder stating that the overbid will remain open and irrevocable until sixty (60) days after the date of entry of an order by the Court approving the sale of the Granted Terminator Assets (a "Sale Approval Order") has been entered by the Clerk of the Court.

5.  <u>Deposits</u>.  In order to be a Qualified Overbid, any overbid must be accompanied by a deposit (the "Deposit") in the form of a bank cashier's check or wire transfer of immediately available funds to the Debtors in the amount of $750,000.  The Debtors shall hold each Deposit in a segregated interest-bearing account, subject to Court order, to defray all costs, expenses and damages arising as a result of the failure of any winning overbidder to close for any reason other than the default of the Debtors.  The Debtors shall return a Deposit to an overbidder as soon as practicable after the earlier to occur of: (i) the Debtors' delivery of written notice to an overbidder that its overbid is not a Qualified Overbid; or (ii) entry of a Sale Approval Order providing for the sale of the Granted Terminator Assets to an entity other than the overbidder.  Interest and investment income accrued or earned on the Deposit shall follow the principal.  Interest that accrues or that is earned on the successful bidder's Deposit (including Buyer's Deposit if Buyer is the successful bidder) shall be credited toward the Purchase Price.  If the successful bidder fails to consummate the sale because of a breach or failure to perform on the part of such successful bidder, the Deposit (plus interest and investment income accrued or earned thereon) will be forfeited to the Debtors, who will have no obligation to return such amount to the successful bidder, without prejudice to the Debtors' other rights, claims or remedies against the defaulting successful bidder.

6.  <u>Ability of Bidder to Consummate Transaction</u>.  In order to be a Qualified Overbid, the overbidder must include written financial evidence, satisfactory to the Debtors, demonstrating that the overbidder has the ability to consummate the transactions contemplated by the Lions Gate APA.  Such financial evidence may include, among other things, background reports and/or references, financing commitments, financial statements, income statements, tax returns, balance sheets, annual reports and bank statements.

3

C.    <u>Qualification and Disqualification of Overbids</u>.  No later than 5:00 p.m., California time, on February 5, 2010 (the "Determination Deadline"), the Debtors shall determine whether any overbids timely submitted are Qualified Overbids and shall inform each overbidder whether it has submitted a Qualified Overbid or whether its overbid has been rejected as unqualified.  The Debtors also shall notify Buyer at that time whether any Qualified Overbid was received and, if so, the identity of each qualified overbidder and the terms of its overbid.  The Debtors shall have the right to permit a bidder that submitted a bid prior to the Bid Deadline that was not a Qualified Bid to modify the bid so that the bid will be deemed a Qualified Bid, except that the Debtors may not change: (i) the amount or form of the initial overbid required under Paragraph B(2) above, (ii) the amount or form of the Deposit required under Paragraph B(5) above, or (iii) the irrevocability of a bid required under Paragraph B(4) above.

D.    <u>Bankruptcy Court Resolution of Disputes.</u>  Any disputes concerning whether an overbidder submitted a Qualified Overbid shall be resolved by the Bankruptcy Court at the Sale Hearing.

E.    <u>Result If No Qualified Overbids</u>.  If the Debtors determine by the Determination Deadline that there are no Qualified Overbids, the Debtors shall move the Court at the Sale Hearing for authority to sell the Granted Terminator Assets to Lions Gate pursuant to the terms of the Lions Gate APA.

F.    <u>Auction To Be Held If A Qualified Overbid Is Timely Submitted</u>.  If the Debtors determine by the Determination Deadline that at least one Qualified Overbid was submitted, the Debtors shall hold the "Auction as follows:

1.    Only Lions Gate and entities that submitted Qualified Overbids may participate in the Auction.  The Debtors will not be required to entertain any bids submitted at the Auction by any entities other than Lions Gate and those entities that submitted Qualified Overbids.

2.    The Debtors may continue the Auction to a later date without further notice other than an announcement at the Auction and the service and filing of written notice in the docket of this case.

3.    At the commencement of the Auction, the Debtors shall announce which of the initial Qualifying Overbids is, in their determination, the highest and best offer.  In making this determination, the Debtors shall have the right to consider, among other things: (a) the number, type and nature of any changes to the Lions Gate APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the acquired Granted Terminator Assets to such bidder and the cost to the Debtors of such modifications or delay; (c) the likelihood of the bidder's ability to close the transaction and the timing thereof, and (d) the net benefit to the Debtors' estates, taking into account Lions Gate's right to receive the Break-Up Fee described herein.

4.    At the Auction, after the announcement of the initial Qualifying Overbid, any further overbids must be in increments of not less than $1,000,000 in cash.

5.    At the conclusion of the Auction, the Debtors shall announce which of the bids is, in their determination, the highest and best offer, and that bid will be presented to the Court for approval at the Sale Hearing.

4

EXHIBIT C
Page 106

6.      All unsuccessful final bids at the Auction shall be treated as binding back-up bids and, in the event that the successful bidder fails to close, the Debtors shall have the right to select one of the unsuccessful final bids as the replacement successful bid; *provided, however*, the right of the Debtors to select an unsuccessful final bid as the replacement successful bid shall expire sixty (60) days after the date of entry of the Sale Approval Order.

G.      In the event that Lions Gate is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Lions Gate shall be paid a break-up fee in the amount of Seven Hundred Fifty Thousand Dollars ($750,000), which represents five percent (5%) of the Cash Payment that would have been due from Lions Gate at closing under the Lions Gate APA if Lions Gate had been the successful bidder (the "Break-Up Fee").  The Break-Up Fee shall be paid to Lions Gate from the proceeds of the sale, by bank cashier's check or wire transfer in the full amount of the Break-Up Fee without any deduction or offset of any nature, immediately upon the occurrence of the closing of the sale.

**PLEASE TAKE FURTHER NOTICE** that the Sale Motion and Supplement are on file with the Bankruptcy Court and are available for inspection and copying at the office of the Clerk of the Court, located at 255 E. Temple Street, Los Angeles, CA.  In addition, copies of the Sale Motion and Supplement may be obtained by delivering a written request to the Debtors' bankruptcy counsel:

> Howard J. Weg, Esq.
> David B. Shemano, Esq.
> Peitzman, Weg & Kempinsky LLP
> 10100 Santa Monica Blvd., Suite 1450
> Los Angeles, California 90067
> Telephone: (310) 552-3100
> Facsimile: (310) 552-3101
> Email: hweg@pwkllp.com
> Email: dshemano@pwkllp.com

In addition, information concerning the Assets and the Auction may be obtained by contacting the Debtors' financial advisors:

> Kevin Shultz, Senior Managing Director
> FTI Capital Advisors, LLC
> 633 West 5th Street
> Los Angeles, CA  90071
> Telephone: (213) 452-6050
> Facsimile: (213) 452-6099
> Email: Kevin.Shultz@FTIConsulting.com

**PLEASE TAKE FURTHER NOTICE** that (1) the Debtors are requesting that the Bankruptcy Court authorize the assumption and assignment to Lions Gate (or the successful overbidder, if any) of certain contracts; (2) the Debtors are requesting that the Bankruptcy Court authorize the rejection of certain contracts, including certain licenses of intellectual property under which the Debtors are licensors; and, (3) because Lions Gate will not assume certain attachment and participations or royalties to various entities based on the performance of an existing *Terminator*

5

EXHIBIT C
Page 107

motion picture and certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels, remakes or other works that are derivative of an existing *Terminator* motion picture, the Debtors are treating such attachment and participations as prepetition claims against the Debtors and their estates.  The sale of the Assets is free and clear of all liens, claims, encumbrances and other interests of any nature, including all such attachments and participations.  **Parties in interest are referred to the Supplement, the Lions Gate APA and the separate notices filed and served by the Debtors, dated January 22, 2010, which explain in greater detail the assumption, rejection and/or treatment of the contracts, attachments and participations or royalties described by this paragraph.  Copies of such documents are available upon request to the Debtors' counsel at the address indicated above.**

**PLEASE TAKE FURTHER NOTICE** that any objections to the Sale Motion or the Supplement must be in writing and must be filed and served in accordance with Local Bankruptcy Rule 9013-1(f) no later than **JANUARY 27, 2010**.  **Objections must be served on the Debtors' counsel** (Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067), **on counsel for Lions Gate** (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569), **and on counsel for the Official Committee of Unsecured Creditors** (Martin J. Brill, Esq., and Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA 90067).

**PLEASE TAKE FURTHER NOTICE that, pursuant to Local Bankruptcy Rule 9013-1(h), the failure of a party in interest timely to file and serve a response to the Sale Motion or the Supplement in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be such party's consent to the granting of the relief requested in the Sale Motion and the Supplement including, but not limited to, sale to Lions Gate of the Granted Terminator Assets free and clear of any and all liens, claims, encumbrances and interests whatsoever held or asserted by such party.**

Dated: January __, 2010                    PEITZMAN, WEG & KEMPINSKY LLP

                                            By:_____
                                                Howard J. Weg
                                                David B. Shemano
                                            Counsel for the Debtors

# EXHIBIT D

1 | Howard J. Weg (State Bar No. 91057)
*hweg@pwkllp.com*
2 | David B. Shemano (State Bar No. 176020)
*dshemano@pwkllp.com*
3 | PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
4 | Los Angeles, CA  90067
Telephone: (310) 552-3100
5 | Facsimile:  (310) 552-3101

6 | Counsel for T Asset Acquisition Company, LLC,
Halcyon Holding Group, LLC, dba The Halcyon
7 | Company, and Dominion Group LLC,
Debtors and Debtors in Possession

8 |

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| In re: | Case No.: 2:09-31853-ER |
|---|---|
| T ASSET ACQUISITION COMPANY, LLC, a Delaware limited liability company; HALCYON HOLDING GROUP, LLC, dba THE HALCYON COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited liability company, | Chapter 11 |
| | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |
| | **ORDER AUTHORIZING AND APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATING TO THE *TERMINATOR* MOTION PICTURE FRANCHISE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE** |
| Debtors. | |

**Check One or More as Appropriate:**

Affects All Debtors: ☒
Affects T Asset Acquisition Company, LLC only: ☐
Affects Halcyon Holding Group, LLC only: ☐
Affects Dominion Group LLC only: ☐

Sale Hearing:

Date:      February 10, 2010
Time:      10:00 a.m.
Location:  Courtroom 1568
           255 East Temple St.
           Los Angeles, California

The Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the above-captioned debtors (the "Debtors"), came on for hearing before the

Honorable Ernest M. Robles, United States Bankruptcy Judge, on February 10, 2010, at 10:00 a.m. (the "Sale Hearing").  Appearances were made as reflected in the Bankruptcy Court's record. Capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion, unless otherwise defined.

On December 18, 2009, the Debtors filed and served the Sale Motion and the separate (a) Notice of Hearing on Motion of Debtors for Order Authorizing and Approving Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise Free and Clear of All Liens, Claims, Encumbrances and Other Interests pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Sale Notice"), (b) Notice of Deadline to (1) Object to the Assumption and Assignment of Executory Contracts in Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) File Claims for Amount Due to Cure Defaults Under Executory Contracts to be Assumed and Assigned in Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Cure Notice"), and (c) Notice of Proposed Treatment of Participations and Attachment Rights in Connection with Sale of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Participations and Attachments Notice").  As set forth in the Sale Notice and the Sale Motion, the Debtors requested an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction").

On January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "Lions Gate APA") with Lions Gate Films Inc. ("Lions Gate"), providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the Lions Gate APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the Lions Gate APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  The Lions Gate APA requires. among other thing, that: (a) the Debtors reject certain contracts specified in the Lions Gate APA (the "Rejected Contracts"), including

2

certain licenses of intellectual property within the meaning of Section 101(35A) of the Bankruptcy

Code  (the "Rejected IP Licenses"); (b) assume and assign certain contracts specified in the Lions Gate

APA (the "Assumed Contracts"); and (c) reject, or obtain a determination that the sale is free and clear

of, certain contracts with or obligations to third parties, specified in the Lions Gate APA, that are

related to the *Terminator* franchise for, among other things, (i) the payment of participations or

royalties to various entities based on the performance of one or more *Terminator* motion pictures or

television series including *Terminator: Salvation* or other Sequels or Derivative Rights as defined in

the APA (collectively, Participations"), or (ii) certain contractual rights to negotiate to work on or to

work on or to be paid participations in connection with sequels, prequels or remakes or other works

that are derivative of an existing *Terminator* motion picture (collectively, "Attachments").

On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material

terms and conditions of the Lions Gate APA (the "Supplement"), and attaching a copy of the Lions

Gate APA as an exhibit.  The proposed sale of the Granted Terminator Assets to Lions Gate was

subject to higher and better bids at the Auction, which was conducted on February 8, 2010.

On December 18, 2009, the Debtors filed and served their motion for approval of sale

procedures and related relief (the "Overbidding Procedures Motion").  The Debtors filed a supplement

to the Overbidding Procedures Motion on January 8, 2010.  The Overbidding Procedures Motion, as

supplemented, was granted by an Order entered on January __, 2010 (the "Overbidding Procedures

Order").  As directed by the Bankruptcy Court, on January 22, 2010, the Debtors served and filed the

following notices conforming to the transaction contemplated by the Lions Gate APA: (a) a

Supplemental Notice of Hearing on Motion of Debtors for Order Authorizing and Approving Sale of

Debtors' Assets Relating to the *Terminator* Motion Picture Franchise Free and Clear of All Liens,

Claims, Encumbrances and Other Interests pursuant to Sections 363 and 365 of the Bankruptcy Code

(the "Supplemental Sale Notice"), (b) a Supplemental Notice of Deadline to (1) Object to the

Assumption and Assignment of Executory Contracts in Connection with Sale of Certain of the

Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) File Claims for

Amounts Due to Cure Defaults Under Executory Contracts to be Assumed and Assigned in

Connection with Sale of Certain of the Debtors' Assets Relating to the *Terminator* Motion Picture

Franchise (the "Assumed Contract Notice"), which supplemented the Cure Notice; (c) a Notice of

Deadline to (1) Object to the Rejection of Executory Contracts in Connection with Sale of Certain of

the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) Elect Treatment

under Section 365(n)(1) of the Bankruptcy Code (the "Rejected Contract Notice"); and (d) a

Supplemental Notice of Proposed Treatment of Participations and Attachments in Connection with

Sale of Certain of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the

"Supplemental Participations and Attachments Notice").

On or about _____, 2010, the Debtors caused a notice of the Sale Hearing to be published in

[_____].

[IF AN AUCTION IS HELD, ADD DESCRIPTION OF AUCTION, SUCCESSFUL BIDDER

AND BID, AND DETERMINATION OF HIGHEST AND BEST BID.]

After consideration of the Sale Motion and accompanying supporting papers, the Supplement,

including the Lions Gate APA, the supplemental notices, the arguments of counsel, the files and

records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT**:

A.    <u>Authorization and Approval of Sale</u>.  Pursuant to Section 363(b) of the Bankruptcy

Code, the Debtors are authorized to sell, assign and transfer the Granted Terminator Assets to

_____ ("Buyer") for the purchase price of $_____ pursuant to and in accordance with the

asset purchase agreement submitted by Buyer (the "APA") (filed separately on February __, 2010, as

Docket No. ___), and when the sale, assignment and transfer is effective, the Debtors shall be deemed

to have sold, assigned and transferred all of the Debtors' rights, title and interest in and to the Granted

Terminator Assets to Buyer.  The APA was proposed by Buyer and Seller in good faith and represents

the highest and best offer for the Granted Terminator Assets and should be approved.  The Debtors are

authorized to execute, deliver, perform and consummate the APA, execute, deliver, perform all

documents and instruments and to take all actions that may be reasonably necessary to effectuate the

APA without further Order of the Court.

B.    <u>Sale Free and Clear of Interests</u>.  Pursuant to Sections 363(b) and 363(f) of the

Bankruptcy Code, the sale, assignment and transfer of the Granted Terminator Assets to Buyer shall be

free and clear of all liens, claims, encumbrances and other interests of any nature whatsoever, whether known or unknown, including all Participations and Attachments (collectively, "Interests"), other than the Assumed Obligations specifically set forth in the APA.  All Interests shall attach to the proceeds of the sale with the same priority, validity and enforceability, if any, as they had had against the Granted Terminator Assets, which proceeds shall be held by the Debtors in a segregated account pending further Order of the Bankruptcy Court and subject to all defenses, objections, claims, counterclaims and rights of setoff and recoupment; *provided, however, that* the Lien held by the Screen Actors Guild shall continue as provided for in the APA, and that prospective Guild residuals arising from the Granted Terminator Assets shall be paid as set forth in the APA or applicable assumption agreement .

C.    <u>Assumption and Assignment of Certain Contracts</u>.  The Debtors are hereby authorized to assume and assign, and the Debtors shall be deemed to have assumed, assigned and sold, the Assigned Contracts to Buyer, effective as of the Closing of the sale, pursuant to sections 363 and 365 of the Bankruptcy Code.  There are no unpaid amounts or other obligations that must be paid or performed as a condition to such assumption and assignment, and the Debtors are relieved from any liability for any breach of any of the Assigned Contracts occurring after the Closing pursuant to section 365(k) of the Bankruptcy Code.  Buyer has provided adequate assurance of future performance through its promise to perform in accordance with the applicable Assumed Contract, but only with respect to obligations first arising or incurred under such contract following the Closing, and such assurance is good and sufficient for purposes of section 365(f)(2).  Buyer shall acquire and assume such contracts free and clear of any and all liens, claims, encumbrances or interests of any nature, whether known or unknown, pursuant to sections 365 and 363(f) of the Bankruptcy Code.  Effective upon the Closing of the sale:

1.    Parties to Assigned Contracts are enjoined and prohibited from asserting against the Debtors' estates or the Buyer any default allegedly arising or incurred prior to the closing of the sale (the "Closing"), any actual pecuniary loss resulting from such default, or any other claim or unpaid obligation under the Assumed Contract arising or incurred prior to the Closing; and

2.    The Debtors and the Debtors' estates shall have no liability under the Assumed Contracts after the Closing.

D.    Rejection of Certain Contracts.  The Debtors are hereby authorized to reject the Rejected Contracts, effective as of the Closing of the sale, pursuant to section 365(a) of the Bankruptcy Code.

1.    If the rejection of a Rejected Contract gives rise to a claim by the other party or parties to such contract ("Rejection Damage Claim"), such Rejection Damage Claim shall be forever barred and shall not be enforceable against the Debtors unless the holder files a proof of such Rejection Damage Claim with the Bankruptcy Court no later than thirty (30) days after entry of this Order ("Rejection Damages Deadline).  Any person or entity that fails to file a proof of a Rejection Damages Claim arising from such rejection by the Rejection Damages Deadline shall be forever barred from asserting such a Claim against the Debtors or their estates, and such Claims shall be forever barred against the Debtors, their estates and their assets and properties of the Debtor.  The Buyer shall have no liability, obligation or responsibility of any nature whatsoever with respect to, arising from or related to, any Rejection Damages Claims.

2.    For any Rejected Contract that is a Rejected IP License, the failure of a licensee under such Rejected IP License to have made a timely written election (as required by the Overbidding Procedures Order) to treat such licensee's Rejected IP License as terminated, as permitted by section 365(n)(1)(A) of the Bankruptcy Code, *or* to retain in rights under such license to the extent permitted by section 365(n)(1)(B), shall be deemed to constitute such licensee's election to retain its rights under such Rejected IP License in accordance with section 365(n)(1)(B) of the Bankruptcy Code to the extent such rights existed immediately before the commencement of the Debtors' chapter 11 cases, which include any rights under such license with respect to the existing *Terminator* motion pictures (T1, T2, T3 and T4), but the retained rights do not include any rights with respect to the Granted Terminator Assets sold under the APA, including rights with respect to future *Terminator* remakes, sequels, or other productions, or derivative rights therein.

E.  <u>Treatment of Participations and Attachments</u>.  The treatment of the Participations and Attachments, described in the Sale Motion and the Supplemental Participations and Attachments Notice, and as provided in the APA, is authorized and approved.[1]  Accordingly:

1.  If any Participation or Attachment is an executory contract, it is rejected pursuant to section 365 of the Bankruptcy Code and shall be subject to the treatment of Rejected Contracts under paragraph D.1 above.

