PAMELA KOHLMAN WEBSTER (SBN: 105937)
AUSTIN K. BARRON (SBN: 204452)
BUCHALTER NEMER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
Email: pwebster@buchalter.com
Email: abarron@buchalter.com

Attorneys for
Columbia Pictures Industries, Inc.

RICHARD LEVY, JR. (*pro hac vice* adm. pending)
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
*rlevy@pryorcashman.com*

Attorneys for Lions Gate Films Inc.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>T ASSET ACQUISITION COMPANY, LLC, a Delaware limited liability company;<br>HALCYON HOLDING GROUP, LLC, dba THE HALCYON COMPANY, a Delaware limited liability company; and DOMINION GROUP LLC, a California limited liability company,<br><br>Debtors.<br><br>**Check One or More as Appropriate:**<br><br>Affects All Debtors: ☒<br>Affects T Asset Acquisition Company, LLC only ☐<br>Affects Halcyon Holding Group, LLC only ☐<br>Affects Dominion Group LLC only ☐ | Case No. 2:09-bk-31853-ER<br><br>Chapter: 11<br><br>(Jointly Administered with Case Nos: 2:09-31854-ER and 2:09-31855-ER)<br><br>**JOINT OBJECTION OF COLUMBIA PICTURES INDUSTRIES, INC. AND LIONS GATE FILMS, INC. TO MOTION TO SELL CERTAIN TERMINATOR ASSETS, CONDUCT OF AUCTION, AND PACIFICOR BIDDING AGREEMENT; REQUEST TO QUALIFY JOINT BID AS HIGHER AND BETTER THAN CREDIT BID OF PACIFICOR OR, IN THE ALTERNATIVE, RESTART AUCTION**<br><br>Date: February 10, 2010<br>Time: 10:00 a.m.<br>Ctrm: Courtroom 1568<br>         255 E. Temple Street<br>         Los Angeles, CA 90012 |

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE AND ALL PARTIES IN INTEREST:**

Columbia Pictures, Industries, Inc. ("Columbia"), and Lions Gate Films, Inc. ("Lions Gate," collectively with Columbia the "Studios"), through their attorneys, hereby jointly object to the (a) the pending motions brought by T Asset Acquisition Company, LLC and its affiliated debtors jointly administered in this case (collectively, the "Debtors") seeking to approve a settlement with and credit bid sale to Deep Value Hedged Income-1, Coca Cola Inc., Pacificor Offshore Fund Ltd., Pacificor Fund LP, Pacificor Fund II LP and Pacificor, LLC (collectively, "Pacificor"). For all the reasons set forth below, the Studios request that the Court declare that the Studios' Second Bid (as that term is defined below) be declared the best and highest bid for the Granted Terminator Assets (as defined below) or, alternatively, deny the Bidding Motion and order that the Auction start anew.

**A.   THE AUCTION WAS REPLETE WITH IRREGULARITIES AND DEFECTS**

On February 8, 2010, the Debtors conducted what should have been, but what unequivocally was not, an honest, open and fair auction for the sequel and remake (and related) rights (the "Granted Terminator Assets) for the *Terminator* movies (the "Auction"). Although not the only substantial defect with the Auction, the most significant problem was the Debtors' last minute, and unapproved, bidding agreement with Pacificor (the "Bidding Agreement"). Under this Bidding Agreement, the Debtors abandoned their previously asserted challenges to Pacificor's alleged claims, dropped their counter-claims, granted Pacificor a secured claim in the *entire amount **asserted** by Pacificor* – some $38.3 million – and permitted Pacificor to credit bid that claim up to its maximum amount even though significant portions of that claim are secured only against the parent holding company with no direct ownership of any Granted Terminator Assets, while Pacificor in turn agreed to ensure that the estate's professionals were paid. Although couched by the Debtors as a settlement, a moment's examination reveals that the true purpose and effect of the Bidding Agreement was to modify the Auction for the admitted benefit of Pacificor, requiring bidding increments that violated this Court's procedures order and rigging

the bidding to limit the ability of the other bidders to present bids that that would truly benefit the Debtors' estates.