2.  Regardless of the executory or non-executory nature of any Participation or Attachment, Buyer does not assume or acquire, will not be subject to, and will have no obligation or liability of any nature, whether currently known or unknown, under or relating to any of the Attachments and Participations, or any duties or obligations owed or owing to any person or entity thereunder or relating thereto, or any other contract or agreement, whether known or unknown, that purports to create rights in the nature of Attachments or Participations, unless and to the extent, if any, that Buyer, in writing, specifically assumes and/or agrees to be bound by any such Attachments or Participations or any duty or obligation owed or owing to any person or entity thereunder or relating thereto; and the sale of the Granted Terminator Assets to Buyer is free and clear of all Attachments and Participations, and any rights or entitlements held by, or any duties or obligations of any nature whatsoever, to, any person or entity arising under or relating to the Attachments and Participations or any other document, contract or agreement of any nature, whether known or unknown, that purports to create rights in the nature of Attachments or Participations.

3.  All claims based upon Participations and Attachments will be treated as prepetition claims against the Debtors.  Persons or entities claiming rights under or in the nature of Participations and Attachments are enjoined and prohibited from asserting such rights, or any claims

---

[1] As provided by the APA, Certain Participations or Attachments owed on account of *Terminator: Salvation* may be paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement").  The sale of the Assets shall be subject to the T4 CAM Agreement and nothing in the APA is intended to affect the right of any party to the T4 CAM Agreement.

or obligations of any nature whatsoever arising therefrom or relating thereto, against the Buyer or any of its successors or affiliates.

G.    Cooperation by Seller.  Following the Closing, Seller (including any trustee(s) in bankruptcy that may be appointed for the Debtors) shall deliver to Buyer any Sequel or Remake Right (as defined in the APA) which comes into the possession, custody or control of the Debtors or such trustee(s), and shall cooperate with Buyer in compelling or obtaining the turnover or deliver to Buyer of any Granted Terminator Assets.

H.    Buyer Not Liable for Liabilities or Obligations of Seller Not Expressly Assumed. Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for of with respect to, and liability or obligation of Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this APA and this Order.

I.    Delivery of Assets by Other Persons and Entities.  Any person or entity having notice or knowledge of this Order and who is in possession of any property of the Debtor that constitutes Granted Terminator Assets is directed to deliver immediately such property to Buyer and account to Buyer for such property (other than holders of Possessory Liens (as defined in the APA)).

K.    Prohibition Against Interference with Purchased Assets.  Any person or entity having notice or knowledge of this Order is enjoined, prohibited and restrained from possessing or using any Granted Terminator Assets without the prior written consent of Buyer (other than holders of Possessory Liens (as defined in the APA)), exercising any control or dominion over any Granted Terminator Assets without the prior written consent of Buyer, or interfering with the Closing or with the rights of Buyer or its successors under this Agreement or under this Order with respect to the acquisition, use, exploitation and/or further disposition of the Granted Terminator Assets.

L.    Buyer Not a Successor to Debtors.  Buyer's purchase of the Granted Terminator Assets and its assumption of the Assumed Contracts shall not cause Buyer or its affiliates to be deemed a successor in respect of the Debtors, their businesses or their bankruptcy estates within the meaning of any federal, state or local law.

M.    Buyer's Good Faith.  The Buyer acted in good faith in purchasing the Granted Terminator Assets within the meaning of section 363(m) of the Bankruptcy Code, and is thereby a

good faith purchaser entitled to the benefits of that statute.  The provisions of section 363(n) of the

Bankruptcy Code have not been violated by Buyer.

N.    <u>Retention of Jurisdiction</u>.  The Court hereby retains jurisdiction and, upon motion by

any party with proper notice to Buyer and the Debtors, may (i) enforce, interpret and implement the

terms and provisions of the APA and any supplemental documents or agreements executed in

connection therewith, (ii) compel delivery and payment of the consideration provided for under the

APA, (iii) resolve any disputes, controversies, or claims arising out of or relating to the APA or this

Order, and (iv) interpret, implement and enforce the provisions of this Order.

O.    <u>Amendment of Documents</u>.  The APA and any related agreements, documents or other

instruments may be modified, amended or supplemented by the parties without further order of the

Court, provided that any such modification, amendment or supplement does not have a material

adverse effect on the Debtors' estates.

P.    <u>Immediate Effectiveness of Order</u>.  This Order is self-executing and shall be effective

immediately.  The stays provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy

Procedure are waived.


Dated:                                _____

                                      UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT E

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

9          **UNITED STATES BANKRUPTCY COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA**

            **LOS ANGELES DIVISION**

11 | In re: | Case No.: 2:09-31853-ER |
| | |
12 | T ASSET ACQUISITION COMPANY, LLC, a | Chapter 11 |
| Delaware limited liability company; HALCYON | |
13 | HOLDING GROUP, LLC, dba THE HALCYON | (Jointly Administered with Case Nos.: |
| COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER) |
14 | and DOMINION GROUP LLC, a California limited | |
| liability company, | **SUPPLEMENTAL NOTICE OF DEADLINE** |
15 | | **TO (1) OBJECT TO THE ASSUMPTION** |
| | **AND ASSIGNMENT OF EXECUTORY** |
16 | Debtors. | **CONTRACTS IN CONNECTION WITH** |
| | **SALE OF CERTAIN OF THE DEBTORS'** |
17 | | **ASSETS RELATING TO THE** |
| | ***TERMINATOR* MOTION PICTURE** |
18 | | **FRANCHISE, AND (2) FILE CLAIMS FOR** |
| | **AMOUNTS DUE TO CURE DEFAULTS** |
19 | **Check One or More as Appropriate:** | **UNDER EXECUTORY CONTRACTS TO** |
| | **BE ASSUMED AND ASSIGNED IN** |
20 | Affects All Debtors: ☒ | **CONNECTION WITH SALE OF CERTAIN** |
| Affects T Asset Acquisition Company, LLC only: ☐ | **OF THE DEBTORS' ASSETS RELATING** |
21 | Affects Halcyon Holding Group, LLC only: ☐ | **TO THE *TERMINATOR* MOTION** |
| Affects Dominion Group LLC only: ☐ | **PICTURE FRANCHISE** |
22 | | |
| | Sale Hearing: |
23 | | Date:     February 10, 2010 |
| | Time:     10:00 a.m. |
24 | | Location: Courtroom 1568 |
| |              255 East Temple St. |
25 | |              Los Angeles, California |
26 | | |
| | Objection Deadline: |
| | January 27, 2010 |

27

28

                              1

EXHIBIT E
Page 118

**PLEASE TAKE NOTICE** that on January 22, 2010, the above-captioned debtors (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M. Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction").  The winning bidder is referred to as the "Buyer."

**PLEASE TAKE FURTHER NOTICE** that on December 18, 2009, the Debtors also served notice of deadline to (1) object to the assumption and assignment of executory contracts in connection with sale of the Assets, and (2) file claims for amounts due to cure defaults under executory contracts to be assumed and assigned in connection with sale of the Assets (the "Cure Notice").  This notice serves as a supplement to the Cure Notice.

**PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "APA") with Lions Gate Films, Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature whatsoever, whether known or unknown, other than the Assumed Obligations specifically set forth in the APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the APA (the "Supplement").  A copy of the APA is attached as an exhibit to the Supplement.

**PLEASE TAKE FURTHER NOTICE** that Lions Gate, pursuant to the APA, has agreed to assume certain of the agreements that were listed in the Cure Notice.  The list of the agreements that Lions Gate has agreed to assume is attached hereto as Exhibit 1 (the "Assumed Contracts").  Unless Lions Gate specifically agrees under the APA to assume any contract, such contract will *not*  be assumed by Lions Gate, and Lions Gate will not assume, nor have, nor be bound by, any such contract or obligation and will have no liability to any other party under or relating to such contract.  The APA further provides that, at any time prior to the Closing, Lions Gate may remove a contract from the list of Assumed Contracts under the APA.  It is possible that other bidders may submit bids to acquire the Granted Terminator Assets, and that such bid(s) may require the Debtors to assume and assign a different a list of contracts.

**PLEASE TAKE FURTHER NOTICE** that the listing of the Assumed Contracts is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists, or that any Assumed Contract was an executory contract within the meaning of section 365 of the Bankruptcy Code as of the date the Debtors commenced their chapter 11 cases.  The Debtors do not waive any right of rescission,

2

reformation, defense, claim, or counterclaim respecting any Assumed Contract.  Some of the Assumed Contracts listed may have been terminated or may have expired by their own terms, but such contracts have been listed notwithstanding any such possible termination or expiration so as to provide a complete list of contracts and in the event that one or more parties in interest assert the position that an Assumed Contract was not terminated or did not expire.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to section 365 of the Bankruptcy Code, the Debtors are required to cure any defaults under an Assumed Contract as a condition to the assumption and assignment of the Assumed Contract to Lions Gate (or a successful overbidder at the Auction, if any).  The Debtors are not aware of any defaults that must be cured as a condition to the assumption and assignment of any Assumed Contract. **THEREFORE, IF YOU ARE A PARTY TO ANY OF THE ASSIGNED CONTRACTS** *AND* **YOU ASSERT A CURE CLAIM PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE,** *OR* **IF YOU OTHERWISE OBJECT TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACT, YOU MUST FILE WITH THE BANKRUPTCY COURT AND SERVE A WRITTEN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT AND/OR SPECIFIED CURE AMOUNT, TOGETHER WITH EVIDENCE THAT SUPPORTS THE OBJECTION, NO LATER THAN JANUARY 27, 2010,** **ON THE DEBTORS' COUNSEL** (Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067), **AND ON COUNSEL FOR LIONS GATE** (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569) **AND ON COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** (Martin J. Brill, Esq., and Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA 90067).

**PLEASE TAKE FURTHER NOTICE** that, if you are a party to an Assumed Contract and do not timely file a cure claim or objection by January 27, 2010, the Debtors will request that the Bankruptcy Court enter an Order that provides for the following:

     1.     **YOU SHALL BE FOREVER BARRED** from asserting against the Debtors' estates or the Buyer any default allegedly arising or incurred prior to the closing of the sale (the "Closing"), any actual pecuniary loss resulting from such default, or any other claim or unpaid obligation under the Assumed Contract arising or incurred prior to the Closing;

     2.     The Debtors will be authorized to assume and assign the Assumed Contracts to the Buyer pursuant to section 365 of the Bankruptcy Code, and Buyer shall acquire and assume such contracts free and clear of any and all liens, claims, encumbrances or interests of any nature, whether known or unknown, pursuant to sections 365 and 363(f) of the Bankruptcy Code;

     3.     The Debtors and the Debtors' estates shall have no liability under the Assumed Contracts after the Closing;

     4.     The only adequate assurance required of the Buyer shall be its promise to perform in accordance with the applicable Assumed Contract, but only with respect to obligations first arising or incurred under such contract following the Closing; and

     5.     The ten-day stay provided by Federal Rule of Bankruptcy Procedure 6006(d) shall be waived.

**PLEASE TAKE FURTHER NOTICE** that, if a non-Debtor party to an Assumed Contract timely files a written cure claim, the Debtors shall either:

        (i)     escrow the cure amount in controversy at the Closing (or a lower amount if authorized by the Bankruptcy Court) until the dispute is resolved by the Bankruptcy Court after hearing or stipulation by the parties, or

        (ii)    provide written notice to the non-Debtor party that the Debtors will request at the Sale Hearing that the Assumed Contract will be rejected.

The filing of a written cure claim, however, shall not in any manner affect the Closing of the sale of the Assets to Buyer or the assumption and assignment of the Assumed Contract by Debtors to Buyer.

        **PLEASE TAKE FURTHER NOTICE** that, if a non-Debtor party to an Assumed Contract timely files a written objection to the proposed adequate assurance of future performance and the objection is not resolved prior to or at the Sale Hearing, the Debtors will request that the Bankruptcy Court schedule an expedited hearing to resolve the objection.

Dated: January __, 2010            PEITZMAN, WEG & KEMPINSKY LLP

                          By:_____
                              Howard J. Weg
                              David B. Shemano
                        Counsel for the Debtors

4

## **EXHIBIT 1**

### **Assumed Contracts**

The listing of the agreements in this Exhibit is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases. The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract. Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

1.    Subject to Sections 5.16 and 5.17 of the Asset Purchase Agreement between Lions Gate Films, Inc., as Buyer, and the Halcyon Parties, collectively as Seller, dated January ___, 2010: the Trademark License Agreement dated as of April 29, 1996 between Canal+D.A. and Carolco Pictures Inc., as assigned by Carolco Pictures Inc. to AGV Productions, Inc ("AGV"), as amended by Amendment Agreement dated April __, 2003 by and between StudioCanal Image S.A., (as successor to Canal+D.A.) and AGV and Amendment Agreement dated July 22, 2008 by and between StudioCanal S.A. (as successor to StudioCanal Image S.A) and T Asset Acquisition Company, LLC, as successor to AGV's rights relating to the making of Remakes and Sequels to the films T1 and T2.

2.    Purchase Agreement ("Prior Purchase Agreement") dated as of May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV Productions T4 , LLC ("AGV T4" ) (collectively the "AGV Sellers") on the one hand, and T Asset on the other hand, but only with respect to all of the AGV Sellers' right, title and interest in and to the Granted Terminator Assets.

3.    Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 2 together with the Schedules to the Prior Purchase Agreement, but only with respect to all of the AGV Sellers' right, title and interest in and to the Granted Terminator Assets.

5

# EXHIBIT F

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

9                  **UNITED STATES BANKRUPTCY COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

                    **LOS ANGELES DIVISION**

11 | In re: | Case No.: 2:09-31853-ER |
   |---|---|

12 | T ASSET ACQUISITION COMPANY, LLC, a | Chapter 11 |

13 | Delaware limited liability company; HALCYON HOLDING GROUP, LLC, dba THE HALCYON | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |

14 | COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited | **NOTICE OF DEADLINE TO (1) OBJECT TO THE REJECTION OF  EXECUTORY** |

15 | liability company, | **CONTRACTS IN CONNECTION WITH SALE OF CERTAIN OF THE DEBTORS'** |

16 |                              Debtors. | **ASSETS RELATING TO THE *TERMINATOR* MOTION PICTURE** |

17 | | **FRANCHISE, AND (2) ELECT TREATMENT UNDER SECTION 365(n)(1)** |

18 | | **OF THE BANKRUPTCY CODE** |

19 | **Check One or More as Appropriate:** | |

20 | Affects All Debtors:                                ☒ | Sale Hearing: |
   | Affects T Asset Acquisition Company, LLC only: ☐ | Date:     February 10, 2010 |

   | Affects Halcyon Holding Group, LLC only:   ☐ | Time:     10:00 a.m. |
21 | Affects Dominion Group LLC only:             ☐ | Location: Courtroom 1568 |

22 | |               255 East Temple St. |
   | |               Los Angeles, California |

23 | | Objection Deadline: |
   | |      January 27, 2010 |

24 | | |

25 | | Election Deadline: |
   | |      February 4, 2010 |

26

27          **PLEASE TAKE NOTICE** that on January 22, 2010, the above-captioned debtors
   (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or
28 as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M.

                                          1

Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction").  The winning bidder is referred to as the "Buyer."

     **PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "APA") with Lions Gate Films, Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature whatsoever, whether known or unknown, other than the Assumed Obligations specifically set forth in the APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the APA (the "Supplement").  A copy of the APA is attached as an exhibit to the Supplement.

     **PLEASE TAKE FURTHER NOTICE** that the APA requires the Debtors to reject certain agreements pursuant to section 365 of the Bankruptcy Code (the "Rejected Contracts").  The list of the agreements the Debtors are required to reject is attached hereto as Exhibit 1 (the "Rejected Contracts").  It is possible that other bidders may submit bids to acquire the Granted Terminator Assets, and that such bid(s) may require the Debtors to reject a different a list of agreements.

     **PLEASE TAKE FURTHER NOTICE** that the listing of the Rejected Contracts is not an admission or acknowledgement by the Debtors that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists, or that any Rejected Contract was an executory contract within the meaning of section 365 of the Bankruptcy Code as of the date the Debtors commenced their chapter 11 cases.  The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any Rejected Contract.  Some of the Rejected Contracts listed may have been terminated or may have expired by their own terms, but such contracts have been listed notwithstanding any such possible termination or expiration so as to provide a complete list of contracts and, in the event that one or more parties in interest assert that a Rejected Contract was not terminated or did not expire, to provide notice to such party in interest of its right and opportunity to be heard.

     **PLEASE TAKE FURTHER NOTICE THAT IF YOU ARE A PARTY TO ANY OF THE REJECTED CONTRACTS *AND* YOU OBJECT TO THE REJECTION OF THE REJECTED CONTRACT, YOU MUST FILE WITH THE BANKRUPTCY COURT AND SERVE A WRITTEN OBJECTION TO THE PROPOSED REJECTION, TOGETHER WITH EVIDENCE THAT SUPPORTS THE OBJECTION, NO LATER THAN <u>JANUARY 27, 2010</u>, ON THE DEBTORS' COUNSEL** (Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067), **AND ON**

2

**COUNSEL FOR LIONS GATE** (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569) **AND ON COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** (the "Committee") (Martin J. Brill, Esq., and Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA 90067).

**PLEASE TAKE FURTHER NOTICE** that if you are a party to a Rejected Contract under which a Debtor is a licensor of a right to "intellectual property," as such term is defined in Section 101(35A) of the Bankruptcy Code ("Rejected IP License"), you have the right to make an election of the treatment of your Rejected IP License pursuant to section 365(n)(1) of the Bankruptcy Code, which provides:

> (n)(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—

> (A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

> (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—

> (i) the duration of such contract; and

> (ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

**THE GRANTED TERMINATOR ASSETS ARE BEING SOLD FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS OF ANY NATURE, PURSUANT TO SECTIONS 363(f) AND 365(n) OF THE BANKRUPTCY CODE, INCLUDING ANY RIGHTS UNDER THE REJECTED CONTRACTS AND REJECTED IP LICENSES LISTED ON EXHIBIT 1 ATTACHED HERETO, WITH RESPECT TO THE GRANTED TERMINATOR ASSETS.**

**PURSUANT TO THE OVERBIDDING PROCEDURES ORDER ENTERED BY THE BANKRUPTCY COURT ON JANUARY ___, 2010, IF ANY LICENSEE UNDER A REJECTED IP LICENSE WISHES TO TREAT SUCH LICENSE AS TERMINATED, AS PERMITTED BY SECTION 365(n)(1)(A) OF THE BANKRUPTCY CODE, SUCH LICENSEE MUST ELECT, IN WRITING, NOT LATER THAN FEBRUARY 4, 2010, TO TREAT SUCH LICENSEE'S REJECTED IP LICENSE AS TERMINATED. *IF YOU ARE A LICENSEE UNDER A REJECTED IP LICENSE, IN ORDER TO TREAT YOUR RIGHTS AS TERMINATED UNDER SECTION 365(n)(1)(A) OF THE BANKRUPTCY CODE YOU MUST***

3

*FILE WITH THE BANKRUPTCY COURT AND SERVE UPON DEBTORS' COUNSEL, COUNSEL FOR LIONS GATE AND COUNSEL FOR THE COMMITTEE A WRITTEN NOTICE OF ELECTION ON OR BEFORE <u>FEBRUARY 4, 2010</u>.*

**IF YOU ARE A LICENSEE UNDER A REJECTED IP LICENSE AND YOU DO NOT WISH TO TREAT YOUR LICENSE AS TERMINATED, YOU ARE NOT REQUIRED TO MAKE THE WRITTEN ELECTION DESCRIBED ABOVE. THE OVERBIDDING PROCEDURES ORDER PROVIDES THAT THE FAILURE OF A LICENSEE UNDER A REJECTED IP LICENSE TO MAKE SUCH WRITTEN ELECTION SHALL BE DEEMED TO CONSTITUTE SUCH LICENSEE'S ELECTION TO RETAIN ITS RIGHTS UNDER SUCH REJECTED IP LICENSE IN ACCORDANCE WITH SECTION 365(n)(1)(B) OF THE BANKRUPTCY CODE. UNDER SECTION 365(n)(1)(B), THE LICENSEE MAY RETAIN ITS RIGHTS UNDER SUCH REJECTED IP LICENSE AS SUCH RIGHTS EXISTED IMMEDIATELY BEFORE THE COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES, WHICH INCLUDE ANY RIGHTS UNDER SUCH LICENSE WITH RESPECT TO THE EXISTING *TERMINATOR* MOTION PICTURES (T1, T2, T3 AND T4), BUT THE RETAINED RIGHTS DO NOT INCLUDE RIGHTS WITH RESPECT TO ANY FUTURE *TERMINATOR* REMAKES, SEQUELS, OR OTHER PRODUCTIONS, OR DERIVATIVE RIGHTS THEREIN. *IF YOU ARE NOT ELECTING TO TERMINATE YOUR REJECTED IP LICENSE BUT YOU OBJECT TO THE TREATMENT OF RETAINED RIGHTS THEREUNDER AS DESCRIBED ABOVE, YOU MUST FILE WITH THE BANKRUPTCY COURT AND SERVE UPON DEBTORS' COUNSEL, COUNSEL FOR LIONS GATE AND COUNSEL FOR THE COMMITTEE A WRITTEN OBJECTION NOT LATER THAN <u>JANUARY 27, 2010</u>.* THE FAILURE OF A LICENSEE UNDER A REJECTED IP LICENSE TO OBJECT TO THE TREATMENT OF RIGHTS RETAINED THEREUNDER WILL BE DEEMED BY THE BANKRUPTCY COURT TO BE SUCH PARTY'S CONSENT TO THE LIMITATION ON RETAINED RIGHTS.**

**PLEASE TAKE FURTHER NOTICE** that if the Court approves the rejection of the your Rejected Contract (including Rejected IP Licenses), the Court will set a further deadline by which you must file any claims against the Debtors and the Debtors' estates arising from or relating to such rejection.