In order to appreciate the fundamental unfairness of the Auction process as tainted by the Bidding Agreement, it is important for the Court to appreciate that the Lions Gate stalking horse bid and all other qualifying bids included (i) an upfront cash component (the "Front End Cash") and (ii) contingent compensation the elements of which varied depending on whether and how many films were made from the sequel rights (the "Back End Compensation"). To the best of the Studios' knowledge, at no time prior to the Bidding Agreement were there any agreements as to how the Front End Cash and the Back End Compensation would be divided among the creditor constituencies. It was, the Studios reasonably thought, merely the standard situation of a bucket of consideration the aggregate of which would be considered in assessing the value of bids, and the proceeds of which would go to the estate as fair consideration for the assets sold. As in all other properly conducted auctions, to the extent that there were potential differences in the contents and value of the parties' bids, Debtors' purportedly qualified, experienced and knowledgeable financial advisors from FTI Capital Advisors LLC would (presumably) be in a position to evaluate the bids and their differences through economic models, and thereby arrive at a conclusion on the total value of each of the respective bids, with the highest valued bid prevailing.

The Studios were given merely a summary of the Bidding Agreement after the close of business on the Friday before the Auction and were not provided with the Bidding Agreement itself until after the Auction had commenced. Among other objectionable points, as further discussed below, the Bidding Agreement gave Pacificor the right to credit bid up to $38.3 million in Front End Cash. Given that this amount far exceeds Pacificor's maximum secured claim against T Asset Acquisition ("T Asset"), the owner of the assets being auctioned, and includes claims that Pacificor alleges against T Asset's parent, the Bidding Agreement thus purported to allow Pacificor to bid in the Auction with <u>unsecured</u> claims. Further, the Bidding Agreement (and Debtors' improper course of conduct during the course of the Auction) dictated that not only would Pacificor be allowed to shill up the Front End Cash by far more than it was owed by

T Asset, but that no bidder could meaningfully adjust the Back End Compensation regardless of how much was required as an overbid in Front End Cash. Indeed, during the Auction, the Debtors' financial and legal professionals took the remarkable position that certain guarantees of payment of Back-End Compensation offered by the Studios were *no different* in value from the wholly unguaranteed Back-End Compensation offered by Pacificor – all while failing or refusing to produce any economic or mathematical support for that conclusion.

Recognizing, even based only on the summary, that the Bidding Agreement had as its primary intention the goal of allowing Pacificor to improperly shill the bidding in Front End Cash well beyond an amount which either of the Studios was prepared to bid given their interests in acquiring the assets, shortly before the Auction the Studios decided to pool their resources so as to try to be competitive on the unlevel playing filed set by the Bidding Agreement.

The improprieties of the Auction began with Debtors' first pronouncement that a Pacificor credit bid of $25 million in Front End Cash and Back End Compensation of $5 million per film for three films, without any guarantee that any such films would ever be made or when, was the "best" bid, wchich competing bidders would need to overbid by any subsequent bidding. Debtors announced that FTI had ascribed a total value to the Pacificor bid of $34.7 million, although they refused initially to provide any explanation of how they had arrived at that value. Later, only after being repeatedly pressed, FTI conceded that it had simply added the $25 million in Front End Cash and a figure $9.7 million as their evaluation of the net present value for the $5 million per film for three future films. FTI also later admitted that it gave no discount to the Back End Compensation for the fact that Pacificor had never made a movie and was not in the business of making movies, and that there was no assurance that any movies would ever be made. As the Court may recall, this very same type of consideration, although being provided by Lions Gate, a major studio, was given a value of zero when the break up fee was determined. Indeed, it was Pacificor itself who described this form of consideration as illusory and lacking any value. Yet, inconsistently, when offered by Pacificor, which is not a studio, the consideration took on heightened value.