Dated: January __, 2010                    PEITZMAN, WEG & KEMPINSKY LLP


By:_____
        Howard J. Weg
        David B. Shemano
Counsel for the Debtors

4

989061

## **EXHIBIT 1**

### **Rejected Contracts**

The listing of the agreements in this Exhibit is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases.  The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract.  Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

Certain of the non-Debtor parties to the agreements in this Schedule may be owed Participations on account of *Terminator: Salvation*, which Participations, if owed, are paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement").  Nothing in the APA, including the rejection of any agreement in this Schedule, is intended to affect the right of any party to the T4 CAM Agreement.

1.      Settlement Agreement dated as of May 23, 2008, between T Asset Acquisition Co. LLC and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. and the First Amendment thereto dated as of October 27, 2009, along with the underlying documents titled [Financing/Distribution Agreement re: Terminator dated February 18, 1983] and [Orion Sub-distribution Agreement dated October 24, 1983].

2.      Letter Agreement dated May 31, 2002 among AGV Productions and C-2 Pictures LLC, Intermedia Film Distribution Limited and Toho-Towa Company Limited

3.      Option and Purchase Agreement dated as of August 8, 2005 between Seller and Warner Bros. Television Production Inc. and all ancillary agreements and instruments thereto.

4.      Distribution Agreement dated as of February 13, 2008 between T Salvation Distribution LLC and Worldwide SPE Acquisition, Inc ("Sony") and all ancillary agreements and instruments thereto.

5.      Distribution Agreement dated as of November 10, 2007 and all ancillary agreements and instruments with effect as of September 7, 2007 between T Salvation Distribution, LLC and Warner Bros. and all ancillary agreements and instruments thereto.

6.      Director Loanout Agreement dated as of October 19, 2007 between T Salvation LLC and Five Pennies, Inc f/s/o Joseph McGinty Nichol a/k/a McG.

7.      Agreement dated as of October 1, 2007 between Dominion LLC f/s/o Derek Anderson and Victor Kubiecek and T Salvation Productions LLC, and the amendment dated as of June 16, 2008.

8.      Guaranty dated as of October 1, 2007 between T Asset and Dominion, LLC f/s/o Derek Anderson and Victor Kubicek.

9.      Agreement dated as of September 10, 2007 between Onda Entertainment Inc. f/s/o Moritz Borman and T Salvation Productions LLC.

5

10.     Video Game Development Agreement between Halcyon Games, LLC and Attaction AG d/b/a EGI Equity Games International AG.

11.     Agreement between Halcyon Games, LLC and Grin A.B.

12.     Theme Park License agreement dated as of June 30, 2008 between Halcyon Consumer Products, LLC and Six Flags, Inc. and the trademark license dated the same date

13.     Agreement between Halcyon Consumer Products, LLC and Titan Publishing Group

14.     Merchandising License Agreement dated as of February 13, 2008 between Halcyon Consumer Products, LLC and Playmates Toys, Inc. together with the Short Form License and the Trademark License dated the and the First Amendment thereto dated as of June 22, 2009.

15.     License Agreement between The Halcyon Company and The Topps Company.

16.     Consulting/Executive Producer Agreement dated as of October __, 2007 between T Asset and Peter D Graves.

17.     Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver.

18.     Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale").

19.     Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand.

20.     Animatronic and Prosthetic Effects Agreement dated as of February 6, 2008 between T Salvation Productions and Stan Winston Studio, Inc.

21.     Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis.

22.     Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis.

23.     Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington.

24.     Executive Producer Agreement dated as of February 29, 2008 between T Salvation Productions and Lin Pictures, Inc. furnishing the development and executive producer services of Dan Lin.

25.     Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman.

26.     Acting Agreement dated as of April 21, 2008 between T Salvation Productions and Shell B Productions, Inc. furnishing the acting services of Moon Bloodgood.

6

27.	Acting Agreement dated as of June 28, 2008 between T Salvation Productions and Pigs Can Fly, Inc. furnishing the acting services of Helena Bonham Carter.

28.	Acting Agreement dated as of April 9, 2008 between T Salvation Productions and Anton Yelchin, Inc. furnishing the acting services of Anton Yelchin.

29.	The following documents and correspondence provided by Seller to Buyer with respect to Joseph McGinty (a/k/a McG):  the letter from David E. Weber to Tom Hunter, Esq., dated May 26, 2009 regarding "'T5 / McG – Deal Memorandum and Availability Provisions Language", and the memorandum attached thereto from David E. Weber to Joel Michaels and Tom Hunter, dated May 13, 2009 and entitled "McG – 'T5' / Terms", with various handwritten notations thereon including notes dated May 26, 2009; and email correspondence regarding "McG – T5" between David Weber and Tom Hunter dated June 15 and June 30, 2009, and any related documents.

30.	"Terminator Salvation" Digital Distribution License Agreement dated as of March 30, 2009 between Halcyon Games, LLC and T Asset Acquisition, LLC, on the one hand, and Warner Specialty Video Productions Inc., on the other hand, with respect to the distribution of the Machinima Series.

30.	Writer Loanout Agreement  between AGV Production T4 and  Jonathan Mostow dated July 1, 2003.

31.	Writer Loanout Agreement between AGV Productions T4 & Michael Ferris and John Brancato dated October 15, 2003 and First Amendment to Writer Loanout Agreement re: T4 between AGV Production T4 and The Deadpan Corp/Consumer Recreation Services for Michael Ferris & John Brancato dated July 8, 2005.

32.	Development Agreement dated September 18, 2002, between AGV Productions T4 LLC and RJ Info Tech, Inc. f/s/o Jonathan Mostow and Lieberville Inc. f/s/o Hal Lieberman; First Amendment to Development Agreement dated as of October 15, 2003, with respect to the document and  the Second Amendment to Development Agreement dated December 22, 2003.

7

# EXHIBIT G

1 | Howard J. Weg (State Bar No. 91057)
*hweg@pwkllp.com*
2 | David B. Shemano (State Bar No. 176020)
*dshemano@pwkllp.com*
3 | PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
4 | Los Angeles, CA  90067
Telephone:  (310) 552-3100
5 | Facsimile:  (310) 552-3101

6 | Counsel for T Asset Acquisition Company, LLC,
Halcyon Holding Group, LLC, dba The Halcyon
7 | Company, and Dominion Group LLC,
Debtors and Debtors in Possession

8 |

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| In re: | Case No.: 2:09-31853-ER |
|---|---|
| T ASSET ACQUISITION COMPANY, LLC, a Delaware limited liability company; HALCYON HOLDING GROUP, LLC, dba THE HALCYON COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited liability company, | Chapter 11 |
| | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |
| | **SUPPLEMENTAL NOTICE OF PROPOSED TREATMENT OF PARTICIPATIONS AND ATTACHMENTS IN CONNECTION WITH SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATING TO THE *TERMINATOR* MOTION PICTURE FRANCHISE** |
| Debtors. | |

Sale Hearing:
Date:      February 10, 2010
Time:      10:00 a.m.
Location:  Courtroom 1568
           255 East Temple St.
           Los Angeles, California

Objection Deadline:
January 27, 2010

**Check One or More as Appropriate:**

Affects All Debtors:                                ☒
Affects T Asset Acquisition Company, LLC only: ☐
Affects Halcyon Holding Group, LLC only:       ☐
Affects Dominion Group LLC only:               ☐

       **PLEASE TAKE NOTICE** that on January 22, 2010, the above-captioned debtors (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M. Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant

1

To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction").  The winning bidder is referred to as the "Buyer."

**PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "APA") with Lions Gate Films, Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the APA, with any such liens, claims, encumbrances, or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the APA (the "Supplement").  A copy of the APA is attached as an exhibit to the Supplement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are parties to (or successors-in-interest to parties to) certain contracts with third parties that are related to the *Terminator* franchise that provide for, among other things, (i) the payment of participations or royalties to various entities based on the performance of one or more *Terminator* motion pictures or television series including *Terminator: Salvation* or other Sequels or Derivative Rights as defined in the APA (collectively, Participations"), or (ii) certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of an existing *Terminator* motion picture (collectively, "Attachments"). A list of the documents relating to Participations and/or Attachments is attached hereto as Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that the Debtors believe that the documents relating to Participations and Attachments are not executory contracts within the meaning of section 365 of the Bankruptcy Code because one or more parties to the contract do not have obligations remaining to be performed under the agreement that, if not performed, would constitute a material breach of the contract that would excuse a refusal to perform by the other party.  *See, Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991); *In re Adelphia Communications Corp.*, 307 B.R. 404, 428 (Bankr. S.D.N.Y. 2004); *In re Stein and Day, Inc.*, 81 B.R. 263 (Bankr. S.D.N.Y. 1988).

**PLEASE TAKE FURTHER NOTICE** that the listing of the Participations and Attachments is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists, or that any Participations or Attachments were executory contracts within the meaning of section 365 of the Bankruptcy Code as of the date the Debtors commenced their chapter 11 cases.  The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract.  Some contracts listed may have been terminated or may have expired by their own terms, but such contracts have been listed notwithstanding any such possible termination or expiration so as to provide a complete list of contracts and, in the event that one or more parties in interest assert that a contract was not terminated or did not expire, to provide notice to such party in interest of its right and opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that, under the APA: (1) Lions Gate will *not* assume or acquire, will *not* be subject to, and will have *no* obligation or liability of any nature, whether currently known or unknown, under or relating to any of the Attachments and Participations, or any duties or obligations owed or owing to any person or entity thereunder or relating thereto, or any other contract or agreement, whether known or unknown, that purports to create rights in the nature of Attachments or Participations, unless and to the extent, if any, that Buyer, in writing, specifically assumes and/or agrees to be bound by any such Attachments or Participations or any duty or obligation owed or owing to any person or entity thereunder or relating thereto; (2) the sale of the Granted Terminator Assets to Buyer will be free and clear of all Attachments and Participations, and any rights or entitlements held by, or any duties or obligations of any nature whatsoever, to any person or entity arising under or relating to the Attachments and Participations or any other document, contract or agreement of any nature, whether known or unknown, that purports to create rights in the nature of Attachments or Participations; and (3) to the extent any Attachments or Participations are executory contracts within the meaning of section 365 of the Bankruptcy Code, the Debtors are required to reject, pursuant to section 365 of the Bankruptcy Code, all executory contracts and agreements that include Participations or Attachments that relate to the Granted Terminator Assets.[1] Consequently, all claims based upon Participations and Attachments will be treated as prepetition claims against the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are requesting that the Bankruptcy Court authorize and approve the treatment of Participations and Attachments in the manner described above. **IF YOU ARE A PARTY TO ANY OF THE PARTICIPATIONS OR ATTACHMENTS *AND* YOU OBJECT TO THE TREATMENT OF THE ATTACHMENTS OR PARTICIPATIONS, YOU MUST FILE WITH THE BANKRUPTCY COURT AND SERVE A WRITTEN OBJECTION TO THE PROPOSED TREATMENT, TOGETHER WITH EVIDENCE THAT SUPPORTS THE OBJECTION, NO LATER THAN JANUARY 27, 2010, ON THE DEBTORS' COUNSEL** (Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA 90067), **AND ON COUNSEL FOR LIONS GATE** (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569), **AND ON COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** (Martin J. Brill, Esq., and Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA 90067).

Dated: January __, 2010                    PEITZMAN, WEG & KEMPINSKY LLP


                                           By:_____
                                              Howard J. Weg
                                              David B. Shemano
                                           Counsel for the Debtors

---

[1] Certain Participations owed on account of *Terminator: Salvation* are paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement"). **The sale of the Assets shall be subject to the T4 CAM Agreement and nothing in the APA is intended to affect the right of any party to the T4 CAM Agreement.**

# **EXHIBIT 1**

The listing of the agreements in this Exhibit is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases. The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract. Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

Certain of the non-Debtor parties to the agreements in this Schedule may be owed Participations on account of *Terminator: Salvation*, which Participations, if owed, are paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement"). Nothing in the APA, including the rejection of any agreement in this Schedule, is intended to affect the right of any party to the T4 CAM Agreement.

1.    Agreement dated as of September 10, 2007 between Onda Entertainment Inc. f/s/o Moritz Borman and T Salvation Productions LLC**.**

2.    Agreement dated as of October 1, 2007 between Dominion LLC f/s/o Derek Anderson and Victor Kubicek and T Salvation Productions LLC, and the amendment dated as of June 16, 2008.

3.    Guaranty dated as of October 1, 2007 between T Asset and Dominion, LLC f/s/o Derek Anderson and Victor Kubicek.

4.    Director Loanout Agreement dated as of October 19, 2007 between T Salvation LLC and Five Pennies, Inc. f/s/o Joseph McGinty Nichol (a/k/a McG).

5.    Consulting/Executive Producer Agreement dated as of October __, 2007 between T Asset and Peter D Graves.

6.    Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver.

7.    Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale").

8.    Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand.

9.    Animatronic and Prosthetic Effects Agreement dated as of February 6, 2008 between T Salvation Productions and Stan Winston Studio, Inc.

10.    Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis.

11.    Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis.

4

12.  Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington.

13.  Executive Producer Agreement dated as of February 29, 2008 between T Salvation Productions and Lin Pictures, Inc. furnishing the development and executive producer services of Dan Lin.

14.  Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman.

15.  Acting Agreement dated as of April 21, 2008 between T Salvation Productions and Shell B Productions, Inc. furnishing the acting services of Moon Bloodgood.

17.  Acting Agreement dated as of June 28, 2008 between T Salvation Productions and Pigs Can Fly, Inc. furnishing the acting services of Helena Bonham Carter.

18. Acting Agreement dated as of April 9, 2008 between T Salvation Productions and Anton Yelchin, Inc. furnishing the acting services of Anton Yelchin.

19. The following documents and correspondence provided by Seller to Buyer with respect to Joseph McGinty (a/k/a McG):  the letter from David E. Weber to Tom Hunter, Esq., dated May 26, 2009 regarding "'T5 / McG – Deal Memorandum and Availability Provisions Language", and the memorandum attached thereto from David E. Weber to Joel Michaels and Tom Hunter, dated May 13, 2009 and entitled "McG – 'T5' / Terms", with various handwritten notations thereon including notes dated May 26, 2009; and email correspondence regarding "McG – T5" between David Weber and Tom Hunter dated June 15 and June 30, 2009, and any related documents.

20.  Writer Loanout Agreement  between AGV Production T4 and  Jonathan Mostow dated July 1, 2003

21.  Writer Loanout Agreement between AGV Productions T4 & Michael Ferris and John Brancato dated October 15, 2003 and First Amendment to Writer Loanout Agreement re: T4 between AGV Production T4 and The Deadpan Corp/Consumer Recreation Services for Michael Ferris & John Brancato dated July 8, 2005

22.  Development Agreement dated September 18, 2002, between AGV Productions T4 LLC and RJ Info Tech, Inc. f/s/o Jonathan Mostow and Lieberville Inc. f/s/o Hal Lieberman; First Amendment to Development Agreement dated as of October 15, 2003, with respect to the document and  the Second Amendment to Development Agreement dated December 22, 2003

5

EXHIBIT G
Page 134

# EXHIBIT H

[FORM OF PUBLICATION NOTICE]

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:  T ASSET ACQUISITION COMPANY, LLC, a Delaware limited liability company; HALCYON HOLDING GROUP, LLC, dba THE HALCYON COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited liability company, and other affiliates, Debtors. | Case No.: 2:09-31853-ER (Chapter 11; Jointly Administered with Other Cases)<br><br>**NOTICE OF HEARING ON MOTION FOR ORDER AUTHORIZING AND APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATING TO THE *TERMINATOR* MOTION PICTURE FRANCHISE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS**<br><br><u>Sale Hearing</u>: February 10, 2010<br><br><u>Last Day to Object</u>:  January 27, 2010 |

   **PLEASE TAKE NOTICE** that on January 22, 2010, the above-captioned debtors (collectively, the "Debtors") served notice (the "Sale Notice") that on February 10, 2010, at 10:00 a.m., or as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M. Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the Debtors on December 18, 2009.

   **PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "Lions Gate APA") with Lions Gate Films Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the Lions Gate APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the Lions Gate APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the Lions Gate APA (the "Supplement").  A copy of the Lions Gate APA was filed as an exhibit to the Supplement.

   **PLEASE TAKE FURTHER NOTICE** that the sale of the Granted Terminator Assets to Lions Gate is subject to higher and better bids, pursuant to procedures approved by the order of the Bankruptcy Court entered on January __, 2010 ("Overbidding Procedures Order").  Among other things, the Overbidding Procedures Order provides for the following:

1

[FORM OF PUBLICATION NOTICE]

A.    Auction.  An auction of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") shall take place on February 8, 2010 at 10:00 a.m. at the offices of FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until concluded by the Debtors (the "Auction").

B.    Qualified Overbids.  Interested parties may submit qualified overbids for the Assets ("Qualified Overbids"), which must comply with the criteria specified in the Overbidding Procedures Order, which must be accompanied by a deposit as specified in the Overbidding Procedures Order, and which must be received by the persons specified in the Overbidding Procedures Order no later than 5:00 p.m., California time, on February 4, 2010 (the "Overbid Deadline").  Unless a bid containing all of the required documents and information is submitted by the Overbid Deadline, it will not constitute a Qualified Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

C.    Result If No Qualified Overbids.  If, no later than 5:00 p.m., California time, on February 5, 2010 (the "Determination Deadline"), the Debtors determine that there are no Qualified Overbids, the Debtors will move the Court at the Sale Hearing for authority to sell the Granted Terminator Assets to Lions Gate pursuant to the terms of the Lions Gate APA, and no Auction will be conducted.

D.    Auction To Be Held If A Qualified Overbid Is Timely Submitted.  If the Debtors determine by the Determination Deadline that at least one Qualified Overbid was submitted, the Debtors shall hold the Auction in accordance with the procedures specified in the Overbidding Procedures Order.

E.    Break-Up Fee:  In the event that Lions Gate is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Lions Gate shall be paid a break-up fee by the Debtors in the amount of Seven Hundred Fifty Thousand Dollars ($750,000).