1    FTI also later admitted that in determining present value they had assumed that Pacificor
2    would make a film every two years, which is quite simply an impossible schedule when there is
3    not even in place a concept for the next film much less a script or cast.  That FTI would assume
4    that Pacificor could saturate the market with three *Terminator* films in such a short period of time
5    evidences FTI's lack of industry savvy, a point already a matter of record in the Debtors' cases.
6    In short, the Studios challenge FTI's methodology, assumptions and results that valued
7    Pacificor's entirely illusory Back End Compensation at $9.7 million.

8    The Studios then bid $25.5 million in Front End Cash plus Back End Compensation of $5
9    million dollars per film for three films if and when made but with the enhancements that if they
10    had not commenced principal photography on the first film by April of 2014, then they would pay
11    the Debtors' estates $5 million regardless; in other words, they guaranteed that at least $5 million
12    would be paid (the "Studios' First Bid").  They also pointed out that as Studios in the business of
13    making films, their ability to perform was far more assured than that of Pacificor.  Based on those
14    factors, the Studios' First Bid should have been worth far more than Pacificor's not only on the
15    additional Front End Cash but also on the quality of the Back End Compensation.

16    At about this point in the Auction, Debtors' professionals specifically discussed with the
17    Studios the merits to the estates of not increasing the Studios' Front End Cash bid but instead
18    further enhancing their Back End Compensation.  Astoundingly, given Debtors' subsequent
19    statements and conducts, the Studios were expressly told they could not fail to match Pacificor's
20    Front End Cash because, under yet another collusive provision of the Bidding Agreement, the
21    difference in cash portions of the bids would create a deficiency claim for Pacificor and Debtors'
22    would find unacceptable any increase in claims sharing in the Back End Compensation.

23    Pacificor responded to the Studios' First Bid with a bid for $27.5 million in credit bid and
24    its same non-guaranteed Bank End Compensation.  Shockingly, the Debtors declared that
25    Pacificor had overbid the Studios' First Bid.  FTI explained to the Studios that it ascribed the very
26    same value to the Studios' <u>guaranteed</u> Back End Compensation as to the Pacificor <u>illusory</u> Back
27    End Compensation.  That is preposterous and, in fact, the Studios now understand that FTI
28    admitted to Pacificor and the Committee the value of the Studios' Back End Compensation was

1  higher.  Not only is such behavior patently unprofessional, it is highly prejudicial.  The Studios
2  challenge and object to FTI's unsupported methodology, faulty assumptions and defective models
3  (if, in fact, any models exist) that resulted in valuing the Studios' guaranteed Back End
4  Compensation as worth exactly the same Pacificor's entirely illusory Back End Compensation.
5         Given that the Pacificor overbid must have been valued at $36.7 million using FTI's
6  warped opinion, and that no matter what the Studios bid FTI would continue to undervalue their
7  Back End Compensation, the Studios then bid $35.6 million in Front End Cash and $2 million in
8  Back End Compensation for each of sequel films two and three (which FTI immediately valued at
9  $2.3 million in the aggregate).  Thus, by even FTI's inexpert opinion, the Studios bid a combined
10 package with a value of more than $38.9 million, or at least $2.2 million in more value than
11 Pacificor's immediately preceding bid (the "Studios' Second Bid").
12        Stunning both the Studios and Pacificor, the Debtors then announced that the Studios'
13 Second Bid was not an overbid, stating for the first time, and thereby changing the rules of the
14 Auction as well as all other auctions, in blatant violation of the terms of the Bid Procedures
15 Order, that the Auction was being determined not by who paid the most for the assets but who
16 kicked back the most to the unsecured creditors.  In other words, even though Pacificor could rely
17 on the Bidding Agreement to bid up the Front End Cash to stratospheric levels, the total value
18 didn't matter.  The maximum aggregate value to the "estate" was irrelevant; it didn't matter what
19 you paid, it mattered <u>who</u> you paid.  The Court can imagine the Studios' anger – they found
20 themselves in the untenable and noncompetitive position of being forced to bid up on the Front
21 End Cash because of the fraudulent Bidding Agreement, while at the same time being forced to
22 keep the Back End Compensation at a high level even though they were receiving no credit for
23 doing so.  It bears noting that the Debtors' decision that only value to the unsecured creditors
24 (who are not all creditors of T Asset) makes a mockery of this court's Order Granting Motion of
25 Debtors for Order; (1) Establishing Sale Procedures for Sale of Certain of the Debtors'
26 Terminator Assts, 92) Approving Break-Up Fees, and (3) Approving Form and Manner of Notice
27 of Sale (the "Bid Procedures Order").  That Order states that in determining which of the initial
28 bids was the highest and best offer, the Debtors could consider (a) the changes to the Asset