**PLEASE TAKE FURTHER NOTICE** that (1) the Debtors are requesting that the Bankruptcy Court authorize the assumption and assignment to Lions Gate (or the successful overbidder, if any) of certain executory contracts; (2) the Debtors are requesting that the Bankruptcy Court authorize the rejection of certain executory contracts, including certain licenses of intellectual property under which a Debtor is licensor; and, (3) because Lions Gate will not assume certain attachment and participations or royalties to various entities based on the performance of an existing *Terminator* motion picture and certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of an existing *Terminator* motion picture, the Debtors are treating such attachment and participations as prepetition claims against the Debtors and their estates.  The sale of the Assets is free and clear of all liens, claims, encumbrances and other interests of any nature, including all such attachments and participations.  **Parties in interest are referred to the Supplement, the Lions Gate APA and the separate notices filed and served by the Debtors, dated January 22, 2010, which explain in greater detail the assumption, rejection and/or treatment of the contracts, attachments and participations or royalties described by this paragraph.  Copies of such documents are available upon request to the Debtors' bankruptcy counsel at the address indicated below.**

**PLEASE TAKE FURTHER NOTICE** that any objections to the Sale Motion or the Supplement must be in writing and must be filed and served in accordance with Local Bankruptcy

2

[FORM OF PUBLICATION NOTICE]

Rule 9013-1(f) no later than **JANUARY 27, 2010**.  **Objections must be served on the persons specified in the Sale Notice.**

**PLEASE TAKE FURTHER NOTICE that the failure of a party in interest timely to file and serve a response to the Sale Motion or Supplement in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be such party's consent to the granting of the relief requested in the Sale Motion and Supplement including, but not limited to, sale of the Granted Terminator Assets to Lions Gate (or the successful overbidder, if any) free and clear of any and all liens, claims, encumbrances or interests of any nature whatsoever held or asserted by such party.**

Dated: January __, 2010

> Howard J. Weg, Esq.
> David B. Shemano, Esq.
> PEITZMAN, WEG & KEMPINSKY LLP
> 10100 Santa Monica Blvd., Suite 1450
> Los Angeles, California 90067
> Telephone: (310) 552-3100
> Facsimile: (310) 552-3101
> Email: hweg@pwkllp.com
> Email: dshemano@pwkllp.com
>
> Counsel for the Debtors

3

# EXHIBIT I

Howard J. Weg (State Bar No. 91057)
*hweg@pwkllp.com*
David B. Shemano (State Bar No. 176020)
*dshemano@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA 90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Counsel for T Asset Acquisition Company, LLC,
Halcyon Holding Group, LLC, dba The Halcyon
Company, and Dominion Group LLC,
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>T ASSET ACQUISITION COMPANY, LLC, a Delaware limited liability company; HALCYON HOLDING GROUP, LLC, dba THE HALCYON COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited liability company,<br><br>           Debtors. | Case No.: 2:09-31853-ER<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER)<br><br>**ORDER GRANTING MOTION OF DEBTORS FOR ORDER: (1) ESTABLISHING SALE PROCEDURES FOR SALE OF CERTAIN OF THE DEBTORS'** ~~ASSETS RELATING TO THE~~ ~~*TERMINATOR*~~ ~~MOTION PICTURE~~ ~~FRANCHISE FREE AND CLEAR OF ALL~~ ~~LIENS, CLAIMS, ENCUMBRANCES AND~~ ~~OTHER INTERESTS PURSUANT TO~~ ~~SECTIONS 363 AND 365 OF THE~~ ~~BANKRUPTCY CODE~~ ***TERMINATOR* ASSETS, (2) APPROVING BREAK-UP FEE, AND (3) APPROVING FORM AND MANNER OF NOTICE OF SALE** |

**Check One or More as Appropriate:**

Affects All Debtors:

Affects T Asset Acquisition Company, LLC only:

Affects Halcyon Holding Group, LLC only:

Affects Dominion Group LLC only:

•
◦
◦
◦

**Hearing:**

Date: January 20, 2010
Time: 10:00 a.m.
Place: Courtroom 1568
    255 E. Temple Street
    Los Angeles, CA 90012

~~Date: January 6, 2010~~
~~Time: 10:00 a.m.~~
~~Location: Courtroom 1568~~
~~255 East Temple St.~~
~~Los Angeles, California~~

1

EXHIBIT I
Page 138

The Motion Of Debtors For Order Establishing Sale Procedures For Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (~~as supplemented and amended,~~ the "~~Sale~~Overbidding Procedures Motion"), filed by the above-captioned debtors (the "Debtors"), came on for hearing before the Honorable Ernest M. Robles, United States Bankruptcy Judge, on January ~~6,~~20, 2010, at 10:00 a.m. (the "Hearing"). Appearances were made as reflected in the Bankruptcy Court's record.

On January 8, 2010, the Debtors filed a supplement to the Overbidding Procedures Motion (the "Overbidding Supplement") disclosing that, subject to approval of the Bankruptcy Court, the Debtors had agreed to sell to Lions Gate Films, Inc. ("Buyer"), for the amount of Fifteen Million Dollars ($15,000,000.00) in cash (the "Cash Payment"), plus certain contingent consideration, plus the assumption of certain liabilities (together, the "Purchase Price"), the Granted Terminator Assets specified in that certain Asset Purchase Agreement dated as of January 7, 2010 attached as Exhibit A to the Overbidding Supplement (the "Lions Gate APA"), pursuant to the terms set forth in the Lions Gate APA. Capitalized terms used herein ~~shall~~ have the meanings ascribed to them in the ~~Sale~~Overbidding Procedures Motion and the Overbidding Supplement, unless otherwise defined.

The Court has jurisdiction over the Overbidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1333. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper under 28 U.S.C. §§ 1408 and 1409. Good and appropriate notice of the relief sought by the Overbidding Procedures Motion has been given under the circumstances, and no other or further notice is required. A reasonable opportunity was afforded to all interested parties and entities to object to or to be heard regarding the relief requested in the Overbidding Procedures Motion including, without limitation, with respect to the Break-Up Fee described below.

After consideration of the ~~Sale~~Overbidding Procedures Motion, the Overbidding Supplement and accompanying supporting papers, the arguments of counsel, the files and records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT:**

A.    Sale Hearing. ~~The hearing on the Sale Motion shall take place on January 27, 2010, at~~

2

EXHIBIT I
Page 139

10:00 a.m. (the "Sale Hearing" On February 10, 2010, at 10:00 a.m. Pacific Time (the "Sale Hearing"), the Bankruptcy Court (the "Court") shall hold a hearing on the Debtors' motion for approval of a sale of the Granted Terminator Assets to Buyer pursuant to the terms set forth in the Lions Gate APA.  No later than January 22, 2010, the Debtors shall file and serve a supplement to the previously filed motion for approval of sale of the Debtors' assets relating to the *Terminator* motion picture franchise that describes the terms of the Lions Gate APA and the modified relief that will be requested at the Sale Hearing (as supplemented and modified, the "Sale Approval Motion"").  Any objections to the Sale Approval Motion must be filed and served in accordance with Local Bankruptcy Rule 9013-1(f) no later than fourteen (14) days before the Sale Hearing, and replies thereto must be filed and served in accordance with Local Bankruptcy Rule 9013-1(g) no later than seven (7) days before the Sale Hearing.

B. Qualified Bids Overbids.  The Debtors shall consider qualified bids overbids for the Granted Terminator Assets ("Qualified Bids at the Sale Hearing Overbids), but shall not consider proposed bids overbids that are not Qualified Bids Overbids.  In order for a proposed bid overbid to be deemed a Qualified Bid Overbid, a proposed bid overbid must meet each of the criteria set forth in the following subparagraphs 1 through 5 6:

1. Timing Deadline for Receipt of Overbids.  All of the documents and information required to be submitted pursuant to subparagraphs 2 through 5 6 below must be received by (a) the Debtors, (b) the Debtors' bankruptcy counsel, Howard J. Weg of Peitzman, Weg & Kempinsky LLP, and (c) the Debtors' financial advisor, Kevin Shultz of FTI Capital Advisors, LLC, and (d) counsel for Buyer, no later than 5:00 p.m., California time, five (5) days before the Sale Hearing (the "Bid Pacific Time, on February 4, 2010 (the "Overbid Deadline").  Unless a bid containing all of the required documents and information is submitted by the Bid Overbid Deadline, it will not constitute a Qualified Bid Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

2. Form and Content of Bid.  In order to be a Qualified Bid, any bid must include an executed asset purchase agreement ("APA"), identify the executory contracts to be assumed by the Debtors and assigned to the bidder if it is the purchaser, and contain a commitment that the bidder, if it is the purchaser, shall pay to the Debtors' estates, in addition to the amount of its successful final bid, the cure amounts, if any, associated with any executory contracts designated by the bidder to be assumed by the Debtors and assigned to the bidder.  Together with the executed APA, the bid must contain a redline

of the bidder's APA showing the differences from the form APA attached as Exhibit A to the Sale Procedures Motion.Initial Overbid Amount.  In order to be a Qualified Overbid, the overbid must be for a price, payable at the closing by bank cashier's check or wire transfer of immediately available funds, in an amount not less than the sum of (i) the Cash Payment, *plus* (ii) the Contingent Compensation (upon terms equal to or better than the terms set forth in the Lions Gate APA), *plus* (iii) the Break-Up Fee described in Paragraph G below, *plus* (iii) Five Hundred Thousand Dollars ($500,000).  Any holder of an allowed claim that is authorized to credit bid under section 363(k) of the Bankruptcy Code must agree to pay *in cash* a minimum amount equal to (i) the Break-Up Fee described in Paragraph G below, *plus* (ii) Five Hundred Thousand Dollars ($500,000).

3.    Form and Content of Overbid.  In order to be a Qualified Overbid, any overbid must include an executed asset purchase agreement in form and substance the same as the Lions Gate APA (other than the identity of the Buyer and the amount of the bidder's price, which must satisfy the conditions of paragraph 2 above), together with a redline comparison of the overbidder's asset purchase agreement showing the differences from the Lions Gate APA.  Without limiting the foregoing, the overbid may not include any representations, warranties or conditions to closing (including due diligence or financing contingencies) other than those set forth in the Lions Gate APA (unless they have been previously waived by Buyer).  If any Qualified Overbid is conditioned upon the assumption and assignment, or rejection, of any executory contracts or leases, the overbidder must identify such contracts or leases.  For executory contracts or leases to be assumed and assigned, the overbidder must provide written evidence, satisfactory to the Debtors, of the overbidder's ability to provide adequate assurance of future performance of such assumed contracts or leases.

4.    3.Offers Irrevocable.  In order to be a Qualified BidOverbid, any bidoverbid must contain a letter from the bidderoverbidder stating that the bidoverbid will remain open and irrevocable until sixty (60) days after the date of entry of an order by the Court approving the sale of the Granted Terminator Assets (ana "Sale Approval Order") has been entered by the Clerk of the Court.

5.    4.Deposits.  In order to be a Qualified BidOverbid, any bidoverbid must be accompanied by a deposit (the "Deposit") in the form of a cashiers'bank cashier's check or wire transfer of immediately available funds to the Debtors in the amount of $750,000.   The Debtors shall hold all Depositseach Deposit in a segregated interest-bearing account, subject to Court order, to defray all costs,

4

EXHIBIT I
Page 141

expenses and damages arising as a result of the failure of any winning ~~bidder~~overbidder to close for any reason other than the default of the Debtors.  The Debtors shall return a Deposit to ~~a bidder~~an overbidder as soon as practicable after the earlier to occur of: (i) the Debtors' delivery of written notice to ~~a bidder~~an overbidder that its ~~bid~~overbid is not a Qualified ~~Bid and~~Overbid; or (ii) entry of ~~an~~a Sale Approval Order providing for the sale of the Granted Terminator Assets to an entity other than the ~~bidder~~overbidder. Interest and investment income accrued or earned on the Deposit shall follow the principal.  Interest that accrues or that is earned on the successful bidder's Deposit~~, if any,~~ (including Buyer's Deposit if Buyer is the successful bidder) shall be credited toward the ~~purchase price~~Purchase Price.  If the successful bidder fails to consummate the sale because of a breach or failure to perform on the part of such successful bidder, the Deposit (plus interest and investment income accrued or earned thereon) will be forfeited to the Debtors, who will have no obligation to return such amount to the successful bidder, without prejudice to the Debtors' other rights, claims or remedies against the defaulting successful bidder.

   6. ~~5.~~Ability of Bidder to Consummate Transaction.  In order to be a Qualified ~~Bid~~Overbid, the ~~bid~~overbidder must include written financial evidence, satisfactory to the Debtors, demonstrating that the ~~bidder~~overbidder has the ability to consummate the transactions contemplated by the Lions Gate APA.  Such financial evidence may include, among other things, background reports and/or references, financing commitments, financial statements, income statements, tax returns, balance sheets, annual reports and bank statements.

   C. Qualification and Disqualification of ~~Bids~~Overbids.  No later than 5:00 p.m., California time, ~~one (1) business day before the Sale Hearing~~on February 5, 2010 (the "Determination Deadline"), the Debtors shall determine whether any overbids timely submitted are Qualified Overbids and shall inform each ~~bidder~~overbidder whether it has submitted a Qualified ~~Bid~~Overbid or whether its overbid has been rejected as unqualified.  The Debtors also shall notify Buyer at that time whether any Qualified Overbid was received and, if so, the identity of each qualified overbidder and the terms of its overbid. The Debtors shall have the right to permit a bidder that submitted a bid prior to the Bid Deadline that was not a Qualified Bid to modify the bid so that the bid will be deemed a Qualified Bid, except that the Debtors may not change: (i) the amount or form of the initial overbid required under Paragraph B(2) above, (ii) the amount or form of the Deposit required under Paragraph B(5) above, or (iii) the irrevocability of a bid required under Paragraph B(4) above.

EXHIBIT I
Page 142

D. <u>Bankruptcy Court Resolution of Disputes.</u>  Any disputes concerning whether ~~a bidder~~<u>an overbidder</u> submitted a Qualified ~~Bid~~<u>Overbid</u> shall be resolved by the Bankruptcy Court at the Sale Hearing.

E. ~~Auction~~<u>Result</u> If No Qualified ~~Bids~~<u>Overbids</u>.  If the Debtors determine by the Determination Deadline that there are ~~one or more~~<u>no</u> Qualified ~~Bids~~<u>Overbids</u>, the Debtors shall ~~have the right to hold an auction with reserve (the "Auction")~~<u>move the Court</u> at the Sale Hearing <u>for authority to sell the Granted Terminator Assets to Buyer pursuant to the terms of the Lions Gate APA</u>.

<u>F.</u> <u>Auction To Be Held If A Qualified Overbid Is Timely Submitted.  If the Debtors determine by the Determination Deadline that at least one Qualified Overbid was submitted, the Debtors shall hold an auction (the "Auction") as follows:</u>

<u>1.</u> <u>The Auction shall take place on February 8, 2010 at 10:00 a.m. at the offices of FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until concluded by the Debtors.</u>

<u>2.</u> ~~1.~~Only <u>the Buyer and</u> entities that submitted Qualified ~~Bids~~<u>Overbids</u> may participate in the Auction.  <u>The Debtors will not be required to entertain any bids submitted at the Auction by any entities other than the Buyer and those entities that submitted Qualified Overbids.</u>

<u>3.</u> ~~2.~~The Debtors may continue the Auction to a later date without further notice other than an announcement at the Auction <u>and the service and filing of written notice in the docket of this case</u>.

<u>4.</u> ~~3.~~At the commencement of the Auction, the Debtors shall announce which of the initial Qualifying ~~Bids~~<u>Overbids</u> is, in their determination, the highest and best offer.   In making this determination, the Debtors shall have the right to consider, among other things: (a) the number, type and nature of any changes to the <u>Lions Gate</u> APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the <u>acquired Granted Terminator</u> Assets to such bidder and the cost to the Debtors of such modifications or delay; ~~and~~(c) the likelihood of the bidder's ability to close ~~a~~<u>the</u> transaction and the timing thereof<u>, and (d) the net benefit to the Debtors' estates, taking into account the Buyer's right to receive the Break-Up Fee described herein</u>.  ~~At the Auction,~~

<u>5.</u> <u>At the Auction, after the announcement of the initial Qualifying Overbid, any</u> further overbids must be in increments of ~~at least~~<u>not less than</u> $1,000,000 in cash.

6

EXHIBIT I
Page 143

6.    4. At the conclusion of the Auction, the Debtors shall announce which of the bids is, in their determination, the highest and best offer, and that bid will be presented to the Court for approval at the Sale Hearing.

7.    5. All unsuccessful final bids at the Auction shall be treated as binding back-up bids and, in the event that the successful bidder fails to consummate the APAclose, the Debtors shall have the right to select one of the unsuccessful final bids as the replacement successful bid; *provided, however*, the right of the Debtors to select an unsuccessful final bid as the replacement successful bid shall expire sixty (60) days after the date of entry of the Sale Approval Order.

F.    Sale Notice.  The Sale Notice, previously filed and served by the Debtors as described in the Sale Procedures Motion, is approved.

G.    Cure Notice.  The Cure Notice, previously filed and served by the Debtors as described in the Sale Procedures Motion, is approved.Break-Up Fee.  In the event that Buyer is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Buyer shall be paid a break-up fee in the amount of Seven Hundred Fifty Thousand Dollars ($750,000) which represents five percent (5%) of the Cash Payment that would have been due from Buyer at closing under the Lions Gate APA if Buyer had been the successful bidder (the "Break-Up Fee").  The Break-Up Fee shall be paid to Buyer from the proceeds of the sale, by bank cashier's check or wire transfer in the full amount of the Break-Up Fee without any deduction or offset of any nature, immediately upon the occurrence of the closing of the sale.

H.    Participations and Attachment Rights Notice.  The Participations and Attachment Rights Notice, previously filed and served by the Debtors as described in the Sale Procedures Motion, is approved.Sale Notice.  The form of the Sale Notice attached as Exhibit C to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Sale Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts, (v) each party that previously submitted or expressed an interest in submitting an offer for the Granted Terminator Assets, (vi) all parties identified on the Debtors' Master Mailing Matrix; (vii) all parties to any other contracts or

7

EXHIBIT I
Page 144

obligations of the Debtors that will not be assumed by Buyer; and (viii) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.  In addition, the Debtors, at the sole expense of Buyer, shall cause notice substantially in the form attached to the Overbidding Supplement as Exhibit H to be published not less than once in the daily or weekly edition of *Variety* and such other publication(s) as the Debtors and Buyer may agree.

I.    ~~Break-Up Fee.  Without further Order of the Bankruptcy Court, the Debtors are authorized, in their discretion, to grant a proposed bidder a break-up fee of up to 2% of the purchase price.~~  Assumed Contracts Notice.  The form of the Assumed Contract Notice attached as Exhibit E to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Assumed Contracts Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts, and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

J.    Participations and Attachment Rights Notice.  The form of the Participations and Attachment Rights Notice attached as Exhibit G to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Participations and Attachment Rights Notice upon the following parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases,  (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to the Participations and Attachment Rights, and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2) 6004, and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

K.    Rejected Contracts and Intellectual Property Licenses Notice. The form of the Rejected Contracts Notice attached as Exhibit F to the Overbidding Supplement is hereby approved.  No later than January 22, 2010, the Debtors shall file and serve the Rejected Contracts Notice upon the following

8

EXHIBIT I
Page 145

parties: (i) the Office of the United States Trustee, (ii) all parties that receive electronic delivery or have filed requests for special notice in these cases, (iii) all parties that hold, or that have asserted, liens, encumbrances, or interests of any nature in or against any of the Granted Terminator Assets, (iv) all parties to any Assumed Contracts and Rejected Contracts (including Rejected IP Licences), and (v) any other Persons to whom notice is required in order to comply with Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and all related Local Bankruptcy Rules of the Bankruptcy Court.

       L.      J. Effectiveness.  This Order shall be effective immediately upon entry.

Dated: _____

                                              _____
                                              UNITED STATES BANKRUPTCY JUDGE

9

EXHIBIT I
Page 146

# EXHIBIT J

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                    **CENTRAL DISTRICT OF CALIFORNIA**

11                        **LOS ANGELES DIVISION**

11  In re:                                  | Case No.: 2:09-31853-ER

12  T ASSET ACQUISITION COMPANY, LLC, a     | Chapter 11
    Delaware limited liability company; HALCYON
13  HOLDING GROUP, LLC, dba THE HALCYON     | (Jointly Administered with Case Nos.:
    COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER)
14  and DOMINION GROUP LLC, a California limited
15  liability company,                      | **SUPPLEMENTAL NOTICE OF HEARING
                                            | ON MOTION OF DEBTORS FOR ORDER
                                            | AUTHORIZING AND APPROVING SALE
16                              Debtors.     | OF CERTAIN OF THE DEBTORS' ASSETS
                                            | RELATING TO THE *TERMINATOR*
17                                          | MOTION PICTURE FRANCHISE FREE
                                            | AND CLEAR OF ALL LIENS, CLAIMS,
18                                          | ENCUMBRANCES AND OTHER
                                            | INTERESTS PURSUANT TO SECTIONS
19                                          | 363 AND 365 OF THE BANKRUPTCY
                                            | CODE**

20  **Check One or More as Appropriate:**

21  Affects All Debtors:                    | Sale Hearing:
    Affects T Asset Acquisition Company, LLC only: | Date:    ~~January 27,~~ February 10, 2010
    Affects Halcyon Holding Group, LLC only: | Time:    10:00 a.m.
22  Affects Dominion Group LLC only:        | Location: Courtroom 1568
                                            |          255 East Temple St.
23                                          |          Los Angeles, California

24                                          | Objection Deadline**:**
                                            |          January ~~13,~~ 27, 2010
25

26
       **PLEASE TAKE NOTICE** that on January ~~27, 2009,~~ 22, 2010, the above-captioned debtors
27  (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or
28  as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M.
    Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los

                                        ~~1~~ 1

Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the ~~above-captioned debtors (collectively, the "Debtors").~~**PLEASE TAKE FURTHER NOTICE** ~~that, as set forth in~~Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction")~~ to be conducted at the hearing on the Motion (the "Sale Hearing").  The winning bidder is referred to as the "Buyer."~~.