Purchase Agreement submitted by Lions Gate, (b) the extent to which the changes would delay closing the sale or the costs to Debtors, (c) the likelihood of the bidder's ability to close; and (d) **"the net benefit to the Debtors' estates, taking into account Lions Gate's right to received the Break-Up Fee described herein."** Bid Procedures Order §G.4. The Court will note it did not countenance Debtors looking only to certain creditors' benefit but instead to the estate as a whole.

In any event, both the Studios and Pacificor strongly announced and reserved their objections, and the Studios *and Pacificor* continued to challenge and object to Debtors' statement that the Studios' Second Bid was not an adequate overbid. Preserving their objections, the Studios then offered $28.5 million in Front End Cash and matched Pacificor's illusory Back End Compensation (the "Studios' Third Bid"). Ironically, the Studios' Third Bid was worth $700,000 less than the Studios' Second Bid when measured using FTI's calculations of net present value, but the Debtors, with their newly announced "money isn't fungible" mantra, announced that they were pleased with it. Preserving their own objections, Pacificor then responded by raising the Front End Compensation to $29.5 million with the same Back End Compensation. Although this bid was declared a qualified overbid, the Studios note that the aggregate consideration of that last Pacificor bid is $39.2 million, or less than the required bidding increment over the Studios' Second Bid, which has a value of at least (and likely much more) than $38.9 million. Thus, the Studios contend that if that bid had been properly valued they would have and should have won the Auction.

Disgusted by the warped process and the patently unfair playing field created by the Bidding Agreement and the Debtors' mismanagement of the entire process and lack of adherence to the Court's Bid Procedures Order – with result oriented rules being plucked out of air as necessity arose, stunned by the repeatedly unsupportable financial analyses with no reason or accountability, and ultimately feeling that the Auction could never end fairly, the Studios stopped bidding.

B.  **THE BIDDING AGREEMENT SHOULD NOT BE APPROVED**

The Bidding Agreement that forms the basis and support for Debtors' and Pacificor's manipulation of the Auction is defective in its own right. As demonstrated below, the Bidding Agreement is clearly unsupported and unsupportable under applicable law. A few of its many defects include:

- The Bidding Agreement provides Pacificor the right to credit bid a claim in excess of any claims it has asserted in these cases.

- The Bidding Agreement set a mandatory bidding increment for Pacificor of $1 million, twice what this Court approved in the Bid Procedures Order, which has the obvious effect of running up the amount of the Front End Cash.

- The Bidding Agreement provides Pacificor the right to credit bid the full amount of its claims against <u>all</u> Debtors, despite the fact that many of those claims are valid, if at all, only against the parent holding company. In addition to being inequitable to the creditors of the various Debtors who actually own the assets being sold – millions of dollars in the principal claims (and presumably related interest and fee claims as well) are not secured by the assets for sale – the Bidding Agreement is therefore tantamount to an unnoticed substantive consolidation motion.

- By determining who will be paid how much and from what assets, the Bidding Agreement is effectively a *sub rosa* plan, offered without any of the protections attendant to the plan confirmation process.

- The Bidding Agreement is a complete abdication by Debtors of any and all defenses to Pacificor's claims as well as Debtors' affirmative causes of actions in exchange for a $2.18 kickback by Pacificor to fund administrative expenses of the cases.

- The Bidding Agreement was entered into after the deadline for the submission of qualified bids and in direct contravention to the Court's bidding procedures order. Indeed, this Court has already determined that Pacificor's claims are in *bona fide* dispute and cannot be asserted as a credit bid. Notwithstanding that breach of the governing protocol for the Auction, Debtors insisted on conducting the Auction without any court approval of the proposed scheme with Pacificor.