~~**PLEASE TAKE FURTHER NOTICE** that the material terms of the proposed sale of the Assets are fully set forth in the Sale Motion and accompanying exhibits.  While there is no requirement that bids include any specific terms, the Debtors expect that the winning bid will be a straightforward cash sale of the Assets, "as-is, where-is," without representations or warranties, free and clear of all liens, claims, interests and encumbrances.~~

**PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "Lions Gate APA") with Lions Gate Films Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the Lions Gate APA (collectively, the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the Lions Gate APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the Lions Gate APA (the "Supplement").  A copy of the Lions Gate APA is attached as an exhibit to the Supplement.

**PLEASE TAKE FURTHER NOTICE** that the sale of the Granted Terminator Assets to Lions Gate is subject to higher and better bids at the Auction.

**PLEASE TAKE FURTHER NOTICE** that ~~the Debtors have requested that~~on January ___, 2010, the Bankruptcy Court ~~approve~~entered its Order approving the following procedures for the Auction:

A.    ~~Sale Hearing.  The Auction and the Sale Hearing shall occur on January 27, 2010.~~Auction.  The Auction shall take place on February 8, 2010 at 10:00 a.m. at the offices of FTI Consulting, Inc., 633 West 5th Street, Los Angeles, California 90071, and shall continue until concluded by the Debtors.

B.    Qualified ~~Bids~~Overbids.  The Debtors shall consider qualified ~~bids~~overbids for the Granted Terminator Assets ("Qualified ~~Bids~~Overbids"), but shall not consider proposed ~~bids~~overbids that are not Qualified ~~Bids~~Overbids.  In order for a proposed ~~bid~~overbid to be deemed a Qualified ~~Bid~~Overbid, a proposed ~~bid~~overbid must meet each of the criteria set forth in the following subparagraphs 1 through ~~5~~6:

1.    ~~Timing~~Deadline for Receipt of Overbids.  All of the documents and information

~~2~~2

required to be submitted pursuant to subparagraphs 2 through ~~5~~6 below must be received by (a) the Debtors, (b) the Debtors' bankruptcy counsel, Howard J. Weg of Peitzman, Weg & Kempinsky LLP, ~~and~~ (c) the Debtors' financial advisor, Kevin Shultz of FTI Capital Advisors, LLC, and (d) counsel for Buyer, no later than 5:00 p.m., ~~California time, five (5) days before the Sale Hearing (the "Bid~~Pacific Time, on February 4, 2010 (the "Overbid Deadline").  Unless a bid containing all of the required documents and information is submitted by the ~~Bid~~Overbid Deadline, it will not constitute a Qualified ~~Bid~~Overbid and the Debtors will have no duty or obligation to consider such non-qualified bid.

2.    ~~Form and Content of Bid.  In order to be a Qualified Bid, any bid~~ must include an executed asset purchase agreement ("APA"), identify the executory contracts to be assumed by the Debtors and assigned to the bidder if it is the purchaser, and contain a commitment that the bidder, if it is the purchaser, shall pay to the Debtors' estates, in addition to the amount of its successful final bid, the cure amounts, if any, associated with any executory contracts designated by the bidder to be assumed by the Debtor and assigned to the bidder  Attached as Exhibit A to the Sale Motion is a form asset purchase agreement (the "APA").  Together with the executed APA, the bid must contain a redline of the bidder's APA showing the differences from the form APA.Initial Overbid Amount.  In order to be a Qualified Overbid, the overbid must be for a price, payable at the closing by bank cashier's check or wire transfer of immediately available funds, in an amount not less than the sum of (i) the Cash Payment, *plus* (ii) the Contingent Compensation (upon terms equal to or better than the terms set forth in the Lions Gate APA), *plus* (iii) the Break-Up Fee described in Paragraph G below, *plus* (iii) Five Hundred Thousand Dollars ($500,000).  Any holder of an allowed claim that is authorized to credit bid under section 363(k) of the Bankruptcy Code must agree to pay *in cash* a minimum amount equal to (i) the Break-Up Fee described in Paragraph G below, *plus* (ii) Five Hundred Thousand Dollars ($500,000).

3.    Form and Content of Overbid.  In order to be a Qualified Overbid, any overbid must include an executed asset purchase agreement in form and substance the same as the Lions Gate APA (other than the identity of the Buyer and the amount of the bidder's price, which must satisfy the conditions of paragraph 2 above), together with a redline comparison of the overbidder's asset purchase agreement showing the differences from the Lions Gate APA.  Without limiting the foregoing, the overbid may not include any representations, warranties or conditions to closing (including due diligence or financing contingencies) other than those set forth in the Lions Gate APA (unless they have been previously waived by Buyer).  If any Qualified Overbid is conditioned upon the assumption and assignment, or rejection, of any executory contracts or leases, the overbidder must identify such contracts or leases.  For executory contracts or leases to be assumed and assigned, the overbidder must provide written evidence, satisfactory to the Debtors, of the overbidder's ability to provide adequate assurance of future performance of such assumed contracts or leases.

4.    ~~3.~~Offers Irrevocable.  In order to be a Qualified ~~Bid~~Overbid, any ~~bid~~overbid must contain a letter from the ~~bidder~~overbidder stating that the ~~bid~~overbid will remain open and irrevocable until sixty (60) days after the date of entry of an order by the Court approving the sale of the Granted Terminator Assets (~~an~~a "Sale Approval Order") has been entered by the Clerk of the Court.

5.    ~~4.~~Deposits.  In order to be a Qualified ~~Bid~~Overbid, any ~~bid~~overbid must be accompanied by a deposit (the "Deposit") in the form of a ~~cashiers'~~bank cashier's check or wire transfer of immediately available funds to the Debtors in the amount of $750,000.   The Debtors shall

hold all Depositseach Deposit in a segregated interest-bearing account, subject to Court order, to defray all costs, expenses and damages arising as a result of the failure of any winning bidderoverbidder to close for any reason other than the default of the Debtors.  The Debtors shall return a Deposit to a bidderan overbidder as soon as practicable after the earlier to occur of: (i) the Debtors' delivery of written notice to a bidderan overbidder that its bidoverbid is not a Qualified Bid andOverbid; or (ii) entry of ana Sale Approval Order providing for the sale of the Granted Terminator Assets to an entity other than the bidderoverbidder.  Interest and investment income accrued or earned on the Deposit shall follow the principal.  Interest that accrues or that is earned on the successful bidder's Deposit, if any, (including Buyer's Deposit if Buyer is the successful bidder) shall be credited toward the purchase pricePurchase Price.  If the successful bidder fails to consummate the sale because of a breach or failure to perform on the part of such successful bidder, the Deposit (plus interest and investment income accrued or earned thereon) will be forfeited to the Debtors, who will have no obligation to return such amount to the successful bidder, without prejudice to the Debtors' other rights, claims or remedies against the defaulting successful bidder.

5. 6. Ability of Bidder to Consummate Transaction.  In order to be a Qualified BidOverbid, the bidderoverbidder must include written financial evidence, satisfactory to the Debtors, demonstrating that the bidderoverbidder has the ability to consummate the transactions contemplated by the Lions Gate APA.  Such financial evidence may include, among other things, background reports and/or references, financing commitments, financial statements, income statements, tax returns, balance sheets, annual reports and bank statements.

C.    Qualification and Disqualification of BidsOverbids.  No later than 5:00 p.m., California time, one (1) business day before the Sale Hearingon February 5, 2010 (the "Determination Deadline"), the Debtors shall determine whether any overbids timely submitted are Qualified Overbids and shall inform each bidderoverbidder whether it has submitted a Qualified BidOverbid or whether its overbid has been rejected as unqualified.  The Debtors also shall notify Buyer at that time whether any Qualified Overbid was received and, if so, the identity of each qualified overbidder and the terms of its overbid.  The Debtors shall have the right to permit a bidder that submitted a bid prior to the Bid Deadline that was not a Qualified Bid to modify the bid so that the bid will be deemed a Qualified Bid, except that the Debtors may not change: (i) the amount or form of the initial overbid required under Paragraph B(2) above, (ii) the amount or form of the Deposit required under Paragraph B(5) above, or (iii) the irrevocability of a bid required under Paragraph B(4) above.

D.    Bankruptcy Court Resolution of Disputes.  Any disputes concerning whether a bidderan overbidder submitted a Qualified BidOverbid shall be resolved by the Bankruptcy Court at the Sale Hearing.

E.    AuctionResult If No Qualified BidsOverbids.  If the Debtors determine by the Determination Deadline that there are one or moreno Qualified BidsOverbids, the Debtors shall have the right to hold an auction with reserve (the "Auction")move the Court at the Sale Hearing for authority to sell the Granted Terminator Assets to Lions Gate pursuant to the terms of the Lions Gate APA.

F.    Auction To Be Held If A Qualified Overbid Is Timely Submitted.  If the Debtors determine by the Determination Deadline that at least one Qualified Overbid was submitted, the Debtors shall hold the "Auction as follows:

44

1.    Only Lions Gate and entities that submitted Qualified ~~Bids~~Overbids may participate in the Auction.  The Debtors will not be required to entertain any bids submitted at the Auction by any entities other than Lions Gate and those entities that submitted Qualified Overbids.

2.    The Debtors may continue the Auction to a later date without further notice other than an announcement at the Auction and the service and filing of written notice in the docket of this case.

3.    At the commencement of the Auction, the Debtors shall announce which of the initial Qualifying ~~Bids~~Overbids is, in their determination, the highest and best offer.   In making this determination, the Debtors shall have the right to consider, among other things: (a) the number, type and nature of any changes to the Lions Gate APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the acquired Granted Terminator Assets to such bidder and the cost to the Debtors of such modifications or delay; ~~and~~ (c) the likelihood of the bidder's ability to close a~~the~~ transaction and the timing thereof, and (d) the net benefit to the Debtors' estates, taking into account Lions Gate's right to receive the Break-Up Fee described herein.  ~~At the Auction,~~

4.    At the Auction, after the announcement of the initial Qualifying Overbid, any further overbids must be in increments of ~~at least~~not less than $1,000,000 in cash.

5.    ~~4.~~At the conclusion of the Auction, the Debtors shall announce which of the bids is, in their determination, the highest and best offer, and that bid will be presented to the Court for approval at the Sale Hearing.

6.    ~~5.~~All unsuccessful final bids at the Auction shall be treated as binding back-up bids and, in the event that the successful bidder fails to ~~consummate the APA~~close, the Debtors shall have the right to select one of the unsuccessful final bids as the replacement successful bid; *provided, however*, the right of the Debtors to select an unsuccessful final bid as the replacement successful bid shall expire sixty (60) days after the date of entry of the Sale Approval Order.

G.    In the event that Lions Gate is not the successful bidder at the Auction, at the closing of the sale to the successful overbidder, Lions Gate shall be paid a break-up fee in the amount of Seven Hundred Fifty Thousand Dollars ($750,000), which represents five percent (5%) of the Cash Payment that would have been due from Lions Gate at closing under the Lions Gate APA if Lions Gate had been the successful bidder (the "Break-Up Fee").  The Break-Up Fee shall be paid to Lions Gate from the proceeds of the sale, by bank cashier's check or wire transfer in the full amount of the Break-Up Fee without any deduction or offset of any nature, immediately upon the occurrence of the closing of the sale.

**PLEASE TAKE FURTHER NOTICE** that the Sale Motion ~~is~~and Supplement are on file with the Bankruptcy Court and ~~is~~are available for inspection and copying at the office of the Clerk of the Court, located at 255 E. Temple Street, Los Angeles, CA.  In addition, a ~~copy~~copies of the Sale Motion and Supplement may be obtained by delivering a written request to the Debtors' bankruptcy counsel:

Howard J. Weg, Esq.
David B. Shemano, Esq.

~~5~~5

Peitzman, Weg & Kempinsky LLP
10100 Santa Monica Blvd., Suite 1450
 Los Angeles, California 90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101
Email: hweg@pwkllp.com
Email: dshemano@pwkllp.com

In addition, information concerning the Assets and the Auction may be obtained by contacting the Debtors' financial advisors:

Kevin Shultz , Senior Managing Director
FTI Capital Advisors, LLC
633 West 5th Street
Los Angeles, CA  90071
Telephone: (213) 452-6050
Facsimile: (213) 452-6099
Email: Kevin.Shultz@FTIConsulting.com

**PLEASE TAKE FURTHER NOTICE** that (1) the Debtors are requesting that the Bankruptcy Court authorize the assumption and assignment to Lions Gate (or the successful overbidder, if any) of certain contracts; (2) the Debtors are requesting that the Bankruptcy Court authorize the rejection of certain contracts, including certain licenses of intellectual property under which the Debtors are licensors; and, (3) because Lions Gate will not assume certain attachment and participations or royalties to various entities based on the performance of an existing *Terminator* motion picture and certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels, remakes or other works that are derivative of an existing *Terminator* motion picture, the Debtors are treating such attachment and participations as prepetition claims against the Debtors and their estates.  The sale of the Assets is free and clear of all liens, claims, encumbrances and other interests of any nature, including all such attachments and participations.  **Parties in interest are referred to the Supplement, the Lions Gate APA and the separate notices filed and served by the Debtors, dated January 22, 2010, which explain in greater detail the assumption, rejection and/or treatment of the contracts, attachments and participations or royalties described by this paragraph.  Copies of such documents are available upon request to the Debtors' counsel at the address indicated above.**

**PLEASE TAKE FURTHER NOTICE** that any objections to the Sale Motion or the Supplement must be in writing and must be filed and served in accordance with Local Bankruptcy Rule 9013-1(f) no later than fourteen (14) days before the Sale Hearing.  Pursuant **JANUARY 27, 2010.  Objections must be served on the Debtors' counsel** (Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067), **on counsel for Lions Gate** (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569), **and on counsel for the Official Committee of Unsecured Creditors** (Martin J. Brill, Esq., and Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA 90067).

**PLEASE TAKE FURTHER NOTICE that, pursuant** to Local Bankruptcy Rule 9013-

**1(h), the failure of a party in interest timely to file and serve ~~timely~~ a response to the Sale Motion or the Supplement in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be such party's consent to the granting of the relief requested in the Sale Motion and the Supplement including, but not limited to, sale to Lions Gate of the Granted Terminator Assets free and clear of any and all liens, claims, encumbrances and interests whatsoever held or asserted by such party.**

Dated: ~~December 18, 2009~~January ___, 2010          PEITZMAN, WEG & KEMPINSKY LLP

                                        By: ___~~/s/ David B. Shemano~~_____

                                            Howard J. Weg
                                            David B. Shemano
                                            Counsel for the Debtors

77

# EXHIBIT K

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

9                    **UNITED STATES BANKRUPTCY COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11                         **LOS ANGELES DIVISION**

11  In re:                                    | Case No.: 2:09-31853-ER

12  T ASSET ACQUISITION COMPANY, LLC, a       | Chapter 11
    Delaware limited liability company; HALCYON
13  HOLDING GROUP, LLC, dba THE HALCYON        | (Jointly Administered with Case Nos.:
    COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER)
14  and DOMINION GROUP LLC, a California limited
15  liability company,                        | **ORDER AUTHORIZING AND APPROVING
                                              | SALE OF CERTAIN OF THE DEBTORS'
                                              | ASSETS RELATING TO THE**
16                              Debtors.       | ***TERMINATOR* MOTION PICTURE
                                              | FRANCHISE FREE AND CLEAR OF ALL
17                                            | LIENS, CLAIMS, ENCUMBRANCES AND
                                              | OTHER INTERESTS PURSUANT TO
18                                            | SECTIONS 363 AND 365 OF THE
                                              | BANKRUPTCY CODE**

19

20  **Check One or More as Appropriate:**     | Sale Hearing:

21  Affects All Debtors:                  ▪   | Date:     ~~January 27,~~February 10, 2010
    Affects T Asset Acquisition Company, LLC only: ▪ | Time:     10:00 a.m.
                                              | Location: Courtroom 1568
22  Affects Halcyon Holding Group, LLC only: ▪ |           255 East Temple St.
    Affects Dominion Group LLC only:      ▪   |           Los Angeles, California

23

24         The Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets

25  Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims,

26  Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the

27  "Sale Motion"), filed by the above-captioned debtors (the "Debtors"), came on for hearing before the

28

Honorable Ernest M. Robles, United States Bankruptcy Judge, on ~~January 27,~~February 10, 2010, at 10:00 a.m. (the "Sale Hearing").  Appearances were made as reflected in the Bankruptcy Court's record.  Capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion, unless otherwise defined.

On December 18, 2009, the Debtors filed and served ~~their motion for approval of sale procedures and related relief (the "Sale Procedures Motion").  The Sale Procedures Motion was granted by an Order entered on January __, 2010 (the "Sale Procedures Order").~~As approved by the ~~Sale Procedures Order, on December 18, 2009, the Debtors filed and served~~ the Sale Motion and the separate (~~i~~a) Notice of Hearing on Motion of Debtors for Order Authorizing and Approving Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise Free and Clear of All Liens, Claims, Encumbrances and Other Interests pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Sale Notice"), (~~ii~~b) Notice of Deadline to (1) Object to the Assumption and Assignment of Executory Contracts in Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) File Claims for Amount Due to Cure Defaults Under Executory Contracts to be Assumed and Assigned in Connection with Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "~~Assigned Contract~~Cure Notice"), and (~~iii~~c) Notice of Proposed Treatment of Participations and Attachment Rights in Connection with Sale of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Participations and Attachments Notice").  As set forth in the Sale Notice and the Sale Motion, the Debtors requested an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction (the "Auction").

On January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "Lions Gate APA") with Lions Gate Films Inc. ("Lions Gate"), providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the Lions Gate APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and

other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the Lions Gate APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  The Lions Gate APA requires. among other thing, that: (a) the Debtors reject certain contracts specified in the Lions Gate APA (the "Rejected Contracts"), including certain licenses of intellectual property within the meaning of Section 101(35A) of the Bankruptcy Code  (the "Rejected IP Licenses"); (b) assume and assign certain contracts specified in the Lions Gate APA (the "Assumed Contracts"); and (c) reject, or obtain a determination that the sale is free and clear of, certain contracts with or obligations to third parties, specified in the Lions Gate APA, that are related to the *Terminator* franchise for, among other things, (i) the payment of participations or royalties to various entities based on the performance of one or more *Terminator* motion pictures or television series including *Terminator: Salvation* or other Sequels or Derivative Rights as defined in the APA (collectively, Participations"), or (ii) certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of an existing *Terminator* motion picture (collectively, "Attachments").

On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the Lions Gate APA (the "Supplement"), and attaching a copy of the Lions Gate APA as an exhibit.  The proposed sale of the Granted Terminator Assets to Lions Gate was subject to higher and better bids at the Auction, which was conducted on February 8, 2010.