- The Bidding Agreement was clearly intended to and had the effect of artificially inflating the bid price at the Auction through a Debtor-created shill bidder. As but one example, the Bidding Agreement limited the types of bids that could be offered by Pacificor, thus artificially hampering the ability of competing bidders to offer bids that would in fact be better for all parties in interest.

C.  **THE COURT SHOULD DETERMINE THAT THE STUDIOS GAVE THE BEST AND HIGHEST OFFER**

Despite the clear fact that the Studios' Second Bid was and is the "highest" offer for the Debtors' assets, the Studios understand that Debtors will recommended Pacificor's last bid as the

1  "best" bid for those assets at the Auction.  Although the views of a debtor in this regard are

2  accorded weight, this Court need not and should not blindly accept Debtors' judgment.  As the

3  Ninth Circuit BAP has noted:

> The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances. The requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers. Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition by creditors, the requirement of court approval means that the responsibility ultimately is the court's.

*In re Lahijani*, 325 B.R. 282, 288-89 (9th Cir. BAP 2005).  Indeed, the court has "the power to disapprove a proposed sale . . . if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable." *In re Broadmoor Place Investments, L.P.*, 994 F.2d 744, 746 (10th Cir. 1993) (citations omitted).  "Although a trustee's business judgment enjoys 'great judicial deference', this discretion is not without limit. A duty is imposed upon the trustee to maximize the value obtained from a sale, particularly in liquidation cases " *In re Bakalis*, 220 B.R. 525, 532 (Bankr .E.D.N.Y. 1998); *In re Psychrometric Systems, Inc.*, 367 B R. 670, 674 (Bankr. D. Colo. 2007).  *See also In re Derivium Capital, LLC*, 380 B R. 392, 404 (Bankr D.S.C. 2007), *In re New Era Resorts*, LLC, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999) (quoting *Embrace Systems*); *In re Integrated Resources, Inc* , 135 B R. 746, 750 (Bankr.S.D.N.Y. 1992) (when a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold) (citation omitted), , appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

Simply put, "in appropriate circumstances it is proper for a court to interfere with the trustee's judgment for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders." *In re Bakalis*, 220 B.R. at 532, citing *In re Blue Coal Corp.*, 59 B.R. 157, 163 (Bankr. M.D. Pa. 1986) and *In re Broadmoor Place Invs., L.P.*, 994 F. 2d 744 (10th Cir. 1993).  If Debtors' determination that the Studios' Second Bid was not an overbid was mistaken or based upon incomplete analysis, this Court should not affirm that decision.

In this regard, given the Debtors' over-valuation of Pacificor's entirely contingent Back End Compensation, and the corresponding under-valuation of the Studios' partially guaranteed partially contingent Back End Compensation, *Lahijani*, is highly instructive even though there the trustee made the other extreme of errors from Debtors. In *Lahijani*, the trustee was selling causes of action, with bidding being undertaken between an entity who intended to prosecute those claims and share the proceeds with the estate and an insider bidder who was not going to pursue the claims. Contrary to the problem here, the trustee placed no value on the back end and sold them to the party interested in not seeing the claims pursued. The sale was overturned on appeal, where the BAP noted:

> The trustee in this instance refused to entertain bids that included a fixed percentage of net proceeds in addition to a sum certain. In effect, he valued the fixed percentage at zero, which he purported to justify on the basis that he had no way to value the merits of the causes of action being sold. The court deferred to the trustee, accepted the trustee's zero valuation of net litigation proceeds, and essentially required the appellants to stop adding a percentage to their offers. They acquiesced after making a record that they wished to continue to add percentages. After bidding $160,000, they let "Claims Prosecutor's" $ 175,000 bid stand.
>
> [This leaves] the question whether $175,000 was actually the higher bid in the face of the additional percentage offered by appellants.
>
> ...
>
> While the plaintiffs (our appellant) did not bid more than $160,000, they were willing to add, even though the trustee did not want to hear it, a portion of the net return. The trustee's zero valuation does not inspire confidence in his business judgment.
>
> In addition, it is debatable that $ 175,000 was actually the high bid in light of the standing offer of a percentage of the net litigation proceeds. An economist would place an "expected value" on such a proposition and discount it to "present value," based on a calculation that, in its simplest form, is the product of the possible result, multiplied by the probability of achieving the result, discounted to present value. The crucial point for purposes of the present analysis is that, so long as the pertinent probability is not zero, the expected and present value calculation will yield some value. **Any such value should be taken into account.**