On December 18, 2009, the Debtors filed and served their motion for approval of sale procedures and related relief (the "Overbidding Procedures Motion").  The Debtors filed a supplement to the Overbidding Procedures Motion on January 8, 2010.  The Overbidding Procedures Motion, as supplemented, was granted by an Order entered on January __, 2010 (the "Overbidding Procedures Order").  As directed by the Bankruptcy Court, on January 22, 2010, the Debtors served and filed the following notices conforming to the transaction contemplated by the Lions Gate APA: (a) a Supplemental Notice of Hearing on Motion of Debtors for Order Authorizing and Approving Sale of Debtors' Assets Relating to the *Terminator* Motion Picture Franchise Free and Clear of All Liens, Claims, Encumbrances and Other Interests pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Supplemental Sale Notice"), (b) a Supplemental Notice of Deadline to (1) Object to the

Assumption and Assignment of Executory Contracts in Connection with Sale of Certain of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) File Claims for Amounts Due to Cure Defaults Under Executory Contracts to be Assumed and Assigned in Connection with Sale of Certain of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Assumed Contract Notice"), which supplemented the Cure Notice; (c) a Notice of Deadline to (1) Object to the Rejection of Executory Contracts in Connection with Sale of Certain of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise, and (2) Elect Treatment under Section 365(n)(1) of the Bankruptcy Code (the "Rejected Contract Notice"); and (d) a Supplemental Notice of Proposed Treatment of Participations and Attachments in Connection with Sale of Certain of the Debtors' Assets Relating to the *Terminator* Motion Picture Franchise (the "Supplemental Participations and Attachments Notice").

On or about _____, 2010, the Debtors caused a notice of the Sale Hearing to be published in [_____].

[IF AN AUCTION IS HELD, ADD DESCRIPTION OF AUCTION, SUCCESSFUL BIDDER AND BID, AND DETERMINATION OF HIGHEST AND BEST BID.]

After consideration of the Sale Motion and accompanying supporting papers, the Supplement, including the Lions Gate APA, the supplemental notices, the arguments of counsel, the files and records in these jointly administered chapter 11 cases, and sufficient cause appearing, it is hereby

**ORDERED THAT**:

A.    ~~The~~Authorization and Approval of Sale.  Pursuant to Section 363(b) of the Bankruptcy Code, the Debtors are authorized to sell, assign and transfer the Granted Terminator Assets to _____ ("Buyer") for the purchase price of $_____ pursuant to and in accordance with the asset purchase agreement submitted by Buyer (the "APA") (filed separately on February __, 2010, as Docket No. ____), and when the sale, assignment and transfer is effective, the Debtors shall be deemed to have sold, assigned and transferred all of the Debtors' rights, title and interest in and to the ~~Assets to Buyer~~Granted Terminator Assets to Buyer.  The APA was proposed by Buyer and Seller in good faith and represents the highest and best offer for the Granted Terminator Assets and should be approved. The Debtors are authorized to execute, deliver, perform and consummate the APA, execute, deliver,

perform all documents and instruments and to take all actions that may be reasonably necessary to

effectuate the APA without further Order of the Court.

B.    The sale, assignment and transfer of the Assets to Buyer shall be free and clear of all

Liens, except that the Lien held by the Screen Actors Guild shall continue as provided for in the APA,

and that prospective Guild residuals in all motion pictures subject to the APA shall be paid as set forth

in the APA or applicable supplemental documentation.

B.    C. All Liens Sale Free and Clear of Interests.  Pursuant to Sections 363(b) and 363(f) of

the Bankruptcy Code, the sale, assignment and transfer of the Granted Terminator Assets to Buyer

shall be free and clear of all liens, claims, encumbrances and other interests of any nature whatsoever,

whether known or unknown, including all Participations and Attachments (collectively, "Interests"),

other than the Assumed Obligations specifically set forth in the APA.  All Interests shall attach to the

proceeds of the sale with the same priority, validity and enforceability, if any, as they had had against

the Granted Terminator Assets, which proceeds shall be held by the Debtors in a segregated account

pending further Order of the Bankruptcy Court and subject to all defenses, objections, claims,

counterclaims and rights of setoff and recoupment; *provided, however, that* the Lien held by the

Screen Actors Guild shall continue as provided for in the APA, and that prospective Guild residuals

arising from the Granted Terminator Assets shall be paid as set forth in the APA or applicable

assumption agreement .

C.    D. Assumption and Assignment of Certain Contracts.  The Debtors are hereby

authorized to assume and assign, and the Debtors shall be deemed to have assumed and, assigned and

sold, the Assigned Contracts to Buyer, effective as of the Closing of the sale, pursuant to sections 363

and 365 of the Bankruptcy Code.   There are no unpaid amounts or other obligations that must be paid

or performed as a condition to such assumption and assignment, and the Debtors are relieved from any

liability for any breach of any of the Assigned Contracts occurring after the Closing pursuant to

section 365(k) of the Bankruptcy Code.  Buyer has provided adequate assurance of future performance

through its promise to perform in accordance with the applicable Assumed Contract, but only with

respect to obligations first arising or incurred under such contract following the Closing, and such

assurance is good and sufficient for purposes of section 365(f)(2).  Buyer shall acquire and assume

such contracts free and clear of any and all liens, claims, encumbrances or interests of any nature, whether known or unknown, pursuant to sections 365 and 363(f) of the Bankruptcy Code.  Effective upon the Closing of the sale:

      1.    Parties to Assigned Contracts are enjoined and prohibited from asserting against the Debtors' estates or the Buyer any default allegedly arising or incurred prior to the closing of the sale (the "Closing"), any actual pecuniary loss resulting from such default, or any other claim or unpaid obligation under the Assumed Contract arising or incurred prior to the Closing; and

      2.    The Debtors and the Debtors' estates shall have no liability under the Assumed Contracts after the Closing.

    D.    Rejection of Certain Contracts.  The Debtors are hereby authorized to reject the Rejected Contracts, effective as of the Closing of the sale, pursuant to section 365(a) of the Bankruptcy Code.

      1.    If the rejection of a Rejected Contract gives rise to a claim by the other party or parties to such contract ("Rejection Damage Claim"), such Rejection Damage Claim shall be forever barred and shall not be enforceable against the Debtors unless the holder files a proof of such Rejection Damage Claim with the Bankruptcy Court no later than thirty (30) days after entry of this Order ("Rejection Damages Deadline).  Any person or entity that fails to file a proof of a Rejection Damages Claim arising from such rejection by the Rejection Damages Deadline shall be forever barred from asserting such a Claim against the Debtors or their estates, and such Claims shall be forever barred against the Debtors, their estates and their assets and properties of the Debtor.  The Buyer shall have no liability, obligation or responsibility of any nature whatsoever with respect to, arising from or related to, any Rejection Damages Claims.

      2.    For any Rejected Contract that is a Rejected IP License, the failure of a licensee under such Rejected IP License to have made a timely written election (as required by the Overbidding Procedures Order) to treat such licensee's Rejected IP License as terminated, as permitted by section 365(n)(1)(A) of the Bankruptcy Code, *or* to retain in rights under such license to the extent permitted by section 365(n)(1)(B), shall be deemed to constitute such licensee's election to retain its rights under such Rejected IP License in accordance with section 365(n)(1)(B) of the Bankruptcy Code to the

extent such rights existed immediately before the commencement of the Debtors' chapter 11 cases, which include any rights under such license with respect to the existing *Terminator* motion pictures (T1, T2, T3 and T4), but the retained rights do not include any rights with respect to the Granted *Terminator* Assets sold under the APA, including rights with respect to future *Terminator* remakes, sequels, or other productions, or derivative rights therein.

E.   ~~The Debtors'~~ Treatment of Participations and Attachments.  The treatment of the Participations and ~~Attachment Rights agreements~~Attachments, described in the Sale Motion and the Supplemental Participations and Attachments Notice, and as provided in the APA, is authorized and approved.[1]  Accordingly:

1.   If any Participation or Attachment is an executory contract, it is rejected pursuant to section 365 of the Bankruptcy Code and shall be subject to the treatment of Rejected Contracts under paragraph D.1 above.

2.   Regardless of the executory or non-executory nature of any Participation or Attachment, Buyer does not assume or acquire, will not be subject to, and will have no obligation or liability of any nature, whether currently known or unknown, under or relating to any of the Attachments and Participations, or any duties or obligations owed or owing to any person or entity thereunder or relating thereto, or any other contract or agreement, whether known or unknown, that purports to create rights in the nature of Attachments or Participations, unless and to the extent, if any, that Buyer, in writing, specifically assumes and/or agrees to be bound by any such Attachments or Participations or any duty or obligation owed or owing to any person or entity thereunder or relating thereto; and the sale of the Granted *Terminator* Assets to Buyer is free and clear of all Attachments and Participations, and any rights or entitlements held by, or any duties or obligations of any nature whatsoever, to, any person or entity arising under or relating to the Attachments and Participations or

---

[1] As provided by the APA, Certain Participations or Attachments owed on account of *Terminator: Salvation* may be paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement").  The sale of the Assets shall be subject to the T4 CAM Agreement and nothing in the APA is intended to affect the right of any party to the T4 CAM Agreement.

any other document, contract or agreement of any nature, whether known or unknown, that purports to create rights in the nature of Attachments or Participations.

           3.     All claims based upon Participations and Attachments will be treated as prepetition claims against the Debtors.  Persons or entities claiming rights under or in the nature of Participations and Attachments are enjoined and prohibited from asserting such rights, or any claims or obligations of any nature whatsoever arising therefrom or relating thereto, against the Buyer or any of its successors or affiliates.

    G.    Cooperation by Seller.  Following the Closing, Seller (including any trustee(s) in bankruptcy that may be appointed for the Debtors) shall deliver to Buyer any Sequel or Remake Right (as defined in the APA) which comes into the possession, custody or control of the Debtors or such trustee(s), and shall cooperate with Buyer in compelling or obtaining the turnover or deliver to Buyer of any Granted Terminator Assets.

    H.    Buyer Not Liable for Liabilities or Obligations of Seller Not Expressly Assumed.  Buyer does not assume, and shall have no costs, expenses, liability or obligations of any nature whatsoever for of with respect to, and liability or obligation of Seller of any nature whatsoever that is not expressly assumed by Buyer in writing pursuant to this APA and this Order.

    I.    Delivery of Assets by Other Persons and Entities.  Any person or entity having notice or knowledge of this Order and who is in possession of any property of the Debtor that constitutes Granted Terminator Assets is directed to deliver immediately such property to Buyer and account to Buyer for such property (other than holders of Possessory Liens (as defined in the APA).

    K.    Prohibition Against Interference with Purchased Assets.  Any person or entity having notice or knowledge of this Order is enjoined, prohibited and restrained from possessing or using any Granted Terminator Assets without the prior written consent of Buyer (other than holders of Possessory Liens (as defined in the APA)), exercising any control or dominion over any Granted Terminator Assets without the prior written consent of Buyer, or interfering with the Closing or with the rights of Buyer or its successors under this Agreement or under this Order with respect to the acquisition, use, exploitation and/or further disposition of the Granted Terminator Assets.

L.      Buyer Not a Successor to Debtors.  Buyer's purchase of the Granted Terminator Assets and its assumption of the Assumed Contracts shall not cause Buyer or its affiliates to be deemed a successor in respect of the Debtors, their businesses or their bankruptcy estates within the meaning of any federal, state or local law.

M.      F. Buyer's Good Faith.  The Buyer acted in good faith in purchasing the Granted Terminator Assets within the meaning of section 363(m) of the Bankruptcy Code, and is thereby a good faith purchaser entitled to the benefits of that statute.  The provisions of section 363(n) of the Bankruptcy Code have not been violated by Buyer.

N.      G. Retention of Jurisdiction.  The Court hereby retains jurisdiction to and, upon motion by any party with proper notice to Buyer and the Debtors, may (i) enforce, interpret and implement the terms and provisions of the APA and any supplemental documents or agreements executed in connection therewith, (ii) compel delivery and payment of the consideration provided for under the APA, (iii) resolve any disputes, controversies, or claims arising out of or relating to the APA or this Order, and (iv) interpret, implement and enforce the provisions of this Order.

O.      Amendment of Documents.  The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

P.      H. Immediate Effectiveness of Order.  This Order is self-executing and shall be effective immediately.  The stays provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived.

Dated:                                      _____
                                            UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT L

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8

                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                         **LOS ANGELES DIVISION**

11  In re:                                    Case No.: 2:09-31853-ER

12  T ASSET ACQUISITION COMPANY, LLC, a       Chapter 11
    Delaware limited liability company; HALCYON
13  HOLDING GROUP, LLC, dba THE HALCYON        (Jointly Administered with Case Nos.:
    COMPANY, a Delaware limited liability company;   2:09-31854-ER and 2:09-31855-ER)
14  and DOMINION GROUP LLC, a California limited
    liability company,                        **SUPPLEMENTAL NOTICE OF DEADLINE
15                                            TO (1) OBJECT TO THE ASSUMPTION
                                              AND ASSIGNMENT OF EXECUTORY
16                                Debtors.    CONTRACTS IN CONNECTION WITH
                                              SALE OF CERTAIN OF THE DEBTORS'
17                                            ASSETS RELATING TO THE
                                              *TERMINATOR* MOTION PICTURE
18                                            FRANCHISE, AND (2) FILE CLAIMS FOR
                                              AMOUNTS DUE TO CURE DEFAULTS
19  **Check One or More as Appropriate:**     UNDER EXECUTORY CONTRACTS TO
                                              BE ASSUMED AND ASSIGNED IN
20  Affects All Debtors:                   •  CONNECTION WITH SALE OF CERTAIN
    Affects T Asset Acquisition Company, LLC only:   OF THE DEBTORS' ASSETS RELATING
21  Affects Halcyon Holding Group, LLC only:  •  TO THE *TERMINATOR* MOTION
    Affects Dominion Group LLC only:          PICTURE FRANCHISE**
22                                         •
                                                  Sale Hearing:
23                                            Date:     ~~January 27,~~February 10, 2010
                                              Time:     10:00 a.m.
24                                            Location: Courtroom 1568
                                                        255 East Temple St.
25                                                      Los Angeles, California

26                                                  Objection Deadline:
                                              January ~~13,~~27, 2010
27

28

                                        1

**PLEASE TAKE NOTICE** that on January ~~27,~~ 22, 2010, the above-captioned debtors (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M. Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the ~~above-captioned debtors (collectively, the "Debtors").~~ **PLEASE TAKE FURTHER NOTICE** ~~that, as~~ Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction ~~to be conducted at the hearing on the Motion (the "Sale Hearing~~ (the "Auction").  The winning bidder is referred to as the "Buyer."

~~**PLEASE TAKE FURTHER NOTICE** that, as set forth in the Motion, in connection with the sale of the Assets, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the assumption by the Debtors and assignment to the Buyer of certain contracts relating to the *Terminator* motion picture franchise (the "Assigned Contracts").  The lists of the Assigned Contracts is attached hereto as Exhibit A.~~

**PLEASE TAKE FURTHER NOTICE** that on December 18, 2009, the Debtors also served notice of deadline to (1) object to the assumption and assignment of executory contracts in connection with sale of the Assets, and (2) file claims for amounts due to cure defaults under executory contracts to be assumed and assigned in connection with sale of the Assets (the "Cure Notice").  This notice serves as a supplement to the Cure Notice.

**PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "APA") with Lions Gate Films, Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature whatsoever, whether known or unknown, other than the Assumed Obligations specifically set forth in the APA, with any such liens, claims, encumbrances or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the APA (the "Supplement").  A copy of the APA is attached as an exhibit to the Supplement.

**PLEASE TAKE FURTHER NOTICE** that Lions Gate, pursuant to the APA, has agreed to assume certain of the agreements that were listed in the Cure Notice.  The list of the agreements that Lions Gate has agreed to assume is attached hereto as Exhibit 1 (the "Assumed Contracts").  Unless Lions Gate specifically agrees under the APA to assume any contract, such contract will *not* be assumed by Lions Gate, and Lions Gate will not assume, nor have, nor be bound by, any such contract or obligation and will have no liability to any other party under or relating to such contract.  The APA further provides that, at any time prior to the Closing, Lions Gate may remove a contract from the list of Assumed Contracts under the APA.  It is possible that other bidders may submit bids to acquire the

EXHIBIT L
Page 164

Granted Terminator Assets, and that such bid(s) may require the Debtors to assume and assign a different a list of contracts.

**PLEASE TAKE FURTHER NOTICE** that the listing of the ~~Assigned~~Assumed Contracts is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists, or that any Assumed Contract was an executory contract within the meaning of section 365 of the Bankruptcy Code as of the date the Debtors commenced their chapter 11 cases.  The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any ~~Assigned~~Assumed Contract.  Some ~~Assigned~~of the Assumed Contracts listed may have been terminated or may have expired by their own terms, but such contracts have been listed notwithstanding any such possible termination or expiration so as to provide a complete list of contracts and in the event that one or more parties in interest assert the position that an ~~Assigned~~Assumed Contract was not terminated or did not expire.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to section 365 of the Bankruptcy Code, the Debtors are required to cure any defaults under an ~~Assigned~~Assumed Contract as a condition to the assumption and assignment of the ~~Assigned~~Assumed Contract to Lions Gate (or a successful overbidder at the Auction, if any).  The Debtors are not aware of any defaults that must be cured as a condition to the assumption and assignment of any ~~Assigned~~Assumed Contract. **THEREFORE, IF YOU ARE A PARTY TO ANY OF THE ASSIGNED CONTRACTS *AND* YOU ASSERT A CURE CLAIM PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, *OR* IF YOU OTHERWISE OBJECT TO THE ASSUMPTION AND ASSIGNMENT OF ~~YOUR ASSIGNED~~THE ASSUMED CONTRACT, YOU MUST FILE WITH THE BANKRUPTCY COURT AND SERVE ~~ON THE DEBTORS' COUNSEL (Howard J. Weg, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067),~~ A WRITTEN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT AND/OR SPECIFIED CURE AMOUNT, TOGETHER WITH EVIDENCE THAT SUPPORTS THE OBJECTION, NO LATER THAN JANUARY ~~13, 2010~~27, 2010, ON THE DEBTORS' COUNSEL(Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067), AND ON COUNSEL FOR LIONS GATE (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569) AND ON COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (Martin J. Brill, Esq., and Juliet Y. Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA 90067).**

**PLEASE TAKE FURTHER NOTICE** that, if you are a party to an ~~Assigned~~Assumed Contract and do not timely file a cure claim or objection by January ~~13,~~27, 2010, the Debtors will request that the Bankruptcy Court enter an Order that provides for the following:

1.    **YOU SHALL BE FOREVER BARRED** from asserting against the Debtors' estates or the Buyer any default allegedly arising or incurred prior to the closing of the sale (the "Closing"), any actual pecuniary loss resulting from such default, or any other claim or unpaid obligation under the ~~Assigned~~Assumed Contract arising or incurred prior to the Closing;

2.    The Debtors will be authorized to assume and assign the ~~Assigned Contracts to the Buyer~~Assumed Contracts to the Buyer pursuant to section 365 of the Bankruptcy Code, and Buyer shall acquire and assume such contracts free and clear of any and all liens, claims, encumbrances or

3

EXHIBIT L
Page 165

interests of any nature, whether known or unknown, pursuant to sections 365 and 363(f) of the Bankruptcy Code;

      3.    The Debtors and the Debtors' estates shall have no liability under the ~~Assigned~~Assumed Contracts after the Closing;

      4.    The only adequate assurance required of the Buyer shall be its promise to perform in accordance with the applicable ~~Assigned~~Assumed Contract, but only with respect to obligations first arising or incurred under such contract following the Closing; and

      5.    The ten-day stay provided by Federal Rule of Bankruptcy Procedure 6006(d) shall be waived.

**PLEASE TAKE FURTHER NOTICE** that, if a non-Debtor party to an ~~Assigned~~Assumed Contract timely files a written cure claim, the Debtors shall either:

      (i)    escrow the cure amount in controversy at the Closing (or a lower amount if authorized by the Bankruptcy Court) until the dispute is resolved by the Bankruptcy Court after hearing or stipulation by the parties, or

      (ii)    provide written notice to the non-Debtor party that the Debtors will request at the Sale Hearing that the ~~Assigned~~Assumed Contract will be rejected.

The filing of a written cure claim, however, shall not in any manner affect the Closing of the sale of the Assets to Buyer or the assumption and assignment of the ~~Assigned~~Assumed Contract by Debtors to Buyer.

**PLEASE TAKE FURTHER NOTICE** that, if a non-Debtor party to an ~~Assigned~~Assumed Contract timely files a written objection to the proposed adequate assurance of future performance and the objection is not resolved prior to or at the Sale Hearing, the Debtors will request that the Bankruptcy Court schedule an expedited hearing to resolve the objection.