*In re Lahijani*, 325 B.R. at 288-89 (emphasis added).

As counseled by the BAP, the judgment of the Debtors in this case is not supported and not supportable, and this Court should not approve the sale to Pacificor in light of the facts that

BN 5352469v1                                    10

**OBJECTION TO CONDUCT OF AUCTION AND PACIFICOR BIDDING; OR TO RESTART BIDDING**

1  FTI both improperly over-valued Pacificor's Back End Compensation and improperly under-
2  valued the Studios' Back End Compensation.  Further, the terms of the Bidding Agreement were
3  a straitjacket to truly competitive bidding and that there is a significantly higher offer for the
4  Debtors' assets outstanding.  As the Tenth Circuit has noted, a bankruptcy court has "the power to
5  disapprove a proposed sale recommended by a trustee ... if it has awareness there is another
6  proposal in hand which, from the estate's point of view, is better or more acceptable."
7  *Broadmoor*, 994 F. 2d at 746.  Where, as here, there is a higher and better offer, the Court should
8  disapprove the proposed sale as not being in the best interests of the debtor or its creditors.  *See*,
9  *e.g.*, *In re Landscape Properties, Inc.*, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) ("The Court
10 then can ... disapprove the Trustee's proposed sale if it believes that there is a higher offer and
11 better offer for the estate's assets.").

12       Unquestionably, the Studios' Second Bid was both a qualifying overbid and a higher and
13 qualitatively and quantitatively better offer than anything previously or subsequently received at
14 the Auction.  Yet, even if the Court is unwilling declare that the Studios' Second Bid should have
15 been determined an overbid (which would have made it the winning bid), the Studios request that
16 the Court then reject entirely the results of the Auction and, on the terms previously ordered,
17 begin the Auction at the beginning.  The Studios request that, in order to eliminate both the
18 inherent unfairness of how Debtors conducted the Auction and the risk that Debtors unilaterally
19 would introduce new restrictions on the bidders, the Court itself supervise the Auction and ensure
20 that it is conducted with dignity, another attribute missing from the first Auction.

21       Finally, even if the Court desires to not restart the Auction from the beginning, the Studios
22 request that the Court at a minimum at least reopen the Auction under the Court's supervision and
23 allow the Studios to match Pacificor's Front End Cash make a further and higher bid of the Back
24 End Compensation.

25
26
27
28

**D.**     **CONCLUSION**

WHEREFORE, the Studios respectfully request the Court deny the Debtors' sale motion and provide such other relief as is just and proper..

DATED: February 9, 2010    BUCHALTER NEMER,
A Professional Corporation


By: /s/ Pamela Kohlman Webster
    PAMELA KOHLMAN WEBSTER
    Attorneys for Columbia Pictures Industries, Inc.

PRYOR CASHMAN LLP


By: /s/ Richard Levy, Jr.
    RICHARD LEVY, JR.
    Attorneys for Lions Gate Films, Inc.

| In re:<br>T ASSET ACQUISITION COMPANY, LLC,<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER  2:09-bk-31853-ER |
|---|---|
| | |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Buchalter Nemer, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA  90017

The foregoing document described _____ JOINT OBJECTION OF COLUMBIA PICTURES INDUSTRIES, INC. AND LIONS GATE FILMS, INC. TO MOTION TO SELL CERTAIN TERMINATOR ASSETS, CONDUCT OF AUCTION, AND PACIFICOR BIDDING AGREEMENT; REQUEST TO QUALIFY JOINT BID AS HIGHER AND BETTER THAN CREDIT BID OF PACIFICOR OR, IN THE ALTERNATIVE, RESTART AUCTION _____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On  February 9, 2010   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On   February 9, 2010   I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 9, 2010 | Terrine Pearsall | /s/ Terrine Pearsall |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                                                                                      **F 9013-3.1**