Dated: ~~December 18, 2009~~January ___, 2010       PEITZMAN, WEG & KEMPINSKY LLP

      By:  ~~/s/ David B. Shemano~~

      Howard J. Weg
      David B. Shemano
      Counsel for the Debtors

4

EXHIBIT L
Page 166

# EXHIBIT ~~A~~1

## Assumed Contracts

### ~~TERMINATOR RIGHTS CONVEYANCES BY AND TO CAROLCO:~~

~~**1.** Sale of Assets Agreement dated as of January 16, 1996 between Canal + D.A. ("Canal +") and Carolco Pictures, Inc. and its subsidiaries (collectively "Carolco"), pursuant to which Carolco conveyed to Canal + all of Carolco's right, title and interest in and to certain motion pictures, including T2. This Agreement as amended by the documents referred to in Items 7 and 8 was authorized and approved by Order of the Bankruptcy Court referred to in Item 5.~~

~~**2.** First Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco.~~

~~**3.** Second Amendment to Sale of Assets Agreement dated as of February 23, 1996 between Canal + and Carolco.~~

~~**4.** Trademark License Agreement dated as of April 29, 1996 between Canal + and CPI, pursuant to which Canal + granted CPI a non-exclusive license to use the titles, trademarks, trade mark rights, service marks and service mark rights in and to the motion pictures covered by the Sale of Assets Agreement referred to in Item 6, including T2.~~

~~**5.** Purchase and Sale – Quitclaim Agreement dated as of September 11, 1997 between the Carolco Liquidating Trust, as successor in interest to the rights of Carolco, and AGV Productions, Inc. ("AGV"), pursuant to which AGV acquired all of Carolco's right, title and interest in and to T1 and T2, including the right to produce and exploit prequels, sequels and remakes based thereon.~~

~~**6.** Amendment to Trademark License Agreement dated as of April, 2003 between StudioCanal Image S.A., ("StudioCanal") as successor in interest to Canal+, and AGV, pursuant to which StudioCanal granted AGV an exclusive license to use the marks Terminatrix, T X and T3.~~

The listing of the agreements in this Exhibit is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases. The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract. Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

1. ~~7. Second~~Subject to Sections 5.16 and 5.17 of the Asset Purchase Agreement between Lions Gate Films, Inc., as Buyer, and the Halcyon Parties, collectively as Seller, dated January ___, 2010: the Trademark License Agreement dated as of April 29, 1996 between  Canal+D.A. and Carolco Pictures Inc., as assigned by Carolco Pictures Inc. to AGV Productions, Inc ("AGV"), as amended by Amendment Agreement dated April __, 2003 by and between StudioCanal Image S.A., (as successor to Canal+D.A.) and AGV and Amendment ~~to Trademark License~~ Agreement dated ~~as of July 22, 2008~~July 22, 2008 by and between StudioCanal S.A. (as successor to StudioCanal Image S.A) and T~~-~~Asset Acquisition Company, LLC, as successor to AGV's rights relating to the making of Remakes

5

EXHIBIT L
Page 167

and Sequels to the films T1 and T2.

**TRANSFER OF TERMINATOR ASSETS FROM C-2 AND AGV TO T ASSET ACQUSITION COMPANY, LLC ("T ASSET"):**

2.    8.  Purchase Agreement ("Prior Purchase Agreement") dated as of May 12, 2007 between AGV, Mario Kassar Productions, LP, C-2 and AGV T4 Productions T4 , LLC ("AGV T4" ) (collectively "Seller"),the "AGV Sellers") on the one hand, and T Asset on the other hand, but only with respect to all of Seller's the AGV Sellers' right, title and interest in and to the Granted Terminator Assets.

3.    9.  Amendment dated as of May __, 2007 to the Purchase Agreement referred to in Item 1, 2 together with the Schedules to the Prior Purchase Agreement, but only with respect to all of the AGV Sellers' right, title and interest in and to the Granted Terminator Assets.

**INTERNAL CONVEYANCES:**

**10.**  Asset Purchase Agreement dated as of April 12, 2007 (effective as of the closing date of the purchase transaction set forth in the Purchase Agreement referred to in Item 1) among T Asset and T Asset International (BVI) Ltd. ("T Asset International") with respect to the Terminator Asset Rights outside the United States and Canada (the "Domestic Territory").

**11.**  One Picture License Agreement dated as of November 9, 2007 between T Asset and T Salvation Distribution, LLC ("T Salvation Distribution") with respect to the production of one motion picture and distribution rights in the Domestic Territory.

**12.**  Amended and Restated  One Picture License Agreement dated as of November 9, 2007 between T Asset and T Salvation Distribution with respect to the production of one motion picture and distribution rights in the Domestic Territory.

**13.**  Exclusive Grant of Rights dated as of November 9, 2007 from T Asset to T Salvation Distribution with respect to the Domestic Territory.

**14.**  One Picture License Agreement dated as of November 9, 2007 between T Asset International and T Salvation Distribution (BVI) Ltd. ("T Distribution BVI") with respect to the production of one motion picture and distribution rights outside the Domestic Territory.

**15.**  Production Services Agreement dated as of November 9, 2007 between T Asset and T Asset International, on the one hand, and T Salvation Productions, LLC ("T Salvation Productions").

**16.**  Assignment Agreement dated as of January 29, 2008 between T Asset and Halcyon Consumer Products, LLC ("HCP") with respect to merchandising rights.

**17.**  Termination and Reassignment dated as of February 12, 2008 between T Asset International and T Distribution BVI, terminating the one picture license referred to in Item 12 and reassigning the rights conveyed therein to T Asset International.

**18.**  One Picture License Agreement dated as of February 12, 2008 between T Asset and T

6

Salvation Distribution with respect to the production of one motion picture and distribution rights for the world outside of the Domestic Territory, South Korea and the Middle East.

19. Exclusive Grant of Rights dated as of February 12, 2008 from T Asset to T Salvation Distribution with respect to the world outside the Domestic Territory, South Korea and the Middle East.

20. Amended and Restated Production Services Agreement dated as of November 9. 2007 as amended as of February 12, 2008 between T Salvation Distribution and T Salvation Productions.

21. Amended and Restated Security Agreement and Mortgage of Copyright dated as of November 9, 2007 as amended as of February 12, 2008, between T Salvation Productions and T Salvation Distribution.

22. Assignment Agreement dated as of April 17, 2008 between T Asset and Halcyon Games, LLC ("Games") with respect to interactive/video game rights.

**T4 PRODUCTION RELATED DOCUMENTS:**

23. Agreement dated as of September 10, 2007 between T Salvation Productions and Onda Entertainment, Inc. furnishing the producing services of Moritz Borman.

24. Agreement dated as of October 1, 2007 between T Salvation Productions and Dominion, LLC furnishing the producing services of Derek Anderson and Victor Kubicek.

25. Guaranty dated as of October 1, 2007 between T Asset and Dominion, LLC f/s/o Derek Anderson and Victor Kubicek.

26. Agreement (draft with comments) dated as of October 19, 2007 between T Salvation Productions and Five Pennies, Inc. furnishing the directing services of Joseph McGinty Nichol (a/k/a McG) ("McG").

27. Consulting/Executive Producer Agreement dated as of October ___, 2007 between T Asset and Peter D Graves.

28. Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver.

29. Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale").

30. Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand.

31. Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis.

32. Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis.

7

EXHIBIT L
Page 169

33.  Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington.

34.  Executive Producer Agreement dated as of February 29, 2008 between T Salvation Productions and Lin Pictures, Inc. furnishing the development and executive producer services of Dan Lin.

35.  Amendment dated as of June 16, 2008 between T Salvation Productions and Dominion, LLC amending the agreement referred to in Item 31.

36.  Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman.

37.  Agreement dated as of  March 17, 2009 between T Salvation Productions and T Salvation Distribution, on the one hand, and Warner Bros. on the other hand with respect to shortfall payments which may be made by Warner Bros. to Five Pennies, Inc. f/s/o McG.

38.  Amended and Restated Agreement dated as of May ___, 2009 between T Salvation Productions and T Salvation Distribution, on the one hand, and Warner Bros. on the other hand with respect to certain shortfall payments which may be made by Warner Bros. to Aboriginal Merchants, Inc. f/s/o Bale.

39.  Enhancement Funding Agreement dated as of December 16, 2008 among T Salvation Distribution, T Salvation Productions, T Asset, T Asset International, T Distribution BVI, Warner Bros., Sony, Union Bank and IFG and Fireman's Fund Insurance Company.

40.  Amendment to Enhancement Funding Agreement dated as of May 11, 2009 among the parties to the document referred to in Item 47.

**MOTION PICTURE DISTRIBUTION RIGHTS:**

**41.**  Distribution Agreement dated as of November 10, 2007 with effect as of September 7, 2007 between T Salvation Distribution and Warner Bros. with respect to the Domestic Territory.

42.  Master License Agreement dated as of  December 3, 2007 between T Distribution BVI and Batrax Entertainment B.V. ("Batrax") for the territory described therein as the Middle East.

43.  Master License Agreement dated as of December 3, 2007 between T Distribution BVI and Fintage Magyar Kft. ("Fintage Magyar") for the territory of  South Korea.

44.  Memorandum of Agreement dated December 5, 2007 between Batrax and Gulf Film LLC with respect to the territory described therein as the Middle East.

45.  Motion Picture Lease Agreement dated as of January 25, 2008 between Fintage Magyar, on the one hand, and Mars Entertainment Korea and Lotte Shopping Co., Ltd on the other hand for the territory of South Korea.

46.  Distribution Agreement dated as of February 13, 2008 between T Salvation Distribution and Worldwide SPE Acquisitions, Inc. ("Sony") for the world exclusive of the Domestic Territory,

8

South Korea and the Middle East.

47.  Non-Theatrical Distribution Agreement dated April 3, 2009 between T Salvation Distribution and Entertainment In Motion Inc. with respect to Airline Rights in South Korea and the Middle East.

**MOTION PICTURE DISTRIBUTION FIRST NEGOTIATION RIGHTS:**

**48.**  Settlement and First-Negotiation Agreement dated as of May 23, 2008 between T Asset, on the one hand, and Metro-Goldwyn-Mayer Inc. and Metro-Goldwyn-Mayer Studios Inc. on the other hand.  The Orion Foreign Distribution Agreement and Domestic Distribution Agreement referenced in Paragraph 2 are the Documents referred to in Index 1, Items 20 and 24 respectively.

49.  First Amendment to Settlement and First-Negotiation Agreement, dated as of October 27, 2009, amending the document referred to in Item 8.

**MERCHANDISING/TRADEMARK LICENSE AGREEMENTS:**

**50.**  Merchandising Licensing Agreement dated as of February 1, 2009 between HCP and Art You Grew Up With Ltd.

51.  Trademark License Agreement dated as of February 1, 2009 between T Asset and Art You Grew Up With.

52.  Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Bladez Toys PLC.

53.  Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Bladez Toys PLC.

54.  Merchandising Licensing Agreement dated as of March 10, 2008 between HCP and C-Life Group, Ltd.

55.  Trademark Licensing Agreement dated as of July 10, 2008 between T Asset and C-Life Group, Ltd.

56.  Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and Danilo Promotions Ltd.

57.  Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and Danilo Promotions Ltd..

58.  Merchandising Licensing Agreement dated as of June 15, 2008 between HCP and DC Comics.

59.  Trademark Licensing Agreement dated as of June 15, 2008 between T Asset and DC Comics.

60.  Merchandising Licensing Agreement dated as of March 30, 2009 between HCP and

9

Designworks Clothing Company Pty. Ltd.

61.  Trademark Licensing Agreement dated as of March 30, 2009 between T Asset and Designworks Clothing Company Pty. Ltd.

62.  Merchandising Licensing Agreement dated as of January 19, 2009 between HCP and Dryen Australia Pty. Ltd.

63.  Trademark Licensing Agreement dated as of January 19, 2009 between T Asset and Dryen Australia Pty. Ltd.

64.  Merchandising Licensing Agreement dated as of September 3, 2008 between HCP and FunKo.

65.  Trademark Licensing Agreement dated as of September 3, 2008 between T Asset and FunKo.

66.  Merchandising Licensing Agreement dated as of June 1, 2008 between HCP and GB Posters Limited.

67.  Trademark Licensing Agreement dated as of June 1, 2008 between T Asset and GB Eye Ltd.

68.  First Amendment to Merchandising Licensing Agreement dated as of November 1, 2008 between HCP and GB Posters Limited.

69.  Merchandising Licensing Agreement dated as of October 10, 2008 between HCP and Gendai Merchandise Inc.

70.  Trademark Licensing Agreement dated as of October 10, 2008 between T Asset and Gendai Merchandise Inc.

71.  First Amendment to Merchandising Licensing Agreement dated as of January 23, 2009 between HCP and Gendai Merchandise Inc.

72.  Merchandising Licensing Agreement dated as of September 1, 2008 between HCP and H Grossman HK Ltd.

73.  Trademark Licensing Agreement dated as of September 1, 2008 between T Asset and H Grossman HK Ltd.

74.  Merchandising Licensing Agreement dated as of _____, 2008 between HCP and Hollywood Collectibles.

75.  Trademark Licensing Agreement dated as of September 1, 2008 between HCP and Hollywood Collectibles..

76.  Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Hot Toys Limited.

10

EXHIBIT L
Page 172

77.  Trademark Licensing Agreement dated as of June 15, 2008 between HCP and Hot Toys Limited.

78.  Merchandising Licensing Agreement dated as of January 19, 2008 between HCP and Hunter Overseas Pty. Ltd.

79.  Trademark Licensing Agreement dated as of January 19, 2008 between T Asset and Hunter Overseas Pty. Ltd.

80.  Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC.

81.  Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC.

82.  First Amendment to Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Idea and Design Works, LLC.

83.  First Amendment to Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Idea and Design Works, LLC.

84.  Merchandising Licensing Agreement dated as of January 25, 2008 between HCP and Iris Co., Ltd.

85.  Trademark Licensing Agreement dated as of January 25, 2008 between T Asset and Iris Co., Ltd.

86.  Merchandising Licensing Agreement dated as of January 28, 2008 between HCP and Licensing Essentials Pty. Ltd.

87.  Trademark Licensing Agreement dated as of January 28, 2008 between T Asset and Licensing Essentials Pty. Ltd.

88.  Merchandising Licensing Agreement dated as of October 28, 2008 between HCP and Lightec Inc.

89.  Trademark Licensing Agreement dated as of October 28, 2008 between T Asset and Lightec Inc.

90.  Merchandising Licensing Agreement dated as of April 30, 2008 between HCP and Medicom Toy Corporation.

91.  Trademark Licensing Agreement dated as of June 27, 2008 between T Asset and Medicom Toy Corporation.

92.  Merchandising Licensing Agreement dated as of December 2, 2008 between HCP and Moderati, a Bellrock Media Inc. company.

93.  Trademark Licensing Agreement dated as of February 17, 2009 between T Asset and

11

EXHIBIT L
Page 173

Moderati, a Bellrock Media Inc. company.

94.    Merchandising Licensing Agreement dated as of December 1, 2008 between HCP and Muckle Mannequins e.K.

95.    Trademark Licensing Agreement dated as of December 1, 2008 between T Asset and Muckle Mannequins e.K.

96.    Merchandising Licensing Agreement dated as of August 1, 2008 between HCP and New Era Cap Company Ltd.

97.    Trademark Licensing Agreement dated as of August 1, 2008 between T Asset and New Era Cap Company Ltd.

98.    Merchandising Deal Memo dated August 28, 2008 between HCP and Playground Maniacs, Inc.

99.    Merchandising Deal Memo dated February 13, 2008 between HCP and Playmate Toys Inc.

100.        Short Form License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc.

101.        Merchandising License Agreement dated as of February 13, 2008 between HCP and Playmate Toys Inc.

102.        Trademark License Agreement dated as of February 13, 2008 between T Asset and Playmate Toys Inc.

103.        First Amendment to License Agreement dated as of June 22, 2009 between HCP and Playmate Toys Inc.

104.        Merchandising License Agreement dated as of March 17, 2009 between HCP and Promotional Partners Worldwide Inc.

105.        Trademark License Agreement dated as of February 25, 2009 between T Asset and Promotional Partners Worldwide Inc.

106.        Merchandising License Agreement dated as of December 16, 2008 between HCP and Raffles Inc.

107.    Trademark License Agreement dated as of December 16, 2008 between T Asset and Raffles Inc.

108.    Merchandising License Agreement dated as of September 3, 2008 between HCP and Ripple Junction Design Co., Inc.

109.    Trademark License Agreement dated as of September 3, 2008 between T Asset and Ripple Junction Design Co., Inc.

12

EXHIBIT L
Page 174

110.    Merchandising License Agreement dated as of July 13, 2008 between HCP and Rubies Costume Co. Inc.

111.    Trademark License Agreement dated as of July 13, 2008 between T Asset and Rubies Costume Co. Inc.

112.    Merchandising License Agreement dated as of April 30, 2008 between HCP and Sideshow Collectibles.

113.    Trademark License Agreement dated as of April 30, 2008 between T Asset and Sideshow Collectibles.

114.    Theme Park License Agreement dated as of June 30, 2008 between HCP and Six Flags, Inc.

115.    Trademark  License Agreement dated as of June 30, 2008 between T Asst and Six Flags, Inc.

116.    Merchandising Deal Memo Dated June 9, 2009 between HCP and Sony Pictures Home Eentertainment Inc.

117.    Merchandising License Agreement dated as of December 3, 2008 between HCP and Targa Co., Ltd.

118.    Trademark License Agreement dated as of December 3, 2008 between T Asset and Targa Co., Ltd.

119.    Merchandising License Agreement dated as of April 28, 2009 between HCP and Three OZ. Co., Ltd.

120.    Trademark License Agreement dated as of April 28, 2009 between T Asset and Three OZ. Co., Ltd.

121.    Publishing Agreement dated April 1, 2008 between The Halcyon Company (executed by HCP) and Titan Publishing Group Ltd.

122.    Trademark License Agreement dated as of May 15, 2008 between T Asset and Titan Publishing Group Ltd.

123.    Merchandising Deal Memo dated March 27, 2008 between The Halcyon Company and The Topps Company, Inc.

124.    Merchandising License Agreement dated as of April 1, 2008 between HCP and Trends International, LLC.

125.    Trademark License Agreement dated as of August 5, 2008 between T Asset and Trends International, LLC.

126.    Merchandising License Agreement dated as of February 25, 2009 between HCP and

13

EXHIBIT L
Page 175

Vibe Inc.

127.   Trademark License Agreement dated as of January 6, 2009 between T Asset and Vibe Inc.

128.   Merchandising License Agreement dated as of February 25, 2009 between HCP and Visions Inc.

129.   Trademark License Agreement dated as of July 22, 2008 between T Asset and Visions Inc.

**INTERACTIVE/VIDEO GAME DEVELOPMENT, PRODUCTION AND EXPLOITATION AGREEMENTS:**

**130.**   Video Game Development Agreement dated as of August 8, 2008 between Games and Attaction AG d/b/a EGI Equity International AG ("Attaction").

131.   Accommodation Security Agreement (California law) dated as of August 8, 2008 between Attaction, on the one hand, and Games, Halcyon Holding Group, LLC ("HHG") and T Asset on the other hand.

132.   Security Transfer and Assignment Agreement (German law) dated as of August 8, 2008 between Games, HHG and T Asset, on the one hand, and Attaction on the other hand.

133.   Guarantee Agreement executed on August 14, 2008 by HHG in favor of Attaction.

134.   Video Game Work for Hire Agreement between Games and Grin AB.

135.   License Agreement dated as of March 25, 2008 between Games and Gameloft S.A. with respect to video game for wireless devices.

136.   License Agreement dated as of April 30, 2008 between Games and Raw Thrills, Inc. with respect to arcade game.

137.   Trademark License Agreement dated as of April 30, 2008 between T Asset and Raw Thrills, Inc.

138.   Video Game Distribution Agreement dated as of May 18, 2008 between XIM, Inc. d/b/a Evolved Games, Inc. and Warner Bros. Home Entertainment, Inc.

139.   Letter of Intent, draft dated November 21, 2008, executed February, 2009 between Games and Stillfront AB with respect to the development and exploitation of an online T4 Fan Immersion Game.

140.   Digital Distribution License Agreement dated as of March 30, 2009 between T Asset and Games, on the one hand, and Warner Specialty Video Productions Inc on the other hand with respect to the production and exploitation of a Machinima animated series based on the T4 Video Game.

14

141.    Long Form Merchandise License Agreement dated as of March 20, 2009 between Halcyon Games, LLC, on the one hand, and DK/Brady Games, on the other hand, with respect to the production and exploitation of "Terminator: Salvation, the Game."