BN 5356179v1

| In re:<br>T ASSET ACQUISITION COMPANY, LLC,<br>Debtor(s). | CHAPTER 11<br>CASE NUMBER  2:09-bk-31853-ER |
|---|---|
| | |

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** –

- David E Ahdoot    dahdoot@bushgottlieb.com, tjimines@bushgottlieb.com
- Korin A Avelino    kelliott@ktbslaw.com
- Austin K Barron    abarron@buchalter.com, IFS_filing@buchalter.com;tcarson@buchalter.com
- Sandor T Boxer    tedb@tedboxer.com
- Martin J Brill    mjb@lnbrb.com
- Alberto J Campain    acampain@blutlaw.com
- Leslie A Cohen    leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com
- Marc S Cohen    mcohen@kayescholer.com
- Jon L Dalberg    jdalberg@lgbfirm.com, mprokocki@lgbfirm.com
- Ashleigh A Danker    adanker@kayescholer.com
- Robert K Edmunds    robert.edmunds@bipc.com
- G Larry Engel    lengel@mofo.com
- Wayne S Flick    wayne.s.flick@lw.com, colleen.rico@lw.com
- Scott F Gautier    sgautier@pwkllp.com
- Michael D Good    mgood@southbaylawfirm.com
- Julian I Gurule    jgurule@pwkllp.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- Viviana B Hedrick    vhedrick@lglaw.la
- Robbin L Itkin    ritkin@steptoe.com
- Louis E Kempinsky    lkempinsky@pwkllp.com
- Joseph A Kohanski    jkohanski@bushquinonez.com
- Dare Law    dare.law@usdoj.gov
- David W Levene    dwl@lnbrb.com
- Richard Levy    rlevy@pryorcashman.com
- Monserrat Morales    mmorales@pwkllp.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Katherine C Piper    kpiper@steptoe.com
- Kimberly A Posin    kim.posin@lw.com
- Jeremy V Richards    jrichards@pszjlaw.com, bdassa@pszjlaw.com
- Debra Riley    driley@allenmatkins.com
- David B Shemano    dshemano@pwkllp.com
- Adam M Starr    starra@gtlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Jason Wallach    jwallach@gladstonemichel.com
- Pamela Kohlman Webster    pwebster@buchalter.com
- Howard J Weg    hweg@pwkllp.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                                                    F 9013-3.1

BN 5356179v1

| In re: | CHAPTER 11 |
|---|---|
| T ASSET ACQUISITION COMPANY, LLC, Debtor(s). | CASE NUMBER 2:09-bk-31853-ER |
| | |

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**

<u>VIA OVERNIGHT MAIL</u>

Hon. Ernest M. Robles
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple St., Suite 1560
Los Angeles, CA 90012-3332

<u>U.S. MAIL</u>

    Patricia Glaser
    Glaser Weil Fink Jacobs Howard & Shapiro
    10250 Constellation Blvd
    19th Fl
    Los Angeles, CA 90067

    Bruce Isaacs
    8840 Wilshire Blvd 2nd Fl
    Beverly Hills, CA 90211

    Jennings, Strouss & Salmon, PLC
    The Collier Center, 11th Fl
    201 E Washington St
    Phoenix, AZ 85004-2385

    Levene, Neale, Bender, Rankin & Brill L.L.P.
    10250 Constellation Blvd., sTe.1700
    Los Angeles, CA 90067

    Bryan Sullivan
    Glaser Weil Fink Jacobs Howard & Shapiro
    10250 Constellation Blvd
    19th Floor
    Los Angeles, CA 90067

    Roland Tellis
    1620 26th St
    4th Fl N Tower
    Santa Monica, CA 90404-4060

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

**F 9013-3.1**

BN 5356179v1