15

# EXHIBIT M

1  Howard J. Weg (State Bar No. 91057)
   *hweg@pwkllp.com*
2  David B. Shemano (State Bar No. 176020)
   *dshemano@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   10100 Santa Monica Boulevard, Suite 1450
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile:  (310) 552-3101

6  Counsel for T Asset Acquisition Company, LLC,
   Halcyon Holding Group, LLC, dba The Halcyon
7  Company, and Dominion Group LLC,
   Debtors and Debtors in Possession

8
                   **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                        **LOS ANGELES DIVISION**
11 | In re:                                  | Case No.: 2:09-31853-ER
   |                                         |
12 | T ASSET ACQUISITION COMPANY, LLC, a    | Chapter 11
   | Delaware limited liability company; HALCYON |
13 | HOLDING GROUP, LLC, dba THE HALCYON     | (Jointly Administered with Case Nos.:
   | COMPANY, a Delaware limited liability company; | 2:09-31854-ER and 2:09-31855-ER)
14 | and DOMINION GROUP LLC, a California limited |
   | liability company,                      | **SUPPLEMENTAL NOTICE OF PROPOSED**
15 |                                         | **TREATMENT OF PARTICIPATIONS AND**
   |                                         | ~~**ATTACHMENT RIGHTS**~~**ATTACHMENTS**
16 |                              Debtors.   | **IN CONNECTION WITH SALE OF**
   |                                         | **CERTAIN OF THE DEBTORS' ASSETS**
17 |                                         | **RELATING TO THE *TERMINATOR***
   |                                         | **MOTION PICTURE FRANCHISE**
18 |                                         |
   |                                         |              Sale Hearing:
19 |                                         | Date:      ~~January 27,~~February 10, 2010
   |                                         | Time:      10:00 a.m.
20 | **Check One or More as Appropriate:**   | Location: Courtroom 1568
   |                                         |              255 East Temple St.
21 | Affects All Debtors:                  □ | Los Angeles, California
   | Affects T Asset Acquisition Company, LLC only: □ |
22 | Affects Halcyon Holding Group, LLC only: □ |          Objection Deadline:
   | Affects Dominion Group LLC only:      □ | January ~~13,~~27, 2010
23
24        **PLEASE TAKE NOTICE** that on January ~~27,~~22, 2010, the above-captioned debtors
25 (collectively, the "Debtors") served notice (the "Notice") that on February 10, 2010, at 10:00 a.m., or
   as soon thereafter as the matter can be heard (the "Sale Hearing"), before the Honorable Ernest M.
26 Robles, United States Bankruptcy Judge, in Courtroom 1568, located at 255 East Temple Street, Los
   Angeles, California, the Bankruptcy Court will consider and act upon the Motion Of Debtors For
27 Order Authorizing And Approving Sale Of Debtors' Assets Relating To The *Terminator* Motion
28 Picture Franchise Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant

                                        1

To Sections 363 And 365 Of The Bankruptcy Code (the "Sale Motion"), filed by the ~~above-captioned debtors (collectively, the "Debtors").~~ **PLEASE TAKE FURTHER NOTICE** that, as Debtors on December 18, 2009.  As set forth in the Notice and the Sale Motion, the Debtors are requesting an order of the Bankruptcy Court authorizing and approving the sale of the Debtors' assets relating to the *Terminator* motion picture franchise (the "Assets") to the bidder that submits the highest and best bid at a sale auction ~~to be conducted at the hearing on the Motion (the "Sale Hearing~~ (the "Auction").  The winning bidder is referred to as the "Buyer."

**PLEASE TAKE FURTHER NOTICE** that on January 7, 2010, subject to approval of the Bankruptcy Court, the Debtors entered into an Asset Purchase Agreement (the "APA") with Lions Gate Films, Inc. ("Lions Gate") providing for the sale of the certain of the Debtors' rights in the *Terminator* motion picture franchise, including all of the Debtors' sequel and remake rights, all merchandising and other derivative rights related to sequel and remakes, and other assets, all as further specified in the APA (collectively the "Granted Terminator Assets"), free and clear of all liens, claims, encumbrances and other interests of any nature, whether known or unknown, other than the Assumed Obligations specifically set forth in the APA, with any such liens, claims, encumbrances, or interests to attach to the proceeds of the sale.  On January 22, 2010, the Debtors filed a supplement to the Sale Motion describing the material terms and conditions of the APA (the "Supplement").  A copy of the APA is attached as an exhibit to the Supplement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are parties to (or successors-in-interest to parties to) certain contracts with third parties that are related to the *Terminator* franchise ~~but~~ that provide for, among other things, (i) the payment of participations or royalties to various entities based on the performance of one or more *Terminator* motion pictures or television series including *Terminator: Salvation* or other Sequels or Derivative Rights as defined in the APA (collectively, Participations"), or (ii) certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of an existing *Terminator* motion picture (collectively, "Attachments"). A list of the documents relating to Participations and/or Attachments is attached hereto as Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that the Debtors believe that the documents relating to Participations and Attachments are not executory contracts within the meaning of section 365 of the Bankruptcy Code ~~.  These agreements are not executory contracts within the meaning of section 365~~ because one or more parties to the contract do not have obligations remaining to be performed under the agreement that, if not performed, would constitute a material breach of the contract that would excuse a refusal to perform by the other party.  *See, Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991); *In re Adelphia Communications Corp.*, 307 B.R. 404, ~~428,~~428 (Bankr. S.D.N.Y. 2004); *In re Stein and Day, Inc.*, 81 B.R. 263 (Bankr. S.D.N.Y. 1988).

**PLEASE TAKE FURTHER NOTICE** that ~~a list of these non-executory contracts is attached as Exhibit A.  These agreements~~ provide for, among other things, (i) the payment of participations or royalties to various entities based on the performance of ~~an existing *Terminator* motion picture ("Participations"), or (ii) certain contractual rights to negotiate to work on or to work on or to be paid participations in connection with sequels, prequels or remakes or other works that are derivative of an existing *Terminator* motion picture ("Attachment Rights").~~  **PLEASE TAKE FURTHER NOTICE** ~~that~~ the listing of the Participations and ~~Attachment Rights~~Attachments is not an admission or

2

acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists, or that any Participations or Attachments were executory contracts within the meaning of section 365 of the Bankruptcy Code as of the date the Debtors commenced their chapter 11 cases.  The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract.  Some contracts listed have been terminated or may have expired by their own terms, but such contracts have been listed notwithstanding any such possible termination or expiration so as to provide a complete list of contracts and, in the event that one or more parties in interest assert that a contract was not terminated or did not expire, to provide notice to such party in interest of its right and opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that, under the APA: (1) Lions Gate will *not* assume or acquire, will *not* be subject to, and will have *no* obligation or liability of any nature, whether currently known or unknown, under or relating to any of the Attachments and Participations, or any duties or obligations owed or owing to any person or entity thereunder or relating thereto, or any other contract or agreement, whether known or unknown, that purports to create rights in the nature of Attachments or Participations, unless and to the extent, if any, that Buyer, in writing, specifically assumes and/or agrees to be bound by any such Attachments or Participations or any duty or obligation owed or owing to any person or entity thereunder or relating thereto; (2) the sale of the Granted Terminator Assets to Buyer will be free and clear of all Attachments and Participations, and any rights or entitlements held by, or any duties or obligations of any nature whatsoever, to any person or entity arising under or relating to the Attachments and Participations or any other document, contract or agreement of any nature, whether known or unknown, that purports to create rights in the nature of Attachments or Participations; and (3) to the extent any Attachments or Participations are executory contracts within the meaning of section 365 of the Bankruptcy Code, the Debtors are required to reject, pursuant to section 365 of the Bankruptcy Code, all executory contracts and agreements that include Participations or Attachments that relate to the Granted Terminator Assets.[1] Consequently, all claims based upon Participations and Attachments will be treated as prepetition claims against the Debtors.

PLEASE TAKE FURTHER NOTICE that the Debtors are requesting that the Bankruptcy Court authorize and approve the treatment of Participations and Attachments in the manner described above.  IF YOU ARE A PARTY TO ANY OF THE PARTICIPATIONS OR ATTACHMENTS *AND* YOU OBJECT TO THE TREATMENT OF THE ATTACHMENTS OR PARTICIPATIONS, YOU MUST FILE WITH THE BANKRUPTCY COURT AND SERVE A WRITTEN OBJECTION TO THE PROPOSED TREATMENT, TOGETHER WITH EVIDENCE THAT SUPPORTS THE OBJECTION, NO LATER THAN JANUARY 27, 2010, ON THE DEBTORS' COUNSEL (Howard J. Weg, Esq., and David B. Shemano, Esq., Peitzman, Weg & Kempinsky LLP, 10100 Santa Monica Blvd., Suite 1450, Los Angeles, CA  90067), AND ON COUNSEL FOR LIONS GATE (James A. Janowitz, Esq., and Richard Levy, Jr., Esq., Pryor Cashman LLP, 7 Times Square, New York, NY 10036-6569), AND ON COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (Martin J. Brill, Esq., and Juliet Y.

---

[1] Certain Participations owed on account of *Terminator: Salvation* are paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement").  The sale of the Assets shall be subject to the T4 CAM Agreement and nothing in the APA is intended to affect the right of any party to the T4 CAM Agreement.

1    Oh, Esq., Levene, Neale, Bender, Rankin & Brill LLP, 10250 Constellation Blvd., Los Angeles, CA
     90067).

2    Dated: January __, 2010                    PEITZMAN, WEG & KEMPINSKY LLP

3

4                                              By: _____

5                                                   Howard J. Weg

6                                                   David B. Shemano
                                                 Counsel for the Debtors

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    4

# EXHIBIT 1

The listing of the agreements in this Exhibit is not an admission or acknowledgement that any contractual relationship exists or existed or that, if such a contractual relationship existed, said relationship presently exists or that any agreement was an executory contract as of the commencement of the Debtors' chapter 11 cases.  The Debtors do not waive any right of rescission, reformation, defense, claim, or counterclaim respecting any contract.  Some contracts listed may have been terminated or expired by their own terms, but have been listed notwithstanding any such possible termination or expiration to provide a complete list and in the event that one or more parties in interest assert the position that a contract was not terminated or did not expire.

PLEASE TAKE FURTHER NOTICE that, under the proposed asset purchase agreement for the sale of the Assets (the "APA"), the Buyer will not assume and shall have no obligation to pay or satisfy any Participations or Attachment Rights that accrued prior to the closing of the sale of the Assets (the "Closing"), but shall assume any Participations or Attachment Rights that accrue on and after the Closing.[‡]  The Participations and Attachments Rights that will not be assumed by the Buyer will be treated as prepetition claims against the Debtors.  With respect to any future *Terminator* movies, because such movies have not yet been developed, there are no outstanding Participations or Attachment Rights that must be paid and, under the APA, the Debtors propose that the Buyer will assume and pay any Participations and Attachment Rights arising after the Closing if and when a future *Terminator* movie is developed.  However, it is possible that the Buyer will refuse to assume the post-Closing Participations and Attachment Rights, in which case the post-Closing Participations and Attachment Rights will also be treated as prepetition claims against the Debtors.

PLEASE TAKE FURTHER NOTICE that the Debtors are requesting that the Bankruptcy Court authorize and approve the treatment of Participations and Attachment Rights in the manner described above.  If you are a party to any of the Participations or Attachment Rights and object to the proposed treatment of your contract, you must file with the Bankruptcy Court and serve on the Debtors' counsel (Howard J. Weg, Esq., Peitzman, Weg & Kempinsky LLP, Los Angeles, CA 90067), a written objection to the proposed treatment, together with evidence that supports the objection, no later than January 13, 2010.

Dated: December 18, 2009                    PEITZMAN, WEG & KEMPINSKY LLP


                                            By:    /s/ David B. Shemano
                                                   Howard J. Weg
                                                   David B. Shemano
                                            Counsel for the Debtors

---

[‡] Certain Participations owed on account of *Terminator: Salvation* are paid by a third party in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement").  The sale of the Assets shall be subject to the T4 CAM Agreement and nothing in the APA is intended to affect the right of any party to the T4 CAM Agreement.

5

## **EXHIBIT A**

Certain of the non-Debtor parties to the agreements in this Schedule may be owed Participations on account of *Terminator: Salvation*, which Participations, if owed, are paid in accordance with the terms and conditions of a Collection Account Management Agreement dated February 2, 2009 (the "T4 CAM Agreement"). Nothing in the APA, including the rejection of any agreement in this Schedule, is intended to affect the right of any party to the T4 CAM Agreement.

1.  Agreement dated as of September 10, 2007 between ~~T Salvation Productions and~~ Onda Entertainment~~,~~ Inc. ~~furnishing the producing services of~~f/s/o Moritz Borman and T Salvation Productions LLC.

2.  Agreement dated as of October 1, 2007 between ~~T Salvation Productions and~~ Dominion~~,~~ LLC ~~furnishing the producing services of~~f/s/o Derek Anderson and Victor Kubicek~~.~~ and T Salvation Productions LLC, and the amendment dated as of June 16, 2008.

3.  Guaranty dated as of October 1, 2007 between T Asset and Dominion, LLC f/s/o Derek Anderson and Victor Kubicek.

4.  Director Loanout Agreement ~~(draft with comments)~~ dated as of October 19, 2007 between T Salvation ~~Productions~~LLC and Five Pennies, Inc. ~~furnishing the directing services of~~f/s/o Joseph McGinty Nichol (a/k/a McG) ~~("McG")~~.

5.  Consulting/Executive Producer Agreement dated as of October __, 2007 between T Asset and Peter D Graves.

6.  Line Producer Agreement dated as of December 4, 2007 between T Salvation Productions and Sashamax Films, Inc. furnishing the line producer services of Jeffrey Silver.

7.  Agreement dated as of December 13, 2007 between T Salvation Productions and Aboriginal Merchants, Inc. furnishing the acting services of Christian Bale ("Bale").

8.  Guaranty dated as of December 13, 2007 between the Halcyon Company and T Salvation Distribution, on the one hand, and Aboriginal Merchants, Inc. f/s/o Bale on the other hand.

9.  Animatronic and Prosthetic Effects Agreement dated as of February 6, 2008 between T Salvation Productions and Stan Winston Studio, Inc.

10.  Writing Agreement dated as of February 25, 2008 between T Salvation Productions and Paul Haggis, Inc. furnishing the writing services of Paul Haggis.

11.  Guarantee dated as of February 25, 2008 between The Halcyon Company and Paul Haggis, Inc. f/s/o Paul Haggis.

12.  Acting Agreement dated as of February 29, 2008 between T Salvation Productions and Mexican Crab Apples, Inc. furnishing the acting services of Sam Worthington.

13.  Executive Producer Agreement dated as of February 29, 2008 between T Salvation Productions and Lin Pictures, Inc. furnishing the development and executive producer services of Dan

6

Lin.

14.  Amendment dated as of June 16, 2008 between T Salvation Productions and Dominion, LLC amending the agreement referred to in Item 31.

14.  15. Agreement dated January 7, 2009 between T Salvation Productions and Morte Surgical Instruments, Inc furnishing the composing services of Danny Elfman.

15.  16. Acting Agreement dated as of April 21, 2008 between T Salvation Productions and Shell B Productions, Inc. furnishing the acting services of Moon Bloodgood.

17. Acting Agreement dated as of June 28, 2008 between T Salvation Productions and Pigs Can Fly, Inc. furnishing the acting services of Helena Bonham Carter.

18. Acting Agreement dated as of April 9, 2008 between T Salvation Productions and Anton Yelchin, Inc. furnishing the acting services of Anton Yelchin.

19. The following documents and correspondence provided by Seller to Buyer with respect to Joseph McGinty (a/k/a McG):  the letter from David E. Weber to Tom Hunter, Esq., dated May 26, 2009 regarding "'T5 / McG – Deal Memorandum and Availability Provisions Language", and the memorandum attached thereto from David E. Weber to Joel Michaels and Tom Hunter, dated May 13, 2009 and entitled "McG – 'T5' / Terms", with various handwritten notations thereon including notes dated May 26, 2009; and email correspondence regarding "McG – T5" between David Weber and Tom Hunter dated June 15 and June 30, 2009, and any related documents.

20. Writer Loanout Agreement  between AGV Production T4 and  Jonathan Mostow dated July 1, 2003

21. Writer Loanout Agreement between AGV Productions T4 & Michael Ferris and John Brancato dated October 15, 2003 and First Amendment to Writer Loanout Agreement re: T4 between AGV Production T4 and The Deadpan Corp/Consumer Recreation Services for Michael Ferris & John Brancato dated July 8, 2005

22. Development Agreement dated September 18, 2002, between AGV Productions T4 LLC and RJ Info Tech, Inc. f/s/o Jonathan Mostow and Lieberville Inc. f/s/o Hal Lieberman; First Amendment to Development Agreement dated as of October 15, 2003, with respect to the document and  the Second Amendment to Development Agreement dated December 22, 2003

7

EXHIBIT M
Page 184

| | |
|---|---|
| In re:  T Asset Acquisition Company, LLC,<br><br>Debtor(s). | CHAPTER  11<br><br>CASE NUMBER  2:09-bk-31853-ER<br><br>(Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**10100 Santa Monica Boulevard, Suite 1450, Los Angeles, CA  90067.**

The foregoing document described **SUPPLEMENT TO MOTION OF DEBTORS FOR ORDER ESTABLISHING SALE PROCEDURES FOR SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATING TO THE _TERMINATOR_ MOTION PICTURE FRANCHISE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE; DECLARATION OF MONSI MORALES** , will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 8, 2010,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

David E Ahdoot      dahdoot@bushgottlieb.com, tjimines@bushgottlieb.com
Korin A Avelino      kelliott@ktbslaw.com
Austin K Barron      abarron@buchalter.com, IFS_filing@buchalter.com;salarcon@buchalter.com
Sandor T Boxer      tedb@tedboxer.com
Martin J Brill      mjb@lnbrb.com
Alberto J Campain      acampain@blutlaw.com
Marc S Cohen      mcohen@kayescholer.com
Ashleigh A Danker      adanker@kayescholer.com
G Larry Engel      lengel@mofo.com
Wayne S Flick      wayne.s.flick@lw.com, colleen.rico@lw.com
Scott F Gautier      sgautier@pwkllp.com
Julian I Gurule      jgurule@pwkllp.com
Brian T Harvey      bharvey@buchalter.com, IFS_filing@buchalter.com
Louis E Kempinsky      lkempinsky@pwkllp.com
Joseph A Kohanski      jkohanski@bushquinonez.com
Dare Law      dare.law@usdoj.gov
David W Levene      dwl@lnbrb.com
Richard Levy      rlevy@pryorcashman.com
Monserrat Morales      mmorales@pwkllp.com
Juliet Y Oh      jyo@lnbrb.com, jyo@lnbrb.com
Kimberly A Posin      kim.posin@lw.com
David B Shemano      dshemano@pwkllp.com
Adam M Starr      starra@gtlaw.com
United States Trustee (LA)      ustpregion16.la.ecf@usdoj.gov
Jason Wallach      jwallach@gladstonemichel.com
Pamela Kohlman Webster      pwebster@buchalter.com
Howard J Weg      hweg@pwkllp.com

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_January 2009_                                                                                                                                    **F 9013-3.1**

| In re: T Asset Acquisition Company, LLC, | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 2:09-bk-31853-ER |
| | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **January 8, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**Served by U.S. Mail**
Honorable Ernest M. Robles
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

☒ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 8, 2010**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed*

**Served by Messenger**
**Counsel to Creditors Committee**
Martin J. Brill
Juliet Y Oh
Levene, Neale, Bender, Rankin & Brill LLP
10250 Constellation Blvd.
Los Angeles, CA  90067

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 8, 2010 | Grazel Garcia | /s/ Grazel Garcia |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                   **F 9013-3.1**

| In re:  T Asset Acquisition Company, LLC, | | CHAPTER  11 |
|---|---|---|
| | Debtor(s). | CASE NUMBER  2:09-bk-31853-ER |
| | | (Jointly Administered with Case Nos.: 2:09-31854-ER and 2:09-31855-ER) |

## ADDITIONAL SERVICE LIST:

### Served by U.S. Mail
James Janowitz
Richard Levy
Pryor Cashman LLP
7 Times Square
New York  NY  10036

### Served by U.S. Mail
Dare Law
U.S. Trustee
725 S Figueroa St 26th Fl
Los Angeles, CA 90017

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**